**Nos. 24-1859, 24-1863**

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

NETLIST, INC.,

*Appellant,*

V.

SAMSUNG ELECTRONICS CO., LTD., MICRON TECHNOLOGY INC., MICRON
SEMICONDUCTOR PRODUCTS, INC., MICRON TECHNOLOGY TEXAS, LLC,

*Appellees.*

On Appeal from the U.S. Patent and Trademark Office, Patent Trial and Appeal
Board, Nos. IPR2022-00996, IPR2022-00999, IPR2023-00405, IPR2023-00406

### OPENING BRIEF FOR APPELLANT NETLIST, INC.

Jeffrey A. Lamken
Rayiner Hashem
Jennifer Elizabeth Fischell
Lidiya Mishchenko
Kayvon Ghayoumi
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000
jlamken@mololamken.com

Elizabeth Kathleen Clarke
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL  60654
(312) 450-6700

Philip J. Warrick
IRELL & MANELLA LLP
750 17th Street, N.W., Suite 850
Washington, D.C.  20006
(202) 777-6512
pwarrick@irell.com

Jason Sheasby
H. Annita Zhong
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067
(310) 277-1010

*Counsel for Appellant Netlist, Inc.*
*(Additional Counsel Listed on Inside Cover)*

Sara Margolis
Catherine Martinez
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
(212) 607-8160

Jonathan M. Lindsay
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA  92660
(949) 760-5220

*Counsel for Appellant Netlist, Inc.*

## REPRESENTATIVE PATENT CLAIMS

## U.S. Patent No. 11,016,918

1.     A memory module comprising:

[a]     a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system;

[b]     a first buck converter configured to provide a first regulated voltage having a first voltage amplitude;

[c]     a second buck converter configured to provide a second regulated voltage having a second voltage amplitude;

[d]     a third buck converter configured to provide a third regulated voltage having a third voltage amplitude;

[e]     a converter circuit configured to provide a fourth regulated voltage having a fourth voltage amplitude; and

[f]     a plurality of components coupled to the PCB, each component of the plurality of components coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, the plurality of components comprising:

[g]     a plurality of synchronous dynamic random access memory (SDRAM) devices coupled to the first regulated voltage, and

[h]     at least one circuit coupled between a first portion of the plurality of edge connections and the plurality of SDRAM devices, the at least one circuit operable to (i) receive a first plurality of address and control signals via the first portion of the plurality of edge connections, and (ii) output a second plurality of address and control signals to the plurality of SDRAM devices, the at least one circuit coupled to both the second regulated voltage and the fourth regulated voltage, wherein a first one of the second and fourth voltage amplitudes is less than a second one of the second and fourth voltage amplitudes.

5.      The memory module of claim 1, further comprising:

a voltage monitor circuit configured to monitor a power input voltage re-
ceived via a second portion of the plurality of edge connections, the voltage
monitor circuit configured to produce a trigger signal in response to the
power input voltage having a voltage amplitude that is greater than a first
threshold voltage.

12.     The memory module of claim 5, the plurality of components further
comprising:

a non-volatile memory; and

a controller configured to receive the trigger signal, wherein, in response to
the trigger signal, the controller performs a write operation to the non-
volatile memory.

## U.S. Patent No. 11,232,054

1.      A memory module comprising:

[a]     a printed circuit board (PCB) having an interface configured to fit into a
corresponding slot connector of a host system, the interface including a
plurality of edge connections configured to couple power, data, address and
control signals between the memory module and the host system;

[b]     a voltage conversion circuit coupled to the PCB and configured to provide at
least three regulated voltages, wherein the voltage conversion circuit
includes at least three buck converters each of which is configured to
produce a regulated voltage of the at least three regulated voltages;

[c]     a plurality of components coupled to the PCB, each component of the
plurality of components coupled to at least one regulated voltage of the at
least three regulated voltages, the plurality of components including a
plurality of synchronous dynamic random access memory (SDRAM)
devices and a first circuit that is coupled to the plurality of SDRAM devices
and to a first set of edge connections of the plurality of edge connections,
wherein the first circuit is coupled to first and second regulated voltages of
the at least three regulated voltages, and wherein the plurality of SDRAM
devices are coupled to the first regulated voltage of the at least three
regulated voltages.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**   24-1859, 24-1863

**Short Case Caption**   Netlist, Inc. v. Samsung Electronics Co., Ltd.

**Filing Party/Entity**   Netlist, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/04/2024

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Netlist, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑     None/Not Applicable          ☐     Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)   ☐   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable          ☐     Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# **TABLE OF CONTENTS**

Page

JURISDICTIONAL STATEMENT ..................................................................1

STATEMENT OF THE ISSUES ....................................................................1

STATEMENT OF THE CASE........................................................................2

I.    Technological Background...............................................................2

    A.    Conventional Server Memory Modules ................................2

    B.    The Problem of Reliable, Consistent Power Delivery ........................4

    C.    Netlist Improves Memory Power Delivery with On-Board Voltage Converters That Receive Power From the Motherboard ........................6

II.    Procedural History ........................................................................11

    A.    Asserted Prior Art.................................................................12

        1.    Harris..........................................................................12

        2.    FBDIMM Standards....................................................15

        3.    Amidi.........................................................................16

        4.    Hajeck .......................................................................17

    B.    The Final Written Decisions ................................................17

        1.    Ground 1: Harris and FBDIMM ...............................17

        2.    Ground 2: Harris, FBDIMM, and Amidi...................24

        3.    Ground 3: Harris, FBDIMM, Amidi, and Hajeck ....26

SUMMARY OF ARGUMENT ......................................................................27

STANDARD OF REVIEW ..........................................................................32

i

ARGUMENT ...........................................................................................32

I.    The Board's Determination That Harris and FBDIMM Teach a
      Memory Module (DIMM) With Voltage Regulators That Receive
      Input Voltage From the Motherboard Cannot Be Sustained ........................32

      A.    The Board Erred in Relying on a Combination That Departs
            From the Petition's Asserted Grounds .................................................34

      B.    The Board Failed To Properly Evaluate Motivation To
            Combine Where Harris Teaches Away From the Claimed
            Invention ...............................................................................................36

      C.    The Record Would Not Support the Board's Determination..............42

II.   The Board's Determination That Skilled Artisans Would Have
      Modified Harris To Include Three (or Four) Voltage Converters
      Cannot Be Sustained .....................................................................................47

      A.    The Board Failed To Explain Why Skilled Artisans Would
            Have Modified Harris To Include Additional On-Board
            Converters .............................................................................................48

      B.    Substantial Evidence Does Not Support the Board's
            Conclusion .............................................................................................52

III.  The Board's Determination That the Prior Art Teaches the
      Voltage-Monitoring Limitations Cannot Be Sustained .................................56

      A.    The Board Erred in Determining That Skilled Artisans
            Would Have Combined Harris's FBDIMM With Amidi
            (Grounds 2 and 3).................................................................................57

      B.    Amidi Does Not Disclose a Voltage Monitor That Detects an
            Overvoltage as Required by Claim 5 (and Similar Claims)...............61

      C.    Amidi Does Not Teach Performing a Write Operation in
            Response to a Trigger Signal, as Required by Claim 12
            (and Similar Claims) ............................................................................63

      D.    Hajeck Does Not Cure the Deficiencies...............................................66

IV.    The Board's Unreasoned Analysis of Other Claims and Limitations
       Requires Remand ...................................................................................... 69

CONCLUSION ..................................................................................................... 70

# TABLE OF AUTHORITIES

Page(s)

### CASES

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
    522 U.S. 359 (1998)................................................................49

*Allergan, Inc. v. Sandoz Inc.*,
    796 F.3d 1293 (Fed. Cir. 2015) ..........................................37

*In re Anova Hearing Labs, Inc.*,
    809 F. App'x 840 (Fed. Cir. 2020) ................................57, 58

*Arctic Cat Inc. v. Polaris Indus., Inc.*,
    795 F. App'x 827 (Fed. Cir. 2019) ......................................59

*AstraZeneca AB v. Mylan Pharms. Inc.*,
    19 F.4th 1325 (Fed. Cir. 2021) ...........................................52

*BlephEx, LLC v. Myco Indus., Inc.*,
    24 F.4th 1391 (Fed. Cir. 2022) ...........................................37

*Chemours Co. FC, LLC v. Daikin Indus., Ltd.*,
    4 F.4th 1370 (Fed. Cir. 2021) .............................................41

*Corephotonics, Ltd. v. Apple Inc.*,
    84 F.4th 990 (Fed. Cir. 2023) ........................................34, 36

*EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*,
    859 F.3d 1341 (Fed. Cir. 2017) .....................................34, 35

*In re Fritch*,
    972 F.2d 1260 (Fed. Cir. 1992) ...........................................67

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000) ..........................................44

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966)...........................................................36, 67

*In re Gurley*,
    27 F.3d 551 (Fed. Cir. 1994) ..............................................37

iv

*In re Hedges*,
   783 F.2d 1038 (Fed. Cir. 1986) ....................................................67, 69

*Henny Penny Corp. v. Frymaster LLC*,
   938 F.3d 1324 (Fed. Cir. 2019) ......................................48, 51, 59, 60

*In re Hodges*,
   882 F.3d 1107 (Fed. Cir. 2018) ......................................41, 62, 66

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
   849 F.3d 1034 (Fed. Cir. 2017) ......................................52, 70

*Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*,
   738 F.3d 1337 (Fed. Cir. 2013) ......................................46

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ..........................................36, 48, 51, 67

*In re Lee*,
   277 F.3d 1338 (Fed. Cir. 2002) ......................................45, 49, 50, 59

*In re Magnum Oil Tools Int'l, Ltd.*,
   829 F.3d 1364 (Fed. Cir. 2016) ......................................56

*Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*,
   69 F.4th 1341 (Fed. Cir. 2023) ......................................51

*Mintz v. Dietz & Watson, Inc.*,
   679 F.3d 1372 (Fed. Cir. 2012) ......................................36

*In re Nuvasive, Inc.*,
   842 F.3d 1376 (Fed. Cir. 2016) ......................................32, 48, 60

*Panduit Corp. v. Dennison Mfg. Co.*,
   810 F.2d 1561 (Fed. Cir. 1987) ......................................69

*Parks v. Booth*,
   102 U.S. 96 (1880) ..........................................36

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
   882 F.3d 1056 (Fed. Cir. 2018) ......................................41

v

*PPC Broadband, Inc. v. Iancu*,
    739 F. App'x 615 (Fed. Cir. 2018) ....................................................62

*Provisur Techs., Inc. v. Weber, Inc.*,
    50 F.4th 117 (Fed. Cir. 2022) .................................................63, 64

*Raytheon Techs. Corp. v. Gen. Elec. Co.*,
    993 F.3d 1374 (Fed. Cir. 2021) ...............................................42, 45

*S.-Tek Sys., LLC v. Engineered Corrosion Sols., LLC*,
    748 F. App'x 1003 (Fed. Cir. 2018) .........................................57, 58

*SAS Inst., Inc. v. Iancu*,
    584 U.S. 357 ..........................................................................34

*Tec Air, Inc. v. Denso Mfg. Michigan Inc.*,
    192 F.3d 1353 (Fed. Cir. 1999) ..............................................42

*TQ Delta, LLC v. CISCO Sys., Inc.*,
    942 F.3d 1352 (Fed. Cir. 2019) .................................45, 53, 56, 62

*United States v. Adams*,
    383 U.S. 39 (1966)................................................................37, 45

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*,
    17 F.4th 155 (Fed. Cir. 2021) ............................................41, 42, 65

*VirnetX Inc. v. Cisco Sys., Inc.*,
    776 F. App'x 698 (Fed. Cir. 2019) .........................................39, 63

*Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*,
    97 F.4th 882 (Fed. Cir. 2024) ........................................*passim*

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
    853 F.3d 1272 (Fed. Cir. 2017) ...........................................34, 35, 58

*Winner Int'l Royalty Corp. v. Wang*,
    202 F.3d 1340 (Fed. Cir. 2000) ..........................................59

*In re Zurko*,
    258 F.3d 1379 (Fed. Cir. 2001) ...........................................47

## STATUTES

28 U.S.C. §1295(a)(4)(A) ..............................................................1

35 U.S.C. §141(c) .........................................................................1

35 U.S.C. §314 .............................................................................1

35 U.S.C. §318(a) .........................................................................1

35 U.S.C. §319 .............................................................................1

## <u>STATEMENT OF RELATED CASES</u>

No appeal in or from this proceeding was previously before this or any other appellate court.  The following cases may directly affect or be directly affected by this Court's decision in the pending cases: *Netlist, Inc. v. Samsung Electronics Co., Ltd., et al.*, No. 2:21-cv-00463 (E.D. Tex.); *Netlist, Inc. v. Micron Tech., Inc., et al.*, No. 2:22-cv-00203 (E.D. Tex.); and *Netlist, Inc. v. Samsung Electronics Co., Ltd.*, No. 24-2203 (Fed. Cir.) (appeal from No. 2:21-cv-00463 (E.D. Tex.)).  In addition, on September 12, 2024, this Court ordered that this appeal and the following related appeals be treated as companion cases and assigned to the same merits panel: Nos. 2024-1707, 2024-2203, 2024-2240, and 2024-2241.  ECF No. 22.

## JURISDICTIONAL STATEMENT

The Board asserted jurisdiction under 35 U.S.C. §§ 314, 318(a).  It issued final written decisions in IPR2022-00999 and IPR2022-00996 on December 5 and 6, 2023, respectively.  Appx1; Appx92.  Director Review was denied on March 18, 2024.  Appx172-74.  Netlist timely appealed.  Appx1216-19; Appx12671-74.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c), 319.

## STATEMENT OF THE ISSUES

1.     Whether the Board's determination that the prior art teaches a memory module that obtains an input voltage from the motherboard, and produces regulated voltages using converters on the module itself, as the claims require, was arbitrary, capricious, unsupported by substantial evidence, or contrary to law.

2.     Whether the Board's determination that the prior art teaches a memory module including three (or four) voltage converters supplying three (or four) regulated voltages, as the claims require, was arbitrary, capricious, unsupported by substantial evidence, or contrary to law.

3.     Whether the Board's determination that the prior art teaches a voltage monitor that detects overvoltage, and performs a write operation in response, as the claims require, was arbitrary, capricious, unsupported by substantial evidence, or contrary to law.

4.     Whether the Board's failure to explain its obviousness determination for each limitation of each challenged claim requires vacatur.

## STATEMENT OF THE CASE

Netlist is a leader in developing memory modules for servers.  This case concerns patented Netlist inventions that enhance memory speed and reliability, while improving power-efficiency.

## I.    TECHNOLOGICAL BACKGROUND

Through the Internet, consumers rely on powerful remote servers to access vast quantities of data and perform sophisticated processing.  To support thousands of users, and demanding features such those based on artificial intelligence, servers must have both powerful processors and large amounts of memory to store data temporarily for computations.  Server memory must be fast, to keep up with increasing processor speeds; reliable, with a low probability of data corruption or loss; and power-efficient.   Netlist's patents-at-issue, Nos. 11,016,918 ('918 patent) and 11,232,054 ('054 patent), are directed to inventions that enhance the speed, reliability, and efficiency of memory modules by improving how power is delivered to memory-module components.

### A.    Conventional Server Memory Modules

Server memory is contained in memory modules, called "dual inline memory modules," or "DIMMs":

2



Appx7764.  As shown above, a DIMM consists of a printed circuit board (green), with rows of dynamic random access memory ("DRAM") chips (black rectangles). DIMMs have hundreds of electrical contacts or "edge connectors" on their bottom edge (gold).

DIMMs plug into slots (red below) in the server's motherboard; the portion with electrical contacts slides into the slot.



Appx11361 (annotated).  Connections between motherboards and DIMMs supply "power" and allow transmission of "data, address, and control signals" between DIMMs and other components.  Appx212(22:1-10); Appx9652; Appx9766.

Nearly all DIMMs conform to industry standards published by the Joint Electron Device Engineering Council ("JEDEC").  Appx203(3:10-45).  Those standards

specify the "form factor" (physical configuration) of DIMMs and their electrical connections with motherboards.  Because DRAM-chip capacity is limited by manufacturing technology, DIMM makers seek to maximize memory capacity by packing many DRAM chips onto each DIMM.

### B.    The Problem of Reliable, Consistent Power Delivery

DRAM devices and other DIMM components require significant amounts of power, *i.e.*, electrical current, to perform operations like storing data in memory cells.  Appx10188; Appx8075.  "Volatile" memory, such as DRAM, requires continuous power to retain stored data.  Appx9499.  Memory-module components, moreover, require power at precise voltages, such as 1.8 volts, to operate correctly. Appx214(26:38-44).

Voltage, a measure of electromagnetic force, is akin to water *pressure* in a plumbing system; current is akin to water *flow*.  Voltage and electrical current are related.  In plumbing, increasing water flow, such as by turning on multiple faucets, can reduce pressure.  Likewise, in computers, increasing electrical-current demand, such as by increasing workload, can cause drops in voltage.  Such voltage drops can cause data to be corrupted or lost in DRAM chips.  Appx6059(1:15-17).  It also creates "noise" in "data lines" between DIMMs and motherboards, which reduces signal quality and data-transfer speeds.  Appx8509.

4

Servers have "power suppl[ies]" to convert the 120 or 240 volts Alternating Current ("AC") received from the electric grid into different Direct Current ("DC") voltages required by server components. Appx4674(¶2); *see* Appx5040. Power supplies include voltage "regulators" to ensure power is supplied at a constant voltage, even when electrical-current demands change. Appx8636-37. A voltage regulator functions like a pump that ensures consistent water pressure even when someone turns on multiple faucets simultaneously. Appx8638-39.

Voltage regulators can be bulky; they also generate "heat," and may require "heatsink[s]"—metal covers with fins—to dissipate heat. Appx8643. For cost and space reasons, voltage regulators for memory conventionally were placed on the "motherboard." Appx10222. Motherboards supplied regulated voltages to memory-module components through DIMM edge connectors. Appx10217.

As servers required more memory, they needed more power. To mitigate that concern, the industry worked to reduce memory "energy consumption," including by reducing "supply voltage." Appx10190. Reducing the supply voltage, however, made memory devices more sensitive to voltage fluctuations; data could be lost if the voltage dropped too low. Appx10190. New generations of DRAM devices, which packed more data into each chip, also had greater susceptibility to errors from noise in the power supply. Appx9803. Improvements in memory power delivery were needed.

5

**C.    Netlist Improves Memory Power Delivery With On-Board Voltage Converters That Receive Power From the Motherboard**

Netlist developed a new kind of DIMM that overcame shortcomings of the prior art.  Unlike prior-art DIMMs, which relied exclusively on voltage regulators on the motherboard, Netlist's technology "integrat[ed]" voltage converters and power-management circuits into the "memory module."  Appx10222; Appx10881. That counter-intuitive approach sacrificed precious space on the DIMM, but "enable[d] better power regulation" and enhanced "signal integrity," and enabled memory modules to be "more reliable" and have better "performance."  Appx10222; Appx10881.  Despite the added voltage-conversion circuits, Netlist's DIMMs were designed to fit into the "form factor of a standard DIMM."  Appx203 (3:12-15). Servers thus could use Netlist's improved DIMMs without changes to motherboards and power supplies.

Netlist's technology was widely adopted.  *See* Appx10222; Appx10880-81. JEDEC's latest "fifth-generation double data rate (DDR5)" standard requires power to be supplied using converters on the DIMM.  Appx10880-81.  For its invention, Netlist obtained the '918 and '054 patents.  Appx176.

1.    The patents-at-issue are directed to a "memory module" that includes an on-board "[p]ower [m]odule"; the power module has "converter circuit[s]" that supply regulated voltages for DIMM components.  Appx195; Appx220 (38:18-52). The DIMM, however, still uses the motherboard power supply.  The power module,

6

shown below, receives power "from [the] system" (red below), and supplies system power to voltage converters that produce regulated voltages (blue below).  Appx195; *see* Appx211(20:55-60) ("power module . . . power[s] the volatile memory with system power"); Appx214(26:50-51) ("system power . . . received via [DIMM] interface"); Appx215(28:15-20) (power module "receive[s] a 1.8V input system voltage"); Appx216(29:1-5) (voltage "converter . . . receives a 1.8V system voltage").



FIG. 16

Appx195 (annotated).

The power module uses "buck converters," a type of voltage regulator, to "reduce[]" the motherboard "input" voltage into regulated voltages "for powering . . . components of the memory system."  Appx216(29:33-54); Appx220(38:25-30)

(limitations 1[b-d]).  The image above shows a power module with multiple voltage converters (blue) to supply four regulated voltages (1102, 1104, 1105, and 1107) to DIMM components, including "D[RAM]s."  Appx215(28:3-19).

Moving voltage converters onto the DIMM also enabled Netlist to incorporate a "voltage monitor" (blue below) that enhances reliability by detecting input-voltage anomalies.  Appx214(25:8-32).



Appx190 (annotated).  The "voltage monitor" (blue above) "monitors the voltage supplied by the host system."  Appx214(25:9-10).  The voltage monitor detects "overvoltage"—higher-than-expected voltages—which Netlist found was an indicator of imminent "power failure."  Appx211(20:60-65); Appx213(24:27-30).

When the voltage monitor detects overvoltage, it "transmit[s] a signal" to a "controller" (orange above).  Appx214(25:11-15); Appx175.  The controller then takes preventative action *before* "power failure has actually occurred," by storing data to "non-volatile memory" (green above) as a "backup" in case power fails.  Appx211(20:60-65); Appx213(24:30-56); Appx214(25:20-26).  Non-volatile memory, like flash memory, will not lose data if power is lost.  Appx213(24:35-56).

2.    Claim 1 of the '918 patent is representative.  It recites a memory module that receives power from the host system and includes four voltage converters, three of them being buck converters, to provide four regulated voltages.  It reads:

A memory module comprising:

[a]  a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of *edge connections* configured to couple *power*, data, address and control signals between the memory module and the *host system*;

[b]  a *first buck converter* configured to provide a first regulated voltage having a first voltage amplitude;

[c]  a *second buck converter* configured to provide a second regulated voltage having a second voltage amplitude;

[d]  a *third buck converter* configured to provide a third regulated voltage having a third voltage amplitude;

[e]  a *converter circuit* configured to provide a fourth regulated voltage having a fourth voltage amplitude; and

[f]  a plurality of components coupled to the PCB, each component of the plurality of components coupled to one or more regulated

voltages of the first, second, third and fourth regulated voltages, the plurality of components comprising:

[g] a plurality of synchronous dynamic random access memory (SDRAM) devices coupled to the first regulated voltage, and

[h] at least one circuit coupled between a first portion of the plurality of edge connections and the plurality of SDRAM devices, the at least one circuit operable to (i) receive a first plurality of address and control signals via the first portion of the plurality of edge connections, and (ii) output a second plurality of address and control signals to the plurality of SDRAM devices, the at least one circuit coupled to both the second regulated voltage and the fourth regulated voltage, wherein a first one of the second and fourth voltage amplitudes is less than a second one of the second and fourth voltage amplitudes.

Appx220 (38:18-52) (emphasis added).[1]

Independent claim 16 similarly recites a "memory module" that receives "power" from the "host system"; the memory module has three "buck converters" that "receive a pre-regulated input voltage" and "produce first, second and third regulated voltages." Appx221 (39:53-59).

Claim 1 of the '054 patent is similar to claim 1 of the '918 patent, but requires "at least three buck converters" that supply "at least three regulated voltages" (rather than four). Appx268 (38:26-29).

Claim 5 of the '918 patent, which depends from claim 1, addresses a voltage monitor that detects overvoltage (higher-than-expected voltage). It recites:

---

[1] For clarity and in light of the issues relevant to this appeal, the limitation labels used herein differ from those the Board used.

> The memory module of claim 1, further comprising: a ***voltage monitor circuit*** configured to monitor a power input voltage received via a second portion of the plurality of edge connections, the voltage monitor circuit configured to produce a ***trigger signal*** in response to the power input voltage having ***a voltage amplitude that is greater than a first threshold voltage***.

Appx220 (38:61-67) (emphasis added).  Claims 6-7, 9-13, 16-22, and 24-27 of the '918 patent, and claims 6-7, 9-12, and 17 of the '054 patent, recite similar limitations.

Claim 12 of the '918 patent, which depends from claim 5, further recites "perform[ing] a write operation to . . . non-volatile memory" in response to the "trigger signal" from claim 5's voltage monitor.  Appx221 (39:30-36).  Claims 11, 18-19, and 25-26 of the '918 patent, and claim 7 of the '054 patent, recite similar limitations.

## II.   PROCEDURAL HISTORY

Samsung and Micron adopted Netlist's technology into their DDR5 DIMMs, and Netlist sued for infringement.  *See* Appx10222; Appx10880-81; Appx7280; Appx11780.  Samsung and Micron then filed IPR petitions challenging all claims of the '918 and '054 patents.  Appx298; Appx11862.

In the district court, Netlist's suit against Samsung proceeded to trial.  A jury found claims 1, 5, 13, 16, 18, and 19 of the '918 patent and claims 16 and 17 of the '054 patent not invalid and at least one claim of each patent infringed.  *Netlist, Inc. v. Samsung Elecs. Co.*, No. 21-cv-463, Dkt. 479 at 4-5 (E.D. Tex.).  The district court

11

stayed the Micron case before trial. *Netlist, Inc. v. Micron Tech., Inc.*, No. 22-cv-203, Dkt. 493 (E.D. Tex.).

In the IPRs, the Board joined the substantively identical Samsung and Micron proceedings, and found all challenged claims obvious on three grounds. Appx547; Appx12124; Appx1; Appx92. Ground 1 relied on Harris and the JEDEC FBDIMM standards; Ground 2 relied on Harris, FBDIMM, and Amidi; Ground 3 relied on Harris, FBDIMM, Amidi, and Hajeck. Appx9.

## A.    Asserted Prior Art

### 1.    *Harris*

Harris is an abandoned patent application published in 2006. Appx4668. Harris addresses the shortcomings of using "system board or main board voltage sources" for powering memory. Appx4674(¶2). Harris teaches a memory module that "include[s]" an "on-board voltage regulator for converting an ***externally supplied*** voltage into appropriate local voltage levels." Appx4668(abstract) (emphasis added). Harris observes that new, "advanced memory designs" require improved "power suppl[ies]." Appx4674(¶2). Conventional power supplies from the "system board or main board," it explains, struggle to provide the "tightly regulated power" advanced memory technologies require. Appx4674(¶2). Moreover, "each generation of DIMM/DRAM technology" requires "different power supply" voltages. Appx4674(¶2). Thus, conventional systems, where the motherboard provides a

12

fixed set of voltages for a particular DRAM generation, cannot easily be "upgraded" to "next-generation DRAM technology."  Appx4674 (¶2).

Harris solves those problems by "***replacing***" the motherboard "power supply" with an "external voltage source."   Appx4675 (¶12) (emphasis added); *see* Appx4676 (¶19) ("system board power supply . . . [is] eliminated"); *see* Appx4668; Appx4670; Appx4674-77 (¶¶9-12, 14, 16, claims).  Harris's chief embodiment is a memory module that receives power "from an external source," at a voltage of "12V," through a connector on the module's ***side*** (red below).  Appx4674 (¶3); Appx4674-75 (¶¶10, 12).



*FIG. 1A*

Appx4669 (annotated).  A "voltage regulator module" (green above) "convert[s] [the] externally supplied voltage" into ***two*** regulated voltages: "$V_{dd}$" (orange above) and "$V_{cc}$" (blue above).  Appx4674-75 (¶10).  Harris otherwise embodies a "fully-buffered DIMM" ("FBDIMM"), a type of DIMM intended for servers.

13

Appx4674 (¶9). Harris's DIMM, however, is not "interchangeable with [a] standard DIMM." Appx4675 (¶13).

Harris "eliminate[s]" the DIMM's "system board power supply" and the corresponding edge-connector "pin[s]." Appx4676 (¶19); *see* Appx4675 (¶12) ("power supply interface pins" "replace[d]" with "external voltage source"). Harris explains that "elimination of [the] system-board" power supply enables servers to be "upgrade[d]" to "newer DRAM technologies" without "change[s] [to] system board power distribution." Appx4676 (¶¶19-20). Eliminating power connections also enables a "reduction in the pin count on [the] DIMM connector." Appx4676 (¶19). Among other things, reduced pin count allows for "wider ... spacing" of the remaining pins, which "improve[s] signal integrity due to reduced crosstalk." Appx4676 (¶19).

Harris also teaches providing power-supply "redundancy" in the case of power failure by using multiple external voltage sources (red below). Appx4675 (¶14); *see* Appx4670.



Appx4670 (annotated).

2.  *FBDIMM Standards*

In 2004, Intel developed "fully buffered" DIMMs for servers.  Appx11024-56.  In 2007, JEDEC adopted a standard for FBDIMMs.  Appx4840; Appx5030.  An FBDIMM incorporates an "Advanced Memory Buffer" ("AMB") on the DIMM.  Ordinarily, the CPU's memory controller communicates directly with DRAM chips.  Appx9524-25.  With FBDIMMs, however, the memory controller communicates with the AMB; the AMB, in turn, communicates with the DRAM chips.  Appx9524-25.  That reduces the burden on the memory controller, which enables increased memory "capacity and . . . data rates."  Appx9796.  The AMB, however, occupies substantial space, leaving less room for DRAM chips:



Appx10221 (front and back).

Like conventional DIMMs, FBDIMMs obtain power from the motherboard at various voltages (shown below) through the DIMM's connector "pins."

15

| Power Supplies | | |
|---|---|---|
| VCC (24 pins) | A | 1.5V nominal supply for core IO |
| VCCFBD (8 pins) | A | 1.5V nominal supply for FBD high speed IO |
| VDD (24 pins) | A | 1.8V nominal supply for DDR IO |
| VSS (156 pins) | A | Ground |
| VDDSPD | A | 3.3V nominal supply for SMB receivers and ESD diodes |

Appx4934; Appx5038; Appx5040; Appx5059; Appx10377-78.

> ### 3.    *Amidi*

Amidi is a U.S. patent directed to a memory module that can maintain "data in volatile memory even when a . . . system loses power."   Appx4694(1:28-30). Amidi's "voltage supervisory block" monitors the system voltage to detect if it falls "below a reference voltage."   Appx4695(4:44-55); Appx4697(8:25-30).   If that occurs, the memory module switches to a backup "battery."   Appx4695(4:38-55). Amidi's battery and associated circuitry take up significant space, occupying the entire "backside of the memory module."   Appx9549.



Appx4682.

4.    *Hajeck*

Hajeck is a U.S. patent that discloses a "memory card" with a "voltage detection circuit that monitors" the system power for "surges and spikes."  Appx6056(abstract); Appx6059(1:29).  Hajeck's solution to power surges (overvoltage) is to protect memory devices with a "charge pump," and to "assert[] a busy signal to block the host system from performing" further "write operations."  Appx6056(abstract).

## B.    The Final Written Decisions

The Board found the challenged claims obvious on three grounds.  Under Ground 1, the Board found claims 1-3, 8, 14, 15, and 23 of the '918 patent and claims 1-3 and 15 of the '054 patent obvious in view of Harris and FBDIMM.  Appx90; Appx170.  Under Ground 2, the Board found all claims obvious in view of Harris, FBDIMM, and Amidi, but specifically addressed only claims 4-7, 9-13, 16-22, and 24-30 of the '918 patent and claims 4-14 and 16-30 of the '054 patent.  Appx70-84; Appx146-63.  Under Ground 3, the Board found all claims obvious in view of Harris, FBDIMM, Amidi, and Hajeck, but specifically addressed only claims 5, 16, and 24 of the '918 patent and claims 7, 9-12, 17, 29, and 30 of the '054 patent.  Appx84-89; Appx163-68.  The Board did not reach the Petition's two other grounds.

1.    *Ground 1: Harris and FBDIMM*

The Requirement That On-Board Voltage Converters Receive Power From the Host System.  Claim 1 of the '918 patent recites a "memory module" that receives "power" from the "host system" via memory-module "edge connections,"

17

and regulates that power using on-board voltage "converter[s]." Appx220(38:20-25) (limitations 1[a]-[e]); *see* Appx195 (converters receive power "from system"); Appx216(29:1-5) ("converter . . . receives a 1.8V system voltage"); *see* pp. 6-8, *supra*. And claim 16 requires voltage "converters configured to receive a pre-regulated input voltage and to produce . . . regulated voltages." Appx221(39:60-62). The parties thus disputed whether the prior art teaches supplying on-board voltage regulators using power from the "host system," as the claims require. Appx43.

The Petition asserted that ***Harris*** taught those limitations because Harris's DIMM supposedly receives "power" from the "host system" at a voltage of "12V" through the DIMM's edge-connector "pins." Appx316; *see* Appx368 (asserting that Harris's DIMM receives a "'regulated'" "'input voltage'").[2] The Petition pointed to connection 104 in Figure 1A, labeled "external voltage source," as the claimed edge connection to the motherboard power supply. Appx316-17.

---

[2] Where issues are similar in both IPRs, Netlist cites to the '918 patent IPR as representative.



Appx44 (annotated by Netlist in proceedings below).

The Board did not deny Figure 1A labels the input voltage as "***external***," and depicts it on the ***side***, separate from the edge connections on the ***bottom***. Appx44 (emphasis added). The Board also did not dispute that Harris teaches "eliminat[ing]" the "system board power supply" so servers can be "upgrade[d]" without "change[s] [to] system board power distribution" and to allow "reduction" in the DIMM connector's "pin count." Appx4674 (¶¶ 19-20).

Although the ***Petition*** relied only on Harris to teach on-board converters that receive "power" from the "host system," the ***Board*** relied on a "combination of Harris and the FBDIMM Standards." Appx49. The Board asserted that Harris's "external voltage source may be the host system in the combination." Appx50. The Board pointed to Harris's observation, in its "background," that ***prior-art*** "DRAM devices may be 'powered from system board.'" Appx49. The Board did not explain why skilled artisans would modify Harris to rely on ***prior-art*** motherboard power

supplies when Harris's *invention* disparaged that approach and eliminated the associated edge-connector power pins.  *See* pp. 13-14, *supra*.

The Board also observed that an "FBDIMM derives its power from the host." Appx50.  But it did not address the undisputed fact that FBDIMM motherboards did not provide the 12-volt power Harris's voltage converters require.  The Board did not evaluate whether skilled artisans would have modified Harris—which itself modified FBDIMMs to *eliminate* the motherboard power supply and all the associated connector pins—to *use* motherboard power.  Appx50.

The Board also invoked Harris's statement that the "'*external* voltage sources may comprise any combination of known . . . voltage supplies'" to conclude the "supplies" could even be *internal*, from the motherboard.  Appx50 (emphasis added).  The Board did not address Harris's express distinction between "external voltage source[s]" and motherboard "power suppl[ied]" through DIMM "interface pins."  Appx4675 (¶12).

From there, the Board's decisions in the '918 and '054 patent IPR proceedings diverged (without explanation).  The '918 patent decision pointed to Harris's statement that "'the supply voltage may be sourced from the memory controller 302.'" Appx49.  Despite acknowledging that neither party's expert had heard of memory controllers supplying power, the Board asserted that "Harris expressly discloses this feature."  Appx49.  In the '054 patent decision, the Board asserted that Harris's

Figure 3 "impl[ies] that power" is delivered through DIMM "edge connections," because it shows *data* being sent on DIMM edge connections but no external power connections. Appx129. The Board did not address Harris's note that, in Figure 3, the "supply voltage" connections are "not explicitly shown." Appx4675 (¶17).

<u>Three or Four Voltage Converters</u>. Each independent claim of the '918 patent recites a memory module with *four* voltage "converter[s]," three of which are "buck converter[s]," supplying *four* "regulated voltage[s]." Appx220 (38:25-52) (claim 1); *see* Appx221 (39:53-67) (claim 16); Appx222 (41:4-7) (claim 23). Each independent claim of the '054 patent requires "at least *three* buck converters" supplying "at least *three* regulated voltages." Appx268 (38:26-31) (emphasis added) (claim 1); Appx269 (39:63-40:5) (claim 16); Appx270 (41:10-16) (claim 24).

The Petition acknowledged that Harris disclosed "*a* . . . converter" supplying *two* voltages ($V_{CC}$ and $V_{DD}$, green below). Appx323 (emphasis altered). But the Petition urged that skilled artisans would have modified Harris to generate additional regulated voltages ($V_{DDL}$, $V_{DDQ}$, $V_{CCFBD}$, $V_{DDSPD}$, and/or $V_{TT}$, red below) using additional on-board converters. Appx325.

| Voltage Mappings (Grounds 1-3) | | |
|---|---|---|
| | **A** | **B** | **C** |
| *"first"*: | $V_{DD}$ or $V_{DDQ}$ = 1.8V | $V_{DD}$, $V_{DDQ}$, or $V_{DDL}$ = 1.8V | $V_{DD}$, $V_{DDQ}$, or $V_{DDL}$ = 1.8V |
| *"second"*: | $V_{CC}$ or $V_{CCFBD}$ = 1.5V | $V_{CC}$=1.5V | $V_{CC}$ or $V_{CCFBD}$ = 1.5V |
| *"third"*: | $V_{DDL}$=1.8V | $V_{CCFBD}$=1.5V | $V_{TT}$=0.9V |
| *"fourth"*: | $V_{DDSPD}$=3.3V | $V_{DDSPD}$=3.3V | $V_{DDSPD}$=3.3V |

| Voltage Mappings (Grounds 1-3) | | |
|---|---|---|
| | **A** | **B** | **C** |
| *"first"*: | $V_{DD}$ or $V_{DDQ}$ = 1.8V | $V_{DD}$ or $V_{DDQ}$ = 1.8V | $V_{DD}$ or $V_{DDQ}$ = 1.8V |
| *"second"*: | $V_{CC}$ or $V_{CCFBD}$ = 1.5V | $V_{CC}$=1.5V | $V_{CC}$ or $V_{CCFBD}$ = 1.5V |
| *"third"*: | $V_{DDL}$=1.8V | $V_{CCFBD}$=1.5V | $V_{TT}$=0.9V |

Appx322 (top, for the '918 patent) (annotated); Appx11906 (bottom, for the '054 patent) (annotated).

The Board agreed. Appx24-29; Appx113-18. The Board asserted that skilled artisans would have "looked to the FBDIMM standards for information concerning . . . voltage[s]," because Harris's Figure 1A was a modified "fully buffered DIMM[.]" Appx40; Appx125-26; *see* Appx4674(¶9). But the Board did not explain why looking to the standard would have led skilled artisans to ***modify*** Harris with additional on-board converters. The Board did not deny that the FBDIMM standards teach supplying all voltages from ***the motherboard***. Nor did the Board dispute that Harris teaches an FBDIMM that supplies only ***two voltages*** from on-

board converters.  The Board identified no reason why skilled artisans would have deviated from Harris's design to include ***three (or four)*** on-board converters, as in the claims.

The Board also failed to explain why skilled artisans would have incorporated additional on-board converters in Harris given space limitations.  The Board did not deny that Harris's FBDIMMs were "tightly spaced," or that additional on-board "buck converters" would require "large inductors" that would leave less space for DRAM chips.  Appx28.  The Board asserted that it would have been ***possible*** to modify Harris to include three (or four) on-board converters, as the claims require.  *See* Appx36 (additional voltages "can be generated onboard" the DIMM); Appx26 ("multiple converters can be used"); Appx38; Appx124.  But it nowhere explained why skilled artisans would have been motivated to do so given the drawbacks.

Remaining Limitations.  The Board conducted virtually no analysis of the remaining limitations of independent claim 1, or the corresponding limitations of independent claims 16 and 23 of the '918 patent or independent claims 1, 16, and 25 of the '054 patent.  Appx42; Appx59-64; Appx70; Appx126; Appx139; Appx161.  The Board conducted no meaningful analysis of dependent claims 2, 3, 8, and 14 of the '918 patent or dependent claims 2 and 3 of the '054 patent.  Appx63-64; Appx142-43.  The Board simply reiterated the Petition's contentions and declared

23

that, based on the record, the limitations or claims were obvious. Appx42; Appx59-64, Appx70; Appx126, Appx139-43; Appx161.

2.    *Ground 2: Harris, FBDIMM, and Amidi*

The Board turned to the "voltage monitor circuit" in dependent claim 5 and other claims of the '918 and '054 patents. Appx78-83; Appx152-58. Claim 5 recites the memory module of claim 1, "further comprising: a voltage monitor circuit" that (1) "***monitor[s]*** a power input voltage received via" the memory module's "edge connections," and (2) produces a "***trigger signal***" when the input voltage "is ***greater*** than a first threshold voltage." Appx220(38:61-67) (emphasis added). Claim 12 further requires a "controller configured to receive the trigger signal" and "perform[] a ***write operation*** to … non-volatile memory." Apx221(39:30-37) (emphasis added). The Board found those claims obvious by adding Amidi to the Harris/FBDIMM combination. Appx78-83; Appx152-58.

Combining Harris with Amidi's Voltage Monitor. The Petition urged that skilled artisans would have augmented Ground 1's Harris/FBDIMM combination to include Amidi's "battery backup" system, including its "voltage supervisory block," as the claimed "voltage monitor." Appx347; Appx356; *see* Appx70-72. The Board rejected Netlist's argument that skilled artisans would have lacked motivation to combine Amidi with Harris. Appx72-75. Amidi solves the problem of "maintaining data during power disruption"—the same problem Harris solves with "redundant"

external "power source[s]."  Appx72; *see* Appx4675 (¶¶ 14-15).  Despite Amidi teaching a solution to a power-disruption problem Harris already solved, the Board found that skilled artisans would have combined those references.  Appx75.

The Board acknowledged that Harris's FBDIMM faced "space" constraints, and that Amidi's battery-backup system would occupy an entire "side of [Harris's] FBDIMM."  Appx75.  But the Board opined that "the other side still can include one rank or two ranks" of memory chips.  Appx75.  The Board did not explain why skilled artisans would modify Harris to include Amidi's backup-battery system— dramatically reducing capacity—when Harris already taught a different solution.

Producing Trigger Signal on Overvoltage.  Claims 5-7, 9-13, 16-22, and 24-27 of the '918 patent and claims 6-7, 9-12, and 17 of the '054 patent require a "voltage monitor circuit configured to produce a trigger signal" when the motherboard's input voltage supply exceeds a certain "threshold"—*i.e.*, when it detects an overvoltage.  Appx220 (38:61-67).  The Petition relied on Amidi to teach the voltage monitor, but Amidi did not disclose detecting overvoltage.  Appx356-57.  The Board thus pointed to Amidi's reference to detecting a "'power fault,'" and asserted that phrase was "broad enough to encompass overvoltage as well."  Appx79.  The Board did not address that Amidi defined "power fault" as voltage falling "***below*** a reference voltage."  Appx4697 (8:23-28) (emphasis added).  It simply asserted that skilled artisans "would have seen the value of [over]voltage detection."  Appx80.

Performing a Write Operation.  Claims 11-12, 18-19, and 25-26 of the '918 patent and claim 7 of the '054 patent require that the DIMM's power-management circuitry respond to overvoltage by "execut[ing] a write operation" or "writ[ing] information into [a] non-volatile memory."  Appx221(39:29-30, 40:22).  The Board found that FBDIMMs' "S3 sleep mode" taught that limitation.  Appx69.  S3 is a power-saving mode in which "[c]ontrol and [s]tatus" information is stored onto an "SPD" chip on the DIMM that contains "non-volatile memory."  Appx67-69.  There was no dispute that S3 mode is triggered by a signal from the **CPU** when the system enters a "low[] power state."  Appx340.  The Board found, however, that skilled artisans would have modified the DIMM to enter S3 mode in response to detecting overvoltage.  Appx82.  The Board did not explain why skilled artisans would have modified FBDIMMs to enter S3 mode in response to overvoltage, and do so in response not to a motherboard signal but detection on the DIMM.  Appx82.

Remaining Limitations.  As with Ground 1, the Board's analysis of the remaining limitations chiefly asserted that "Petitioner has shown that these claims are disclosed by the combination."  Appx84; Appx152, Appx158-59, Appx161-62.

3.     *Ground 3: Harris, FBDIMM, Amidi, and Hajeck*

The Board ruled that, even if Amidi did not teach detecting overvoltage, skilled artisans would have combined Hajeck's overvoltage detection with Amidi's battery-backup system, and incorporated that combination into Harris's FBDIMM.

Appx86-87.  The Board did not explain why skilled artisans in possession of Hajeck, which teaches a **complete** solution to both overvoltage and undervoltage, would have been motivated to turn to Amidi, which teaches a solution **only** to undervoltage.  The Board simply asserted that "the combination . . . teaches, or at least suggests, the limitations" and that Hajeck does not "negate any of the [combination's] teachings." Appx88.

## SUMMARY OF ARGUMENT

I.     The challenged claims, for example claim 1 of the '918 patent, require receiving "power" from the "host system" through DIMM "edge connections," and using on-board voltage "converters" to generate "regulated voltages" for DIMM components.  The Board erred in determining that the combination of Harris and the FBDIMM standards taught that limitation.

A.     The Board's decision defied the IPR statute and the APA's fair-notice requirements by finding that limitation obvious based on a combination of disparate disclosures in Harris and the FBDIMM standards, when the Petition had relied solely on a single embodiment of Harris for that limitation.

B.     The Board also failed to provide a reasoned explanation for why skilled artisans would have combined disparate disclosures in Harris and the FBDIMM standards to arrive at the claimed memory module, which receives power from the motherboard and produces regulated voltages using on-board converters.  Harris

27

teaches away from the claims. It disparages obtaining power from the motherboard and teaches reliance on an *external* voltage supply. The Board failed to explain why skilled artisans would have modified Harris to obtain power from the motherboard, as the claims require. The Board also overlooked that skilled artisans would not have expected success in such a modification, given that FBDIMM motherboards do not provide the 12-volt power supply Harris's voltage converters require.

C.    Insofar as the Board's decision could be read as suggesting Harris's "external voltage source," standing alone, teaches obtaining power from the mother-board, that conclusion is unsupported by substantial evidence. Harris expressly distinguishes "external" power, which it asserts is advantageous, from motherboard power, which it disparages. Harris teaches *eliminating* the power-supply pins on the DIMM connector. And Harris's passing reference to obtaining power from the "memory controller" is of no moment, because the experts agreed that memory controllers do not supply power.

II.    The challenged claims of the '918 patent require four "converters," three of them "buck converters," supplying four regulated voltages; the '054 patent claims, meanwhile, require at least "three buck converters" supplying at least three "regulated voltages." The FBDIMM standards teach obtaining power from the motherboard, while Harris teaches a modified FBDIMM that supplies *two* regulated voltages using on-board converters. The Petition thus had to show why skilled

artisans would have been motivated to modify Harris to incorporate additional on-board converters to supply additional voltages.  The Board erred in determining that skilled artisans would have been so motivated.

A.    The Board offered no explanation of why skilled artisans would have incorporated additional on-board voltage converters in Harris.  The Board asserted that skilled artisans would have "looked to" the FBDIMM standards given that Harris teaches a modified FBDIMM, but nowhere explained why that would have led skilled artisans to incorporate three or four on-board converters, as the claims require, especially given Harris's teaching of an FBDIMM that supplies only *two* regulated voltages using on-board converters.

B.    The Board also failed to account for the tradeoffs skilled artisans would have weighed, as this Court's precedent requires.  There was no dispute that Harris's FBDIMMs are space-constrained, or that adding bulky buck converters to Harris would have reduced the space available for DRAM chips.  The Board nowhere explained why skilled artisans would have been motivated to overlook those draw-backs to incorporate three or four on-board converters, as the claims require.

III.    Dependent claim 5 of the '918 patent, and other similar claims, recites the memory module of claim 1, further comprising a "voltage monitor" that monitors the input voltage from the motherboard and generates a "trigger signal" upon detect-ing an overvoltage.  Claim 12, and other similar claims, requires responding to that

trigger signal by performing a "write operation" to save certain data to non-volatile memory.  The Board found those claims obvious based on the combination of Harris, the FBDIMM standards, and Amidi (Ground 2), or those references plus Hajeck (Ground 3).  Those determinations cannot be sustained.

A.    The Board relied on Amidi's battery-backup system, including its voltage supervisor, for claim 5's "voltage monitor."  But Amidi's battery-backup system solves a problem, dealing with power disruptions, that Harris already solves through redundant external power supplies.  Under this Court's precedent, skilled artisans would not have looked to Amidi to solve power-disruption problems, when Harris already contained a solution to that problem.

B.    Even if skilled artisans would have combined Amidi with Harris and the FBDIMM standards, that combination failed to teach claim 5's requirement of detecting overvoltage.  The Board asserted that Amidi's disclosure of detecting "power faults" encompassed detecting overvoltage, but Amidi expressly equates "power faults" with ***undervoltage*** conditions.  And Petitioner's expert conceded Amidi does not expressly disclose detecting overvoltage.  The Board erred by overlooking that expert concession and Netlist's arguments, in violation of the APA.

C.    The Board pointed to the FBDIMM standards' S3 mode, which stores data to non-volatile memory during a sleep state, for claim 12's requirement of "perform[ing] a write operation."  But the claims require the DIMM to perform a

write operation upon detecting an overvoltage. S3 mode, by contrast, is triggered by the **CPU** when the **whole system** enters a power-saving mode. The Board offered no explanation of why skilled artisans would have been motivated to modify the FBDIMM standards to enter S3 mode upon detecting an overvoltage, or why skilled artisans would have expected success in doing so.

D.    The Board's reliance on Hajeck to teach detecting overvoltage cannot be sustained. The Board nowhere explained why skilled artisans would have been motivated to pluck a single feature out of Hajeck—detecting overvoltage—and insert it into a combination of Harris, FBDIMM, and Amidi. Insofar as skilled artisans would have been motivated to modify Harris to address overvoltage **and** undervoltage conditions, Hajeck teaches a complete solution to that problem: using a charge pump to protect DIMM circuits and disabling write operations to memory. Skilled artisans would have had no need to then combine Hajeck with Amidi, which teaches a different solution that addresses undervoltage only. And without Amidi, the Petition's combination fails, because Hajeck teaches neither claim 5's trigger signal nor claim 12's write operation.

IV.    Vacatur is required because, for numerous limitations of claim 1 and other claims, the Board simply accepted Petitioner's arguments without providing the reasoned explanations this Court's precedent requires.

31

## STANDARD OF REVIEW

Obviousness is a question of law, reviewed de novo.  *See Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*, 97 F.4th 882, 886 (Fed. Cir. 2024).  Any underlying fact-findings are reviewed for substantial evidence.  *Id.*  Motivation to combine is a question of fact, but this Court applies an especially "'thorough and searching'" review to that issue, demanding "'specificity'" in the Board's findings.  *In re Nuvasive, Inc.*, 842 F.3d 1376, 1381-82 (Fed. Cir. 2016).

## ARGUMENT

### I.    THE BOARD'S DETERMINATION THAT HARRIS AND FBDIMM TEACH A MEMORY MODULE (DIMM) WITH VOLTAGE REGULATORS THAT RECEIVE INPUT VOLTAGE FROM THE MOTHERBOARD CANNOT BE SUSTAINED

The claimed invention is a memory module including voltage converters that receive power from "the [host] system" and generate regulated voltages for memory-module components.  Appx195.  Claim 1 of the '918 patent, for example, requires *both* that the memory module receive "power" from the "host system" through "edge connections," *and* that it include on-board "buck converters" that produce "regulated voltage[s]."  Appx220(38:20-26) (limitations 1[a]-[e]).  Claim 16 similarly requires "buck converters configured to receive a pre-regulated input voltage and to produce . . . regulated voltages."  Appx221(39:55-65).  The invention thus provides for voltage conversion *on the DIMM* while receiving power from the motherboard's existing slot connectors and power supplies.  It does not require modifying motherboard slot connectors, power supplies, or DIMM edge connections.  *See* p. 6, *supra*.

32

The Board's determination that the prior art teaches that limitation cannot be sustained. The Petition invoked a specific embodiment of Harris, Figure 1A, to meet the requirement of receiving power from the motherboard. But the Board relied on a "***combination*** of" teachings in "Harris and the FBDIMM Standards." Appx49 (emphasis added). The IPR statute and precedent preclude the Board from finding obviousness based on a combination that departs from the Petition.

The Board also failed to explain why skilled artisans would have combined Harris and the FBDIMM standards to arrive at the invention. The Board's primary reference, Harris, ***teaches away*** from the invention. Harris addresses the inability of "system board sources"—power from the host system—"to provide tightly regulated power." Appx4674(¶2). Harris's solution was to eschew "system board" power supplies altogether, and instead power DIMMs from "***externally*** supplied" sources. Appx4668 (emphasis added). Netlist's invention operates differently—it receives and then further regulates a power supply ***from the motherboard***. Appx175. The Board nowhere explained why skilled artisans would have ***reversed*** Harris's key teaching—switching from a motherboard power supply to external power—to arrive at the claimed invention.

Substantial evidence does not support the Board's decision regardless. The Board asserted that, "in the combination of Harris with the FBDIMM Standards," the "voltage source ***may*** be the host system." Appx50 (emphasis added). But Harris

does not, and cannot, obtain the input power supply for its voltage converters from the DIMM's edge connectors, as the claims require.

### A.    The Board Erred in Relying on a Combination That Departs From the Petition's Asserted Grounds

IPR "petition[s]" must "identify with particularity the evidence that supports the grounds for the challenge to each claim." *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1286 (Fed. Cir. 2017). "[T]he petition[] . . . define[s] the scope of the litigation all the way from institution through to conclusion." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 367 (2018). Consistent with that, the Board cannot find patent claims obvious based on a "theory of *prima facie* obviousness absent from the petition." *Wasica*, 853 F.3d at 1286. The Board thus errs when it finds a limitation obvious based on a different reference than the one in the petition, or even a "different passage" of the same reference. *Id.*; *see EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*, 859 F.3d 1341, 1348 (Fed. Cir. 2017).

Here, the parties disputed whether Harris's on-board voltage converters receive "power" from the "host system," as the claims require. Appx43. The Petition addressed the limitation in a single bullet point: "'*power*': EX1023, ¶[0012] ('power'/'+12V' 'pins'); *id.*, ¶¶[0010, 19] & Fig.1A (104, below)." Appx316. Even if that cryptic assertion meets the statutorily required "understandable explanation" of Petitioner's theory, *Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990, 1001 (Fed. Cir. 2023), it relies on Harris's "external voltage source" to teach the claimed

"power" source supplied via the "edge connector." Appx4669; *see* Appx4674-76; pp. 13-14, *supra*. The cited paragraphs all discuss the embodiment in Figure 1A (¶¶10, 12), or the benefits of the invention generally (¶19). The Petition nowhere relies on Harris's discussion of the prior art, or on the FBDIMM standards. Nor did the Petition provide any argument for why skilled artisans would have looked to those other disclosures.[3]

The Board, however, found obviousness based on a "***combination*** of Harris and the FBDIMM Standards." Appx49 (emphasis added). Unlike the Petition, the Board went beyond Harris's "external voltage source," and invoked ***the prior art***, which observed that "DRAM devices may be 'powered from the system board.'" Appx49-50. The Board also invoked the "FBDIMM Standards," which disclose that the "FBDIMM derives its power from the host." Appx50. The Petition never relied on those disclosures. *See* Appx316. The Board erred by relying on "different passage[s]" of Harris, plus an entirely separate reference, the Petition never invoked. *Wasica*, 853 F.3d at 1286; *see EmeraChem*, 859 F.3d at 1348.[4]

---

[3] The Board's '054 patent decision, but not its '918 patent decision, stated the Petition "relied on the FBDIMM Standards as disclosing this feature." Appx130. That was incorrect. Appx11900.

[4] The Board also relied on ¶¶14 & 17 of Harris. Appx49-50. The Petition never relied on those paragraphs. Regardless, they appear to refer to different "embodiment[s]" of Harris than the one in Figure 1A. Appx4675 (¶¶14, 17).

That "deviat[ion]" from the Petition was significant. *Corephotonics*, 84 F.4th at 1002. The Petition's theory was that Harris ***expressly disclosed*** a DIMM with on-board voltage conversion that obtains input power from the motherboard. The Board's theory, by contrast, was that stitching together selective bits from Harris and the FBDIMM standards would have been ***obvious***. Appx49. That is a different theory that requires different proof—including proof of motivation to modify, reasonable expectation of success, and enablement—that the Petition never provided.

## B.    The Board Failed To Properly Evaluate Motivation To Combine Where Harris Teaches Away From the Claimed Invention

The Supreme Court recognized long ago that most inventions are a "new combination of old elements or devices." *Parks v. Booth*, 102 U.S. 96, 102 (1880). Such inventions "may seem deceptively simple, particularly when retracing the path already blazed by the inventor." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378 (Fed. Cir. 2012). To "guard against" such "hindsight," *Graham v. John Deere Co.*, 383 U.S. 1, 3 (1966), obviousness law requires the Board not only to identify the elements of the invention in the prior art, but to articulate the "***reason***" skilled artisans would have "combine[d] [those] elements as the new invention does" and would have expected success in doing so, *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 401 (2007) (emphasis added).

36

The Board must also consider whether the prior art would "deter" skilled artisans from pursing the specific "combination" of claimed elements, *United States v. Adams*, 383 U.S. 39, 51-53 (1966), or "le[a]d" them "in a direction divergent from the" invention, *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994); *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305 (Fed. Cir. 2015).   A reasoned motivation-to-combine analysis is required not only when combining ***different references***, but also when drawing together separate embodiments or teachings in the ***same reference***. *See BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1403 (Fed. Cir. 2022).   The Board's decision here falls short of those requirements.

1.    The Board relied on a "***combination***" of disparate teachings from Harris and the FBDIMM standards, Appx49-50 (emphasis added), but failed to address motivation to combine those (oppositional) teachings.   As explained above, the claimed invention requires the memory module to obtain input power from the motherboard and then use voltage converters on the DIMM to produce three (or four) regulated voltages for DIMM components.   But Harris disparages a motherboard power supply and teaches "an ***externally supplied*** voltage" source instead. Appx4668 (emphasis added); *see* pp. 12-14, *supra*.   While the Board acknowledged that the Petition relied on Harris's "externally supplied voltage," Appx49-50, it asserted that skilled artisans would also have looked to the teachings in Harris's "background" discussion of the prior art, and the "FBDIMM Standards," Appx50.

Based on those disclosures, the Board reasoned, "a person of ordinary skill in the art *would have known*" to supply power from the motherboard to Harris's voltage converters, as the claims would require. Appx49 (emphasis added).

The Board, however, nowhere explained why skilled artisans would have combined those disparate teachings as the claims do, or why skilled artisans would reasonably have expected success in doing so. That failure is glaring, because, as explained below, Harris teaches away from that result. *See* pp. 39-42, *infra*. Harris modifies an FBDIMM to *eliminate* reliance on power from the motherboard in favor of an *external* power supply. The Board nowhere explained why skilled artisans would have undone the very innovation Harris taught. Nor did it explain why skilled artisans would have arrived at the counter-intuitive combination of subjecting power to *two* conversions, one to provide a pre-regulated voltage and another to take that already-regulated voltage and make it into multiple regulated voltages for different DIMM components.

Instead of addressing motivation to combine or expectation of success, the Board asserted that, based on the prior art, the "the external voltage source" in Harris "*may be* the host system," such that power is supplied to Harris's DIMM through the edge connectors. Appx50 (emphasis added). But finding obviousness requires more than positing what skilled artisans "'*could have*'" (or may have) done; it requires assessing what they "'*would have been motivated to*'" do, and what they

would have expected "'success'" in doing.  *Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*, 97 F.4th 882, 886-87 (Fed. Cir. 2024).  The Board's failure to provide the required explanation, or to address Netlist's arguments regarding that issue, require vacatur and remand.  *See VirnetX Inc. v. Cisco Sys., Inc.*, 776 F. App'x 698, 702-03 (Fed. Cir. 2019).

2.     Skilled artisans ***would not*** have combined the teachings on which the Board relied to arrive at the claimed invention, because Harris ***teaches away*** from the claims.  The Board pointed to Harris's teaching that conventional DIMMs may be "'powered from system board or main board voltage sources,'" Appx49 (quoting Appx4674(¶2)), but Harris mentions that approach only to disparage it, observing that it causes "significant" "issues."  Appx4674(¶2).  Harris explains that it is "difficult for the system board sources" to provide the "tightly regulated power" required for advanced memory technology.  Appx4674(¶2).  And it explains how the fixed set of voltages provided by the motherboard hampers "upgrades" to "next generation DRAM technology"; if later DRAMs require lesser voltages, the DRAM and the motherboard would need to be upgraded.  Appx4674(¶2).

Harris teaches that those problems are solved by ***eliminating*** the motherboard power supply altogether.  Instead, Harris's memory modules receive "12V" power "from an ***external source***."  Appx4674(¶3) (emphasis added); Appx4674-75(¶¶10, 12).



Appx679. Harris expressly distinguishes between that external voltage source and the conventional internal voltage supply. It explains that, in its invention, the "power supply" from the DIMM's "interface pins" is "*replace[d]*" with connections to an "***external voltage source***." Appx4675(¶12) (emphasis added).

Harris thus emphasizes that, in its DIMM, the "system board power supply and associated voltage[s]" are "***eliminated***." Appx4676(¶19) (emphasis added). And it touts the resulting benefits. It explains that eliminating reliance on the internal voltage supply "provide[s] upgradeability" to new memory technologies without requiring "change[s]" to the "system board power distribution." Appx4676(¶20). And it reduces the "pin count on [the] DIMM" by eliminating the electrical contacts required for the motherboard voltage sources. Appx4676(¶19).

Based on those disclosures, skilled artisans would not have relied on Harris to arrive at the claimed invention. Doing so would ***undo*** the very change Harris espoused, by reintroducing the motherboard power supply that Harris disparages. And it would eviscerate Harris's stated benefits from eliminating the motherboard power supply. Because every ground relies on Harris, and Harris teaches away from the claims, this Court should reverse. *See In re Hodges*, 882 F.3d 1107, 1113 (Fed. Cir. 2018). At a minimum, the Board's decision should be vacated for "ignor[ing] the express disclosure . . . that teaches away from the claimed invention." *Chemours Co. FC, LLC v. Daikin Indus., Ltd*., 4 F.4th 1370, 1376 (Fed. Cir. 2021); *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1069 (Fed. Cir. 2018).

3. Skilled artisans, moreover, would not have had a "reasonable expectation of success" in attaining the claimed invention. *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021). It was undisputed that Harris's voltage converters require an input power supply of "12V" to regulate the power down to the levels required by the DIMM components. *See* Appx4674 (¶ 3); Appx4674-75 (¶¶ 10, 12); Appx310; Appx316. Harris's DIMM, moreover, is a modified FBDIMM. Appx4674 (¶ 9). But FBDIMM edge connectors do not provide 12-volt power; at most they provide 3.3 volts. Appx5038, Appx5040. Thus, it would have been impossible for Harris's voltage regulators (which require 12 volts) to obtain power from the edge connectors on Harris's FBDIMM (which provide at most

3.3 volts). Samsung's expert, Dr. Wolfe, conceded that FBDIMM edge connectors "do[n't] supply 12 volts," and that he had "[n]ever seen a power supply" that "provide[d] 12 volts to a DIMM." Appx9474; Appx9286, Appx9291.

Skilled artisans thus would not have expected success in modifying Harris's DIMM to rely on motherboard voltage sources—they do not provide the 12-volt power Harris requires. *See Strathclyde*, 17 F.4th at 160. That, moreover, underscores the arbitrariness of the Board's combination. It is impermissible to combine references in a way that "would produce . . . an inoperative device." *Tec Air, Inc.*, 192 F.3d 1353, 1360 (Fed. Cir. 1999); *see also Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021) (prior art must enable skilled artisan to make and use the invention). Yet the Board did that here.

## C. The Record Would Not Support the Board's Determination

The Board never found that skilled artisans would understand Harris's "external voltage source"—standing alone—to expressly disclose supplying power to DIMMs from the motherboard. There is a reason for that: The record would not support such a finding.

1. Harris's "*external* voltage source" is not a connection to the motherboard power supply via the edge connections, as the claims require. Harris's DIMM "*eliminate[s]*" reliance on the "system board power supply" by receiving "12V" power "from an external source." Appx4675-76(¶¶12,19). Harris states that its

42

DIMM receives power "***externally***," not from the host system, ***twenty-four times***. Appx4668 (abstract); Appx4669 (Fig. 1A); Appx4670 (Fig. 1B); Appx4674-75 (¶¶3, 10, 11, 12, 14, 16); Appx04676-77 (claims 1-36).

Figure 1A, on which the Petition relied, confirms that.  It shows that Harris's DIMM receives power from an "external voltage source" on the ***side*** of the DIMM, not through connections to the motherboard on the ***bottom*** of the DIMM.  Appx4669; Appx9513.  Indeed, Harris discloses ***eliminating*** the unused edge connectors, to "reduc[e]" the DIMM's "pin count."  Appx4676 (¶19).  And the DIMM depicted in Harris's Figure 1A ***could not*** receive power through its edge-connector pins, because it is a modified FBDIMM, and FBDIMM motherboards do not provide the 12-volt power supply that Harris's voltage converters require.  *See* pp. 41-42, *supra*.



Appx679.

2.    The Board's citations to Harris could not sustain the conclusion that Harris's "external voltage source" is a motherboard power supply.  In both IPRs, the Board pointed to Harris's statement that the "'external voltage sources may comprise any combination of known or heretofore unknown voltage supplies, either regulated or unregulated, and even including variable voltages.'"    Appx50. According to the Board, that suggested that the "external" voltage source "may" encompass power from the DIMM edge connections.  Appx50.

But the quoted passage simply means that various technologies can be used to provide the "external voltage source[]."  Appx4675 (¶ 14).  It would be nonsensical to read the passage as stating that an external voltage source may be comprised of the very thing it is defined in opposition to—an internal voltage source.  Harris expressly distinguishes between receiving power from the DIMM's "power supply interface pins" and receiving it from the "external voltage source."  Appx4675 (¶ 12). It teaches that use of the external power supply "*eliminate[s]*" reliance on mother-board power.  Appx4676 (¶ 19).  And it touts the benefits of doing so.  *See* pp. 13-14, *supra*.

3.    In the '918 patent IPR, the Board pointed to two other disclosures in Harris.  Because the final written decision in the '054 patent IPR did not rely on those disclosures, they cannot support the Board's decision there.  *In re Gartside*, 203 F.3d 1305, 1314 (Fed. Cir. 2000).  The Board pointed to a remark in Harris that

44

power may be sourced from the "memory controller." Appx49. But memory controllers undisputedly were not known to be capable of supplying power, and Harris does not purport to disclose how to build such a controller. Appx4675 (¶17); Appx9518; Appx9299-300. The Board acknowledged as much, but asserted that "Harris expressly discloses this feature." Appx49.

That is no answer. Non-enabled prior art cannot support obviousness. *See Raytheon*, 993 F.3d at 1380; *see also Adams*, 383 U.S. at 50 (claims not obvious where proposed combination renders system "inoperable"). Harris cannot be read to teach a DIMM that is not enabled and would not work. The Board's failure to address that issue meaningfully defies the requirements of reasoned decisionmaking and substantial evidence. *See TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1360 (Fed. Cir. 2019); *In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002).

The Board also pointed to Harris's statement about "'replacing' [the] power supply interface pins" on the DIMM "'with as few as six +12V pins *(from an external voltage source)*.'" Appx49 (emphasis added). Omitting the bold and italicized portions, the Board urged that the quote "impl[ies] that power still comes from the interface with the host system." Appx49. But the omitted portion makes clear that the statement refers to replacing power *from the motherboard* with power "*from an external voltage source*." Appx4675 (¶12) (emphasis added). Far from supporting the Board, that statement *distinguishes* the DIMM's "power supply interface

45

pins" that supply power in the prior art from Harris's advantageous "external voltage source." Appx4675 (¶ 12). Language stating that the power comes from an ***external*** voltage source is not substantial evidence that the power comes ***internally*** from the motherboard. *See Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1346-47 (Fed. Cir. 2013) (vacating decision because Board "misread" a reference to say the opposite of what it actually said).

4.    In the '054 patent IPR, the Board pointed to Harris's Figure 3, and asserted that it "shows that the memory boards have only edge connections." Appx130.



*FIG. 3*

Appx4672. According to the Board, that meant the DIMMs in that embodiment must obtain power from those edge connections, as in the claims here. Appx130.

But the Board once again overlooks key language: Harris states that "FIG. 3" *does* "*not* explicitly show[]" *how* each DIMM "receives a supply voltage." Appx4675 (¶17) (emphasis added). The absence of the external voltage source from Figure 3 thus does not imply that the DIMM relies on internal power; it means only that the power supply is not shown. It is not substantial evidence the power comes from edge connectors—and overlooking express language making that clear is not reasoned decisionmaking. *See In re Zurko*, 258 F.3d 1379, 1386 (Fed. Cir. 2001). Figure 1A, by contrast, shows the power connection, and clearly depicts it as a connection to an *external* power source, not the motherboard.

## II. THE BOARD'S DETERMINATION THAT SKILLED ARTISANS WOULD HAVE MODIFIED HARRIS TO INCLUDE THREE (OR FOUR) VOLTAGE CONVERTERS CANNOT BE SUSTAINED

The challenged independent claims require three (or four) on-board converters supplying three (or four) regulated voltages. Limitations 1[b-e] of the '918 patent require three "buck converter[s]" for three "regulated voltage[s]" and a fourth "converter" for a "fourth regulated voltage." Appx220 (38:18-52). Limitation 1[b] of the '054 patent, meanwhile, requires "at least three buck converters" and "regulated voltages." Appx268 (38:25-30).

The Board found that Harris and the FBDIMM standards together rendered those limitations obvious. Appx24-29; Appx113-18. The FBDIMM standards teach receiving specified voltages *from the motherboard*, but not on-board voltage con-

verters or specific types of converters. Appx21-23. Harris, meanwhile, teaches a modified FBDIMM that obtains power from an external source and supplies *two* regulated voltages using one on-board converter. Appx19.

The Board thus did not dispute that, to prove obviousness, Petitioner had to show that skilled artisans would have been motivated to *modify* Harris's FBDIMM to supply *additional* voltages using additional on-board converters. The Board's conclusion that skilled artisans would have been so motivated is unreasoned and unsupported by the record.

### A.    The Board Failed To Explain Why Skilled Artisans Would Have Modified Harris To Include Additional On-Board Converters

To find obviousness based on a combination of prior art, the Board must "explicit[ly]" identify the "reason" skilled artisans would have been motivated to combine the references "in the fashion claimed by the patent." *KSR*, 550 U.S. at 418. Claims are obvious only where skilled artisans, "facing the wide range of needs" in the field, *id.* at 424, and "'weigh[ing]'" "'[t]he benefits, *both lost and gained*'" of the asserted combination, would have been motivated to pursue that combination, *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1331-32 (Fed. Cir. 2019). Precedent requires the Board's analysis of "motivation to combine" to "be thorough and searching," and demands "specificity" in the Board's "findings." *In re Nuvasive, Inc.*, 842 F.3d 1376, 1381-82 (Fed. Cir. 2016). And the APA requires

the Board to provide a "full and reasoned explanation" for its obviousness determinations.  *Lee*, 277 F.3d at 1342.

Here, the Board did not deny that Harris's Figure 1A teaches a modified "fully buffered DIMM" that uses one converter to supply *two* regulated voltages, Appx4674(¶9); *see* Appx19, or that the FBDIMM standards teach supplying all voltages from the motherboard, Appx21-23.  Thus, skilled artisans would need some motivation to modify Harris's FBDIMM to supply *additional* regulated voltages using additional on-board converters.

1.    The Board purported to find motivation because Harris's memory module is a "fully buffered DIMM[]" (*i.e.*, FBDIMM), and skilled artisans would have been motivated to "look[] to the FBDIMM Standards for information concerning the voltage values standardized for use in an FBDIMM."  Appx41; *see* Appx125-26.  But that assertion does not show that skilled artisans would have been motivated to *modify* Harris's FBDIMM to meet the claims.  Even if skilled artisans would have "looked to" the FBDIMM standards, it does not "logical[ly]" follow that skilled artisans would have modified Harris's FBDIMM to incorporate additional on-board voltage converters to supply additional regulated voltages, as the claims require. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374-75 (1998).

Any reason for skilled artisans to modify Harris to supply three (or four) voltages using on-board converters is not self-evident.  The FBDIMM standards

teach supplying all voltages from the motherboard via the "DIMM Connector." Appx5040. And Harris purports to implement a (presumably functional) "fully buffered DIMM." Appx4674(¶9). But Harris uses **one** on-board voltage converter to supply **two** voltages ("$V_{CC}$" and "$V_{DD}$"). Appx19. Harris's inventor presumably was aware of the other FBDIMM voltages, but chose not to incorporate on-board converters to supply other voltages.[5] The Board never found that Harris's FBDIMM embodiment was inadequate or flawed, or explained what would compel modifying Harris to include on-board converters for additional voltages. And, as explained below, pp. 52-57, *infra*, there were myriad reasons **not to** modify Harris—space constraints, reduced memory capacity, heat generation, duplication of functions, etc. The Board's nonexistent analysis falls far short of the "full and reasoned explanation" the APA demands. *Lee*, 277 F.3d at 1342.

Instead of explaining why skilled artisans would have been **motivated** to modify Harris to supply additional regulated voltages using on-board converters, the Board asserted that it was **possible**. "[T]he combination of Harris and the FBDIMM Standards," the Board insisted, "suggests that" additional voltages "**can be** generated onboard the memory module." Appx36 (emphasis added); Appx124 (same); *see*

---

[5] While JEDEC's FBDIMM standard was finalized after Harris's 2005 filing date, Appx5030, preliminary FBDIMM specifications available in 2005 do not differ in any relevant respect, *compare* Appx5038-40 *with* Appx10377-78.

Appx38 ("Harris teaches generating voltages onboard the memory module, which *suggests* this would include V$_{DDSPD}$." (emphasis added)); Appx26 ("multiple converters *can* be used" (emphasis added)).  But pointing to a mere possibility is insufficient to show a motivation to modify.  *See Virtek*, 97 F.4th at 886-87.  Nor is it enough to say that a combination is one "'suitable option'" among many.  Appx29.  Such a finding does not insulate the Board from having to explain *why* it is a suitable option, or to identify the "apparent reason" for combining the references.  *KSR*, 550 U.S. at 418.

2.    The Board's failure to analyze motivation was especially glaring given the acknowledged drawbacks of on-board voltage converters.  Where, as here, design choices involve tradeoffs, the Board must explain why skilled artisans would have been motivated to balance the costs and benefits in the manner of the claimed invention.  *See Henny Penny*, 938 F.3d at 1332; *Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*, 69 F.4th 1341, 1349 (Fed. Cir. 2023).  Here, there was no dispute that FBDIMMs, like Harris's, are space constrained.  Appx9530-32; Appx10221.  FBDIMMs were meant "to increase the capacity of server DIMMs," Appx9540, which requires adding more DRAM chips.  But the AMB occupies significant space, which reduces space for DRAM chips.  Appx9530-32; Appx10221.  Skilled artisans thus would have been dissuaded from adding circuits, like bulky buck converters, that would further reduce the space available for DRAM chips.  *See* Appx9529-30.

Indeed, Harris "implicit[ly] disparge[s]" adding additional on-board converters by teaching an FBDIMM implementation that supplies only *two* regulated voltages with on-board converters. *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1337 (Fed. Cir. 2021).

The Board did not deny the drawbacks, *see* Appx29; Appx116, but offered no explanation for why skilled artisans would have modified Harris to include additional on-board buck converters given space limits. In the '918 patent IPR, the Board asserted, without explanation, that "one of ordinary skill in the art would have implemented a memory module with four buck converters to generate respective voltages in at least some situations." Appx29. But the Board said nothing about what "situations" those might be, let alone address costs and benefits. In the '054 patent IPR, the Board addressed Netlist's argument regarding "space issues" by asserting that additional buck converters would "fit" on Harris's DIMM. Appx116. But that does not show what skilled artisans would have been ***motivated*** to do given tradeoffs. The APA, and obviousness law, require more. *See Virtek*, 97 F.4th at 886-87; *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1047 (Fed. Cir. 2017).

## B.     Substantial Evidence Does Not Support the Board's Conclusion

The Board's conclusion that skilled artisans would have been motivated to modify Harris to incorporate additional on-board converters is also unsupported by

"substantial evidence." *TQ Delta*, 942 F.3d at 1360. Here, Harris supplies two voltages using on-board converters: $V_{CC}$ and $V_{DD}$. Appx19. The Board pointed to five other voltages, $V_{DDL}$, $V_{DDQ}$, $V_{CCFBD}$, $V_{DDSPD}$, and $V_{TT}$, and posited that skilled artisans would have included separate on-board buck converters for those voltages. Appx30-38. But the record showed that skilled artisans would not have done that, because each of those voltages could be provided in other ways, and space limits would have dissuaded skilled artisans from choosing on-board buck converters for those voltages.

1.    Skilled artisans would have supplied the other voltages in the FBDIMM standards without incorporating additional buck converters into Harris.

$\underline{V_{CCFBD}, V_{DDL}, \text{ and } V_{DDQ}}$. Netlist's expert explained that these voltages are the same as $V_{CC}$ or $V_{DD}$. Appx9535-38. Thus, skilled artisans would have supplied $V_{DDL}$ and $V_{DDQ}$ from Harris's $V_{DD}$ (1.8V), and $V_{CCFBD}$ from Harris's $V_{CC}$ (1.5V). Appx9535-38. Indeed, the FBDIMM standards provide DIMM connections for $V_{CC}$ and $V_{DD}$, ***but not*** $V_{DDL}$ or $V_{DDQ}$. Appx5040. And JEDEC DRAM standards provide that "VDD, VDDL, and VDDQ are driven from a single power converter." Appx25. The Board did not deny that evidence, Appx25, Appx30, but insisted skilled artisans would have considered using "separate converters" for those voltages to be an "option . . . for reasons of cost, space availability, etc.," Appx33. The Board nowhere explained, however, why "cost" and "space availability" would have led

skilled artisans to include ***more components*** on Harris's space-constrained DIMM, for voltages that Harris's DIMM ***already supplies***. The Board also asserted that using "separate converters for $V_{CC}$ and $V_{CCFBD}$" could have "benefits" like power "sequencing" and "eliminating cross-coupling of noise." Appx33. But the Board did not explain why those supposed benefits would motivate skilled artisans to incorporate those separate converters ***onto Harris's DIMM***.

$\underline{V_{TT}}$. Netlist's expert explained that "$V_{TT}$ generally need not even be provided to [the DIMM]"; a technique called "passive termination[ ]" could be used instead. Appx9540. Even if $V_{TT}$ were provided, buck converters would not be used because modern DRAM chips are designed to allow $V_{TT}$ to be supplied using an "LDO," a "much smaller" type of voltage converter. Appx9541. The Board did not deny that evidence, but asserted that "$V_{TT}$ ***can be*** generated onboard" the DIMM using buck converters. Appx36 (emphasis added). The Board did not explain, however, why skilled artisans would been ***motivated*** to do so.

$\underline{V_{DDSPD}}$. Netlist's expert testified that skilled artisans would not have used on-board buck converters for $V_{DDSPD}$, because they would be "very inefficient" when used for that purpose. Appx9543. The Board did not deny that drawback. Instead, the Board asserted it would have been "obvious" to generate $V_{DDSPD}$ using on-board converters. Appx38-40. But the fact that it would have been obvious to skilled

artisans that something ***could*** be done does not mean skilled artisans would have been ***motivated*** to pursue that course. *See Virtek*, 97 F.4th at 886-87.

2.     Even if skilled artisans would have considered providing voltages other than $V_{CC}$ and $V_{DD}$ using on-board converters, space limits would have dissuaded them from that course of action.   Netlist's expert explained that skilled artisans would have been aware that each added circuit on the DIMM would come at the cost of space for additional DRAM chips (thus reducing memory capacity).   *See* Appx9529.   Adding voltage converters on the DIMM, he opined, "would add un-necessary complexity and board area to Harris's design that was already opera-tional." Appx9529-30.   Thus, skilled artisans would have been "***discouraged***" from modifying Harris as the Petition proposed "to arrive at the" claims.   Appx9529-30 (emphasis added).

The Board's response was to concoct its own theory about how additional voltage regulators might fit on Harris's FBDIMM.   It pointed to Harris's disclosure that its ***single*** voltage regulator occupies "one square inch" on the DIMM.  Appx116. Pointing to documentation for an "ADP1821" converter, the Board speculated that skilled artisans could fit ***three converters*** into "40%" of that one-square inch space using ADP1821 converters, leaving "60%" for unspecified associated "circuitry." Appx116.   The Board pointed to no expert testimony or record support for that calculation or its theory that the additional circuitry would still fit.   Nor did the Board

theorize, let alone prove, that skilled artisans could have used ADP1821 converters in the proposed combination with a likelihood of success. Unsupported speculation cannot support its determination. *See TQ Delta*, 942 F.3d at 1360-61. The Board then made matters worse by improperly shifting the burden to the "***Patent Owner***" to "demonstrate" that the space remaining on the chip after adding the ADP1821s would be "insufficient to accommodate" additional required circuitry. Appx116 (emphasis added). As Netlist pointed out, it is the "Petitioner" that must show feasibility and motivation to combine. Appx116; *see In re Magnum Oil Tools Int'l, Ltd*., 829 F.3d 1364, 1380 (Fed. Cir. 2016). The Board's passing reference to Harris's note that the DIMM form factor may be "modified" cannot save its decision either. Appx116. The Board never explained why skilled artisans would be motivated ***to expand*** the size of the DIMM so as to make it incompatible with standard servers.

## III.  THE BOARD'S DETERMINATION THAT THE PRIOR ART TEACHES THE VOLTAGE-MONITORING LIMITATIONS CANNOT BE SUSTAINED

Claim 5 of the '918 patent (and similar claims) requires a "voltage monitor" that "monitor[s] a power input voltage" from the motherboard and "produce[s] a trigger signal" when it detects an overvoltage (when "the power input voltage [has] a voltage amplitude that is greater than a first threshold voltage"). Appx220(38:61-66). Claim 12 (and similar claims) adds the requirement of saving data upon detecting overvoltage: it requires "a ***controller*** configured to receive the trigger signal"

and "respon[d]" by "perform[ing] a **write operation** to . . . non-volatile memory."

Appx221(39:31-36) (emphasis added).

The Board found those limitations obvious by further combining Harris and

the FBDIMM standards with Amidi (Ground 2) or with Amidi and Hajeck (Ground

3). Appx70-89. The Board, however, again failed to provide reasoned analysis of

motivation to combine, and offered speculation to create disclosures the prior art

lacks.

### A.    The Board Erred in Determining That Skilled Artisans Would Have Combined Harris's FBDIMM With Amidi (Grounds 2 and 3)

1.    Skilled artisans are presumed to lack a motivation to combine two

references where the second reference merely teaches how to solve a problem that

the first reference "already" solves. *S.-Tek Sys., LLC v. Engineered Corrosion Sols.,

LLC*, 748 F. App'x 1003, 1007 (Fed. Cir. 2018); *In re Anova Hearing Labs, Inc.*,

809 F. App'x 840, 843 (Fed. Cir. 2020). That is the case here: Skilled artisans

would not have looked to Amidi because it teaches solving a problem—handling

power interruptions—that Harris already solves.

Amidi solves that problem by using a backup battery; it includes a "voltage

supervisory block" to trigger the switch to battery power. Appx9501-02. To address

the absence of claim 5's "voltage monitor" in Harris, the Board found that skilled

artisans would have incorporated Amidi's "battery backup solution," including the

voltage supervisor, into Harris. Appx74. According to the Board, that combination

would provide a "redundant power supply" for Harris's DIMM in the event of a "power disruption." Appx72-74.[6] But Harris ***already teaches*** a solution to power disruption: receiving power from multiple "independent" external power sources, so the DIMM continues to receive power even if one source fails. Appx4675(¶¶14-15); *see* Appx9545. Under *S.-Tek*, 748 F. App'x at 1007, and *Anova*, 809 F. App'x at 843, skilled artisans would not have been motivated to incorporate Amidi's backup battery to address the same problem Harris already solves.

The Board's assertion that Harris's solution, independent external power supplies, is different than Amidi's solution, a battery backup, does not show motivation to combine. Appx74-75. Motivation to combine is missing where a reference "already includes" a feature "that serves [the same] purpose" as would be served by incorporating another reference. *S.-Tek*, 748 F. App'x at 1007. Here, Harris teaches use of independent external power supplies to serve the same function—handling a "power disruption," Appx72—that Amidi's battery backup would serve. The fact that Amidi's battery backup could operate slightly differently does not mean skilled artisans would have been motivated to further modify Harris to solve a problem Harris already solves. The Board's assertion that "memory modules with battery backup were known in the art" is similarly misplaced. Appx75. The existence of

---

[6] The Petition also combined Amidi's entire "battery backup" system with Harris, Appx347-48, limiting the Board to that combination, *see Wasica*, 853 F.3d at 1286.

solutions to a problem does not show that skilled artisans would have turned to those solutions to modify a prior-art reference that does not suffer from that problem (because that reference already solves it). The Board nowhere explained *why* skilled artisans would have turned to battery-backup solutions, like Amidi, given Harris's teaching of multiple independent external power sources. The APA requires that explanation. *See Lee*, 277 F.3d at 1342.

2.    "The Board must [also] weigh the benefits and drawbacks of the modification against each other, to determine whether there would be a motivation to combine." *Arctic Cat Inc. v. Polaris Indus., Inc.*, 795 F. App'x 827, 833 (Fed. Cir. 2019) (citing *Henny Penny*, 938 F.3d at 1331-32); *see Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 & n.8 (Fed. Cir. 2000). Here, the Board identified *no benefits* to incorporating Amidi's backup battery, compared to Harris's pre-existing solution of independent external power supplies. The Board asserted Amidi's battery backup would have been useful "'when the entire system surrounding the memory module loses power,'" Appx75, but Harris's independent external power supplies would also continue to function in the same scenario.

The drawbacks of combining Harris and Amidi, meanwhile, were enormous. As shown below and explained above, the space available for DRAM devices on an FBDIMM, like Harris's, is already at a premium. As Netlist's expert explained, incorporating the claimed voltage-conversion circuitry onto the DIMM would have

59

required additional space on the DIMM, *further reducing* space for DRAM devices. Appx10221; *see* pp. 52-57, *supra*.



Appx10221 (front and back).

Amdi's "battery backup" would occupy even more space. The Board did not deny that Amidi's system would "occup[y] *one side* of [the] FBDIMM board"—making that space unavailable for DRAM devices. Appx75 (emphasis added). The Board waved away that "space issue," however, because "the other side" could still be used for some DRAM devices. Appx75. The Board nowhere explained why skilled artisans would have found the resulting loss of memory capacity tolerable, especially for FBDIMMs, like Harris's, where maximizing capacity is a top priority. Appx9795-96; *see* pp. 52-54, *supra*.

The Board's failure to weigh costs and benefits requires, at the very least, vacatur and remand. *See Henny Penny*, 938 F.3d at 1332; *Nuvasive*, 842 F.3d at

1383.  But given the absence of record evidence of benefits from the combination with Amidi, and the undisputed drawbacks of that combination, this Court can simply reverse.  *See Hodges*, 882 F.3d at 1113.

### B.    Amidi Does Not Disclose a Voltage Monitor That Detects an Overvoltage as Required by Claim 5 (and Similar Claims)

Even if skilled artisans would have incorporated Amidi's battery backup into Harris's FBDIMM, that combination fails to teach claim 5's requirement that the "voltage monitor" "produce a trigger signal in response to the power input voltage" being "*greater* than a first threshold voltage" (overvoltage).  Appx220(38:60-65) (emphasis added); *see* p. 25, *supra* (related claims).  The Board did not deny that Amidi does not expressly mention "overvoltage."  Appx79.  But the Board insisted it would have been "obvious."  Appx79.  According to the Board, Amidi teaches switching to battery power upon detecting a "'power fault,'" which, in the Board's view, "encompass[es] overvoltage."  Appx79.  Amidi, however, equates "power fault" with *undervoltage*.  As explained in Amidi, and as shown in Figure 14, below, Amidi's system triggers a "power fault" only when "the power supply is below a reference voltage."  Appx4697(8:23-30).



Appx4692 (cropped, annotated).

The Board's citationless assertion that "'power fault' is broad enough to encompass overvoltage" is devoid of substantial-evidence support. Appx79. The Board identified no evidence that skilled artisans would have understood "power fault" to encompass overvoltage. No expert testified that Amidi's disclosure of detecting "power faults" encompassed detecting overvoltage. To the contrary, Petitioner's expert conceded that "Amidi" does not "disclose" "switch[ing] to the backup power" upon detecting "overvoltage." Appx9427. The Board's reliance on unsupported speculation about how skilled artisans would understand technical terms in prior-art references, and refusal to confront expert concessions, doom the decision below. *See TQ Delta*, 942 F.3d at 1360; *PPC Broadband, Inc. v. Iancu*, 739 F. App'x 615, 623 (Fed. Cir. 2018).

The Board suggested Harris's disclosure that its voltage regulators have a "tolerance" of "+/-15%" would have motivated skilled artisans to incorporate overvoltage detection in Amidi. Appx79. Netlist's expert testified without contradiction, however, that Harris's "±15%" figure reflected a *wide* tolerance," such that the

"probability that the input voltage would be above the permissible operating range . . . is extremely low . . . [a] one in half a billion chance." Appx9551-52. The Board nowhere addressed that testimony or explained why skilled artisans would have modified Harris to avoid that unlikely probability. The Board's other assertions—that "overvoltage was a [known] danger" and "power surges would have been a problem in at least some circumstances," Appx80—do not address the relevant inquiry either. The Board's failure to "meaningfully address" this issue requires vacatur as well. *VirnetX*, 776 F. App'x at 702-03; *see Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 123-24 (Fed. Cir. 2022).

### C. Amidi Does Not Teach Performing a Write Operation in Response to a Trigger Signal, as Required by Claim 12 (and Similar Claims)

Claim 12 of the '918 patent requires "a controller configured to receive the trigger signal" from the voltage monitor and "respon[d]" by "perform[ing] a ***write operation*** to . . . non-volatile memory." Appx221(39:31-36) (emphasis added); *see* p. 26, *supra* (related claims). Amidi's battery backup (which includes the putative voltage monitor) concededly does not perform a write operation in response to a trigger signal. The Petition therefore invoked the "S3 power-saving mode" disclosed in the FBDIMM standards. Appx82. But that has nothing to do with responding to voltage anomalies. The Board offered virtually no explanation of why skilled artisans would have combined that power-save mode with Harris and Amidi, or how

they would have done so.  The record shows that skilled artisans would not have been motivated to produce the claimed combination.

1.    The Board's analysis of claim 12 (and similar claims) falls far short of the APA's requirement that the board "fully and particularly set out the bases upon which it reaches its decision." *Provisur*, 50 F.4th at 123.  Here, the Board's decision simply summarized Petitioner's arguments, and asserted:

> As Petitioner notes, Amidi provides the teaching of generating the trigger signal ***onboard the memory module*** in response to detecting a "power fault" or "disruption."  Considering the prior art teachings together, we agree with Petitioner that one of ordinary skill in the art would have understood that overvoltage detection and generating the trigger signal onboard the memory module was an option to pursue.  This option would have been both predictable and pursued with a reasonable expectation of success since the prior art combination, Amidi in particular, teaches how it could be implemented.

Appx83 (internal citations omitted).

That was the ***entirety*** of the Board's analysis.  The Board did not mention the relevant limitation (claim 12's "write operation"), the relevant reference (the FBDIMM standards, not Amidi), or the "S3 power-save mode" on which Petitioner relied.  That is insufficient.  The Board's failure to explain why the limitation was obvious requires vacatur.  *Provisur*, 50 F.4th at 123.

2.    Regardless, skilled artisans would not have been motivated to modify the FBDIMM standards' S3 power-save mode as the Petition proposed.  S3 power-save mode "put[s] the []DRAMs in a self-refresh state to preserve data while con-

serving power." Appx349. Upon entering that state, the FBDIMM saves certain information to "non-volatile memory" so it can be "restored" later. Appx342. The Petition urged that skilled artisans would have combined S3 sleep mode with Harris and Amidi's battery backup, so the DIMM would enter S3 mode when it detected an overvoltage. Appx363. According to the Petition, skilled artisans would have been motivated to perform that modification to "conserve power" "in the event of a power disruption." Appx363.

The Board also failed to address the fact that the proposed combination was unworkable, destroying any expectation of success. *See Strathclyde*, 17 F.4th at 160. As Netlist's expert explained, S3 mode is a ***system-wide*** power-saving state. Appx9556-57. It puts the whole computer to sleep, including the CPU, and disables access to memory by shutting off circuits that transfer data between the memory controller and DRAMs. Appx9556-57; Appx1855. Entry into S3 mode thus is orchestrated by the "CPU." Appx9556. It was undisputed that memory ***never*** enters the "S3 state by itself." Appx9557. Indeed, the "computer" could not "properly operate if the memory module were allowed to just enter S3 state by itself," effectively moving data to non-volatile memory and shutting down. Appx9557. But that is what would happen in the Petition's combination. Upon detecting over-voltage, the ***DIMM*** would enter S3 mode, disabling access to the memory unex-pectedly.

Petitioner's expert did not explain how the computer could operate properly under those circumstances.  Nor is any such explanation apparent from the record.  Because Petitioner failed to meet its burden of showing why skilled artisans would have expected success in modifying the prior art as the Petition proposed, this Court should reverse.  *See Hodges*, 882 F.3d at 1113.

### D.    Hajeck Does Not Cure the Deficiencies

To overcome Amidi's failure to disclose detecting overvoltage, Ground 3 of the Petition combined Harris, FBDIMM, and Amidi with Hajeck.  Appx371.  Hajeck teaches a "voltage detection circuit" that protects memory from overvoltage using a "charge pump" and disabling access to the memory by "generating a 'busy' signal."  Appx85-86; *see* p. 17, *supra*.  The Board's unexplained agreement that Hajeck cured any deficiency in Ground 2's combination of Harris, FBDIMM, and Amidi, Appx86-88; Appx164-67, cannot be sustained.

1.    The Board offered no explanation why skilled artisans would have been motivated to combine Hajeck with the other references.  In the '918 patent IPR, the Board summarized the Petition's contentions and agreed with its conclusion without explaining why skilled artisans would be motivated to add Hajeck to Harris, FBDIMM, and Amidi.  Appx86-87.  The Board asserted that ***the Petition*** "relie[d] on Hajeck for its teaching of detecting an overvoltage condition to the extent that the combination of Harris, the FBDIMM standards, and Amidi were deemed not to

already disclose that feature." Appx87. But the need to fill gaps in prior-art disclosures is not a proper motivation to combine. *See KSR*, 550 U.S. at 418. The Board was required "to identify a ***reason*** that would have prompted a person of ordinary skill in the relevant field to combine" the references. *Id.* (emphasis added). The Board made no attempt to do so.

The Board said even less about the corresponding claims of the '054 patent. Appx268-69 (38:65-39:5). The Board simply restated Petitioner's contentions, without even saying it ***agreed***. Appx164-65. The total failure to address motivation-to-combine is fatal. *See Virtek*, 97 F.4th at 886.

2.    There is no basis—other than impermissible "hindsight"—for finding skilled artisans would have combined Hajeck with Harris, FBDIMM, and Amidi to arrive at the claimed invention. *Graham*, 383 U.S. at 36. This Court has made clear that the Board may not "use the claimed invention as [a] . . . 'template' to piece together the teachings of the prior art," "pick[ing] and choos[ing] from any one reference only so much of it as will support a given position." *In re Hedges*, 783 F.2d 1038, 1041 (Fed. Cir. 1986); *see In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992). Here, the Board's analysis was transparently hindsight driven.

The Board posited that skilled artisans would have added ***both*** Amidi and Hajeck to the combination of Harris and the FBDIMM standards to address power disruption problems. Appx78-80; Appx357. Hajeck, however, teaches a ***complete***

solution to that problem, which accounts for both overvoltage and undervoltage. When Hajeck detects either situation, it uses a "charge pump" to maintain the voltage and protect stored data. Appx6056 (abstract); Appx6060 (3:30-40). It then "assert[s] a busy signal to block" further "write operations" to prevent data corruption. Appx6056 (abstract); Appx6060 (3:30-40). Amidi, by contrast, solves only half the problem; it addresses only undervoltage. *See* pp. 62-64, *supra*.

Insofar as skilled artisans would have been motivated by the need to handle power disruptions, as the Board supposed, they would have no reason to combine Hajeck's **complete** solution, which addresses both overvoltage and undervoltage, with Amidi's **half** solution, which addresses undervoltage only. But Hajeck alone undisputedly does not teach claim 5's "trigger signal"—only Amidi allegedly does. Appx356.

To find the limitations in claims 5 and 12 obvious, the Board posited that skilled artisans would have plucked a single feature out of Harris, detecting overvoltage, while ignoring the rest of its solution: the charge pump and blocking write operations. Appx87. Then, the Board reasoned, skilled artisans would have taken that feature and inserted it into Amidi's battery-backup system. Appx87. But the Board reached that conclusion only with the benefit of its 20/20 hindsight. The **record** is devoid of any reason why skilled artisans **at the time of the invention** would have done that. For example, there was no suggestion that skilled artisans

would have found Amidi's battery backup preferable to Hajeck's charge pump and blocking of write operations. It is difficult to imagine a clearer example of the Board impermissibly "select[ing] bits and pieces" of a reference—using the invention as a template—to arrive at the claims. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1577-78 (Fed. Cir. 1987); *see Hedges*, 783 F.2d at 1041. Reversal is required.

## IV. THE BOARD'S UNREASONED ANALYSIS OF OTHER CLAIMS AND LIMITATIONS REQUIRES REMAND

The Board's decision must be vacated because the Board failed to address all arguments and fully explain its determinations for each limitation of each claim. For example, limitation 1[h] requires a "circuit" on the module that "receive[s] a first plurality of address and control signals" via "edge connections." Appx220(38:41-47). Claims 8 and 14, which depend on claim 1, require storing "the first plurality of address and control signals" in "registers," and "output[ting]" them to "[ ]DRAM[s]." Appx221(39:9-19, 39:40-45). Netlist argued that Harris does not teach those limitations because the putative "circuit" (Harris's AMB) transmits ***different signals*** to the DRAM devices than what it receives. Appx686-689; Appx877-881; Appx905; Appx9525-26. The Board did not deny that, Appx55-56, but maintained claims 8 and 14 were obvious, Appx64-66. It did not address the claims' requirements that the "first plurality" of signals—the same plurality—is both "receive[d]" by the "circuit" and "output[ted]" to DRAMs. Instead, it simply referred back to its analysis of claim 1, which lacks those requirements.

69

The Board also repeatedly found limitations and claims obvious by reciting Petitioner's "contentions" and asserting Netlist "does not dispute" them.  *E.g.*, Appx42, Appx59-64, Appx70, Appx84; Appx142, Appx152, Appx158-59, Appx161-62; *see* pp. 23-24, 26, 65, 67-68, *supra*.  But *Icon Health* requires the Board to fully explain its decisions even as to claims and limitations the patentee "d[id] not challenge."  849 F.3d at 1047.

## **CONCLUSION**

The Board's decisions should be reversed, or at least vacated and remanded.

November 4, 2024

Philip J. Warrick
IRELL & MANELLA LLP
750 17th Street, N.W., Suite 850
Washington, D.C. 20006
(202) 777-6512
pwarrick@irell.com

Jason Sheasby
H. Annita Zhong
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

Jonathan M. Lindsay
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
(949) 760-5220

Respectfully submitted,

/s/ Jeffrey A. Lamken

Jeffrey A. Lamken
Rayiner Hashem
Jennifer Elizabeth Fischell
Lidiya Mishchenko
Kayvon Ghayoumi
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000
jlamken@mololamken.com

Elizabeth Kathleen Clarke
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
(312) 450-6700

Sara Margolis
Catherine Martinez
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022
(212) 607-8160

*Counsel for Appellant Netlist, Inc.*

**ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

Page

Final Written Decision in IPR2022-00996 (Dec. 6, 2023)
(U.S. Patent No. 11,016,918) (Paper 49).....................................................Appx1

Final Written Decision in IPR2022-00999 (Dec. 5, 2023)
(U.S. Patent No. 11,232,054) (Paper 51)....................................................Appx92

Decision Denying Rehearing (Mar. 18, 2024)
(IPR2022-00996 Paper 53, IPR2022-00999 Paper 56) ...........................Appx172

U.S. Patent No. 11,016,918..........................................................................Appx175

U.S. Patent No. 11,232,054..........................................................................Appx223

Trials@uspto.gov                                              Paper 49
571-272-7822                                        Entered: December 6, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

SAMSUNG ELECTRONICS CO., LTD., MICRON TECHNOLOGY, INC.,
MICRON SEMICONDUCTOR PRODUCTS, INC., and MICRON
TECHNOLOGY TEXAS LLC,[1]
Petitioner,

v.

NETLIST, INC.,
Patent Owner.

———————————

IPR2022-00996
Patent 11,016,918 B2

———————————

Before PATRICK M. BOUCHER, JON M. JURGOVAN, and
DANIEL J. GALLIGAN, *Administrative Patent Judges.*

JURGOVAN, *Administrative Patent Judge.*

DECISION
Final Written Decision
Determining All Challenged Claims Unpatentable
Dismissing Petitioner's Motion to Exclude
*35 U.S.C. § 318(a)*

———————————

[1] Micron Technology, Inc., Micron Semiconductor Products, Inc., and
Micron Technology Texas LLC filed a motion for joinder and a petition in
IPR2023-00406 and have been joined as petitioners in this proceeding. *See*
Paper 26.

IPR2022-00996
Patent 11,016,918 B2

## I.    INTRODUCTION

Samsung Electronics Co., Ltd. ("Samsung") filed a Petition (Paper 1, "Pet.") for *inter partes* review of claims 1–30 ("challenged claims") of U.S. Patent 11,016,918 B2 (Ex. 1001, "the '918 patent"). Netlist, Inc. ("Patent Owner") filed a Preliminary Response (Paper 7, "Prelim. Resp.") to the Petition. We instituted *inter partes* review under 35 U.S.C. § 314(a). Paper 10 ("Inst. Dec.").

During the trial, Patent Owner filed a Response (Paper 21, "Resp."), Petitioner filed a Reply (Paper 25), and Patent Owner filed a Sur-Reply (Paper 31). We joined Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC as petitioners in this proceeding, and we refer to Samsung and these entities collectively as "Petitioner." *See* Paper 26.

Petitioner and Patent Owner requested oral argument (Papers 28 and 29). A hearing was conducted on September 11, 2023. Paper 47 ("Tr.").

Petitioner objected to evidence (Paper 32) and filed a Motion to Exclude (Paper 33). Patent Owner filed an Opposition to Petitioner's Motion to Exclude (Paper 34), and Petitioner filed a Reply (Paper 37) in support of its Motion to Exclude.

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a). Having reviewed the complete trial record, we determine that Petitioner has shown, by a preponderance of the evidence, that the challenged claims are unpatentable.

IPR2022-00996
Patent 11,016,918 B2

## II.   BACKGROUND

### A.   *Real Parties in Interest*

The identified real parties in interest on the Petitioner side are the following entities: Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC. Pet. 1; IPR2023-00406, Paper 3, 1.

Patent Owner identifies itself as the sole real party in interest. Paper 4, 1.

### B.   *Related Matters*

The parties advise that the '918 patent is related to the following pending matters:

- *Samsung Electronics Co., Ltd. et al. v Netlist, Inc.,* No. 1:21-cv-01453 (D. Del. filed Oct. 15, 2021)

- *Netlist, Inc. v. Samsung Electronics Co., Ltd. et al.*, No. 2:21-cv-00463 (E.D. Tex. filed Dec. 20, 2021)

- *Netlist, Inc. v. Micron Technology, Inc.*, No. 2:22-cv-00203 (E.D. Tex. filed June 13, 2022)

- IPR2012-00999 (U.S. Patent No. 11,232,054)

- U.S. Patent Application No. 17/582,797

Pet. 1; Paper 4, 1; Paper 9, 2; Paper 12, 1.

The parties advise that the following related proceeding is no longer pending:

- IPR2017-00692 (U.S. Patent No. 8,874,831)

Pet. 1; Paper 4, 1.

IPR2022-00996
Patent 11,016,918 B2

### C.    *Overview of the '918 Patent (Ex. 1001)*

The '918 patent is titled "Flash-DRAM Hybrid Memory Module."
Ex. 1001, code (54). Figure 12 of the '918 patent is reproduced below.



FIG. 12

Figure 12 shows an example memory system 1010 of the '918 patent.
*Id.* at 21:14–16. The memory system 1010 includes a volatile memory
subsystem 1030, a non-volatile memory subsystem 1040, and a controller
1062 operatively coupled to the volatile memory subsystem 1030 and
selectively coupled to the non-volatile memory subsystem 1040. *Id.* at
21:16–22. Volatile memory 1030 may comprise elements 1032 of two or
more dynamic random access memory (DRAM) elements such as double
data rate (DDR), DDR2, DDR3, and synchronous DRAM (SDRAM). *Id.* at
22:16–19. Non-volatile memory 1040 may comprise elements 1042 of flash
memory elements such as NOR, NAND, ONE-NAND flash and multi-level

cell (MLC). *Id.* at 22:35–40. Memory system 1010 may comprise a
memory module or printed circuit board (PCB) 1020. *Id.* at 21:24–26.
Memory system 1010 has an interface 1022 for power voltage, data, address,
and control signal transfer between memory system 1010 and a host system.
*Id.* at 22:3–6.

Controller 1062 may include microcontroller unit 1060 and FPGA
logic 1070, either as separate devices or integrated together. *Id.* at 24:35–37,
23:19–22, Fig. 14. Microcontroller 1060 may transfer data between the
volatile memory 1030 and non-volatile memory 1040. *Id.* at 24:35–41.
Logic element 1070 provides signal level translation and address translation
between the volatile memory and the non-volatile memory. *Id.* at 24:45–56.

When the system is operating normally, controller 1062 controls
switch 1052 to decouple the volatile memory 1030 from controller 1062 and
the non-volatile memory 1040 (the '918 patent refers to this as the "first
state."). *Id.* at 24:60–25:7. In response to a power interruption, for example,
controller 1062 controls switch 1052 to couple the volatile memory 1030 to
itself and non-volatile memory 1040, and transfers data from the volatile
memory to the non-volatile memory to prevent its loss (the '918 patent
refers to this as the "second state"). *Id.* at 25:9–20.

Memory system 1010 may comprise a voltage monitor 1050 to
monitor voltage supplied from the host system via interface 1022. *Id.* at
25:8–10. When the voltage monitor 1050 detects a low voltage condition,
the voltage monitor transmits a signal to the controller 1062 to indicate the
detected condition. *Id.* at 25:11–15.

Power may be supplied from a first power supply (e.g., a system
power supply) when the memory system 1010 is in the first state and from a

IPR2022-00996
Patent 11,016,918 B2

second power supply 1080 when the memory system 1010 is in the second state. *Id.* at 25:54–58. Second power supply 1080 may comprise step-up transformer 1082, step-down transformer 1084, and capacitor bank 1086 with one or more capacitors. *Id.* at 26:3–13.

The memory system 1010 further has a third state in which controller 1062 is decoupled from the volatile memory system 1030 and power is supplied to the volatile memory subsystem 1030 from a third power supply (not shown). *Id.* at 25:62–69. "[T]he third power supply may provide power to the volatile memory subsystem 1030 when the memory system 1010 detects that a trigger condition is likely to occur but has not yet occurred." *Id.* at 25:66–26:3.

Figure 16 of the '918 patent is reproduced below.



FIG. 16

Figure 16 shows power module 1100 of memory system 1010. *Id.* at 27:59–61. Power module 1100 comprises conversion element 1120, first power element 1130, and second power element 1140. *Id.* at 28:7–15,

28:20–22. Conversion element 1120 comprises sub-blocks 1122, 1124, 1126 comprised of various converter circuits such as buck converters, boost converters, and buck-boost converters for providing various voltages 1102, 1104, 1105, 1107 from the outputs of the first and second power elements 1130, 1140. *Id.* at 29:18–54. The first power element 1130 may comprise a pulse-width modulation power controller generating voltage 1110 from voltages 1106, 1108. *Id.* at 28:13–15. Second power element 1140 may comprise capacitor array 1142, buck-boost converter 1144 receiving voltages 1106, 1108 and adjusting the voltage for charging the capacitor array, and voltage/current limiter 1146, which limits charge current to the capacitor array and stops charging the capacitor array 1142 when it reaches a certain charge voltage. *Id.* at 28:62–67. "[P]ower module 1100 provides power to [ ] components of the memory system 1010 using different elements based on a state of the memory system 1010 in relation to a trigger condition." *Id.* at 27:61–65.

Specifically, "[i]n a first state, the first voltage 1102 is provided to the memory system 1010 from the input 1106 and the fourth voltage 1110 is provided to the conversion element 1120 from the first power element 1130." *Id.* at 28:27–31. "In a second state, the fourth voltage 1110 is provided to the conversion element 1120 from the first power element 1130 and the first voltage 1102 is provided to the memory system 1010 from the conversion element 1120." *Id.* at 28:32–37. "In the third state, the fifth voltage 1112 is provided to the conversion element 1120 from the second power element 1140 and the first voltage 1104 is provided to the memory system 1010 from the conversion element 1120." *Id.* at 28:34–38. Transition from the first state to the second state may occur when power

module 1100 detects a power failure is about to occur, and transition from the second state to the third state may occur when it detects a power failure has occurred. *Id.* at 28:39–47.

D.    *Illustrative Claim*

Of the challenged claims, claims 1, 16, and 23 are independent. Independent claim 1, reproduced below with brackets noting Petitioner's identifiers, is illustrative of the claimed subject matter.

1. [1.a] A memory module comprising:

[1.b] a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system;

[1.c] a first buck converter configured to provide a first regulated voltage having a first voltage amplitude;

[1.d] a second buck converter configured to provide a second regulated voltage having a second voltage amplitude;

[1.e] a third buck converter configured to provide a third regulated voltage having a third voltage amplitude;

[1.f] a converter circuit configured to provide a fourth regulated voltage having a fourth voltage amplitude; and

[1.g] a plurality of components coupled to the PCB, each component of the plurality of components coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, the plurality of components comprising:

[1.h] a plurality of synchronous dynamic random access memory (SDRAM) devices coupled to the first regulated voltage, and

[1.i] [1.i.1] at least one circuit coupled between a first portion of the plurality of edge connections and the plurality of SDRAM devices, [1.i.2] the at least one circuit operable to (i) receive a first plurality of address and control signals via the first portion of the plurality of edge connections, and (ii) output a second plurality of address and control signals to the plurality of SDRAM devices, [1.i.3] the at least one circuit coupled to both

the second regulated voltage and the fourth regulated voltage, [1.i.4] wherein a first one of the second and fourth voltage amplitudes is less than a second one of the second and fourth voltage amplitudes.

Ex. 1001, 38:19–44.

### E.    Evidence

Petitioner relies on the following references (*see* Pet. 3, 10–14), as well as the Declaration of Dr. Andrew Wolfe (Ex. 1003).

| Reference | Exhibit No. | Patent/Printed Publication |
|---|---|---|
| Harris | 1023 | U.S. Patent Pub. No. 2006/0174140 A1 to Harris, published August 3, 2006 |
| Amidi | 1024 | U.S. Patent No. 7,724,604 B2, issued May 25, 2010 |
| Spiers | 1025 | U.S. Patent Pub. No. 2006/0080515 A1, published April 13, 2006 |
| FBDIMM Standards | 1027, 1028 | JESD82-20 and JESD205 standards published March 2007 |
| Hajeck | 1038 | U.S. Patent No. 6,856,556 B1 to Hajeck, issued February 15, 2005 |

### F.    Prior Art and Asserted Grounds

Petitioner asserts that claims 1–30 are unpatentable on the following Grounds (Pet. 3):

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–3, 8, 14, 15, 23 | 103(a) | Harris, FBDIMM Standards |
| 1–30 | 103(a) | Harris, FBDIMM Standards, Amidi |
| 1–30 | 103(a) | Harris, FBDIMM Standards, Amidi, Hajeck |
| 1–30 | 103(a) | Spiers, Amidi |
| 1–30 | 103(a) | Spiers, Amidi, Hajeck |

## III. ANALYSIS OF CHALLENGED GROUNDS

We now consider Petitioner's asserted grounds of unpatentability and Patent Owner's arguments to determine whether Petitioner has demonstrated by a preponderance of the evidence that the challenged claims would have been obvious under 35 U.S.C. § 103. *See* 35 U.S.C. § 316(e) (petitioner has the burden of proving unpatentability by a preponderance of the evidence).

### A.   *Principles of Law*

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

A patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. An obviousness determination based on the teachings of multiple references requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016) (citation

omitted); *see also KSR*, 550 U.S. at 418.  Further, an assertion of obviousness "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418; *In re NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (a finding of a motivation to combine "must be supported by a 'reasoned explanation'").

> B.    *Level of Ordinary Skill in the Art*

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.* at 696–697.  The prior art may reflect an appropriate level of skill. *Okajima v. Bourdeau*, 261 F.3d 1350, 1354–55 (Fed. Cir. 2001).

Petitioner asserts a person of ordinary skill in the art "would have had an advanced degree in electrical or computer engineering, or a related field, and two years working or studying in the field of design or development of memory systems, or a bachelor's degree in such engineering disciplines and at least three years working in the field."  Pet. 8–9 (citing Ex. 1003 ¶ 67). Petitioner contends that additional training can substitute for educational or research experience, and vice versa. *Id.* at 8.  Petitioner asserts that such a hypothetical person would have been familiar with the JEDEC industry

IPR2022-00996
Patent 11,016,918 B2

standards, and knowledgeable about the design and operation of standardized DRAM and SDRAM memory devices and memory modules and how they interacted with a memory controller and other parts of a computer system, including standard communication busses and protocols, such as PCI and SMBus busses and protocols. *Id.* at 8–9. Petitioner further contends that such "a hypothetical person would also have been familiar with the structure and operation of circuitry used to access and control computer memories, including sophisticated circuits such as ASICs, FPGAs, and CPLDs, and more low-level circuits such as tri-state buffers." *Id.* at 9. Petitioner further asserts that such "a hypothetical person would further have been familiar with voltage supply requirements of such structures (e.g., memory modules, memory devices, memory controller, and associated access and control circuitry), including voltage conversion and voltage regulation circuitry." *Id.*

Patent Owner indicates "[f]or the purposes of this [Response], Patent Owner is applying the level of ordinary skill in the art proposed by Petitioner" for this proceeding. Resp. 1.

The evidence that Petitioner presents mostly applies to the educational level and experience of workers in the field, but also touches upon other factors as well, including problems and solutions in the prior art and complexity of the technology. *See* Pet. 7–8. We find Petitioner's proposal is consistent with the level of ordinary skill in the art reflected by the '918 patent and the prior art of record, and, therefore, we adopt Petitioner's proposed level of ordinary skill in the art, with the exception of the open-ended language "at least" which introduces ambiguity and may encompass skill levels beyond ordinary. *See Okajima v. Bourdeau*, 261 F.3d 1350,

IPR2022-00996
Patent 11,016,918 B2

1355 (Fed. Cir. 2001) (the prior art may reflect an appropriate level of skill in the art).

    C.    *Claim Construction*

We construe claim terms "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2021). There is a presumption that claim terms are given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art in the context of the specification. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Nonetheless, if the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess[,] . . . the inventor's lexicography governs.*" Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing Phillips, 415 F.3d at 1312–17). Only disputed claim terms must be construed, and then only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

    1.    *"Memory Module"*

Patent Owner contends as follows:

> The term "memory module" appears in the preamble of the independent claims, which provides antecedent basis for the same term in the body of the text. The preamble is thus limiting

IPR2022-00996
Patent 11,016,918 B2

> as the District Court found after reviewing the specification in
> detail. The Court further explained that "a skilled artisan would
> understand a 'memory module' is distinct from, and has essential
> structural requirements not necessarily found in, other modular
> computer accessories. That includes the structure necessary to
> connect to a memory controller.

Resp. 1–2 (citing Ex. 2032, 28; Ex. 2034, 319). Patent Owner argues that the

"court's ruling is consistent with the specification which states in the

Overview section that the invention is particularly 'couplable to a *memory*

*controller* of a host system.'" *Id.* at 2 (citing Ex. 1001, 1:66–67, 3:66–67).

Patent Owner states that Petitioner "objected to the court's finding that the

memory module is limiting, but does not dispute the Court'[s] finding on

what a 'memory module' means to a [person of ordinary skill in the art]."

*Id.* (citing Ex. 2033, 4).

      As support for its argument, Patent Owner relies on a claim

construction order issued by the District Court for the Eastern District of

Texas, which states as follows:

> Having reviewed the entire patent "to gain an
> understanding of what the inventors actually invented and
> intended to encompass by the claim[s]," *Catalina Mktg. Int'l*, 289
> F.3d at 808–09, the Court finds the preamble limiting. While the
> claims recite many of the structural requirements of a "memory
> module," the claims arguably read on other modular computer
> devices, such as a video card or network controller, despite no
> evidence the inventors intended to encompass such devices by
> the claims. To the contrary, as the Overview section [of the
> Court's claim construction order] explains, the invention "is
> couplable *to a memory controller* of a host system," [Ex. 1001]
> at 3:66–67 (emphasis added), not just the host system as recited
> in the claims. *See also id.* at 1:66–67 ("[t]he present disclosure
> relates generally to computer memory devices"). Thus, a skilled
> artisan would understand a "memory module" is distinct from,

and has essential structural requirements not necessarily found in, other modular computer accessories. That includes the structure necessary to connect to a memory controller. *See Memory Systems: Cache, DRAM, Disk*, Dkt. No. 76-17 at 319 (depicting, in FIG. 7.6, a memory controller connected to two memory modules). Accordingly, the preambles are limiting.

Ex. 2032, 28) (alterations in original), *cited in* Resp. 2.

Patent Owner argues that Petitioner's expert, Dr. Wolfe, testified that the term "memory modules" typically refers to "main memory modules," which "are *designed to connect to the primary memory controller* for the purpose of holding general purpose code and data in a computer system." *Id.* at 2 (citing Ex. 2030, 123:14–25; Ex. 2056, 100:15–101:8 (by 2004–2005, a memory module "was intended to go into a dedicated memory slot and not a general-purpose IO slot")). Patent Owner contends that the '918 patent's usage of "memory module" is consistent with that understanding, and asserts that we should adopt the District Court's claim construction, including that the claimed "memory module" includes structures necessary to connect to a memory controller. *Id.* at 2–3 (citing Ex. 2031 ¶¶ 51–53); *accord* Sur-Reply 1.

In Reply, Petitioner contends that we properly found that Harris, the FBDIMM Standards, Amidi, and Spiers all disclose a "memory module" in our Institution Decision. Reply 1–2 (citing Inst. Dec. 14–15, 17–18, 34–37, 45; Pet. 19–20, 82–83; Reply 23–26). Petitioner contends that the District Court's construction did not limit "memory module" to only "***main*** memory modules . . . designed to connect to the ***primary*** memory controller." *Id.* at 1–2 (emphasis in original) (citing Resp. 2; Ex. 2032, 26–28, 35; Ex. 2030, 125:12–127:13; Ex. 2056, 100:15–101:19).

IPR2022-00996
Patent 11,016,918 B2

In Sur-Reply, Patent Owner disagrees with Petitioner's contention that "memory module" is not limited to "***main memory*** modules . . . designed to connect to the primary memory controller." Sur-Reply 1 (emphasis in original) (citing Reply 1). Patent Owner argues that Petitioner's contention "ignores the District Court's finding based on intrinsic evidence—which [Petitioner] did not object to—that the 'invention [i.e., the claimed memory module] 'is couplable *to a memory controller* of a host system,' [Ex. 1001] at 3:66–67 …, not just the host system as recited in the claims.'" *Id.* (citing Ex. 2032, 28; Ex. 1001, 4:5–12, 4:14–24, 4:35–39, 4:45–51, 5:4–20, 4:36–50, 6:4–6, 6:25–29, 6:61–66, 7:1–4, 7:21–25, 7:29–34, 7:43–49, 7:54–57, 21:24–25, 22:53–58, 23:19–22, 26:43–51, 23:41–44).

The District Court's Claim Construction Order (Ex. 2032) issued after our Institution Decision (Paper 10). Although Petitioner argued in the District Court litigation that the claim preambles were not limiting, Petitioner does not appear to maintain that argument here following the District Court's determination that the preambles were limiting. Ex. 2032, 28. Since the term is recited in both the preambles and bodies of these claims, there is evidence that the inventors of the '918 patent intended the term to limit the claim, as the District Court determined. *See Catalina Mktg. Int'l., Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citing *Bell Commc'ns Rsch., Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995) ("dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention.")).

IPR2022-00996
Patent 11,016,918 B2

We agree with Petitioner's contention that "memory module" is not limited to "*main* memory modules . . . designed to connect to the *primary* memory controller." Reply 1. The '918 patent states

> **In certain embodiments**, the device contains a high density Flash memory with a low density DRAM, wherein the DRAM is used as a data buffer for read/write operation. The Flash serves as the **main memory**.

Ex. 1001, 11:3–6 (emphases added). This is the only mention of "main memory" in the '918 patent. That the Flash memory serves as "main memory" in "certain embodiments" implies that there may be other embodiments in which this is not the case. Accordingly, we agree with Petitioner that the term "memory module" is not limited to "*main* memory modules . . . designed to connect to the *primary* memory controller." *See* Reply 1.

We agree with Patent Owner that the "memory module" includes structure to connect with a "host system" including its memory controller. *See, e.g.*, Ex. 1001, code (57), 12:52–59. The claims do not mention a "memory controller" but they do mention that the "memory module" has an "interface" to connect with a "host system." Ex. 1001, 38:19–24 (claim 1), 39:54–59 (claim 16), 40:51–56 (claim 23). That the "memory module" has structure for connecting to the host system's memory controller may thus be implied from the claims.

We agree with Petitioner that the District Court's determination was that the preambles of all claims of the '918 patent are limiting. Ex. 2032, 35. To the extent that the District Court's determination construed "memory module" to include structure necessary to connect to a memory controller, our construction of "memory module" is consistent.

17

### 2.    *"Pre-Regulated Input Voltage"*

Claims 16–22 recite a "pre-regulated input voltage." Ex. 1001, 39:61, 42:23. Petitioner identifies at least two meanings for this claim term, one meaning within pre-determined limits and the other meaning the voltage must be pre-regulated on the memory board itself. Pet. 73. Petitioner contends that the District Court construed "pre-regulated input voltage" to have its plain and ordinary meaning, and rejected Samsung's argument that the voltage must be pre-regulated on the memory module. Reply 20, n.3 (citing Ex. 2032, 21–22, 34; Inst. Dec. 37–38; Ex. 2030, 268:18–270:5). Petitioner contends that Patent Owner's expert does not dispute the District Court's construction. *Id.* (citing Ex. 1075, 142:10–144:18). According to Petitioner, both experts agree that the V12V input to Harris can be pre-regulated under that construction. Reply 20 (citing *id.* at 5, n.2).

Patent Owner argues that a "pre-regulated input voltage is just a regulated voltage provided to these voltage conversion circuits." Resp. 38.

Under its ordinary and plain meaning in the context of the '918 patent, we understand "pre-regulated input voltage" to mean that the voltage is regulated before conversion to a stepped up or down level by the voltage converters. *See* Ex. 1001, code (57), 28:53–58, Fig. 16 (1110, 1112). This is consistent with Patent Owner's proposed construction.

### D.    *Ground 1: Obviousness Over Harris and FBDIMM Standards*

Petitioner contends claims 1–3, 8, 14, 15, and 23 would have been obvious over the combination of Harris and FBDIMM Standards and relies on the Declaration of Dr. Andrew Wolfe (Ex. 1003) in support. Pet. 14–51. For the reasons that follow, we are persuaded that the evidence, including

IPR2022-00996
Patent 11,016,918 B2

Dr. Wolfe's testimony, supports Petitioner's showing and establishes by a preponderance of the evidence that these claims are unpatentable.

> 1.   *Harris (Ex. 1023)*

Harris is titled "Voltage Distribution System and Method for a Memory Assembly." Ex. 1023, code (54). Harris was published as U.S. Patent Pub. No. 2006/0174140 A1 on August 3, 2006. Petitioner contends Harris is prior art under § 102(a). Pet. 10.

Harris's Figure 1A is reproduced below.



*FIG. 1A*

As shown in Figure 1A, Harris discloses a memory module 100A including on-board regulator 102 for converting an externally supplied voltage 104 to appropriate local voltage levels 106 ($V_{cc}$), 108 ($V_{dd}$), such as 0.5V to 3.5V. Ex. 1023, code (57), ¶¶ 9–10. Voltage 106 is supplied to buffer/logic component 112 which may be connected to a memory controller via interface 114 and daisy-chained with other memory assemblies via interface

19

IPR2022-00996
Patent 11,016,918 B2

116. *Id.* ¶ 9. Voltage 108 powers memory devices 110-1 to 110-N. *Id.* The memory module 100A may be a Dual In-Line Memory Modules (DIMM) wherein each of the memory devices 100-1 to 100-N comprises a Double Data Rate (DDR), DDR2, or DDR3 device. *Id.* The memory module 100A may be an unbuffered, registered or fully buffered DIMM. *Id.*

> 2. *FBDIMM Standards (Exs. 1027, 1028)*

In March 2007, the Joint Electron Device Engineering Council (JEDEC) published standards for Fully Buffered DIMM (FBDIMM) memory modules titled "JESD82-20" (Ex. 1027) and "JESD205" (Ex. 1028). Ex. 1029; Ex. 1003 ¶¶ 134–136. Petitioner refers to these standards collectively as the "FBDIMM Standards." Pet. 11. Petitioner contends the FBDIMM Standards are prior art under § 102(a). *Id.*

The FBDIMM Standards specify voltages for components on the memory module as follows:

IPR2022-00996
Patent 11,016,918 B2

**Product Family Attributes**

| | | | | |
|---|---|---|---|---|
| DIMM organization | x72 ECC | | | |
| DIMM dimensions (nominal) | 30.35mm (height) x 133.35mm (width) x 8.2 mm (max  thickness)  MO-256 variation AB  30.35mm (height) x 133.35mm (width) x 8.8 mm (max  thickness)  MO-256 variation BB | | | |
| Pin count | 240 | | | |
| SDRAMs supported | 256Mb, 512Mb, 1Gb, 2Gb, 4Gb | | | |
| Capacity | 256MB, 512MB, 1GB, 2GB, 4GB, 8GB, 16GB | | | |
| Serial PD | Consistent with JC 45 | | | |
| Supply voltages (nominal) | min | typ | max | |
| | 1.7 | 1.8 | 1.9 | (DRAM $V_{DD}/V_{DDQ}$, AMB $V_{DDQ}$) |
| | $1.455^1$ | 1.5 | $1.575^1$ | (AMB $V_{CC}/V_{CCFBD}$) |
| | $0.453^*V_{DD}$ | $0.5^*V_{DD}$ | $0.547^*V_{DD}$ | (DRAM Interface $V_{TT}$)  This supply should track as 0.5 * 1.8 volt supply |
| | 3.0 | 3.3 | 3.6 | ($V_{DDSPD}$) |
| Buffer Interface | High-speed Differential Point-to-point Link at 1.5 volt | | | |
| DRAM Interface | SSTL_18 | | | |

Note 1: Approximate DC values, refer to AMB Component Specification for actual DC and AC values and conditions.
Note 2: Vtt range accomodates measurable offset due to complementary CA bus current paths. (See Vtt section)
        An Unloaded system should supply Vtt of 0.48*Vdd/0.52*Vdd to Dimm socket

Ex. 1028, 9.  The above table shows values for supply voltages including DRAM $V_{DD}$, AMB $V_{CC}$, DRAM interface $V_{TT}$, and $V_{DDSPD}$.  The FBDIMMM Standards further specify the following voltages for various power supplies:

IPR2022-00996
Patent 11,016,918 B2

**Table 9.2 — Pin Description (Sheet 3 of 3)**

| Signal | Type | Description |
|---|---|---|
| RESET | | Power Good Reset |
| **Miscellaneous Test** | | |
| TEST (4 pins) | NC | Pin for debug and test. Must be floated on DIMM. |
| TESTLO (5 pins) | A | Pin for debug and test. Must be tied to Ground on DIMM |
| TESTLO_AB20 | A | Pin for debug and test. Connected to two resistors. One resistor is connected to VCCFBD, the other resistor is connected to VSS. |
| TESTLO_AC20 | A | Pin for debug and test. Connected to two resistors. One resistor is connected to VCCFBD, the other resistor is connected to VSS. |
| **Power Supplies** | | |
| VCC (24 pins) | A | 1.5V nominal supply for core IO |
| VCCFBD (8 pins) | A | 1.5V nominal supply for FBD high speed IO |
| VDD (24 pins) | A | 1.8V nominal supply for DDR IO |
| VSS (156 pins) | A | Ground |
| VDDSPD | A | 3.3V nominal supply for SMB receivers and ESD diodes |
| **Other Pins** | | |
| BFUNC | I | **Buffer Function Bit:** When BFUNC = 0, AMB is used as a regular buffer on FB-DIMM. When BFUNC = 1, AMB is used as either a repeater or a buffer for LAI function. On FB-DIMM, BFUNC is tied to Ground |
| RFU (18 pins) | NC | **Reserved for Future Use.** Must be floated on DIMM. RFU pins denoted by "a" are reserved for forwarded clocks in future AMB implementations. |
| **Other No Connect Pins** | | |
| NC (129 pins) | NC | No Connect pins |

Ex. 1027, 83. The table above sets voltage levels for power supplies $V_{CC}$, $V_{CCFBD}$, $V_{DD}$, $V_{SS}$, and $V_{DDSPD}$.

### 3.    *Motivation to Combine*

Petitioner contends that a person of ordinary skill in the art would have been motivated to combine Harris with the FBDIMM Standards with a reasonable expectation of success because Harris states that its Figure 1A may be a "fully buffered DIMM" (FBDIMM or FBD). Pet. 16 (citing Ex. 1023 ¶¶ 9–13; Ex. 1003 ¶¶ 158–165). Petitioner contends that a person of ordinary skill in the art would have understood that this type of DIMM is standardized in JEDEC's FBDIMM Standards and thus would naturally look to them for more details about the "fully buffered DIMM" that Harris

22

IPR2022-00996
Patent 11,016,918 B2

describes as compatible with his on-board voltage regulator module (VRM). *Id.*

To explain its combination, Petitioner provides the following table:

| Voltage Mappings (Grounds 1-3) | | |
|---|---|---|
| | **A** | **B** | **C** |
| "*first*": | $V_{DD}$ or $V_{DDQ}$ = 1.8V | $V_{DD}$, $V_{DDQ}$, or $V_{DDL}$ = 1.8V | $V_{DD}$, $V_{DDQ}$, or $V_{DDL}$ = 1.8V |
| "*second*": | $V_{CC}$ or $V_{CCFBD}$ = 1.5V | $V_{CC}$=1.5V | $V_{CC}$ or $V_{CCFBD}$ = 1.5V |
| "*third*": | $V_{DDL}$=1.8V | $V_{CCFBD}$=1.5V | $V_{TT}$=0.9V |
| "*fourth*": | $V_{DDSPD}$=3.3V | $V_{DDSPD}$=3.3V | $V_{DDSPD}$=3.3V |

Pet. 27. The table above shows Petitioner's Voltage Mappings A, B, and C from the FBDIMM Standards for Grounds 1–3, and how they disclose the "first," "second," "third," and "fourth regulated voltages" in the claims. *Id.*

For Ground 1, Petitioner provides the illustration below:



Pet. 15. This illustration shows how Petitioner is combining the teachings of Harris and the FBDIMM Standards to arrive at the claims. Specifically,

IPR2022-00996
Patent 11,016,918 B2

JEDEC FBDIMM Standard JESD205 applies to Harris's memory module
and JESD82-20 applies to the Harris's buffer.

*a)        Modifying Harris to Have Four Converters*

Patent Owner asserts that a person of ordinary skill in the art would
not have modified Harris's memory module to have four converters, as
Petitioner asserts. Resp. 17–21. Patent Owner argues that Harris discloses a
single converter providing at least two voltages in each of Petitioner's
voltage mappings. *Id.* at 17 (citing Ex. 2031 ¶¶ 75–79). Patent Owner
asserts that Harris discloses "***a*** high-frequency switching voltage converter
capable of generating tightly-controlled voltage level**s**." (Emphases original)
*Id.* (citing Ex. 1023 ¶ 10, Fig. 1A); *see also* Sur-Reply 15–17.

Petitioner replies that the Petition explained the motivation for
multiple converters, including that "the JEDEC standards treat those
voltages separately, thus permitting power-on sequencing; providing
independent control; improving efficiency; and saving power." Reply 14
(citing Pet. 30–31; Ex. 2030, 39:2–10, 44:25–46:10; Ex. 1075,
134:22–136:2, 194:23–195:7; Ex. 1062, 13–15). In addition, Dr. Wolfe
explains that smaller, lower-power regulators may be more desirable than
larger, higher-power regulators because they can be less costly. Ex. 2030,
45:21–25. He also stated that space availability on the memory board can
require separate regulators. *Id.* at 46:1–4. In sum, Dr. Wolfe stated that "a
number of ordinary engineering factors" would be considered when deciding
to use one supply for both voltages or two separate supplies. *Id.* at 46:5–10.

Petitioner provides the following excerpt from the JEDEC standards
to explain its position:

24

### 2.3.1 Power-up and initialization sequence

The following sequence is required for POWER UP and Initialization.

a) Apply power and attempt to maintain CKE below 0.2*VDDQ and ODT*[1] at a low state (all other inputs may be undefined.) The power voltage ramp time must be no greater than 20mS; and during the ramp, VDD>VDDL>VDDQ and VDD-VDDQ<0.3 volts.

- VDD, VDDL and VDDQ are driven from a single power converter output, AND
- VTT is limited to 0.95 V max, AND
- Vref tracks VDDQ/2.

**or**

- Apply VDD without any slope reversal before or at the same time as VDDL.
- Apply VDDL without any slope reversal before or at the same time as VDDQ.
- Apply VDDQ without any slope reversal before or at the same time as VTT & Vref.

at least one of these two sets of conditions must be met.

Reply 14 (citing Resp. 25; Ex. 1026, 9 (DDR2); Ex. 1046, 15 (same for DDR3); Pet. 30–31. The excerpt from JEDEC's JESD79-2B (DDR2) and JESD79-3A (DDR3)[2] above shows two options for compliance with these standards, one shown partially with a blue box,[3] the other with a red box. Although the first option (blue box) indicates that a single converter generates the voltages, Petitioner correctly contends that the second option (red box) does not list that any converter provides these voltages, but leaves open how they are generated. *Id.* at 13–14. A person of ordinary skill in the

---

[2] Although Petitioner does not expressly rely on JEDEC's JESD79-2B (DDR2) and JESD79-3A (DDR3) in its combinations, the parties seem to be in agreement that these specifications are part of the background knowledge that a person of ordinary skill in the art would have had. In an obviousness analysis, the background knowledge is properly considered together with the demands known in the design community, and the inferences and creative steps that a person of ordinary skill in the art would employ. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013).

[3] In our opinion, Petitioner should have drawn the blue box to include the following two lines "VTT is limited to 0.95 V max, AND Vref tracks VDDQ/2" because of the way the standard presents the two sets of conditions with the word "or" between them and refers to them as "two sets of conditions." We refer to the two sets of conditions as "options" herein.

IPR2022-00996
Patent 11,016,918 B2

art would have understood that the listed voltages may be generated with respective converters. *See* Ex. 1026, 9; Ex. 1046, 15; Ex. 1003 ¶ 242 (Dr. Wolfe testifying that JESD79-2B's disclosure that the voltage supplies can be turned on and off separately suggests to a person of ordinary skill in the art that the voltages are provided by separate converters); *see also KSR*, 550 U.S. at 418 ("a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.").

Moreover, Harris discloses "***at least one*** on-board voltage regulator module (VRM) is provided as part of the memory board assembly module 100A for converting externally supplied voltage level available on external source path 104 into appropriate local voltage levels that power the first and second voltage paths, i.e., the $V_{dd}$ and $V_{cc}$." Ex. 1023 ¶ 10 (emphases added). Also, Harris's claim 1 recites "***at least one*** voltage regulator module for converting an externally supplied voltage level into appropriate ***voltage levels*** that power said first and second voltage paths, respectively." Ex. 1023, claim 1. Thus, Harris discloses that multiple converters can be used to generate respective multiple voltage levels.

Furthermore, Petitioner contends that Patent Owner's examples relate to a SODIMM, not an FBDIMM like Harris. Reply 14 (citing Resp. 23; Ex. 2006, 4 ("SODIMM"); Ex. 1075, 102:17–103:9 (SODIMM is unbuffered as shown in Ex. 2045 and Ex. 2046, 4.20.11-23)). Although Harris discloses unbuffered DIMMs may be an option to use, Petitioner relies upon Harris's FBDIMM teachings in its Petition. *See, e.g.*, Pet. 16, Ex. 1023 ¶ 9, claim 24.

Patent Owner further argues that single buck converters with multiple voltage outputs were known in the art. Resp. 18 (citing Ex. 2031 ¶ 80;

IPR2022-00996
Patent 11,016,918 B2

Ex. 2003; Ex. 2004).  As Petitioner shows, however, single buck converters
for generating single voltages were also known in the art.  Pet. 91 (citing
Ex. 1023, Fig. 6 (640)); Ex. 1047, 1:28–32, 2:47–55, 5:56–59, 7:6–14;
Ex. 1041, 1–2, 9; Ex. 1042, 16; Ex. 1048, 1–2; Ex. 1058, 5).  Although
Patent Owner is correct that Petitioner must show a reason for using separate
buck converters, as already explained, Petitioner did so.  Reply 15
(sequencing the power, turning power on and off independently, saving cost,
eliminating cross-coupling of noise, and solving space constraints);
Ex. 2030, 45:21–46:10 (smaller regulators may be less costly than larger
ones, and may be desirable when separate spaces are available on the
memory board)  Thus, we do not agree with Patent Owner's argument that
Petitioner "has not articulated any advantage of using one converter per
voltage if Harris already uses a single converter for at least two voltages."
Sur-Reply 11 (citing Reply 11–14; Ex. 1023 ¶ 10).

We also find Patent Owner's distinction between a single converter
generating two voltages and two separate converters is not meaningful
because of how the single converter may be internally constructed.  For
example, Petitioner presents the following illustration:

IPR2022-00996
Patent 11,016,918 B2

## DC-DC Converter Specification(DRAFT)
### MPD4S014S



Reply 13 (citing Ex. 1075, 127:21–129:24, 228:25–232:19; Ex. 1042, 16 (corresponding to EX1048, 2)).  The figure above shows two buck converters receiving two Vin inputs and generating respective outputs Vout1 and Vout2 (the LDO Vout3 can be disregarded in this discussion). Externally, this chip resembles a single converter, and has effectively only one input if the pins 1 and 15 are tied together, but internally it has two buck converters generating respective voltages.  Thus, the presence of multiple outputs suggests, to a person of ordinary skill in the art, that multiple buck converters are being used or, at least, that such a configuration is a suitable option.

Patent Owner next argues that a tightly spaced FBDIMM does not allow for the large inductors that multiple buck converters would require, and a person of ordinary skill in the art would not have modified Harris to add more components.  Resp. 18–21 (citing Ex. 2031 ¶¶ 83–84; Ex. 2101, 20 (illustration of FBDIMM prototype); Ex. 2042, 7 (illustration of FBDIMM)).

IPR2022-00996
Patent 11,016,918 B2

Patent Owner also argues that one could use a single-inductor four-output buck converter instead of separate ones. *Id.* at 20–21.

Petitioner counters that defining the number of converters based on the number of inductors lacks any support in the '918 patent. Reply 12 (citing Ex. 1001; Ex. 2032). Petitioner argues that "it was well known that a single chip can include multiple buck converters (and inductors)." *Id.* (citing Ex. 1048, 1–2; Ex. 1075, 106:24–109:8 (discussing use of inductor in buck converter); Ex. 2030, 98:8–18 (same); Ex. 1058, 5, 14–15 (similar)). Petitioner also contends that space for multiple buck converters is not mentioned in the '918 patent or its claims, since solving any such problem was within the level of ordinary skill in the art. Reply 13 (citing *id.* at 19–20; Ex. 2030, 53:16–54:14, 89:1–21).

Petitioner has shown that one of ordinary skill in the art would have implemented a memory module with four buck converters to generate respective voltages in at least some situations. Patent Owner may be right that four buck converters using a single inductor would have been the more typical or preferred approach, as Dr. Mangione-Smith implied. *See, e.g.*, Ex. 2031 ¶¶ 76, 81–84. However, "it is not necessary to show that a combination of prior art references is the best option, only that it be a suitable option." *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023); *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. 2021); *PAR Pharm., Inc. v TWI Pharms., Inc.*, 773 F.3d 1186, 1197–98 (Fed. Cir. 2014).

> b)     *Use of Separate Converters to Generate*
> $V_{DD}/V_{DDQ}/V_{DDL}$ *or* $V_{CC}/V_{CCFBD}$

Patent Owner argues against Petitioner's showing of a motivation to combine by arguing that neither Harris nor the FBDIMM Standards suggest separate power rails for $V_{DD}/V_{DDQ}$ and $V_{DDL}$ or $V_{CC}$ and $V_{CCFBD}$ for Voltage Mappings A and B. Resp. 21–30. Patent Owner argues that the DDR2 Specification that Petitioner cited requires that the voltages $V_{DD}$, $V_{DDQ}$ and $V_{DDL}$ are driven from a single power converter output. *Id.* at 22 (citing Ex. 1026, 9; Ex. 2061 ¶ 87). As discussed previously, Patent Owner argues that the DDR2 Specification requires a single converter (see text in blue box of Exhibit 1026, 9 above) whereas Petitioner relies on the second option (see text in red box) which does not specify how the voltages are to be generated. Although Patent Owner's argument is correct for the first option, it is not for the second option, which is the one on which Petitioner relies.

Patent Owner argues that Dr. Wolfe concedes that in all standard FBDIMMs that he was aware of, $V_{DDL}$, $V_{DD}$ and $V_{DDQ}$ for the DRAMs are connected to a single power converter, and are not individually powered on or off. Resp. 22–23 (citing Ex. 2030, 133:5–134:6, 39:11–40:24). Dr. Wolfe stated "I'm not aware of any [FBDIMMs with three different power rails] on the market. Obviously, the teaching is right here in the JEDEC specification." Ex. 2030, 133:10–17. We understand Dr. Wolfe to be referring to the second option boxed in red in the above excerpt from JEDEC's JESD79-2B (DDR2) (Ex. 1026) and JESD79-3A (DDR3) (Ex. 1046), on which Petitioner relies. Patent Owner argues that Petitioner is suggesting a design that persons of ordinary skill in the art were aware of, but rejected, and that this is evidence of non-obviousness. Resp. 22–23.

IPR2022-00996
Patent 11,016,918 B2

We do not agree that a person of ordinary skill in the art would have rejected the design, however, when the JEDEC specification allows for it and Harris discloses that it is an option for generating $V_{CC}$ and $V_{DD}$. Ex. 1026, 9; Ex. 1023 ¶ 9. Extending Harris's teaching to generate four voltages with respective voltage regulators is within the level of ordinary skill in the art. *See* Ex. 2030, 43:10–14 (Dr. Wolfe stating four voltages specified by JEDEC would require use of four power supplies in most situations); 160:2–3 ("it would be obvious to use four power supplies"); Ex. 1003 ¶¶ 146–149 (credible testimony showing that buck converters were well known to persons of ordinary skill in the art). "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421.

Patent Owner argues that a single power converter was required so that the voltages track one another during power up. Resp. 23–24 (citing Ex. 2006, 4; Ex. 2061 ¶ 88; Ex. 1023 ¶ 12). But Dr. Wolfe indicates that the voltages of separate converters can be made to track one another by coupling their feedback, which was a known option. Ex. 2030, 54:25–55:13. Patent Owner does not refute Dr. Wolfe's testimony.

Patent Owner argues that JEDEC's JESD79-2B (DDR2) and JESD79-3A (DDR3) do not address power generation on the memory module, only the inputs and outputs of the memory device. Resp. 24–25. Petitioner replies that Harris teaches a module that supplies all the voltages needed on the module, which would include all those needed by the memory devices. Reply 14–15 (citing Ex. 2030, 37:13–38:5); *see also* Ex. 1023 ¶ 9. Patent Owner's argument views these JEDEC specifications, which would have been general knowledge of one of ordinary skill in the art, in isolation

IPR2022-00996
Patent 11,016,918 B2

without considering them together in the combination of Harris and the FBDIMM Standards. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) ("[T]he Court required an analysis that reads the prior art in context, taking account of 'demands known to the design community,' '***the background knowledge possessed by a person having ordinary skill in the art***,' and 'the inferences and creative steps that a person of ordinary skill in the art would employ.'" (emphasis added)); *In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("Non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references.").

Patent Owner asserts that Petitioner's contention that an FBDIMM has separate pins for $V_{DD}$, $V_{DDQ}$ and $V_{DDL}$ does not support its contention of separate converters, "particularly where it was known that there are stability and timing benefits when using a single source." Resp. 24 (citing Ex. 2006, 4). Dr. Wolfe explains that the FBDIMM module of Petitioner's combination would not have separate pins to receive $V_{DD}$, $V_{DDQ}$ and $V_{DDL}$ but would derive them onboard the module from the 12-volt input pin. Ex. 2030, 35:25–36:15. As to stability, Dr. Wolfe testifies that a feedback loop maintains stability in light of current variations, temperature changes, and other factors. *Id.* at 64:25–65:10. As to timing, Dr. Wolfe indicated that separate converters can track one another by coupling their feedback, and that this was a known option. *Id.* at 54:25–55:13.

Patent Owner further argues that sequencing the different voltages does not require separate converters. Resp. 24–27. Petitioner contends that this was the obvious way to implement the JEDEC specifications (boxed in

IPR2022-00996
Patent 11,016,918 B2

red above) with several benefits. Reply 15 (citing Ex. 1003 ¶ 256). We agree with Petitioner that separate converters were an option that one of ordinary skill in the art would have used in some practical circumstances for reasons of cost, space availability, etc.

Patent Owner argues that it was actual practice for persons of ordinary skill in the art to use a single power converter to generate the necessary voltages. Resp. 25 (citing Ex. 2030, 133:5–134:6, 39:11–40:24). Although using a single power converter may have been the most common approach, this does not negate Petitioner's showing that a person of ordinary skill in the art would have considered separate converters desirable under certain circumstances. *See Elekta Ltd. v. ZAP Surgical Systems, Inc.*, 81 F.4th 1368 (Fed. Cir. 2023) (quoting *Novartis Pharms. Corp. v. West-Ward Pharms. Int'l Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019) ("Nor does an obviousness showing 'require that a particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation . . . .'").

Patent Owner similarly argues that $V_{CC}$ and $V_{CCFBD}$ are separate voltages with separate pins, but asserts that Petitioner does not explain why a single on-board $V_{CC}$ power source is insufficient for $V_{CC}$ and $V_{CCFBD}$ power rails when a single set of $V_{CC}$ interface pins providing power from the host met the power needs for both $V_{CC}$ and $V_{CCFBD}$. Resp. 25–27 (citing Pet. 30–31; Ex. 1028, 11–12; Ex. 2031 ¶ 92). For similar reasons as explained for $V_{DD}$, $V_{DDQ}$ and $V_{DDL}$, we disagree. As Petitioner indicates, using separate converters for $V_{CC}$ and $V_{CCFBD}$ provides the benefits of sequencing the power, turning power on and off independently, saving cost, eliminating cross-coupling of noise, and solving space constraints. Reply 15

IPR2022-00996
Patent 11,016,918 B2

(citing Ex. 2060, 39:2–10, 44:25–46:10; Ex. 1075, 134:22–136:2, 194:23–195:7; Ex. 1062, 13–15; Ex. 2012, 73; Ex. 1003 ¶ 255).

Patent Owner's arguments do not undercut Petitioner's showing of a motivation to combine.

> c)    *Use of Third Buck Converter for $V_{TT}$*

Patent Owner contends that Petitioner's Voltage Mapping C relies on three different voltages, including a termination voltage, $V_{TT}$, connected to terminators. Resp. 27 (citing Pet. 26, 30; Ex. 1028, 13, 15–16). For context, the relevant figure from the JEDEC JESD205 specification is reproduced below:



Ex. 1028, 13. The above figure shows various voltages $V_{TT}$, $V_{CC}$, $V_{DDSPD}$, $V_{DD}$, $V_{REF}$, $V_{SS}$ and their relationship to one another according to the JEDEC JESD205 specification. *Id.*

Patent Owner argues that Harris does not disclose generating $V_{TT}$ on its module and argues that it would be supplied from the motherboard instead because this would ensure that all DIMMs have the same termination voltages and eliminate ground loops that could degrade signal integrity. Resp. 27–28 (citing Ex. 2061 ¶ 96); Sur-Reply 17–18. Patent Owner further argues that design complexity favors having a single regulator for a group of

DIMMs rather than one regulator per DIMM. Resp. 28–29 (citing Ex. 1027, 20; Ex. 2031 ¶ 97; Ex. 2012, 72). In addition, Patent Owner argues that Petitioner touted JEDEC's move of voltage regulation from the motherboard to the DIMM as a "major design improvement" and Patent Owner asks, "If it had been so obvious, why did it take the industry so long to make that design improvement?" *Id.* at 29. Patent Owner further argues that generating $V_{TT}$ is not one of two choices, and that $V_{TT}$ is generally not provided to DDR2 modules; passive termination is used instead. *Id.* at 33 (citing Ex. 2061 ¶ 98; Ex. 2044, 6; Ex. 2045, 6; Ex. 2046, 4.20.11-6; Ex. 2006, 5).

In Reply, Petitioner contends that Harris teaches generating all of the voltages on the module, including all of the voltages for an FBDIMM, which would include $V_{TT}$. Reply 15 (citing Inst. Dec. 20–23; Ex. 1023 ¶ 12; Ex. 2030, 30:15–20, 72:22–73:7, 103:11–104:23, 109:5–111:10, 239:8–20). Petitioner contends that "Harris's module provides the voltages for the buffer 112 to send address and control signals to the DDR memory devices, which the FBDIMM Standards make clear require not just $V_{DD}$, but also $V_{TT}$ to terminate those signals." *Id.* (underlining omitted) (citing Pet. 17–18; Ex. 1028, 9, 15, 68). Petitioner reproduces the figure below:

IPR2022-00996
Patent 11,016,918 B2



Reply 16 (reproducing the figure at Ex. 1028, 68). The above figure is from the FBDIMM Standards and shows the net structure routing for addresses and commands from the advanced memory buffer (AMB) to the SDRAMs and how they are terminated by $V_{TT}$. *Id.* Petitioner contends that $V_{TT}$ is required by the JEDEC Standards to track $V_{DD}$ (Ex. 1028, 15) which is why dual buck converters for generating $V_{DD}$ and $V_{TT}$ were readily available. Reply 16–17 (citing Ex. 1028, 9; Ex. 2030, 72:22–73:7, 196:3–197:7; Ex. 1040, 1, 11; Ex. 1041, 1; Ex. 1048).

We agree with Petitioner that the combination of Harris and the FBDIMM Standards at least suggests that $V_{TT}$ can be generated onboard the memory module. Reply 15–17 (citing Pet. 17–18; Inst. Dec. 20–24; Ex. 1023 ¶ 12; Ex. 1028, 9, 15, 68; Ex. 1040, 1, 11; Ex. 1041, 1–2, 7–9; Ex. 1048; Ex. 1075, 112:12–114:8; Ex. 2030, 30:15–20, 57:17–20, 58:18–59:10, 72:22–73:7, 103:11–104:23, 109:5–111:10, 140:15–24, 196:3–197:7, 239:8–20). Harris indicates that its on-board voltage regulator converts externally supplied voltage into appropriate local voltage levels for powering

IPR2022-00996
Patent 11,016,918 B2

memory devices of the memory assembly module. Ex. 1023, code (57), ¶¶ 12, 16, Fig. 2, step 204. Petitioner shows that $V_{TT}$ is needed onboard a memory module to terminate address and control signals. Reply 15 (citing Pet. 17–18; Ex. 1028, 9, 15, 68). In addition, Petitioner shows that $V_{TT}$ is required by JEDEC to track $V_{DD}$, which is why dual buck converters for generating these voltages were commercially available. Reply 16–17 (citing Ex. 1028, 9; Ex. 2030, 72:22–73:7, 196:3–197:7; Ex. 1040; Ex. 1041, Ex. 1048). In light of these facts and the teachings of Harris and the FBDIMM Standards, Petitioner has shown that a person of ordinary skill in the art would have added to the memory module a third buck converter to generate $V_{TT}$.

Patent Owner further argues that "even if $V_{TT}$ is generated on module, there is no reason that it should be generated by a buck converter." Resp. 29. Patent Owner contends that, "[a]s Micron noted, . . . an LDO would be sufficient to power $V_{TT}$." *Id.* (citing Ex. 2006, 7; Ex. 2007–2010; Ex. 2050). Patent Owner contends that an LDO is much smaller than a buck converter, which requires a controller and discrete components such as an inductor, which makes the LDO preferable given the space constraint. *Id.* (citing Ex. 2061 ¶ 99). Patent Owner also argues that an LDO is preferred when the current load is below 1A. *Id.* at 29–30 (citing Ex. 2031 ¶ 99; Ex. 2047, 21; Ex. 2048, 23; Ex. 2049, 20; Ex. 1040, 23–24, Figs. 22–25).

In Reply, Petitioner contends that buck converters were commercially available for $V_{TT}$ and provided high efficiency compared to an LDO. Reply 17 (citing Ex. 1075, 112:12–114:8 (LDO may be only 10% efficient); Ex. 2030, 57:17–20, 58:18–59:10 (buck converters up to 98% efficient), 140:15–24 (trend has been to use buck converters). We agree with

37

IPR2022-00996
Patent 11,016,918 B2

Petitioner that, under some circumstances, one of ordinary skill in the art would have chosen a buck converter over an LDO for the reasons that Petitioner mentions.

### d) *Use of Buck Converter to Provide V$_{DDSPD}$*

Patent Owner argues that Petitioner's voltage mappings A–C all relate the recited "fourth regulated voltage" to the 3.3V V$_{DDSPD}$. Resp. 30 (citing Pet. 26). Patent Owner contends that Harris's reasons for on-module regulation do not apply to V$_{DDSPD}$. *Id.* Specifically, Patent Owner argues that the "3.3V-supply voltage is sufficiently high such that a regulator on the motherboard could readily provide the needed 300mV tolerance; and the same SPD [serial presence detect] can be used for different generations of DRAMs." *Id.* (citing Ex. 2031 ¶ 102); *see also* Sur-Reply 18–19.

Petitioner replies that Harris teaches generating all of the voltage onboard the module, including all of the voltages for an FBDIMM, which would include V$_{DDSPD}$. Reply 18 (citing Ex. 1023 ¶ 12; Pet. 16–18). Petitioner further contends there are only two options—generating the voltages on the motherboard or on the module—rendering either option obvious. *Id.* (citing Inst. Dec. 24).

We agree with Petitioner that Harris teaches generating voltages onboard the memory module, which suggests this would include V$_{DDSPD}$ as it is one of the voltages required in the FBDIMM standards. Ex. 1023 ¶¶ 9–12; Ex. 1028, 15. As Petitioner contends, Harris teaches generating the voltages required in the FBDIMM standards on the memory module, and the FBDIMM standards set out what those voltages are. Ex. 1023 ¶¶ 9–12; Ex. 1028, 15.

IPR2022-00996
Patent 11,016,918 B2

We also agree with Petitioner that there are only two options: either $V_{DDSPD}$ is generated on the motherboard or on the module, rendering either option obvious. Reply 18. "[W]hen there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." *KSR*, 550 U.S. at 421.

Patent Owner argues, if $V_{DDSPD}$'s are supplied both on the motherboard and individual DIMMs, they cannot track one another, which would lead to communication problems when they are at different voltage potentials. Resp. 30–31 (citing Ex. 2031 ¶ 102). Patent Owner also argues that "3.3V is a common power rail on the motherboard such that it can be supplied to FBDIMMs without the increased cost and problems associated with providing a regulator for each of Harris' modified FBDIMM memory boards." *Id.* at 31 (citing Ex. 2031 ¶ 102; Ex. 2038, 13 (3.3V PSU output)).

As previously discussed, Dr. Wolfe indicated that separate converters can track one another by coupling their feedback. Ex. 2030, 54:25–55:13. We recognize, however, that this may require connection and coordination across the motherboard-DIMM interface.

Harris mentions in its background a voltage supply level of 3.3V, which is the nominal value for $V_{DDSPD}$ in the JEDEC standards. Ex. 1028, 9. Harris also states that it is one of the values that "keeps getting lower" with each generation of DIMM/DRAM technology, implying that it should be generated not on the motherboard, but on the FBDIMM. Ex. 1023 ¶ 2. One of ordinary skill in the art thus would have recognized that $V_{DDSPD}$ may be generated onboard the memory module when considering Harris's teachings. Ex. 1023 ¶¶ 9–12.

We also note that the JEDEC FBDIMM standards provide that $V_{DDSPD}$ can vary within the range of 3.3V +/- 0.3 V.  Ex. 1029, 9.  As long as the voltage is maintained within this range on both the motherboard and the FBDIMM, the implementation is compliant with the JEDEC standards.

Patent Owner further argues that, for the low currents required for components using $V_{DDSPD}$, buck converters would have been highly inefficient.  Resp. 31 (citing Ex. 2051, D-1 (up to 5mA active power supply current); Ex. 2052, 6, Table III (I2C power consumption less than 15mW on average; and @3.3V, current is less than 5mA); Ex. 1040, Figs. 22–25 (efficiency less than 20% at 10mA current); Ex. 2031 ¶ 103 (an LDO with a 12V-input-3.3V-output would be 26% efficient); Ex. 1062, 14 (using LDO to generate 3.3V from 12V)).  Patent Owner asserts that a person of ordinary skill in the art would have used LDOs to generate $V_{DDSPD}$.  *Id.*

Petitioner replies that Patent Owner concedes that the claimed "converter circuit" can be an LDO (Resp. 30, n.5).  Reply 18.  Petitioner also contends that "using a buck converter . . . was an obvious, highly efficient, and clearly 'suitable' option for converting 12V to 3.3V for $V_{DDSPD}$ . . . regardless of whether [Patent Owner] considers it 'inferior' to an LDO."  Reply 18 (citing Ex. 1048, 2; Ex. 1003 ¶¶ 146–49, 286; Ex. 2030, 76:4–19, 78:18–79:7, 79:24–80:11, 82:7–85:10, 88:4–20, 89:1–21, 138:14–21, 140:15–24; *Dome Pat. L.P. v. Lee*, 799 F.3d 1372, 1381 (Fed. Cir. 2016).

From the foregoing discussion, it is apparent that there are advantages and disadvantages to generating $V_{DDSPD}$ onboard the memory module.  However, "simultaneous advantages and disadvantages ... do[ ] not necessarily obviate motivation to combine."  *Qualcomm*, 21 F.4th 784 (Fed. Cir. 2021) (citing *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed.

IPR2022-00996
Patent 11,016,918 B2

Cir. 2006)). Petitioner has shown that the advantages outweigh the disadvantages in at least some scenarios that the person of ordinary skill in the art would have considered desirable to pursue. Petitioner has shown that a person of ordinary skill in the art would have had reasons to combine Harris and the FBDIMM Standards with a reasonable expectation of success.

> e)    *Conclusion on Motivation to Combine Harris and the FBDIMM Standards*

On this record, Petitioner has shown by a preponderance of the evidence that a person of ordinary skill in the art would have combined Harris and the FBDIMM standards since Harris states that its memory module may include fully buffered DIMMs (FBDs). Ex. 1023 ¶ 9. We agree that one of ordinary skill in the art would have recognized Harris's mention of FBDIMMs as a standard and looked to the FBDIMM Standards for information concerning the voltage values standardized for use in an FBDIMM. Ex. 1027, 83; Ex. 1028, 9. For these reasons and others set forth above, we determine that one of ordinary skill in the art would have combined Harris and the FBDIMM Standards with a reasonable expectation of success.

> 4.    *Analysis of Independent Claim 1*

> a)    *Limitation 1.a: "A memory module comprising:"*

Petitioner asserts that Harris's memory module 100A in Figure 1A or memory module 306-1 in Figure 3 corresponds to the claimed "memory module." Pet. 19–20 (citing Ex. 1023 ¶¶ 9, 17, 20, Figs. 1A, 3; Ex., 1003 ¶¶ 216–222; Ex. 1028, 38). Harris does indeed disclose a memory module with multiple memory devices such as DRAMs 110-1 to 110-N in Figure 1A or 306-1, for example, in Figure 3.

Patent Owner does not dispute that the preamble is met by Harris.
*See* Resp.

Based on our review and consideration of the record, we determine
that Petitioner has shown that Harris teaches the preamble.

> b)    *Limitation 1.b: "a printed circuit board (PCB)*
> *having an interface configured to fit into a corresponding*
> *slot connector of a host system, the interface including a*
> *plurality of edge connections configured to couple*
> *power, data, address and control signals between the*
> *memory module and the host system"*

Petitioner asserts that Harris and the FBDIMM Standards disclose this
limitation. Pet. 20–25. Petitioner contends that Harris and the FBDIMM
Standards disclose printed circuit boards (PCBs). Pet. 20–21 (citing
Ex. 1023 ¶¶ 13, Figs. 1A, 3). Petitioner also contends that a PCB may be
referred to as a "memory board" or "raw card." *Id.* at 20–21 (citing Ex.
1023 ¶ 9, Ex. 1028, 10, 38, 84; Ex. 1003 ¶¶ 223–225).

As for the PCB "*having an interface configured to fit into a*
*corresponding slot connector of a host system*," Petitioner notes that Harris's
Figure 3 shows that each memory module 306-1 to 306-M includes an edge
connection for fitting into a corresponding slot of a host system. Pet. 21
(citing Ex. 1023 ¶¶ 2, 12, 13, 19, Figs. 3, 4; Ex. 1028, 38, 84; Ex. 1003
¶¶ 226–227).

Petitioner further contends that Harris, consistent with the FBDIMM
Standards, discloses that the edge connections are "*configured to couple*
*power, data, address and control signals between the memory module and*
*the host system*." Pet. 21–25. Petitioner contends that the power signal
corresponds to Harris's voltage 104 in Figure 1A. *Id.* at 21 (citing Ex. 1023
¶¶ 10, 12, 19). Petitioner contends that Harris's buffer 112 in Figure 1A is

IPR2022-00996
Patent 11,016,918 B2

called "AMB" (Advanced Memory Buffer) in the FBDIMM Standards.
Pet. 22–23. Petitioner indicates that Harris's buffer 112 receives data,
address, and control signals via memory controller interface 114 and
transmits these signals to DRAMs 110-1 to 110-N in Figure 1A. Pet. 22
(citing Ex. 1023 ¶ 9 ("buffer/logic component 112 is provided for buffering
*command/address* (C/A) space as well as *data* space at least for a portion of
memory devices 110-1 through 110-N"). In addition, Petitioner argues that
the FBDIMM Standards indicate that buffer AMB receives data signals
DQ0–DQ63; address signals A0–A15; and control signals RAS, CAS, WE,
CS, etc. Pet. 22–23 (citing Ex. 1028, 13).

> ### (1)   *Power from the Interface with the Host System*

Patent Owner argues that all challenged claims require a memory
module that includes a printed circuit board (PCB) having an interface with
edge connections configured to couple power between the memory module
and the host system. Resp. 3. According to Patent Owner, Harris does not
disclose such a memory module. *Id.* Instead, Patent Owner asserts, Harris
replaces the power supply interface pins with as few as six +12V non-
interface pins from an external power source which is unregulated and has a
wide tolerance, which does not comport with the regulated sources
associated with a host system. *Id.* at 4, 6, 7 (citing Ex. 1023 ¶¶ 12, 16;
Ex. 2030, 62:21–25, 63:1–8, 92:9–95:8; Ex. 2031 ¶¶ 60–66; Ex. 2037, 22;
Ex. 2038, 13, Table 2); *see also* Sur-Reply 2–6. Patent Owner further argues
that Harris supposedly provides a "technology-independent voltage
distribution scheme for memory devices wherein system board power supply
and associated voltage plane(s) are eliminated." Resp. 4 (citing Ex. 1023

IPR2022-00996
Patent 11,016,918 B2

¶ 19).  Patent Owner argues that Harris effectively decouples the host
system's voltage supply from the memory module.  *Id.* at 5 (citing Ex. 2031
¶ 38).

    To illustrate its points, Patent Owner provides the following annotated
figure:



Resp. 5.  In the figure above, Patent Owner has modified Harris's Figure 1A
to show edge connections along the bottom edge of memory board 100A,
and highlights that the external voltage is connected to the side of the
memory board.  Patent Owner asserts that external sources connected to the
side or top of a memory module were known.  *Id.* at 5 (citing Ex. 2035; Ex.
2036, 41–42; Ex. 2031 ¶ 59).

    In addition, Patent Owner argues that Petitioner's expert, Dr. Wolfe,
testified that, in computer systems using FBDIMMs, the power supply units
provide regulated voltages.  *Id.* at 6 (citing Ex. 2030, EX2030, 62:21–25,
63:1–8, 92:9–95:8; Ex. 2037, 22, Table 15; Ex. 2038, 13, Table 2).
According to Patent Owner, it would be "inadvisable" to provide
unregulated voltages via a memory board to a memory slot because the
"unregulated voltages could cause random noise patterns and degrade signal
integrity."  *Id.* at 7 (citing Ex. 2031 ¶¶ 65–66).  Even with regulated voltage

IPR2022-00996
Patent 11,016,918 B2

sources, Patent Owner asserts, the voltage was not supplied via the DIMM interface. *Id.* (citing Ex. 2031 ¶ 66). Patent Owner argues that Petitioner's modified FBDIMM is powered from an external power source "wherein system board power supply and associated voltage plane(s) are eliminated." Resp. 8 (citing Ex. 1023 ¶¶ 10, 12, 19). Patent Owner further argues that neither Dr. Wolfe nor Dr. Mangione-Smith was aware of any memory controllers that supplied power supply voltages to DIMMs, and that Patent Owner did not provide evidence that a person of ordinary skill in the art would have known how to design a memory controller that supplied power to DIMMs. *Id.* at 8–9 (citing Ex. 1023 ¶ 17; Ex. 2030, 130:19–131:10; Ex. 2031 ¶ 67).

Although Patent Owner acknowledges that Harris discloses that its external voltage sources can be any "known or heretofore unknown voltage supplies, either regulated or unregulated," Patent Owner argues that this would sweep in the type of voltage supply that Harris seeks to eliminate. *Id.* at 9 (citing Ex. 2031 ¶ 68). Patent Owner further asserts that "nothing suggests that the voltage paths are via the memory slot to the interface edge connections." *Id.* at 9–10 (citing Ex. 2031 ¶ 69). Furthermore, Patent Owner asserts that different edge pins would be needed for different voltage sources independently distributed through the motherboard, increasing, rather than decreasing, the cost for power distribution in the motherboard and pin count on the DIMM connector to the motherboard. *Id.* at 10 (citing Ex. 1023 ¶¶ 13, 19–20; Ex. 2031 ¶ 70). Patent Owner summarizes its argument, stating that Harris teaches to eliminate power distribution to the DIMM slot, a feature which Petitioner does not propose to modify. *Id.* at 10–11; *see also* Sur-Reply 6. Patent Owner argues that Harris does not

couple power between the module and the host system, and therefore does not disclose elements 1.b, 16.b, 23.b and 16.f. *See* Pet. xi (1.b), xiii (16.b), xiv (16.d), and xvii (23.b). Patent Owner argues that the specific benefits Harris teaches can be achieved by decoupling power between the motherboard and memory module. Resp. 11 (citing Ex. 1023 ¶¶ 19, 20; Ex. 2031 ¶¶ 26, 58, 70). Patent Owner argues that the same arguments apply to claim 13. *Id.*

Petitioner replies that Patent Owner does not dispute that the FBDIMM Standards teach supplying power via edge connection, and that Patent Owner's expert, Dr. Mangione-Smith, admits that such edge connections were "standard." Reply 2 (citing Pet. 16–21; Resp. 3–11; Inst Dec. 18–20; Ex. 1075, 97:16–98:18, 163:16–20; Ex. 1077, 9). Petitioner also contends that Harris's reference to externally supplied voltage requires power external to the entire host system, but Harris merely requires power external to the DIMM memory module. *Id.* (citing Pet. 21–22; Resp. 3–11; Ex. 2030, 66:7–19, 67:20–68:21, 91:22–92:7, 129:24–130:17).

Petitioner further replies that Patent Owner wrongly modifies Harris's Figure 1A (above) to suggest that Harris would never use edge connections at the bottom for power. Reply 3. To illustrate its points, Petitioner reproduces the following annotated figure:

IPR2022-00996
Patent 11,016,918 B2



FIG. 3

Reply 4 (citing Ex. 1023, Fig. 3).  In Harris's Figure 3 as annotated by
Petitioner, above, Petitioner shows that Harris's memory modules 306-1 to
306–M are connected to the memory controller only through edge
connections (boxed in red), meaning that power must come from those edge
connections.  *Id.* at 3–4.  Petitioner further asserts that Harris's Figure 3 is
nearly identical to an Intel drawing where the memory modules admittedly
receive power through the edge connections form the host system.  *Id.* at 4
(citing Ex. 1075, 171:4–17; Ex. 2101, 4).  According to Petitioner, Harris
confirms that, "[a]lthough not explicitly shown in this FIGURE [3, above],
each memory board also receives a supply voltage …[which] may be
sourced from the memory controller 302 [which is part of the host system,
Ex. 1075, 167:23–168:1] or from a separate voltage source."  *Id.* (quoting
Ex. 1023 ¶ 17) (alterations in original).  Petitioner's expert, Dr. Wolfe,
explained that it was common for the host to supply power through edge
connectors "alongside the memory controller signals."  *Id.* (quoting
Ex. 2030, 131:3–5).

IPR2022-00996
Patent 11,016,918 B2

Petitioner contends that Patent Owner misinterprets Harris to conclude that the system power supply is eliminated entirely. *Id.* at 4–5 (citing Ex. 1023 ¶ 19; Resp. 4–5, 8, 10–11). To the contrary, Petitioner argues, Harris proposes avoiding the need for different system board voltages such as "3.3V, 2.5V, 1.8V, 1.5V and beyond," by simply supplying a single voltage (i.e., "12V") to the memory module so that an "on-board voltage regulator module [e.g., 102 above] [can] generate appropriate local voltage levels" on the memory module. *Id.* at 5 (citing Ex. 1023 ¶¶ 2, 3, 12–13, 19). Petitioner contends, as Dr. Wolfe explained, Harris's "technology-independent voltage distribution scheme" eliminates the need for a "system-board-specific power supply," not all power. *Id.* (citing Ex. 2030, 116:10–117:6).

Petitioner contends that using edge connectors like those shown in Harris's Figure 3 is consistent with Harris's use of the known FBDIMM design, except with "few[er]" power pins given the higher 12V input voltage. Reply 6 (citing Ex. 1023 ¶ 12; Ex. 2030, 100:12–101:19, 102:17–25, 103:11–104:23). Petitioner argues that to prevent "accidental damage" due to this change in the power pins of the edge connector, Harris teaches changing "the board's connector keyway" so that it is "not interchangeable with the standard DIMM." *Id.* (citing Ex. 1023 ¶ 13; Ex. 2030, 117:7–21). According to Petitioner, this was a standard technique for memory modules receiving power from the host via the edge connections. *Id.* (citing Ex. 2016, 6–7; Ex. 2101, 21–22; Ex. 1075, 171:21–175:20). Patent Owner disagrees, stating that the keyway connector does not mean the 12V pins are added to the edge connection. Sur-Reply 5.

Petitioner asserts that Patent Owner's argument that "[s]upplying power…from [the] side…was known" "misses the point: regardless of

whether a side connection was possible, that would not negate the obviousness of using edge connections for power, as was highly common." Reply 7 (citing *Dome Pat. L.P. v. Lee*, 799 F.3d 1372, 1381 (Fed. Cir. 2015) (existence of a better alternative "does not mean that an inferior combination is inapt for obviousness purposes"). Petitioner states that Patent Owner's "expert admitted that using ***both*** was a known option, consistent with the combination for Grounds 2 to 3." *Id.* (emphasis Petitioner's). According to Petitioner, the side connection could be used for battery backup, as taught by Amidi, and the edge connections could be used for power from the host system during normal operation, as taught by Harris. *Id.* (citing Ex. 2035, 39; Ex. 1075, 165:10–166:12).

Considering the foregoing, we determine that Petitioner has shown that the combination of Harris and the FBDIMM Standards discloses limitation 1.b (and claim 13). Harris states that DRAM devices may be "powered from system board or main board voltage sources." Ex. 1023 ¶ 2. Although this is presented in the background of Harris, and Patent Owner argues that it is technology over which Harris seeks to improve, it is nonetheless information that a person of ordinary skill in the art would have known. Harris's teaching of "replacing" power supply interface pins with as few as six +12V pins" means that those six pins take the place of the 72 pins in the interface, implying that power still comes from the interface with the host system. *Id.* ¶ 12. Harris reinforces this by disclosing that "the supply voltage may be sourced from the memory controller 302 or from a separate voltage source." *Id.* ¶ 17. Although Patent Owner argues that Dr. Wolfe nor Dr. Mangione-Smith could recall any DIMM memory module powered by a memory controller, Harris expressly discloses this feature. *Id.*

Harris further teaches that "external voltage sources may comprise any combination of known or heretofore unknown voltage supplies, either regulated or unregulated, and even including variable voltages." Ex. 1023 ¶ 14. This means there may be more than one voltage supply, either regulated or unregulated, as Petitioner contends (which may be the host system and a backup source, for example). Dr. Wolfe explains that Harris's statement that "system board power supply and associated voltage plane(s) are eliminated" means that "supplies such as the memory [$V_{DD}$] and the memory [$V_{CC}$] that are specific to a particular generation of memory chips . . . can be supplied on the DIMM rather than being supplied from the motherboard." Ex. 2030, 116:25–117:6.

Furthermore, Petitioner indicates that the FBDIMM Standards show that the buffer AMB may be connected to a host, suggesting that the FBDIMM derives its power from the host. Pet. 24 (citing Ex. 1027, 4). The experts agree that it was common at the time for the host system to provide the regulated 12V power supply to the FBDIMM, and commercially available devices are in evidence. Ex. 2030, 62:21–25, 63:1–8, 92:9–95:8; Ex. 2037, 22, Table 15, Ex. 2038, 13, Table 2; Ex. 2031 ¶ 65; Ex. 1075, 180:14–183:3; Ex. 2038, 8, 13. These facts point to the conclusion that the external voltage source may be the host system in the combination of Harris with the FBDIMM Standards notwithstanding Patent Owner's arguments to the contrary.

> (2)   *Data, Address, and Control Signals Via*
> *Edge Connection*

Claim 1 recites an "interface including a plurality of edge connections configured to couple … data, address and control signals between the

IPR2022-00996
Patent 11,016,918 B2

memory module and the host system." Ex. 1001, 38:23–25. Patent Owner

argues that the DIMM and AMB do not receive data signals (DQ0–DQ63)

or address and control signals (A0–A15, RAS, CAS, WE) from the host.

Resp. 11 (citing Pet. 22–25). According to Patent Owner, these signals are

instead generated by the AMB based on decoded FBDIMM channel signals

(PS[9:0] and PS[9:0]bar). *Id.* at 11–12 (citing Ex. 2031 ¶ 72; Ex. 1027, 3–4;

Ex. 1028, 29; Ex. 2039, 2; Ex. 2101, 4; Ex. 2040, 1). Patent Owner argues

that Petitioner's evidence does not show that the data, address and control

signals are received from the host. *Id.* at 15. Specifically, Patent Owner

relies on the figure below from the FBDIMM Standards (*see* Sur-Reply 7

(citing Ex. 1028, 13)).



According to Patent Owner, the above figure shows that data, address

and controls signals (highlighted in yellow) are generated and outputted by

the buffer, and are not received from the DIMM interface. Sur-Reply 6–7

(citing Pet. 22–23; Resp. 11–15; Ex. 2031 ¶¶ 72–74). Patent Owner

contends this does not comport with the claim language which requires an

IPR2022-00996
Patent 11,016,918 B2

"interface including a plurality of edge connections configured to couple …
data, address and control signals between the memory module and the host
system." *Id.* at 8 (citing Ex. 1001, 22:1–6). Patent Owner argues that
Dr. Wolfe merely stated that the AMB outputs "information" to the DRAMs
but the claims require specific "signals," not just "information." *Id.* at 8
(citing Ex. 1003 ¶ 230; Ex. 2030, 7:20–11:6). Patent Owner argues that the
outputs from the AMB are not transmitted over FBDIMM's edge
connections. *Id.*

Petitioner argues that Patent Owner's technology tutorial indicates
that an FBDIMM receives address and control signals similar to an RDIMM,
as shown below:





Reply 7–8 (citing Ex. 1077, 8–9; Ex. 1075, 91:23–92:19, 95:14–96:13,
97:16–98:18). The figures above show that the memory controllers transmit

52

IPR2022-00996
Patent 11,016,918 B2

address, command and clock signals (shown in red), or information containing these signals, to the register (RDIMM) or AMB (FBDIMM), which transmits them to the DRAMs. *Id.*; Sur-Reply 9.

Petitioner contends that the host system provides address, command and clock signals to the AMB encoded as a packetized, serialized signal on fewer wires than would be required to receive them as separate, parallel signals. Reply 8–9 (citing Resp. 11–12; Ex. 2031 ¶ 31; Ex. 1075, 155:22–157:1, 212:3–8, 213:3–215:20, 219:13–220:9, 226:7–228:8; Ex. 2030, 8:3–11:6). Petitioner alleges that Patent Owner is in essence attempting to rewrite the claims to require dedicated pins for these signals, which the claims do not require. *Id.* at 9.

Patent Owner argues that it is not attempting to rewrite the claims to require "dedicated pins" as Petitioner alleges. Sur-Reply 8–9 (citing Reply 8–9). Patent Owner asserts that the pin names indicate what "signals" are exchanged at the interface between the host and the FBDIMM, as shown in the figure below.

IPR2022-00996
Patent 11,016,918 B2



| Pin Name | Pin Description | Count |
|---|---|---|
| | **FB-DIMM Channel Signals** | 99 |
| SCK | System Clock input, positive line | 1 |
| SCK | System Clock input, negative line | 1 |
| PN[13:0] | Primary Northbound Data, positive lines | 14 |
| PN[13:0] | Primary Northbound Data, negative lines | 14 |
| PS[9:0] | Primary Southbound Data, positive lines | 10 |
| PS[9:0] | Primary Southbound Data, negative lines | 10 |
| SN[13:0] | Secondary Northbound Data, positive lines | 14 |
| SN[13:0] | Secondary Northbound Data, negative lines | 14 |
| SS[9:0] | Secondary Southbound Data, positive lines | 10 |
| SS[9:0] | Secondary Southbound Data, negative lines | 10 |
| FBDRES | To an external precision calibration resistor connected to Vcc | 1 |
| | **DDR2 Interface Signals** | 175 |
| DQS[8:0] | Data Strobes, positive lines | 9 |
| DQS[8:0] | Data Strobes, negative lines | 9 |
| DQS[17:9]/DM[8:0] | Data Strobes (x4 DRAM only), positive lines. These signals are driven low to x8 DRAM on writes. | 9 |
| DQS[17:9] | Data Strobes (x4 DRAM only), negative lines | 9 |
| DQ[63:0] | Data | 64 |
| CB[7:0] | Checkbits | 8 |
| A[15:0]A, A[15:0]B | Addresses. A10 is part of the pre-charge command | 32 |
| BA[2:0]A, BA[2:0]B | Bank Addresses | 6 |
| RASA, RASB | Part of command, with CAS, WE, and CS[1:0]. | 2 |
| CASA, CASB | Part of command, with RAS, WE, and CS[1:0]. | 2 |
| WEA, WEB | Part of command, with RAS, CAS, and CS[1:0]. | 2 |
| ODTA, ODTB | On-die Termination Enable | 2 |
| CKE[1:0]A, CKE[1:0]B | Clock Enable (one per rank) | 4 |
| CS[1:0]A, CS[1:0]B | Chip Select (one per rank) | 4 |
| CLK[3:0] | CLK[1:0] used on 9 and 18 device DIMMs, CLK[3:0] used on 36 device DIMMs. CLK[3:2] should be output disabled when not in use. | 4 |
| CLK[3:0] | Negative lines for CLK[3:0] | 4 |
| DDRC_C14 | DDR Compensation: Common return pin for DDRC_B18 and DDRC_C18. | 1 |
| DDRC_B18 | DDR Compensation: Resistor connected to common return pin DDRC_C14 | 1 |
| DDRC_C18 | DDR Compensation: Resistor connected to common return pin DDRC_C14 | 1 |
| DDRC_B12 | DDR Compensation: Resistor connected to V$_{SS}$ | 1 |
| DDRC_C12 | DDR Compensation: Resistor connected to V$_{DD}$ | 1 |

Ex. 1028, 29.  The figure above shows Patent Owner's highlighting to show
the "FB-DIMM Channel Signals" including PS[9:0] and PS[9:0]bar, and the
"DDR2 Interface Signals" including DQ0–DQ63, A0–A15, RAS, CAS, and
WE.  Patent Owner states that all memory control for the DRAM resides in
the host, and argues that the fact that all read, write, and configuration
accesses are addressed to the DIMM does not undermine that the signals
Petitioner relies on are generated and outputted by the buffer, and not
exchanged at the interface between the FBDIMM and the host.  Sur-Reply 9
(citing Ex. 2030, 7:20–11:6; Ex. 2030 ¶ 230). [4]

---

[4] Patent Owner's citation to "Ex. 2030 ¶ 230" appears to be an error and we
cannot determine from the context what Patent Owner intended to cite.

Petitioner further argues that the FBDIMM is a preferred embodiment in the '918 patent, and excluding a preferred embodiment from the claims is "rarely, if ever correct." Reply 9 (citing *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022)). To the contrary, Patent Owner argues that the claims need not encompass FBDIMM embodiments, which are disclosed but unclaimed subject matter. Sur-Reply 10 (citing *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1107 (Fed. Cir. 1996); Ex. 1001, 21:38–55).

According to Petitioner, Patent Owner concedes that the signals (PS[9:0] and PS[9:0]bar) received by the AMB result in data, address, and control signals needed by DDR2 SDRAMS. Reply 9 (citing Ex. 2031 ¶ 31). Petitioner further notes that the FBDIMM Standards state that all memory control for the DRAM resides in the host, including memory request initiation, and that the AMB acts as a DRAM memory buffer for all read, write, and configuration accesses addressed to the DIMM. *Id.* (citing Ex. 1027, 1). As a buffer for all such commands to the FBDIMM, Petitioner asserts, the AMB must necessarily couple data, address, and control signals from the host system to the memory module as the claims require. *Id.*

Petitioner and Patent Owner agree that FBDIMM AMB receives information that contains data, address, and control signals encoded in packetized, serialized form at its edge connections via the signals PS[9:0] and PS[9:0]bar, and that the AMB uses these signals to generate data, address and command signals including DQ0–DQ63, A0–A15, RAS, CAS, and WE provided to the DIMMs onboard the memory module. Pet. 21–23; Sur-Reply 10. The claims merely require an "interface including a plurality of edge connections configured to couple … data, address and control signals between the memory module and the host system." Ex. 1001, 38:23–

IPR2022-00996
Patent 11,016,918 B2

25.  We determine that the data, address, and control signals of Harris and the FBDIMM Standards as received at edge connections coupling the memory module and host system satisfy this claim limitation, even though the signals are in encoded, packetized, or serialized form and thus may be received at the same pin or pins.  That the signals are encoded, packetized, and serialized does not change the fact that they are data, address, and control signals.  The claims do not require these signals to be received at the edge connections in any particular form or on any particular pins.  *See In re Self*, 671 F.2d 1344, 1348 (CCPA 1982) (stating that limitations not appearing in the claims cannot be relied upon for patentability).

Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris and the FBDIMM Standards teaches this limitation.

> c)    *Limitations 1.c to 1.f:  "a first buck converter configured to provide a first regulated voltage having a first voltage amplitude; a second buck converter configured to provide a second regulated voltage having a second voltage amplitude; a third buck converter configured to provide a third regulated voltage having a third voltage amplitude; a converter circuit configured to provide a fourth regulated voltage having a fourth voltage amplitude;"*

Petitioner contends that Harris and the FBDIMM Standards disclose limitations 1.c to 1.f.  Pet. 26–31.  Petitioner relies on an annotated version of Harris's Figure 1A, shown below.

IPR2022-00996
Patent 11,016,918 B2



Above is Harris's Figure 1A annotated with information one would have obtained from the FBDIMM Standards according to Petitioner. Pet. 26 (citing Pet. 14–19; Ex. 1003 ¶¶ 232–243, 250–257, 262–276, 281–287). Specifically, the above figure shows voltage mappings A, B, and C of four voltages specified by Harris and the FBDIMM Standards. Petitioner contends the voltage range described in Harris (0.5V–3.5V) is the same range as the voltages described in the FBDIMM Standards. *Id.* at 27 (citing Ex. 1023 ¶ 9). Petitioner contends the voltages would be "*regulated*" because Harris indicates "tightly *regulated* power" is a problem to be solved, and proposes "at least one *on-board* voltage *regulator*" that is "capable of generating tightly-controlled voltage levels" as the solution. *Id.* at 28 (citing Ex. 1023 ¶¶ 2, 3, 9–11; Ex. 1003 ¶ 234).

Petitioner further contends that Harris teaches using "buck converters" to provide the four regulated voltages. *Id.* (citing Ex. 1003 ¶¶ 236, 237, 252, 264, 286). Specifically, Petitioner contends that Harris discloses "replacing [the prior art] power supply interface pins with as few as six +12V pins

IPR2022-00996
Patent 11,016,918 B2

(from an external voltage source)" and then using "*a high-frequency switching voltage converter* capable of generating *tightly-controlled* voltage levels" to provide each needed on-board regulated voltage. *Id.* (alteration by Petitioner; emphasis omitted; citing Ex. 1023 ¶¶ 10, 12). Petitioner contends that a "buck converter" was a conventional device for implementing such a "voltage-reducing switching converter." *Id.* (emphasis omitted; citing Ex. 1030, 2:41–43). Although the claim states that a converter circuit generates the fourth voltage, Dr. Wolfe testifies that a buck converter would be an obvious way to implement a converter circuit. Ex. 1003 ¶ 286 (cited by Pet. 28, n.2). Petitioner further contends a buck converter would have been an obvious way to step down a higher input voltage of 12V to a lower output voltage of 3.5V or less, and that there would have been a reasonable expectation of success because buck converters were well-known switching devices commonly used to step down the voltage between input and output, as had long been taught in textbooks. *Id.* at 28–29 (citing Ex. 1003 ¶¶ 146–149, 236–237; Ex. 1058, 3, 5, 12–16; Ex. 1032, 161, 164; Ex. 1024, Fig. 6; Ex. 1050, 1:21).

Petitioner further notes that "*buck converters*" were well-known as a highly-efficient way to step down voltages without generating excess heat or requiring large cooling devices, providing further motivation to use buck converters. *Id.* at 29–30 (citing Ex. 1003 ¶ 237; Ex. 1040, 1, 23–24, Figs. 22–25; Ex. 1041, 1, 13; Ex. 1048, 3; Ex. 1058, 5; Ex. 1059, 5:23–30; Ex. 1062, 11; Ex. 1064 ¶ 101).

Additionally, Petitioner contends that it would have been obvious to use at least four converters in Harris given the need for four different voltages (e.g., 0.9V, 1.5V, 1.8V, 3.3V) in the FBDIMM Standards. *Id.* at 30

58

IPR2022-00996
Patent 11,016,918 B2

(citing Pet. 14–19). Petitioner asserts that it would have been obvious to use four converters because the voltages at the same level in Petitioner's voltage mappings A and B are described as separate voltages with separate pins that are separately controllable in the FBDIMM Standards. *Id.* at 30–31 (citing Ex. 1028, 17–20, 30–32; Ex. 1026, 2–3, 9; Ex. 1003 ¶¶ 242, 256; Ex. 1062, 13).

For the reasons discussed above in Section III.D.3, we disagree with Patent Owner's arguments regarding the use of buck converters.

Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris and the FBDIMM Standards teaches limitations 1.c to 1.f of claim 1.

> d)    *Limitation 1.g: "a plurality of components coupled to the PCB, each component of the plurality of components coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, the plurality of components comprising:"*

Petitioner asserts that Harris discloses a "*a plurality of components coupled to the PCB*" including a Buffer and DRAMs shown in Harris's Figure 3, and a Serial Presence Detect (SPD) and resistors. Pet. 31 (citing Pet. 14–19; Ex. 1003 ¶¶ 288–90, 293–297). Petitioner further contends that

IPR2022-00996
Patent 11,016,918 B2

these components are each coupled to at least one or more of the second, third, and fourth regulated voltages. *Id.*

Patent Owner does not dispute that the combination of Harris and the FBDIMM Standards discloses this feature. *See* Resp.

Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris and the FBDIMMs Standards teaches this limitation.

> *e)* *Limitation 1.h: "a plurality of synchronous dynamic random access memory (SDRAM) devices coupled to the first regulated voltage, and"*

Petitioner asserts that Harris discloses that the plurality of components includes a plurality of DDR DRAM devices 110-1 to 110-N as shown in Harris's Figure 1A and DRAM devices 312-1 to 312-8 for each of the memory modules shown in Harris's Figure 3. Pet. 32 (citing Ex. 1023 ¶¶ 9, 11, Figs. 1A, 3; Ex. 1003 ¶¶ 298–303). Petitioner contends that a person of ordinary skill in the art would have known that, according to the JEDEC standards, DDR memory devices are "synchronous" DRAM devices. *Id.* (citing Ex. 1026, cover; Ex. 1028, 9; Ex. 1045, cover; Ex. 1046, cover).

Patent Owner does not dispute that the combination of Harris and the FBDIMM Standards discloses this feature. *See* Resp.

Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris and the FBDIMMs Standards teaches this limitation.

> f) *Limitation 1.i.1: "at least one circuit coupled between a first portion of the plurality of edge connections and the plurality of SDRAM devices"*

Petitioner contends that the "first circuit" corresponds to Harris's buffer 112 as shown in Harris's Figure 1A, as well as the buffer of memory module 306-1 in Harris's Figure 3. Pet. 32–34 (citing Pet. 20–25; Ex. 1023, Figs. 1A, 3; Ex. 1003 ¶¶ 304–317). Petitioner contends that Harris's buffers are coupled to receive data, address, and control signals via memory controller interface 114 across edge connections, and transmits them to DRAMs 110-1 to 110-N or DRAMs 312-1 to 312-8. *Id.*

Patent Owner does not specifically respond to Petitioner's contentions for this limitation. *See* Resp.

Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris and the FBDIMM Standards teaches this limitation.

> g) *Limitation 1.i.2: "the at least one circuit operable to (i) receive a first plurality of address and control signals via the first portion of the plurality of edge connections, and (ii) output a second plurality of address and control signals to the plurality of SDRAM devices"*

Petitioner relies on the same showing for limitation 1.i.2 as for limitation 1.i.1. Pet. 32–34.

For the reasons stated with respect to limitation 1.b, the combination of Harris and the FBDIMM Standards discloses this limitation notwithstanding Patent Owner's arguments. *See* Section III.D.4.b.2.

Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris and the FBDIMM Standards teaches this limitation for.

> h) *Limitation 1.i.3: "the at least one circuit coupled to both the second regulated voltage and the fourth regulated voltage"*

Petitioner contends that Harris with the FBDIMM standards discloses this limitation. Pet. 34–35 (citing Pet. 14–19, 27; Ex. 1003 ¶¶ 318–323). Specifically, Petitioner contends that Harris's buffer 112 in Figure 1A is coupled to "the second regulated voltage" (e.g., $V_{CC}$ or $V_{CCFBD}$=1.5V) and "the fourth regulated voltage" (e.g., $V_{DDSPD}$=3.3V). *Id.*

Patent Owner does not specifically respond to Petitioner's contentions for this limitation. *See* Resp.

Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris with the FBDIMM Standards teaches this limitation.

> i) *Limitation 1.i.4: "wherein a first one of the second and fourth voltage amplitudes is less than a second one of the second and fourth voltage amplitudes."*

Petitioner contends that "one of the second and fourth voltage[s]" (e.g., 1.5V) "is less than a second one of the second and fourth voltage[s]" (e.g., 3.3V). Pet. 35 (citing Pet. 14–19, 27; Ex. 1003 ¶¶ 324–327).

Patent Owner does not specifically respond to Petitioner's contentions for this limitation. *See* Resp.

Based on our review and consideration of the current record, we determine that Petitioner has shown that the combination of Harris with the FBDIMM Standards teaches this limitation.

> j) *Determination for Claim 1*

Petitioner has shown that one of ordinary skill in the art would have had reason to combine Harris and the FBDIMM Standards with a reasonable

expectation of success. Petitioner has further shown that the combination of Harris and the FBDIMM Standards meets each limitation of claim 1. Accordingly, Petitioner has established by a preponderance of the evidence that claim 1 is unpatentable as obvious over the combination of Harris and the FBDIMM Standards.

       *5.    Claims 2, 3, 8, 14, and 15*

Claim 2 depends from claim 1 and recites "wherein the first and third buck converters are further configured to operate as a dual buck converter." EX. 1001, 38:53–55. Petitioner contends that the combination of Harris and the FBDIMM Standards discloses this limitation. Pet. 35–40. Specifically, Petitioner contends that at the time there were many commercially available products that could output two regulated voltages using buck converters, and thus, it would have been obvious to implement two or more of the regulated voltages such as the "first" and "third" voltages as a "dual buck converter" to reduce the number of integrated circuits, pins, and interconnections on the module, therefore simplifying the design. Pet. 36 (Ex. 1003 ¶ 338). Petitioner contends that commercially available devices included the Murata MPD4S014S dual buck converter (EX. 1042, 6; Ex. 1048, 1–2; Ex. 1058, 5), the Texas Instruments TPS51020 Dual Step-Down Controller (Ex. 1040, 1, 11) and the Fairchild Semiconductor FAN5026 Dual-Output PWM Controller" (Ex. 1041, 1, 2, 9). *See* Pet. 36–40.

Patent Owner presents no argument specific to claim 2. *See* Resp.

Based on our review and consideration of the current record, we determine that Petitioner has shown that the combination of Harris with the FBDIMM Standards renders claim 2 obvious.

IPR2022-00996
Patent 11,016,918 B2

Claims 3 depends from claim 1 and recites "wherein the first voltage amplitude is 1.8 volts." Ex. 1001, 38:56–57. Petitioner contends that the combination of Harris and the FBDIMM Standards discloses this limitation. Pet. 41 (citing Pet. 14–19, 27; Ex. 1003 ¶¶ 348–353).

Patent Owner presents no argument specific to claim 3. *See* Resp.

Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris with the FBDIMM Standards renders claim 3 obvious.

Claim 8 depends from claim 1 and recites

> the plurality of components further comprising:
> one or more registers coupled to one of the first, second, third and fourth regulated voltages, the one or more registers configured to register, in response to a clock, the first plurality of address and control signals, wherein the one of the first, second, third and fourth regulated voltages is selectively switched off to turn power off to the one or more registers while one or more components of the plurality of components are powered on.

Ex. 1001, 39:9–19.

Petitioner contends the combination of Harris and the FBDIMM Standards discloses claim 8. Pet. 41–46. Specifically, Petitioner contends that Harris's buffer 112 is a component that has registers to register incoming signals and output them according to a "clock" signal, as shown in Harris's Figures 1A and 3. *Id.* at 41. Petitioner contends Harris's buffer 112 is coupled to the voltage $V_{CC}$ or $V_{CCFBD}$ as the "second regulated voltage." *Id.* (citing Pet. 14–19, 27). Petitioner contends Harris discloses "buffer/logic component 112 is provided for buffering command/address (C/A) space as well as data," which a person of ordinary skill in the art would have understood involves registers for registering the address, control, and data

IPR2022-00996
Patent 11,016,918 B2

signals in response to a "clock" signal. *Id.* at 42 (citing Pet. 22–25; Ex. 1023 ¶¶ 9, 17, Fig. 3; Ex. 1003 ¶¶ 400–402; Ex. 1027, 19) (emphasis omitted).

Petitioner further contends that the combination of Harris and the FBDIMM Standards discloses an S3 sleep mode that selectively switches off the second voltage to turn off the power to the one or more registers while the DRAMs remain powered on to refresh data in the DRAMs. Pet. 45 (citing Pet. 14–19, 27; Ex. 1003 ¶¶ 410–411, 414–420; Ex. 1012 ¶ 9; Ex. 1027, 21, 39).

We have already addressed Patent Owner's arguments for patentability of claim 8 with respect to limitation 1.b and determine they do not undermine Petitioner's showing. *See* Section III.D.4.b.2.
.

Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris with the FBDIMM Standards renders obvious claim 8.

Claim 14 depends from claim 8 and recites

> wherein, in response to selectively switching on the one of the first, second, third and fourth regulated voltages to the one or more registers, the one or more registers is configured to output the registered first plurality of address and control signals to the plurality of SDRAM devices.

Ex. 1001, 39:40–45.

Petitioner contends that when the S3 sleep mode ends, normal DRAM transactions begin again and the second voltage which powers the input/output registers switches on and the registers output the registered address and control signals to the SDRAM devices. Pet. 46 (citing Ex. 1027, 25; Ex. 1003 ¶¶ 462–466).

IPR2022-00996
Patent 11,016,918 B2

For the reasons stated for claim 8, we determine that Patent Owner's arguments do not undermine Petitioner's showing. Resp. 11–15.[5]

Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris with the FBDIMM Standards renders claim 14 obvious.

Claim 15 depends from claim 1 and recites

> the plurality of components further comprising:
> a logic element including one or more integrated circuits and discrete electrical elements, the one or more integrated circuit including an internal non-volatile memory, wherein the non-volatile memory is configured to store configuration information.

Ex. 1001, 39:46–52.

Petitioner contends that the combination of Harris and the FBDIMM Standards discloses claim 15. Pet. 47–50. Specifically, Petitioner contends logic in Harris's buffer includes an integrated circuit, as does its serial presence detect (SPD), including non-volatile memory. Pet. 47 (citing Ex. 1027, 25; Ex. 1003 ¶¶ 435–437, 468–476). Petitioner further contends the logic element includes discrete elements such as resistors and capacitors to terminate voltages for Harris's buffer. *Id.* Petitioner asserts that the S3 sleep mode of the FBDIMM Standards requires S3 Recovery Configuration Registers. *Id.* According to Petitioner, an FBDIMM like Harris's memory module will store configuration information in non-volatile memory before entering into S3 sleep mode. *Id.* (citing Ex. 1027, 25, 95–96, 141). Petitioner further contends that a person of ordinary skill in the art would

---

[5] Patent Owner makes this same argument for claim 21 challenged under Ground 2, which we find does not undermine Petitioner's showing for the same reasons as stated for claim 8. Resp. 11–15.

have understood that the "non-volatile memory" can be implemented in the SPD device separate from the integrated circuit implementing the AMB (Advanced Memory Buffer) where the SPD is used to store configuration information in the non-volatile memory. *Id.* at 48–49 (citing Ex. 1023 ¶ 19; Ex. 1027, 117; Ex. 1028, 13; Ex. 1066, 26:64–27:4; Ex. 1067, 1-1; Ex. 1003 ¶ 436). Petitioner further contends a person of ordinary skill in the art would have understood that the logic element includes discrete electrical elements such as resistors and capacitors, as taught by the FBDIMM Standards. *Id.* at 49–50 (citing Ex. 1003 ¶ 475; Ex. 1023 ¶ 9, Fig. 1A; Ex. 1028, 13, 42–45).

Patent Owner argues that Dr. Wolfe acknowledged that the AMB neither inherently nor expressly disclosed having a non-volatile memory. Resp. 43 (citing Ex. 2030, 285:23–286:17; *see also* Ex. 2031 ¶ 122); Sur-Reply 22. Patent Owner further argues that the statement in the FBDIMM Standards that the Control and Status Register (CSR) for the S3 sleep mode should be stored in non-volatile memory does not mean that the non-volatile memory is in the AMB. Resp. 43 (citing Ex. 2030, 285:23–286:17); Ex. 1003 ¶ 435 (CSR meaning). Patent Owner further notes that Dr. Wolfe stated that he had no knowledge that any AMB included a non-volatile memory. *Id.* (citing Ex. 2030, 292:10–20, 293:1–6). Patent Owner argues that the CSRs that the Petition references at page 47 are stored in volatile, not non-volatile, memory. *Id.* (citing Ex. 2030, 293:8–294:2). Patent Owner further argues that SPD and AMB are two different components. *Id.* (citing Ex. 2030, 293:1–6, 292:21–25). For these reasons, Patent Owner argues that Petitioner "has not cited any reference showing a logic element with a non-volatile memory." *Id.*

IPR2022-00996
Patent 11,016,918 B2

    To explain his views, Dr. Wolfe reproduces the figure below from the
FBDIMM Standards:



Ex. 1003 ¶ 437 (citing Ex. 1028, 13) (highlighting Dr. Wolfe's). Dr. Wolfe
shows that the SPD is connected to the AMB to exchange the signals
indicated in yellow highlighting. He further states that "the 'logic element'
includes the logic in the buffer 112 and non-volatile memory (e.g., internal
or external to the buffer) for storing configuration information as required by
the S3 sleep mode." *Id.*

    There is no dispute on this record that the SPD is non-volatile
memory—the FBDIMM Standards require it to be. Ex. 1027, 25. Dr. Wolfe
expounds that the SPD can contain non-volatile memory, such as an
EEPROM, for storing configuration information using a higher voltage
supply at 3.3V. Ex. 1003 ¶ 436. Dr. Wolfe stated that "it would have been

obvious to a [person of ordinary skill in the art] to implement the buffer 112 with an internal nonvolatile memory because it would decrease the number of components, interfaces and interconnections on the memory module, resulting in a cheaper, faster, and more secure solution." Ex. 1003 ¶ 436. Dr. Wolfe further states that the SPD and AMB are tied to the same voltage V$_{DDSPD}$. *Id.* In other words, the SPD and AMB are closely related.

Dr. Mangione-Smith states that the SPD and AMB are two different components. Ex. 2031 ¶ 123. The claims do not preclude, however, that the "logic element" may be parts of the SPD and AMB (Harris's FBDIMM buffer) related to the SPD functionality. Ex. 1023 ¶ 9; Ex. 1028, 105; 1003 ¶ 474. In fact, as Petitioner notes, claim 15 recites that the logic element may include "*one or more* integrated circuits." Reply 23 (citing Ex. 1001, 23:1–18; Pet. 47–49; Ex. 1003 ¶¶ 434–436). Accordingly, Petitioner has shown that the combination discloses a "logic element including a non-volatile memory" as claimed. Pet. 47–50, 67–68, 72; Reply 23.

There is no dispute that the CSRs, which are stored in the SPD before the memory module enters the S3 sleep mode, constitute "configuration information" as recited in claim 15. Pet. 47 (citing Ex. 1027, 25 (DRC, MTR, DREFTC, DAREFTC, S3RESTORE[15:0], SPDPAR[15:0] – SPDI personality bytes), 95–96, 141; Ex. 1003 ¶ 435)).

Further, there is no dispute that Harris's buffer and the SPD are "integrated circuits," and that the buffer is connected to "discrete electrical elements" (e.g., resistors and capacitors) as recited in claim 15. Ex. 1023, Figs. 1A, 3 (showing buffer is integrated circuit on DIMM); Ex. 1027, 25 (non-volatile memory is an integrated circuit); Ex. 1028, 43 (showing resistors and capacitors connected to AMB).

IPR2022-00996
Patent 11,016,918 B2

Thus, we agree with Petitioner that the features of these claims are taught or at least suggested by the combination of Harris and the FBDIMM Standards. Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris with the FBDIMM Standards renders claim 15 obvious.

### 6.     Claim 23

Claim 23 is an independent claim. Ex. 1001, 40:50–41:21. Petitioner contends that the limitations of claim 23 are substantially identical to earlier limitations, and are thus obvious for the reasons stated above. Pet. 50–51.

Patent Owner presents no additional argument for claim 23 other than arguments previously discussed. *See* Resp.

Based on our review and consideration of the record, we determine that Petitioner has shown that Harris in combination with the FBDIMM Standards renders obvious claim 23.

### 7.     Determination for Ground 1

Petitioner has shown by a preponderance of the evidence that claims 1–3, 8, 14, 15, and 23 are unpatentable as obvious over the combination of Harris and the FBDIMM Standards for the reasons explained.

### E.     Ground 2:  Obviousness Over Harris, the FBDIMM Standards, and Amidi

Petitioner contends that claims 1–30 of the '918 patent would have been obvious over the combination of Harris, the FBDIMM Standards, and Amidi. Pet. 51–75. For the reasons that follow, we are persuaded that the evidence, including Dr. Wolfe's testimony, sufficiently supports Petitioner's arguments and, therefore, establishes by a preponderance of the evidence

IPR2022-00996
Patent 11,016,918 B2

that claims 1–30 of the '918 patent are unpatentable as obvious over the combination of Harris, the FBDIMM Standards, and Amidi.

      *1.*    *Amidi (Ex. 1024)*

      Amidi was filed on October 25, 2006, issued on May 25, 2010, and is titled "Clock and Power Fault Detection for Memory Modules." Ex. 1024, codes (22), (45), (54). Petitioner contends Amidi is prior art under § 102(e). Pet. 12.

      Amidi's Figure 5 is reproduced below.



**FIG. 5**

Amidi's Figure 5 above illustrates a power management block 510 that receives an incoming system supply 520, and incoming battery supply 530, and generates an outgoing memory power supply 540 that is stabilized in the face of disruptions to the system supply 520 using the battery supply 530. Ex. 1024, 4:14–22, 8:23–36, Figs. 5, 14; Ex. 1003 ¶¶ 131–132.

IPR2022-00996
Patent 11,016,918 B2

2.    *Motivation to Combine*

Petitioner contends that a person of ordinary skill in the art would have been motivated to combine Harris and the FBDIMM Standards with Amidi with a reasonable expectation of success.  Pet. 52.  Specifically, Petitioner contends that Harris recognizes concerns with power reliability and proposes the use of a redundant power source.  *Id.* (citing Ex. 1023 ¶¶ 12–14, 16, Figs. 1B, 2).  Petitioner notes that Amidi teaches a redundant power source (a battery on the memory module) for maintaining data during power disruption.  *Id.* at 52–53 (citing Ex. 1024, code (57), 1:28–35, 2:6–26, 4:14–60, Figs. 5–6; Ex. 1003 ¶¶ 170–175).  Petitioner further notes that Amidi's power management block could be modified easily to work with Harris's FBDIMM memory module by changing the system supply 520 and memory supply 540 to 12V as taught by Harris.  *Id.* at 53 (citing Ex. 1024, Figs. 5, 6; Ex. 1023 ¶ 12; Ex. 1003 ¶¶ 171–172).  Petitioner contends that, to a person of ordinary skill in the art, it would have been obvious to use the 12V external supply stepped-down with a buck converter to a 5V supply for charging Amidi's battery, and that Amidi's battery voltage would be stepped-up with a boost converter to the 12V level used by Harris's memory module.  *Id.* at 53–54 (citing Ex. 1024, Fig. 6 (620); Ex. 1003 ¶¶ 171–172).  Petitioner contends that Amidi discloses that its power management block uses "buck" converters to step-down voltages as needed, and "boost" converters to step-up voltages as needed, as had long been taught in textbooks.  *Id.* at 54 (citing Ex. 1024, 4:27–32, 4:38–40, Figs. 5, 6; Ex. 1058, 3; Ex. 1032, 161).  Petitioner further contends that Amidi's battery backup mode is similar to the S3 power-saving mode of Harris's FBDIMM memory module and the FBDIMM Standards, such that a person of ordinary skill in

72

IPR2022-00996
Patent 11,016,918 B2

the art would have been motivated to combine their teachings. *Id.* at 54–56. Petitioner contends this is a straightforward modification of Harris's memory module in view of Amidi and the knowledge of a person of ordinary skill in the art and simply uses a known technique (e.g., Amidi's battery backup techniques) to improve a similar device (e.g., Harris's memory module) in the same way (e.g., to provide a backup power supply using a battery). *Id.* at 55 (citing Ex. 1003 ¶ 175). In addition, Petitioner contends, the modification merely applies a known technique (e.g., providing a backup power supply) to a known device (e.g., a memory module) that is ready for the improvement to yield predictable results (e.g., redundancy when the system supply or clock fails). *Id.*

Petitioner contends that the combination of Harris, the FBDIMM Standards, and Amidi would result in the following configuration and voltage mappings:



Pet. 55–56 (citing *id.* at 14–19, 27; Ex. 1003 ¶¶ 174–179). Above, Petitioner has annotated Harris's Figure 1A to show features added from the teachings

IPR2022-00996
Patent 11,016,918 B2

of the FBDIMM Standards (red) and features added from the teachings of Amidi (blue). *Id.*

Patent Owner argues that Harris provides alternate voltage sources to power a memory module in the event of a power interruption, so Harris already provides a solution for the alleged problem that Amidi addresses. Resp. 31–38; Sur-Reply 19–20. Specifically, Patent Owner argues that Harris has "logic 124" that selects a different voltage source if power becomes unavailable on one of the supply voltage paths 120-1 through 120-K. Resp. at 32–33 (citing Ex. 1023, Fig. 1B; Ex. 2031 ¶ 106). Patent Owner further argues that substituting Amidi's battery backup solution for Harris's redundant power sources would require substantial space to accommodate the lithium battery and associated battery charging and monitoring circuits and power management block. *Id.* at 35–38 (citing Ex. 1024, Figs. 4–6; Ex. 1023 ¶¶ 2, 13; Ex. 2031 ¶¶ 108 n.5, 109). Patent Owner argues that Petitioner "has entirely ignored the issue of whether the essential parts of Amidi it seeks to apply to the combination would even fit onto Harris' circuit board" and that "Petitioner has presented no evidence that a [person of ordinary skill in the art] would expect Harris' memory module to be able to accommodate three buck converters, a lithium battery and its associated charging and monitoring circuits, and Amidi's power management module, at least not without undergoing a substantial re-design." *Id.* at 35–38 (citing Ex. 1055, Fig. 4; Ex. 2101, 20; Ex. 2042, 7; Ex. 2031 ¶ 112).

We agree with Petitioner that Amidi provides a redundant power supply on the memory module that is independent from the host, and that a person of ordinary skill in the art would have seen the value of adding a

IPR2022-00996
Patent 11,016,918 B2

redundant power supply onboard Harris's memory module at least for some practical applications. Reply 19–20 (citing Pet. 52–53; Ex. 1003 ¶ 170; Ex. 1024, 1:28–35, 2:6–26). Although Harris mentions an "external voltage source," it does not mention the term "battery." Hence, Patent Owner's arguments that Amidi provides a solution to a problem that Harris already solves is not correct. *See* Ex. 1003 ¶ 170 ("Amidi recognizes that it is useful to keep data on the memory module with a backup power supply on the module itself, such as a battery supply, when the entire system surrounding the memory module loses power.") (citing Ex. 1024, 1:28–35; 2:6–26). Furthermore, Petitioner shows that memory modules with battery backup were known in the art and readily available. Reply 19 (citing Ex. 2035, 39; Ex. 1075, 165:10–167:7). As to the space issue, Petitioner notes that even if the battery backup occupies one side of an FBDIMM board, the other side still can include one rank or two ranks using stacked memory devices. *Id.* at 19–20 (Ex. 1028, 36; Ex. 1075, 74:22–75:25, 77:10–17).

Accordingly, we determine that Petitioner has shown that one of ordinary skill in the art would have been motivated to combine Harris, the FBDIMM Standards, and Amidi with a reasonable expectation of success.

### 3. *Claims 1–3, 8, 14, 15, and 23*

We agree with Petitioner that the addition of Amidi does not negate Petitioner's showing with respect to the previous ground. Pet. 56, 66–67 (citing Ex. 1003 ¶¶ 215–353, 412–413, 467–476, 557–597). Accordingly, Petitioner has shown by a preponderance of the evidence that claims 1–3, 8, 14, 15, and 23 are unpatentable as obvious over the combination of Harris, the FBDIMM Standards, and Amidi for the reasons stated in the previous ground.

> 4.    Claims 16–22 and 30 ("pre-regulated input voltage")

Claims 16–22 and 30 recite a "pre-regulated input voltage." Ex. 1001, 39:61, 42:23. As explained in Section III.C.2, we understand "pre-regulated input voltage" to mean that the voltage is regulated before conversion to a stepped up or down level by the voltage converters. *See* Ex. 1001, code (57), 28:53–58, Fig. 16 (1110, 1112).

Petitioner contends that, with the exception of the "pre-regulated input voltage" limitation, claims 16–22 and 30 are combinations of limitations previously discussed which are rendered obvious for the reasons for reasons earlier presented in the Petition. Pet. 70–75. Petitioner provides a table showing the correspondences of the limitations of these claims to others discussed earlier in the Petition. *Id.* at 71–73. We agree that each limitation of these claims is taught or suggested by the combination of Harris, the FBDIMM Standards, and Amidi for the reasons previously discussed in the Petition for those same limitations.

Turning to the "pre-regulated input voltage" limitation, Petitioner contends that Harris discloses an input that is "pre-regulated" because it is "within pre-determined limits" and because it can be "regulated." Pet. 73 (citing Ex. 1023 ¶¶ 13–14; Ex. 1003 ¶¶ 487–488). Alternatively, Petitioner contends that Amidi teaches a boost converter in its power management block that converts (and thus pre-regulates) the battery voltage to an output of 12 Volts. Pet. 73–74 (citing *id.* at 52–56; Ex. 1003 ¶ 489; Ex. 1032, 161 (explaining that switch-mode converters, including boost converters, "convert the unregulated dc input into a controlled dc output at a desired voltage level")).

IPR2022-00996
Patent 11,016,918 B2

Patent Owner states that Harris's 12V input with a "+/-15%" tolerance is an unregulated voltage source.  Resp. 38 (citing Ex. 1023 ¶ 13).  Patent Owner does not explain what distinguishes a regulated voltage from an unregulated one, but, in any event, Harris expressly discloses that the external voltage supply may be "regulated."  Ex. 1023 ¶ 14.  This means "pre-regulated" in the context of the claims.  Pet. 73–74 (citing Ex. 1023 ¶¶ 13–14; Ex. 1003 ¶¶ 487–489).  Because the voltage that is received at the voltage converters has already been regulated externally, this meets our adopted construction (which, as we note above, is consistent with Patent Owner's proposed construction).  *See* Resp. 38 ("A pre-regulated input voltage is just a regulated voltage provided to these voltage conversion circuits.").

Patent Owner further argues that "when a power supply other than the 12V external power source is used, Harris teaches the use of corresponding VRMs."  Resp. 38 (citing Ex. 1023 ¶ 14, Fig. 1B).  Therefore, Patent Owner argues, there is no reason to generate a pre-regulated 12V voltage, as Petitioner contends.  *Id.*  But, as explained, Harris expressly discloses that a "regulated" voltage may be input to its memory module and, therefore, Harris teaches converters that are "configured to receive a pre-regulated input voltage," as recited in the claims.  Ex. 1023 ¶ 14.

After reviewing the record, we determine that Petitioner has shown by a preponderance of the evidence that the combination of Harris, the FBDIMM Standards, and Amidi teaches the "pre-regulated input voltage" subject matter of claims 16–22.

IPR2022-00996
Patent 11,016,918 B2

     5.    *Claims 5–7, 9–13, 16–22, and 24–27*

Claims 5–7, 9–13, 16–22 and 24–27 recite, or depend from a claim that recites, that the voltage monitor circuit generates the trigger signal in response to the input voltage being ***greater than*** a predetermined threshold voltage. Ex. 1001, 38:61–67, 40:7–13, 41:22–27, 42:21–26. Claims 11, 12, 18, 19, 25, and 26 require certain actions to be taken in response to the "trigger signal."

     a)    *Trigger Signal on Overvoltage—Claims 5, 16, and 24*

Claim 5 recites

> a voltage monitor circuit configured to monitor a power input voltage received via a second portion of the plurality of edge connections, the voltage monitor circuit configured to produce a trigger signal in response to the power input voltage having a voltage amplitude that is greater than a first threshold voltage.

Ex. 1001, 38:61–67. Claims 16 and 24 recite similar limitations. *Id.* at 41:22–27, 40:7–12.

We address claim 5 as representative of this group of claims. For claim 5, Petitioner contends that Harris teaches detecting both undervoltage and overvoltage conditions. Pet. 62 (citing Ex. 1023 ¶ 13). In this regard, Harris states that the tolerance of the +12V power supply is "around +/- 15%." Ex. 1023 ¶ 13. Petitioner asserts that, in the combination, Amidi's power supervisory module/block 665 ("voltage monitor circuit") monitors system supply 605 ("power input voltage") received from Harris's edge connections. Pet. 60–61 (citing Ex. 1003 ¶¶ 359–376). Petitioner further asserts that Amidi's signal 670 is the claimed "trigger signal" to switch to battery power. *Id.* at 61–62 (Ex. 1024, 4:44–52, 5:25–43, 8:23–29, 9:8–12, Figs. 5, 6, 14–15). Petitioner contends that such circuitry for either

IPR2022-00996
Patent 11,016,918 B2

overvoltage and undervoltage protection was well known and commercially available. *Id.* at 62–63 (citing Ex. 1063, 1–2; Ex. 1061, 15 (circuit for "undervoltage" and "overvoltage" detection); Ex. 1062, 15 (same); Ex. 1065, code (57), ¶¶ 14, 18–19, Figs. 1, 5 (similar)).

Patent Owner argues that neither Harris nor Amidi teaches detecting an overvoltage. Resp. 39; Sur-Reply 20–22. However, Harris discloses that its +12V power supply has a tolerance of "+/- 15%" which indicates it would be a concern if the power supply was greater than 15%. Ex. 1023 ¶ 13. Amidi indicates concern with "power fault[s]." Ex. 1024, codes (54), (57). Although Patent Owner points out that Amidi discloses detection of undervoltage (Ex. 1024, Fig. 14), "power fault" is broad enough to encompass overvoltage as well. We agree with Petitioner that a person of ordinary skill in the art considering these teachings would have considered it obvious to detect overvoltage and generate a trigger signal in response to the detection.

Patent Owner argues that the voltage regulators on which Petitioner relies do not detect input overvoltage because they can accommodate a wide range of input voltages, and there is a low probability that they would exceed their operational range. Resp. 40 (citing Ex. 2030, 58:24–61:12; Ex. 1040; Ex. 1041; Ex. 2031 ¶ 117). Petitioner replies that power surges were a known problem that could cause data loss or corruption or damage circuitry in memory boards. Reply 21–22 (citing Ex. 1003 ¶¶ 371–373; Ex. 2030, 254:24–256:11, 258:12–20; Ex. 1065, 18–19; Ex. 1063, 1–2; Ex. 1061, 15; Ex. 1062, 15; Ex. 1075, 196:10–197:13). Petitioner contends that Harris discloses that its module can accommodate only "+/- 15%" of the

IPR2022-00996
Patent 11,016,918 B2

nominal supply voltage, which is consistent with maximum ratings for commercial converters. *Id.* at 22 (citing Ex. 1041, 4).

We agree with Petitioner that power surges would have been a problem in at least some circumstances for which one of ordinary skill in the art would have seen the value of voltage detection in order to take preventive action to avoid loss of data and damage to the memory module. Dr. Wolfe credibly explains that overvoltage was a danger known to persons of ordinary skill in the art, citing industry datasheets that specify overvoltage parameters. Ex. 1003 ¶¶ 371–373 (citing Ex. 1063, 1–2; Ex. 1061, 15; Ex. 1062, 15). Indeed, the cited evidence uses the phrase "an overvoltage fault" (Ex. 1061, 15), which shows that power faults are not limited to undervoltage situations.

> b)  *Logic Element with Non-Volatile Memory—Claims 10, 11, 15, and 22*

Claims 10, 11, 15, and 22 recite a logic element that includes a non-volatile memory. Ex. 1001, 39:23–27, 39:28–30, 39:46–52, 40:43–49. Claim 10 further recites that the non-volatile memory is "configured to store configuration information." Claim 11 depends from claim 10 and recites that the logic element writes information into the non-volatile memory in response to the trigger signal. Claim 15 further recites that logic element includes one or more integrated circuits including an internal non-volatile memory, and discrete electrical elements. Claim 22 omits mentions of integrated circuits or discrete elements, but recites that the configuration information is used to program the logic element.

Petitioner contends that the combination of Harris, the FBDIMM Standards, and Amidi discloses these claims. Pet. 47–50, 67–68, 72; Reply

IPR2022-00996
Patent 11,016,918 B2

23. Specifically, Petitioner contends that the "non-volatile memory" for the "logic" can be either in Harris buffer (e.g., an AMB) or in an SPD connected to that buffer. Pet. 47–50, 67–68, 72.

Patent Owner argues that the FBDIMM AMB is not disclosed as having a non-volatile memory, and that, although the SPD contains a non-volatile memory according to the FBDIMM standards, the AMB and SPD are two different components. Resp. 43.

For the reasons explained for claim 15 under Ground 1, Patent Owner's arguments do not undermine Petitioner's showing. Thus, we agree with Petitioner that the features of these claims are taught or at least suggested by the combination of Harris, the FBDIMM Standards, and Amidi.

### c) Write Operation on Overvoltage—Claims 11, 12, 18, 19, 25, and 26

Claim 11 recites "wherein, in response to the trigger signal, the logic element writes information into the non-volatile memory." Ex. 1001, 39:28–30. Claim 12 depends from claim 11 and recites a non-volatile memory and a controller, and the controller performs a write operation to the non-volatile memory in response to the trigger signal. *Id.* at 39:31–39. Claim 18 recites a controller that executes a write operation in response to a (trigger) signal. *Id.* at 40:17–21. Claim 19 recites that the write operation includes writing data information into non-volatile memory. *Id.* at 40:22–24. Claim 25 recites a controller that executes a write operation in response to the trigger signal. *Id.* at 42:1–5. Claim 26 recites that the write operation includes writing data information to non-volatile memory. *Id.* at 42:6–8.

For claim 11, Petitioner contends that the trigger signal was explained with respect to claim 5 and may be a power disruption. Pet. 68. Petitioner further contends that the logic element writes S3 configuration information as discussed for claims 10 and 15, to allow sleep mode to conserve power during Amidi's battery backup mode. *Id.* (citing Ex. 1003 ¶¶ 439–443). Petitioner contends that Amidi's battery backup mode is similar to the S3 power-saving mode of Harris's FBDIMM memory module, because both modes put the SDRAMs in a self-refresh state to preserve data while conserving power. *Id.* (citing Pet. 45–46; Ex. 1024, 2:16–19, Fig. 11). In the event of a power disruption causing a trigger signal, Petitioner contends that a person of ordinary skill in the art would have been motivated to use the S3 sleep mode (Pet. 45–46) to conserve power during Amidi's battery backup mode, as discussed in claims 10 (Pet. 67) and 15 (Pet. 47–50), and that the S3 sleep mode requires writing S3 configuration information into the non-volatile memory in the SPD before going to sleep. *Id.* (citing Ex. 1003 ¶ 442). For claim 12, Petitioner contends that the "controller" corresponds to Harris's buffer, which stores S3 configuration information in non-volatile memory in the SPD before entering S3 sleep mode. Pet. 47–50, 67–68; Ex. 1071, 39–46; Ex. 1073, 46–63; Ex. 1003 ¶¶ 444–456. Petitioner relies on similar disclosures for claims 18, 19, 25, and 26. Pet. 71–73.

Patent Owner argues that S3 sleep mode is a low power state mode whereas overvoltage does not result in low or lost power. Resp. 44 (citing Ex. 2031 ¶ 124); Sur-Reply 22–23. Patent Owner also argues that known converters could operate even at high input overvoltage. Resp. 44 (citing Resp. Sect. IV.F.1).

Petitioner counters that overvoltage conditions can cause data loss, thus motivating a person of ordinary skill in the art to switch to backup power, where the S3 mode would be used. Reply 23 (citing Pet. 68–69).

Patent Owner argues that a memory module cannot decide to enter the S3 sleep mode upon detection of an overvoltage. Sur-Reply 22. Instead, according to Patent Owner, the CPU determines when the memory module should enter the S3 sleep mode. Sur-Reply 22–23 (citing Ex. 2030, 282:22–284:25; Ex. 2031 ¶¶ 124–125; Ex. 2006, 3). Patent Owner argues there is no evidence that such a modification could be predictably made or result in an operable implementation. *Id.* at 23 (citing Ex. 2031 ¶ 125).

As Petitioner notes, Amidi provides the teaching of generating the trigger signal ***onboard the memory module*** in response to detecting a "power fault" or "disruption." Pet. 12, 52, 55, 61–62; Ex. 1003 ¶¶ 132, 171, 174, 368–374. Considering the prior art teachings together, we agree with Petitioner that one of ordinary skill in the art would have understood that overvoltage detection and generating the trigger signal onboard the memory module was an option to pursue. This option would have been both predictable and pursued with a reasonable expectation of success since the prior art combination, Amidi in particular, teaches how it could be implemented.

### 6. *Claims 4, 28, and 29*

Claim 4 recites that the second, third, and fourth voltage amplitudes are 2.5V. 1.2V, and 3.3V, respectively. Ex. 1001, 38:58–60. Petitioner contends that Harris discloses voltages within the range of 0.5V to 3.3V, and that Voltage Mapping D from the FBDIMM Standards discloses these voltages. Pet. 57–60.

IPR2022-00996
Patent 11,016,918 B2

Claim 28 recites that the second and third buck converters are configured to operate as a dual buck converter. Ex. 1001, 42:14–16. Petitioner contends this feature is disclosed by the combination. Pet. 73.

Claim 29 recites that the SDRAMS devices are configured to receive one of the first through fourth regulated voltages at 1.8V. Petitioner contends this feature is disclosed by the combination. *Id.*

Patent Owner presents no arguments specific to these claims. Petitioner has shown that these claims are disclosed by the combination.

### 7. *Determination for Ground 2*

Petitioner has demonstrated that a person of ordinary skill in the art would have had reason to combine Harris, the FBDIMM Standards, and Amidi with a reasonable expectation of success. Petitioner has also demonstrated that all of the limitations of claims 1–30 are taught or suggested by the combination. Accordingly, Petitioner has demonstrated by a preponderance of the evidence that claims 1–30 of the '918 patent would have been obvious over the combination of Harris, the FBDIMM Standards, and Amidi.

### F. *Ground 3: Obviousness over Harris, the FBDIMM Standards, Amidi, and Hajeck*

Petitioner contends claims 1–30 would have been obvious over the combination of Harris, the FBDIMM Standards, Amidi, and Hajeck. Pet. 75–77.

### 1. *Hajeck (Ex. 1038)*

Hajeck is titled "Storage Subsystem with Embedded Circuit for Protecting Against Anomalies in Power Signal from Host." Ex. 1038, code

IPR2022-00996
Patent 11,016,918 B2

(54).  Hajeck issued as U.S. Patent No. 6,856,556 B1 on February 15, 2005.
Petitioner contends Hajeck is prior art under § 102(b).  Pet. 12.

Hajeck seeks to protect storage subsystems from damage and data loss
caused by irregularities in a power signal provided by a host.  Ex. 1038,
1:10–13.  Specifically, Hajeck seeks to prevent data loss due to loss of
power from a host system, and to prevent power surges or spikes from
damaging circuitry of the storage subsystem.  *Id.* at 1:15–31.

Hajeck's Figure 1 is reproduced below.



In Hajeck's Figure 1, non-volatile memory subsystem 30 receives power
from host system 32 at charge pump 46 which supplies regulated voltage to
controller 40.  *Id.* at 2:64–67.  In the event of a power surge or spike, charge
pump 46 protects controller 40 from damage.  *Id.* at 3:12–16.  In the event of
a voltage drop, charge pump 46 with battery and capacitive array 52
provides sustained voltage to controller 40.  *Id.* at 2:60–63, 3:10–13.
Voltage detection circuit 48 detects anomalies in the input voltage, including

undervoltage and overvoltage conditions, and generates a "busy" signal provided to the host system 32 to block the host system from performing write operations to the storage subsystem. *Id.* at 1:64–67, 3:30–43.

### 2.    Motivation to Combine

Petitioner contends that one of ordinary skill in the art would have been motivated to combine Hajeck with Harris, the FBDIMM Standards, and Amidi because such person would have appreciated the desirability of switching to backup power in both undervoltage and ***overvoltage*** conditions. Pet. 75–76. Hajeck teaches to use a backup power supply, such as a charge pump, battery, or capacitive array, in response to power loss from the host system to complete outstanding operations, and to use the charge pump to protect the controller from surges or spikes in the power supply. *See, e.g.*, Ex. 1038, code (57), 1:53–61.

Petitioner also contends that overvoltage caused by anomalies such as power surges "can cause data loss, data corruption or circuitry damage in memory boards—as anyone with a surge protector at home knows." Reply 22 (citing Pet. 75–76; Ex. 1003 ¶¶ 137, 184). Although Patent Owner argues that Hajeck's charge pump protects against power surges (Resp. 41), Petitioner relies on Hajeck for its "teachings related to overvoltage anomalies when implementing Amidi's voltage supervisory block in Ground 2 so that it detects both undervoltage and overvoltage anomalies." Pet. 76 (emphasis omitted) (citing Ex. 1003 ¶¶ 185–187).

We agree with Petitioner that Patent Owner's arguments attack the references individually and do not properly consider what the combination of references would have signified to a person of ordinary skill in the art. Reply 21 (citing Resp. 39–42); *In re Merck & Co.*, 800 F.2d 1091, 1097

(Fed. Cir. 1986) (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981)). Petitioner relies on Hajeck for its teaching of detecting an overvoltage condition to the extent that the combination of Harris, the FBDIMM Standards, and Amidi were deemed not to already disclose that feature. Pet. 76–77. Thus, the features that Patent Owner argues are missing from Hajeck are not ones for which Petitioner relied on Hajeck.

For similar reasons, we also do not agree with Patent Owner's argument that Hajeck does not suggest that data loss was a concern because its charge pump could provide the desired $V_{REF}$ indefinitely. Resp. 42 (citing Ex. 2031 ¶¶ 120–121). Petitioner does not rely on Hajeck for its teaching of a charge pump, nor does Petitioner propose that one is included in the prior art combination. Pet. 75–76. In any case, Hajeck teaches that the charge pump provides power to its storage subsystem ***temporarily*** and that a battery or capacitive array may provide additional sources of backup power, so we do not agree that Hajeck teaches that the charge pump can supply power indefinitely. Ex. 1038, 1:56–61. Petitioner relies on Amidi for switching operational states and the voltage supply to battery backup in the event of an overvoltage. Reply 21 (citing Pet. 49–50). Thus, this argument too considers Hajeck individually, and not in combination with Harris, the FBDIMM Standards, and Amidi, as set forth in the Petition.

### 3. *Overvoltage—Claims 5, 16, and 24*

Claims 5, 16, and 24 recite detecting that the voltage monitor circuit is configured to produce a trigger signal in response to the power input voltage having a voltage amplitude that is greater than a first threshold voltage. Ex. 1001, 38:61–67, 40:7–12, 41:22–28. Petitioner contends that these claims are disclosed by the combination of Harris, the FBDIMM Standards,

IPR2022-00996
Patent 11,016,918 B2

Amidi, and Hajeck. Pet. 76–77. Patent Owner argues that these claims are not disclosed. Resp. 40–42.

Patent Owner argues that Hajeck does not teach a voltage detection circuit that produces a trigger signal that causes transitions to a different operable state or otherwise relates to switching power sources. Resp. 40–42 (citing EX1038, 3:6–10, 3:30-57, 3:66–4:9, Ex. 2031 ¶¶ 119–121). This attacks Hajeck individually and is an improper approach to the obviousness analysis. *See Merck, Keller, supra.* Petitioner relies on Hajeck for its teaching of detecting an overvoltage condition, in combination with the teachings of Harris, the FBDIMM Standards, and Amidi which teach the voltage detection circuit configured to produce the trigger signal. Pet. 12–13, 60–66, 75–77; Ex. 1003 ¶¶ 137, 180–87, 363–84; Ex. 2030, 226:16–22, 230:17–232:6, 251:10–254:2.

Accordingly, the combination of Harris, the FBDIMM Standards, Amidi and Hajeck teaches, or at least suggests, the limitations of claims 5, 16, and 24.

### 4.    *Remaining Claims*

We find no reason suggesting that Hajeck would negate any of the teachings of Harris, the FBDIMM Standards, and Amidi as shown under Ground 2 (Sect. III.E). Thus, the combination of Harris, the FBDIMM Standards, Amidi, and Hajeck teach or suggest the limitations of the remaining claims under this Ground 3 for the same reasons stated for Ground 2.

### 5.    *Determination for Ground 3*

Petitioner has shown that a person of ordinary skill in the art would have been motivated to combine Harris, the FBDIMM Standards, Amidi,

IPR2022-00996
Patent 11,016,918 B2

and Hajeck with a reasonable expectation of success. Petitioner also shows that each limitation of claims 1–30 is taught or at least suggested by the prior art combination. Accordingly, Petitioner has shown by a preponderance of the evidence that claims 1–30 are unpatentable as obvious over the combination of Harris, the FBDIMM Standards, Amidi, and Hajeck.

G.     *Grounds 4 and 5: Obviousness over Spiers and Amidi*

As we have determined that claims 1–30 are unpatentable as obvious under Grounds 1 to 3, we do not reach Grounds 4 and 5.

H.     *Motion to Exclude*

Petitioner seeks to exclude materials referenced in three URLs submitted with Patent Owner's Sur-Reply on August 4, 2023. Paper 33 (citing Paper 31, 1 n.2, 24, 26). Because we do not rely on any of these URLs in a manner adverse to Petitioner, we dismiss the Motion to Exclude as moot.

## IV.    CONCLUSION

For the foregoing reasons, we determine that Petitioner establishes by a preponderance of the evidence that claims 1–30 of the '918 patent are unpatentable.

## V.    ORDER

Accordingly, it is:

ORDERED that claims 1–30 of the '918 patent have been shown to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is dismissed as moot;

FURTHER ORDERED that any party seeking judicial review must

IPR2022-00996
Patent 11,016,918 B2

comply with the notice and service requirements of 37 C.F.R. § 90.2.[6]

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 1–3, 8, 14, 15, 23 | 103 | Harris, FBDIMM Standards | 1–3, 8, 14, 15, 23 | |
| 1–30 | 103 | Harris, FBDIMM Standards, Amidi | 1–30 | |
| 1–30 | 103 | Harris, FBDIMM Standards, Amidi, Hajeck | 1–30 | |
| 1–30 | 103 | Spiers, Amidi | | |
| 1–30 | 103 | Spiers, Amidi, Hajeck | | |
| **Overall Outcome** | | | 1–30 | |

---

[6] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2022-00996
Patent 11,016,918 B2

FOR PETITIONER:

Eliot D. Williams
Theodore W. Chandler
Ferenc Pazmandi
Aashish Kapadia
Brianna L. Potter
BAKER BOTTS LLP
Eliot.williams@bakerbotts.com
Ted.chandler@bakerbott.com
Ferenc.pazmandi@bakerbotts.com
Aashish.kapadia@bakerbotts.com
Brianna.potter@bakerbotts.com

Juan Yaquian
WINSTON & STRAWN LLP
jyaquian@winston.com

FOR PATENT OWNER:

Hong Annita Zhong
IRELL & MANELLA LLP
hzhong@irell.com

91

Trials@uspto.gov
571-272-7822

Paper 51
Entered: December 5, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

SAMSUNG ELECTRONICS CO., LTD., MICRON TECHNOLOGY, INC.,
MICRON SEMICONDUCTOR PRODUCTS, INC., and MICRON
TECHNOLOGY TEXAS LLC,[1]
Petitioner,

v.

NETLIST, INC.,
Patent Owner.

IPR2022-00999
Patent 11,232,054 B2

Before PATRICK M. BOUCHER, JON M. JURGOVAN, and
DANIEL J. GALLIGAN, *Administrative Patent Judges.*

JURGOVAN, *Administrative Patent Judge.*

DECISION
Final Written Decision
Determining All Challenged Claims Unpatentable
Dismissing Petitioner's Motion to Exclude
*35 U.S.C. § 318(a)*

---

[1] Micron Technology, Inc., Micron Semiconductor Products, Inc., and
Micron Technology Texas LLC filed a motion for joinder and a petition in
IPR2023-00405 and have been joined as petitioners in this proceeding. *See*
Paper 27.

IPR2022-00999
Patent 11,232,054 B2

# I.    INTRODUCTION

## A.    *Background and Summary*

Samsung Electronics Co., Ltd. ("Samsung") filed a Petition (Paper 1, "Pet.") for *inter partes* review of claims 1–30 ("challenged claims") of U.S. Patent 11,232,054 B2 (Ex. 1001, "the '054 patent"). Netlist, Inc. ("Patent Owner") filed a Preliminary Response (Paper 7, "Prelim. Resp.") to the Petition. We instituted *inter partes* review under 35 U.S.C. § 314(a). Paper 11 ("Inst. Dec.").

During the trial, Patent Owner filed a Response (Paper 22, "Resp."), Petitioner filed a Reply (Paper 26), and Patent Owner filed a Sur-Reply (Paper 33). We joined Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC as petitioners in this proceeding, and we refer to Samsung and these entities collectively as "Petitioner." *See* Paper 27.

Petitioner and Patent Owner requested oral argument (Papers 29 and 30). A hearing was conducted on September 11, 2023. Paper 49 ("Tr.").

Petitioner objected to evidence (Papers 23, 34) and filed a Motion to Exclude (Paper 35). Patent Owner filed an Opposition to Petitioner's Motion to Exclude (Paper 36), and Petitioner filed a Reply (Paper 39) in support of its Motion to Exclude.

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a). Having reviewed the complete trial record, we determine that Petitioner has shown, by a preponderance of the evidence, that the challenged claims are unpatentable.

IPR2022-00999
Patent 11,232,054 B2

### B.    Real Parties in Interest

Petitioner entities, Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC identify themselves as real parties in interest.  Pet. 1; IPR2023-00405, Paper 3, 1.

Patent Owner identifies itself as the sole real party in interest.  Paper 4, 1.

### C.    Related Matters

The parties advise that the '054 patent is related to the following pending matters:

- *Samsung Electronics Co., Ltd. et al. v Netlist, Inc.,* No. 1:21-cv-01453 (D. Del. filed Oct. 15, 2021)
- *Netlist, Inc. v. Samsung Electronics Co., Ltd. et al.*, No. 2:21-cv-00463 (E.D. Tex. filed Dec. 20, 2021)
- IPR2012-00996 (U.S. Patent No. 11,016,918)
- IPR2017-00692 (U.S. Patent No. 8,874,831)
- U.S. Patent Application No. 17/582,797

Pet. 1; Paper 4, 1.

### D.    Overview of the '054 Patent (Ex. 1001)

The '054 patent is titled "Flash-DRAM Hybrid Memory Module." Ex. 1001, code (54).  Figure 12 of the '054 patent is reproduced below.

IPR2022-00999
Patent 11,232,054 B2



FIG. 12

Figure 12 shows an example memory system 1010 of the '054 patent. *Id.* at 21:14–16. The memory system 1010 includes a volatile memory subsystem 1030, a non-volatile memory subsystem 1040, and a controller 1062 operatively coupled to the volatile memory subsystem 1030 and the non-volatile memory subsystem 1040. *Id.* at 21:16–20. Volatile memory 1030 may comprise elements 1032 of two or more dynamic random access memory (DRAM) elements such as double data rate (DDR), DDR2, DDR3, and synchronous DRAM (SDRAM). *Id.* at 22:16–19. Non-volatile memory 1040 may comprise elements 1042 of flash memory elements such as NOR, NAND, ONE-NAND flash and multi-level cell (MLC). *Id.* at 22:35–40. Memory system 1010 may comprise a memory module or printed circuit board 1020. *Id.* at 21:24–26. Memory system 1010 has an interface 1022

4

for power voltage, data, address, and control signal transfer between memory system 1010 and a host system. *Id.* at 22:3–6.

Controller 1062 may include microcontroller unit 1060 and FPGA logic 1070, either as separate devices or integrated together. Ex. 1001, 24:35–37, 23:19–22, Fig. 14. Microcontroller 1060 may transfer data between the volatile memory 1030 and non-volatile memory 1040. *Id.* at 24:35–41. Logic element 1070 provides signal level translation and address translation between the volatile memory and the non-volatile memory. *Id.* at 24:45–56.

When the system is operating normally, controller 1062 controls switch 1052 to decouple the volatile memory 1030 from controller 1062 and the non-volatile memory 1040 (the '054 patent refers to this as the "first state"). *Id.* at 24:60–25:7. In response to a power interruption, for example, controller 1062 controls switch 1052 to couple the volatile memory 1030 to itself and non-volatile memory 1040, and transfers data from the volatile memory to the non-volatile memory to prevent its loss (the '054 patent refers to this as the "second state"). *Id.* at 25:9–20.

Memory system 1010 may comprise a voltage monitor 1050 to monitor voltage supplied from the host system via interface 1022. *Id.* at 25:8–10. When the voltage monitor 1050 detects a low voltage condition, the voltage monitor transmits a signal to the controller 1062 to indicate the detected condition. *Id.* at 25:11–15.

Power may be supplied from a first power supply (e.g. a system power supply) when the memory system 1010 is in the first state and from a second power supply 1080 when the memory system 1010 is in the second state. *Id.* at 25:54–58. Second power supply 1080 may comprise step-up transformer

IPR2022-00999
Patent 11,232,054 B2

1082, step-down transformer 1084, and capacitor bank 1086 with one or more capacitors. *Id.* at 26:3–13.

The memory system 1010 further has a third state in which controller 1062 is decoupled from the volatile memory system 1030 and power is supplied to the volatile memory subsystem 1030 from a third power supply (not shown). *Id.* at 25:62–66. The third power supply may provide power to volatile memory subsystem 1030 when the memory system 1010 detects that a trigger condition is likely to occur but has not yet occurred. *Id.* at 25:66–26:3.

Figure 16 of the '054 patent is reproduced below.



FIG. 16

Figure 16 shows power module 1100 of memory system 1010. Ex. 1001, 27:59–61. Power module 1100 comprises conversion element 1120, first power element 1130, and second power element 1140. *Id.* at 28:7–15, 28:20–22. Conversion element 1120 comprises buck converter 1122, dual buck converter 1124, and buck-boost converter 1126 generating respective

6

IPR2022-00999
Patent 11,232,054 B2

voltages 1102, 1104, 1105, 1107 from the outputs of the first and second power elements 1130, 1140. *Id.* at 28:62–67. The first power element 1130 may comprise a pulse-width modulation power controller generating voltage 1110 from voltages 1106, 1108. *Id.* at 28:13–15. Second power element 1140 may comprise capacitor array 1142, buck-boost converter 1144 receiving voltages 1106, 1108 and adjusting the voltage for charging the capacitor array, and voltage/current limiter 1146, which limits charge current to the capacitor array and stops charging the capacitor array 1142 when it reaches a certain charge voltage. *Id.* at 28:62–67. Power module 1100 provides power to components of the memory system 1010 using different elements based on a state of the memory system 1010 in relation to a trigger condition. *Id.* at 27:61–65.

Specifically, in a first state, first voltage 1102 is provided to memory system 1010 from input 1106 and fourth voltage 1102 is provided to conversion element 1120 from the first power element 1130. Ex. 1001, 28:27–31. In a second state, the fourth voltage 1110 is provided to the conversion element 1120 from the first power element 1130 and the first voltage 1102 is provided to the memory system 1010 from the conversion element 1120. *Id.* at 28:31–34. In the third state, the fifth voltage is provided to conversion element 1120 from second power element 1140 and the first voltage 1104 is provided to memory system 1010 from conversion element 1120. *Id.* at 28:34–38. Transition from the first state to the second state may occur when power module 1100 detects a power failure is about to occur, and transition from the second state to the third state may occur when it detects a power failure has occurred. *Id.* at 28:39–47.

IPR2022-00999
Patent 11,232,054 B2

###### E.    *Illustrative Claim*

Of the challenged claims, claims 1, 16, and 24 are independent.

Independent claim 1, reproduced below with brackets noting Petitioner's

identifiers, is illustrative of the claimed subject matter.

1. [1.a] A memory module comprising:

[1.b] a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system;

[1.c] a voltage conversion circuit coupled to the PCB and configured to provide at least three regulated voltages, wherein the voltage conversion circuit includes at least three buck converters each of which is configured to produce a regulated voltage of the at least three regulated voltages;

[1.d] [1.d.1] a plurality of components coupled to the PCB, each component of the plurality of components coupled to at least one regulated voltage of the at least three regulated voltages, [1.d.2] the plurality of components including a plurality of synchronous dynamic random access memory (SDRAM) devices and [1.d.3] a first circuit that is coupled to the plurality of SDRAM devices and to a first set of edge connections of the plurality of edge connections, [1.d.4] wherein the first circuit is coupled to first and second regulated voltages of the at least three regulated voltages, and [1.d.5] wherein the plurality of SDRAM devices are coupled to the first regulated voltage of the at least three regulated voltages.

Ex. 1001, 38:19–44.

IPR2022-00999
Patent 11,232,054 B2

### F.    Evidence

Petitioner relies on the following references (*see* Pet. 3, 9–14), as well as the Declaration of Dr. Andrew Wolfe (Ex. 1003).

| Reference | Exhibit No. | Patent/Printed Publication |
|---|---|---|
| Harris | 1023 | U.S. Patent Pub. No. 2006/0174140 A1 to Harris, published Aug. 3, 2006 |
| Amidi | 1024 | U.S. Patent No. 7,724,604 B2, issued May 25, 2010 |
| Spiers | 1025 | U.S. Patent Pub. No. 2006/0080515 A1, published Apr. 13, 2006 |
| FBDIMM Standards | 1027, 1028 | JESD82-20 and JESD205 standards published March 2007 |
| Hajeck | 1038 | U.S. Patent No. 6,856,556 B1 to Hajeck, issued Feb. 15, 2005 |

### G.    Prior Art and Asserted Grounds

Petitioner asserts that claims 1–30 are unpatentable on the following Grounds (Pet. 3):

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–3, 15 | 103(a) | Harris, FBDIMM Standards |
| 1–30 | 103(a) | Harris, FBDIMM Standards, Amidi |
| 1–30 | 103(a) | Harris, FBDIMM Standards, Amidi, Hajeck |
| 1–30 | 103(a) | Spiers, Amidi |
| 1–30 | 103(a) | Spiers, Amidi, Hajeck |

## II.  ANALYSIS OF CHALLENGED GROUNDS

We now consider Petitioner's asserted grounds of unpatentability and Patent Owner's arguments to determine whether Petitioner has demonstrated by a preponderance of the evidence that the challenged claims would have been obvious under 35 U.S.C. § 103. *See* 35 U.S.C. § 316(e) (providing that

9

petitioner has the burden of proving unpatentability by a preponderance of the evidence).

### A.    Principles of Law

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

A patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. An obviousness determination based on the teachings of multiple references requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016) (citation omitted); *see also KSR*, 550 U.S. at 418. Further, an assertion of obviousness "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418; *In re*

IPR2022-00999
Patent 11,232,054 B2

*NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (a finding of a motivation to combine "must be supported by a 'reasoned explanation'").

### B.     *Level of Ordinary Skill in the Art*

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.* at 696–97. The prior art may reflect an appropriate level of skill. *Okajima v. Bourdeau*, 261 F.3d 1350, 1354–55 (Fed. Cir. 2001).

Petitioner asserts a person of ordinary skill in the art "would have had an advanced degree in electrical or computer engineering, or a related field, and two years working or studying in the field of design or development of memory systems, or a bachelor's degree in such engineering disciplines and at least three years working in the field." Pet. 7–8 (citing Ex. 1003 ¶ 61). Petitioner contends that additional training can substitute for educational or research experience, and vice versa. *Id.* at 8. Petitioner asserts that such a hypothetical person would have been familiar with the JEDEC industry standards, and knowledgeable about the design and operation of standardized DRAM and SDRAM memory devices and memory modules and how they interacted with a memory controller and other parts of a computer system, including standard communication busses and protocols,

IPR2022-00999
Patent 11,232,054 B2

such as PCI and SMBus busses and protocols. *Id.* Petitioner further contends that such "a hypothetical person would also have been familiar with the structure and operation of circuitry used to access and control computer memories, including sophisticated circuits such as ASICs, FPGAs, and CPLDs, and more low-level circuits such as tri-state buffers." *Id.* Petitioner further asserts that such "a hypothetical person would further have been familiar with voltage supply requirements of such structures (e.g., memory modules, memory devices, memory controller, and associated access and control circuitry), including voltage conversion and voltage regulation circuitry." *Id.*

Patent Owner indicates "[f]or the purposes of this [Response], Patent Owner is applying the level of ordinary skill in the art proposed by Petitioner." Resp. 2.

The evidence that Petitioner presents mostly applies to the educational level and experience of workers in the field, but also touches upon other factors as well, including problems and solutions in the prior art and complexity of the technology. *See* Pet. 7–8. We find Petitioner's proposal is consistent with the level of skill in the art reflected by the '054 patent and the prior art of record, and, therefore, we adopt Petitioner's proposed level of ordinary skill in the art, with the exception of the open-ended language "at least," which introduces ambiguity and may encompass skill levels beyond ordinary.

C.    *Claim Construction*

We construe claim terms "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2021). There is a presumption that claim

terms are given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art in the context of the specification. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Nonetheless, if the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess[,] . . . the inventor's lexicography governs." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing Phillips, 415 F.3d at 1312–17). Only disputed claim terms must be construed, and then only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

      *1.    "Memory Module"*

Patent Owner contends as follows:

> The term "memory module" appears in the preamble of the claims, and provides antecedent basis for the same term in the body of claims 1, 4, 6, 11, 16 and 25. The preamble is thus limiting as the District Court found after reviewing the specification in detail. Based on the intrinsic evidence, the Court also concluded that a memory module is a modular computer accessory that "includes the structure necessary to connect to a memory controller" of a host system.

Resp. 2–3 (citing Ex. 2032, 28). As support for its argument, Patent Owner quotes the District Court for the Eastern District of Texas as follows:

> While the claims recite many of the structural requirements of a "memory module," the claims arguably read on other modular computer devices, such as a video card or network controller, despite no evidence the inventors intended to encompass such devices by the claims. To the contrary, as the Overview section explains, the invention "is couplable to a memory controller of a host system," '918 Patent at 3:66–67 (emphasis added), not just the host system as recited in the claims. *See also id.* at 1:66–67 ("[t]he present disclosure relates generally to computer memory devices"). Thus, a skilled artisan would understand ***a "memory module" is distinct from, and has essential structural requirements not necessarily found in, other modular computer accessories. That includes the structure necessary to connect to a memory controller***. *See* Memory Systems: Cache, DRAM, Disk [EX2034] … at 319 (depicting, in FIG. 7.6, a memory controller connected to two memory modules). Accordingly, the preambles are limiting.

Resp. 3 (citing Ex. 2032, 28) (emphasis in original). Patent Owner argues that Petitioner's expert, Dr. Wolfe, testified that the term "memory modules" typically refers to "main memory modules," which "are designed to connect to the primary memory controller for the purpose of holding general purpose code and data in a computer system." Resp. 3–4 (citing Ex. 2060, 123:14–25; Ex. 2056, 100:15–101:8 (by 2004–2005, a memory module "was intended to go into a dedicated memory slot and not a general-purpose IO slot")). Patent Owner contends that the '054 patent's usage of "memory module" is consistent with that understanding, and asserts that we should adopt the District Court's claim construction, including that the claimed "memory module" includes structures necessary to connect to a memory controller. *Id.* at 4 (citing Ex. 2061 ¶¶ 51–53).

In Reply, Petitioner contends that we properly found that Harris, the FBDIMM Standards, Amidi, and Spiers all disclose a "memory module" in

our Institution Decision.  Reply 1–2 (citing Inst. Dec. 14–15, 17–18, 29–33, 47–48; Pet. 19–20, 77–78; Reply 24–27).  Petitioner contends that the District Court's construction did not limit "memory module" to only "***main*** memory modules . . . designed to connect to the ***primary*** memory controller." *Id.* at 2 (emphasis in original) (citing Resp. 3–4).  Petitioner contends that the District Court never used the words "main" or "primary," and that District Court's construction was simply that the "memory module" in the preamble was "limiting" without more. *Id.* (citing Ex. 2032, 26–28, 35).  More specifically, Petitioner contends that the District Court did not further limit "memory module" to only "main memory modules . . . designed to connect to the primary memory controller." *Id.* at 2 (citing Resp. 3–4).  Petitioner further contends that Patent Owner misleadingly quotes Dr. Wolfe's statements about "main memory modules," but asserts that Dr. Wolfe explained in the context of the '054 patent that a "memory module" is not limited to main memory or to any specific connection. *Id.* (citing Ex. 2060, 125:12–127:13 ("memory module" is a "circuit board that connects to a host computer that includes memory"); Ex. 2056, 100:15–101:19).

In Sur-Reply, Patent Owner disagrees with Petitioner's contention that "memory module" is not limited to "***main memory*** modules . . . designed to connect to the primary memory controller."  Sur-Reply 1 (emphasis in original) (citing Reply 2).  Patent Owner argues that Petitioner's contention "ignores the District Court's finding based on intrinsic evidence—which [Petitioner] did not object to—that "the invention [i.e., the claimed memory module] "is couplable *to a memory controller* of a host system," '918 Patent at 3:66–67 …, not just the host system as recited in the claims.'" *Id.* (citing

Ex. 2032, 28; Ex. 1001, 3:66–67, 4:5–12, 4:14–24, 4:35–39, 4:45–51, 5:4–20, 4:36–50, 6:4–6, 6:25–29, 6:61–66, 7:1–4, 7:21–25, 7:29–34, 7:43–49, 7:54–57, 21:24–25, 22:53–58, 23:19–22, 26:43–51, 23:41–44).

The District Court's Claim Construction Order (Ex. 2032) issued after our Institution Decision (Paper 11). Although Petitioner argued in the District Court litigation that the claim preambles were not limiting, Petitioner does not appear to maintain that argument here following the District Court's determination that the preambles are limiting. Ex. 2032, 35. Since the term is recited in both the preambles and bodies of these claims, there is evidence that the inventors of the '054 patent intended the term to limit the claim, as the District Court determined. *See Catalina Mktg. Int'l., Inc. v. Coolsavings,com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citing *Bell Commc'ns Rsch., Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995) ("dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention.")).

We agree with Petitioner's contention that "memory module" is not limited to "***main*** memory modules . . . designed to connect to the ***primary*** memory controller." *See* Reply 2. The '054 patent states

> **In certain embodiments**, the device contains a high density Flash memory with a low density DRAM, wherein the DRAM is used as a data buffer for read/write operation. The Flash serves as the **main memory**.

Ex. 1001, 11:3–6 (emphases added). This is the only mention of "main memory" in the '054 patent. That the Flash memory serves as "main memory" in "certain embodiments" implies that there may be other embodiments in which this is not the case. Accordingly, we agree with

IPR2022-00999
Patent 11,232,054 B2

Petitioner that the term "memory module" is not limited to "***main*** memory modules . . . designed to connect to the ***primary*** memory controller."

We agree with Patent Owner that the "memory module" includes structure to connect with a "host system" including its memory controller. *See, e.g.*, Ex. 1001, code (57), 12:52–59. The claims do not mention a "memory controller," but they do mention that the "memory module" has an "interface" to connect with a "host system." Ex. 1001, 38:20–25 (claim 1), 39:63–65 (claim 16), 41:6–8 (claim 24). That the "memory module" has structure for connecting to the host system's memory controller may thus be implied from the claims.

We agree with Petitioner that the District Court's determination was that the preambles (presumably of claims 1, 4, 6, 11, 16 and 25) are limiting. Ex. 2032, 35. To the extent that the District Court's determination construed "memory module" to include structure necessary to connect to a memory controller, our construction of "memory module" is consistent.

D.     *Ground 1: Obviousness Over Harris and FBDIMM Standards*

Petitioner contends claims 1–3 and 15 would have been obvious over the combination of Harris and FBDIMM Standards and relies on the Declaration of Dr. Andrew Wolfe (Ex. 1003) in support. Pet. 14–40. For the reasons that follow, we are persuaded that the evidence, including Dr. Wolfe's testimony, supports Petitioner's showing and establishes by a preponderance of the evidence that these claims are unpatentable.

IPR2022-00999
Patent 11,232,054 B2

### 1. *Harris (Ex. 1023[2])*

Harris is titled "Voltage Distribution System and Method for a
Memory Assembly." Ex. 1023, code (54). Harris was published as U.S.
Patent Pub. No. 2006/0174140 A1 on August 3, 2006. Petitioner contends
Harris is prior art under § 102(a). Pet. 9.

Harris's Figure 1A is reproduced below.



*FIG. 1A*

As shown in Figure 1A, Harris discloses a memory module 100A including
on-board regulator 102 for converting an externally supplied voltage 104 to
appropriate local voltage levels 106 ($V_{cc}$), 108 ($V_{dd}$), such as 0.5V to 3.5V.
Ex. 1023, code (57), ¶¶ 9–10. Voltage 106 is supplied to buffer/logic
component 112 which may be connected to a memory controller via
interface 114 and daisy-chained with other memory assemblies via interface
116. *Id.* ¶ 9. Voltage 108 powers memory devices 110-1 to 110-N. *Id.* The
memory module 100A may be a Dual In-Line Memory Module (DIMM)

---

[2] Exhibit 1023 is incorrectly identified in the Board's P-TACTS system as
"Micron Tech., Inc. et al. v. Netlist, Inc., IPR2022-00418, Paper No. 2
(PTAB January 14, 2022) (831 Patent IPR Petition)," i.e., incorrectly
repeating the identification provided for Exhibit 1022.

IPR2022-00999
Patent 11,232,054 B2

wherein each of the memory devices 100-1 to 100-N comprises a Double
Data Rate (DDR), DDR2, or DDR3 device. *Id.* The memory module 100A
may be an unbuffered, registered or fully buffered DIMM. *Id.*

## 2.    *FBDIMM Standards (Exs. 1027, 1028)*

In March 2007, the Joint Electron Device Engineering Council
(JEDEC) published standards for Fully Buffered DIMM (FBDIMM)
memory modules titled "JESD82-20" (Ex. 1027) and "JESD205"
(Ex. 1028). Ex. 1029 ¶¶ 134–137. Petitioner refers to these standards
collectively as the "FBDIMM Standards." Pet. 10. Petitioner contends the
FBDIMM Standards are prior art under § 102(a).

The FBDIMM Standards specify voltages for components on the
memory module as follows:

**Product Family Attributes**

| DIMM organization | x72 ECC | | | |
|---|---|---|---|---|
| DIMM dimensions (nominal) | 30.35mm (height) x 133.35mm (width) x 8.2 mm (max thickness) MO-256 variation AB 30.35mm (height) x 133.35mm (width) x 8.8 mm (max thickness) MO-256 variation BB | | | |
| Pin count | 240 | | | |
| SDRAMs supported | 256Mb, 512Mb, 1Gb, 2Gb, 4Gb | | | |
| Capacity | 256MB, 512MB, 1GB, 2GB, 4GB, 8GB, 16GB | | | |
| Serial PD | Consistent with JC 45 | | | |
| Supply voltages (nominal) | min | typ | max | |
| | 1.7 | 1.8 | 1.9 | (DRAM $V_{DD}/V_{DDQ}$, AMB $V_{DDQ}$) |
| | $1.455^1$ | 1.5 | $1.575^1$ | (AMB $V_{CC}/V_{CCFBD}$) |
| | $0.453^*V_{DD}$ | $0.5^*V_{DD}$ | $0.547^*V_{DD}$ | (DRAM Interface $V_{TT}$) This supply should track as 0.5 * 1.8 volt supply |
| | 3.0 | 3.3 | 3.6 | ($V_{DDSPD}$) |
| Buffer Interface | High-speed Differential Point-to-point Link at 1.5 volt | | | |
| DRAM Interface | SSTL_18 | | | |

Note 1: Approximate DC values, refer to AMB Component Specification for actual DC and AC values and conditions.
Note 2: Vtt range accomodates measurable offset due to complementary CA bus current paths. (See Vtt section)
        An Unloaded system should supply Vtt of 0.48*Vdd/0.52*Vdd to Dimm socket

19

IPR2022-00999
Patent 11,232,054 B2

Ex. 1028, 9.  The above table shows values for supply voltages including DRAM $V_{DD}$, AMB $V_{CC}$, DRAM interface $V_{TT}$, and $V_{DDSPD}$.  The FBDIMM Standards further specify the following voltages for various power supplies:

**Table 9.2 — Pin Description (Sheet 3 of 3)**

| Signal | Type | Description |
|---|---|---|
| RESET | | Power Good Reset |
| **Miscellaneous Test** | | |
| TEST (4 pins) | NC | Pin for debug and test. Must be floated on DIMM. |
| TESTLO (5 pins) | A | Pin for debug and test. Must be tied to Ground on DIMM |
| TESTLO_AB20 | A | Pin for debug and test.  Connected to two resistors. One resistor is connected to VCCFBD, the other resistor is connected to VSS. |
| TESTLO_AC20 | A | Pin for debug and test.  Connected to two resistors. One resistor is connected to VCCFBD, the other resistor is connected to VSS. |
| **Power Supplies** | | |
| VCC (24 pins) | A | 1.5V nominal supply for core IO |
| VCCFBD (8 pins) | A | 1.5V nominal supply for FBD high speed IO |
| VDD (24 pins) | A | 1.8V nominal supply for DDR IO |
| VSS (156 pins) | A | Ground |
| VDDSPD | A | 3.3V nominal supply for SMB receivers and ESD diodes |
| **Other Pins** | | |
| BFUNC | I | **Buffer Function Bit:** When BFUNC = 0, AMB is used as a regular buffer on FB-DIMM. When BFUNC = 1, AMB is used as either a repeater or a buffer for LAI function. On FB-DIMM, BFUNC is tied to Ground |
| RFU (18 pins) | NC | **Reserved for Future Use.** Must be floated on DIMM. RFU pins denoted by "a" are reserved for forwarded clocks in future AMB implementations. |
| **Other No Connect Pins** | | |
| NC (129 pins) | NC | No Connect pins |

Ex. 1027, 83.  The table above sets voltage levels for power supplies $V_{CC}$, $V_{CCFBD}$, $V_{DD}$, $V_{SS}$, and $V_{DDSPD}$.

### 3.    Motivation to Combine

Petitioner contends that a person of ordinary skill in the art would have been motivated to combine Harris with the FBDIMM Standards with a reasonable expectation of success because Harris states that its Figure 1A may be a "fully buffered DIMM" (FBDIMM or FBD).  Pet. 16 (citing Ex. 1023 ¶¶ 9–13; Ex. 1003 ¶¶ 158–166).  Petitioner contends that a person of ordinary skill in the art would have understood that this type of DIMM is standardized in JEDEC's FBDIMM Standards and thus would naturally look

IPR2022-00999
Patent 11,232,054 B2

to them for more details about the "fully buffered DIMM" that Harris
describes as compatible with the disclosed on-board voltage regulator
module (VRM). *Id.*

To explain its combination, Petitioner provides the following table:

| | Voltage Mappings (Grounds 1-3) | | |
|---|---|---|---|
| | **A** | **B** | **C** |
| *"first"*: | $V_{DD}$ or $V_{DDQ}$ = 1.8V | $V_{DD}$ or $V_{DDQ}$ = 1.8V | $V_{DD}$ or $V_{DDQ}$ = 1.8V |
| *"second"*: | $V_{CC}$ or $V_{CCFBD}$ = 1.5V | $V_{CC}$=1.5V | $V_{CC}$ or $V_{CCFBD}$ = 1.5V |
| *"third"*: | $V_{DDL}$=1.8V | $V_{CCFBD}$=1.5V | $V_{TT}$=0.9V |

The table above shows Petitioner's Voltage Mappings A, B, and C from the
FBDIMM Standards for Grounds 1–3, and how they disclose the "first,"
"second," and "third regulated voltages" in the claims. Pet. 27.

For Ground 1, Petitioner provides the illustration below:



This illustration shows how Petitioner is combining the teachings of Harris
and the FBDIMM Standards to arrive at the claims. *Id.* at 15. Specifically,

IPR2022-00999
Patent 11,232,054 B2

FBDIMM Standard JESD205 applies to Harris's memory module and JESD82-20 applies to the Harris's buffer. *Id.* at 26.

> a) *Modifying Harris to Have Three Converters*

Patent Owner asserts that a person of ordinary skill in the art would not have modified Harris's memory module to have three converters, as Petitioner asserts. Resp. 18–20. Patent Owner contends that Petitioner did not demonstrate "a reason to modify Harris with the FBDIMM Standards," or "show a reason for Harris to use separate regulators for each of the alleged regulated voltages across all of Petitioner's Voltage Mappings A–C." *Id.* at 20. Patent Owner argues that it would not "have been obvious to use as many buck converters as possible, especially given that Harris expressly discloses a switching regulator outputting multiple voltage levels, consistent with the state of art." Sur-Reply 10–11 (citing Reply 11; Ex. 1023 ¶ 10; Ex. 2020, 5, Table 1-1). Patent Owner asserts that Petitioner "has not articulated any advantage of using one converter per voltage if Harris already uses a single converter for at least two voltages." *Id.* at 11 (citing Reply 11–14; Ex. 1023 ¶ 10).

As to why a person of ordinary skill in the art would use separate regulators for each of the voltages, Petitioner indicates that this was well-known in the art. Specifically, Petitioner contends that "buck converters were well-known switching devices commonly used to step down an input voltage to a lower output voltage." Reply 11 (citing Pet. 28–29; Ex. 1075, 103:21–107:14, 112:12–113:19). Petitioner contends that it "would have been obvious to a [person of ordinary skill in the art]—and consistent with Harris—to use three buck converters to convert the 12V input to the three required voltages on the memory board." *Id.* (citing Pet. 27–30; Ex. 2060,

22

IPR2022-00999
Patent 11,232,054 B2

53:16–54:14).  Petitioner contends that "[t]his was common" as shown in the figure below:



*Id.* at 11–12 (citing Ex. 1062, 15, Fig. 4[3]).  The above figure shows an ADM1066 sequencer and three ADP182 DC-to-DC converters for generating 3.3V, 2.5V and 0.9 voltages outputs.  Ex. 1062, 15.  Petitioner also points to the data sheet for the ADP1821 titled "Step-Down DC-to-DC Controller," which describes a "synchronous, pulse-width-modulated (PWM), voltage-mode, step-down controller."  Ex. 1078, 1; *see* Reply 11 (citing Ex. 1078, 1).  Petitioner further relies on deposition testimony of

---

[3] Exhibit 1062 is titled "Analog Dialogue," Vol. 40, No. 2, published in 2006 by Analog Devices, Inc.  "Analog Dialogue" contains several papers, one of which is titled "Power-Supply Management—Principles, Problems, and Parts" by Alan Moloney.  The figure above was extracted from this paper.  Although Exhibit 1062 was not identified in the Petition, it is part of the background knowledge that one of ordinary skill in the art would have had.  *KSR*, 550 U.S. at 401 (obviousness analysis requires an assessment of the background knowledge possessed by person of ordinary skill in the art).

IPR2022-00999
Patent 11,232,054 B2

Patent Owner's expert, Dr. Mangione-Smith, who confirmed that the ADP1821 is a DC-to-DC converter and that it has structural elements and switching that are in common with buck converters to generate voltages. Reply 11 (citing Ex. 1075, 132:21–141:23). Patent Owner's argument that one of ordinary skill in the art would not have modified Harris to include three buck converters does not undermine Petitioner's showing of a motivation to combine Harris with the FBDIMM Standards when the background knowledge expressly teaches using three buck converters to generate voltages used in FBDIMMs. Pet. 16 (citing Ex. 1023 ¶¶ 9–13; Ex. 1003 ¶¶ 158–166); Reply 11–12 (citing Ex. 1062, 15, Fig. 4; Ex. 1078, 1).

Patent Owner argues that Harris's mention of "**a** high-frequency switching voltage regulator" means only one, and that Petitioner's contention that "a" means "one or more" applies to the claims, not the specification. Sur-Reply 11 (citing *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342–43 (Fed. Cir. 2008); Ex. 1023 ¶ 14). Patent Owner further argues that "Harris's reference to 'a high-frequency switching voltage converter capable of generating tightly-controlled voltage level**s**' (plural) means a single converter with multiple outputs, not multiple converters." *Id.* at 15–16 (citing Ex. 2061 ¶¶ 79–80).

Patent Owner does not address Petitioner's argument that Harris refers to "at least one on-board voltage regulator module (VRM)" in the specification and "at least one voltage regulator module" in claims 1 and 30. Reply 12 (citing Ex. 1023 ¶ 10, Fig. 1A). Patent Owner's argument does not undermine Petitioner's showing.

IPR2022-00999
Patent 11,232,054 B2

Patent Owner further asserts that space issues would have influenced any design decisions. Sur-Reply 12 (citing *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1368 (Fed. Cir. 2016)). Patent Owner argues there are good reasons why a person of ordinary skill in the art would have minimized the number of buck converters, including space constraints, and that Petitioner has not shown how multiple voltage converters would fit in the one square-inch space on both sides of the circuit board described as available for a voltage regulator module (VRM) in Harris. *Id.* at 12–13 (citing Ex. 1023 ¶ 13; Ex. 1078, 20–23; Ex. 2101, 22, 25–26).

Harris states that "[i]t is contemplated that local supply voltage conversion for double-rank DIMMs can be accommodated with a form factor design of approximately about one square inch (both sides of the printed circuit board)." Ex. 1023 ¶ 13. Thus, Harris indicates that the VRM circuitry to generate two regulated voltages can fit within this space. Patent Owner argues that Petitioner's evidence shows that each ADP1821 converter package would be about 0.193 by 0.236 inches. Sur-Reply 12 (citing Ex. 1078, 20–23). This means three ADP1821 converters would occupy about 40% of the available space. Patent Owner does not demonstrate that the remaining 60% of available space would have been insufficient to accommodate the additional components required for three voltage converters. *Id.* at 12–13. In any case, we do not view Harris's disclosure of "approximately about one square inch" to limit the applicability of its teachings to a person of ordinary skill in the art. In the same paragraph, Harris states that the form factor "may be suitably modified." Ex. 1023 ¶ 13.

IPR2022-00999
Patent 11,232,054 B2

Patent Owner further argues that "independent voltage sources for different voltages would require specific control circuitry to delay and more precisely control each voltage source's ramping rate, adding complexity and cost without commensurate benefits." Sur-Reply 14 (citing Ex. 2061 ¶ 90). However, Dr. Wolfe states that it is simpler to use multiple regulators for multiple voltages since a single regulator that generates multiple voltages is more complicated than multiple regulators. Ex. 2060, 53:16–54:14, 89:1–21, *cited in* Reply 14. Dr. Wolfe further indicates that buck converters can be in some applications "extremely small." Ex. 2060, 89:11–15. Dr. Wolfe further testifies that multiple smaller converters may be less costly than a larger single converter because of component costs, separated spaces available for converters on circuit board, and other "ordinary engineering factors." *Id.* at 45:21–46:10.

Although Patent Owner may be correct that individual control of multiple voltage regulators would have required additional control circuitry, this does not meaningfully undermine the benefits that Petitioner mentions including permitting power sequencing, independent control of voltages, improved efficiency without generating excess heat or requiring cooling devices, and saving power. Pet. 29–30 (citing *id.* at 14–19; Ex. 1028, 17–20; Ex. 1026, 2–3, 9; Ex. 1028, 30–32; Ex. 1040, 1, 23–24 (Figs. 22–25); Ex. 1041, 1, 13; Ex. 1048, 3; Ex. 1058, 5; Ex. 1059, 5:23–30; Ex. 1062, 11, 13; Ex. 1064 ¶ 101; Ex. 1003 ¶¶ 240, 255). Dr. Wolfe testified that, in at least some circumstances, multiple converters may be less complicated, less costly, and take up less space. Ex. 2060, 45:21–46:10, 89:11–15. Patent Owner's argument that a single converter generating multiple voltages would be better in some circumstances does not negate that Petitioner's

26

IPR2022-00999
Patent 11,232,054 B2

proposed use of multiple converters for multiple voltages would have been preferred in other circumstances that a person of ordinary skill in the art would have recognized. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. 2021) ("Our caselaw is clear. It's not necessary to show that a combination is 'the *best* option, only that it be a *suitable* option.'" quoting *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197–98 (Fed. Cir. 2014)). Thus, Patent Owner's argument does not undermine Petitioner's showing of a motivation to combine Harris and the FBDIMM Standards.

> b) *Use of Separate Converters to Generate*
> $V_{DD}/V_{DDQ}/V_{DDL}$ or $V_{CC}/V_{CCFBD}$

Patent Owner argues against Petitioner's showing of a motivation to combine by arguing that neither Harris nor the FBDIMM Standards suggest separate power rails for $V_{DD}/V_{DDQ}$ and $V_{DDL}$ or $V_{CC}$ and $V_{CCFBD}$ for Voltage Mappings A and B. Resp. 24–28. Patent Owner argues that the DDR2 Specification that Petitioner cited requires that the voltages $V_{DD}$, $V_{DDQ}$ and $V_{DDL}$ are driven from a single power converter output. *Id.* (citing Ex. 1026, 9; Ex. 2061 ¶ 87). The excerpt from the DDR2 Specification (JESD79-2B) in question states as follows:

**2.3.1  Power-up and initialization sequence**

The following sequence is required for POWER UP and Initialization.

a) Apply power and attempt to maintain CKE below 0.2*VDDQ and ODT[*1] at a low state (all other inputs may be undefined.) The power voltage ramp time must be no greater than 20mS; and during the ramp, VDD>VDDL>VDDQ and VDD-VDDQ<0.3 volts.

- VDD, VDDL and VDDQ are driven from a single power converter output, AND
- VTT is limited to 0.95 V max, AND
- Vref tracks VDDQ/2.

    or

- Apply VDD without any slope reversal before or at the same time as VDDL.
- Apply VDDL without any slope reversal before or at the same time as VDDQ.
- Apply VDDQ without any slope reversal before or at the same time as VTT & Vref.

at least one of these two sets of conditions must be met.

27

IPR2022-00999
Patent 11,232,054 B2

Ex. 1026, 9 (DDR2); *see also* Ex. 1046, 15 (same for DDR3).[4] The above excerpt from the DDR2 Specification states a "first option" (boxed in blue[5]) that requires $V_{DD}$, $V_{DDL}$ and $V_{DDQ}$ are driven from a single power converter output, and a "second option" (boxed in red) the defines timings for when the voltages $V_{DD}$, $V_{DDL}$ and $V_{DDQ}$ must be applied relative to $V_{DDL}$, $V_{DDQ}$, and $V_{TT}$ & $V_{ref}$, respectively. Patent Owner's argument focuses on the "first option" (boxed in blue above), which specifies that $V_{DD}$, $V_{DDL}$ and $V_{DDQ}$ are driven from a single power converter output. Resp. 24–28. However, Petitioner contends that the "second option" (boxed in red above) does not specify any converter. Petitioner contends that $V_{DD}$, $V_{DDQ}$ and $V_{DDL}$ would have been generated with separate converters because they are identified as separate voltages with separate pins (Ex. 1028, 17–20), JEDEC indicates that they can be turned on and off independently (Ex. 1026, 9), and JEDEC indicates that $V_{DDL}$ should use an isolated voltage source (Ex. 1026, 2–3). Pet. 29–30 (citing Ex. 1003 ¶¶ 248–249; Ex. 1062, 13). Petitioner shows that one of ordinary skill in the art would have understood the second option

---

[4] Although Petitioner does not expressly rely on JEDEC's JESD79-2B (DDR2) (Ex. 1026) and JESD79-3A (DDR3) (Ex. 1046) in its combinations, the parties seem to be in agreement that these specifications are part of the background knowledge that a person of ordinary skill in the art would have had. In an obviousness analysis, the background knowledge is properly considered together with the demands known in the design community, and the inferences and creative steps that a person of ordinary skill in the art would employ. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013).
[5] [5] In our opinion, Petitioner should have drawn the blue box to include the following two lines "VTT is limited to 0.95 V max, AND Vref tracks VDDQ/2" because of the way the standard presents the two sets of conditions with the word "or" between them and refers to them as "two sets of conditions." We refer to the two sets of conditions as "options" herein.

IPR2022-00999
Patent 11,232,054 B2

(boxed in red above) and other parts of the JESD78-2B specification suggest the possibility of using separate voltage regulators for $V_{DD}$, $V_{DDQ}$ and $V_{DDL}$.

Patent Owner argues that a single power converter was required so that the voltages track one another during power up. Resp. 25–26 (citing Ex. 2006, 4; Ex. 2061 ¶ 88; Ex. 1023 ¶ 12). But Dr. Wolfe indicates that the voltages of separate converters can be made to track one another by coupling their feedback, which was a known option. Ex. 2060, 54:25–55:13. Patent Owner does not refute Dr. Wolfe's testimony.

Patent Owner asserts that Petitioner's contention that an FBDIMM has separate pins for $V_{DD}$, $V_{DDQ}$ and $V_{DDL}$ does not support its contention of separate converters, "particularly where it was known that there are stability and timing benefits when using a single source." Resp. 27 (citing Ex. 2006, 4). Dr. Wolfe explains that the FBDIMM module of Petitioner's combination would not have separate pins to receive $V_{DD}$, $V_{DDQ}$ and $V_{DDL}$ but would derive them onboard the module from the 12-volt input pin. Ex. 2060, 35:25–36:15. As to stability, Dr. Wolfe testifies that a feedback loop maintains stability in light of current variations, temperature changes, and other factors. *Id.* at 64:25–65:10. As to timing, Dr. Wolfe indicates that separate converters can track one another by coupling their feedback, and that this was a known option. *Id.* at 54:25–55:13.

Patent Owner argues that it was common for persons of ordinary skill in the art to supply all three voltages using a single power converter. Resp. 28 (citing Ex. 2060, 133:5–134:6, 39:11–40:24). Although using a single power converter may have been the most common approach, this does not negate Petitioner's showing that a person of ordinary skill in the art would have considered separate converters desirable under certain circumstances.

29

*See Elekta Ltd. v. ZAP Surgical Systems, Inc.*, 81 F.4th 1368 (Fed. Cir. 2023) (quoting *Novartis Pharms. Corp. v. West-Ward Pharms. Int'l Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019) ("Nor does an obviousness showing 'require that a particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation . . . .'").

Patent Owner similarly argues that $V_{CC}$ and $V_{CCFBD}$ are separate voltages with separate pins, but asserts that Petitioner does not explain why a single on-board $V_{CC}$ power source is insufficient for $V_{CC}$ and $V_{CCFBD}$ power rails when a single set of $V_{CC}$ interface pins providing power from the host met the power needs for both $V_{CC}$ and $V_{CCFBD}$. Resp. 29–30 (citing Pet. 30–31; Ex. 1028, 11–12; Ex. 2061 ¶ 92). For similar reasons as explained for $V_{DD}$, $V_{DDQ}$ and $V_{DDL}$, we disagree. As Petitioner indicates, using separate converters for $V_{CC}$ and $V_{CCFBD}$ provides the benefits of sequencing the power, turning power on and off independently, saving cost, eliminating cross-coupling of noise, and solving space constraints. Reply 15 (citing Ex. 2060, 39:2–10, 44:25–46:10; Ex. 1075, 134:22–136:2, 194:23–195:7; Ex. 1062, 13–15; Ex. 2012, 73; Ex. 1003 ¶ 255).

Patent Owner's arguments do not undercut Petitioner's showing of a motivation to combine.

### c) *Motivation for Third Buck Converter for $V_{TT}$*

Patent Owner contends that Petitioner's Voltage Mapping C relies on three different voltages, including a termination voltage, $V_{TT}$, connected to terminators. Resp. 30 (citing Pet. 26; Ex. 1028, 13, 15–16). For context, the relevant figure from JESD205 is reproduced below:

IPR2022-00999
Patent 11,232,054 B2



Ex. 1028, 13.  The above figure shows various voltages $V_{TT}$, $V_{CC}$, $V_{DDSPD}$, $V_{DD}$, $V_{REF}$, $V_{SS}$ and their relationship to one another according to the JEDEC Specification JESD205.  *Id.*

Patent Owner argues that Harris does not disclose generating $V_{TT}$ on its module and argues that it would be supplied from the motherboard instead because this would ensure that all DIMMs have the same termination voltages and eliminate ground loops that could degrade signal integrity. Resp. 31–32 (citing Ex. 2061 ¶ 96).  Patent Owner further argues that design complexity favors having a single regulator for a group of DIMMs rather than one regulator per DIMM.  *Id.* at 32 (citing Ex. 1027, 20; Ex. 2061 ¶ 97; Ex. 2012, 72).  In addition, Patent Owner argues that Petitioner touted JEDEC's move of voltage regulation from the motherboard to the DIMM as a "major design improvement" and Patent Owner asks, "If it had been so obvious, why did it take the industry so long to make that design improvement?"  *Id.* at 32–33.  Patent Owner further argues that generating $V_{TT}$ is not one of two choices, and that $V_{TT}$ is generally not provided to DDR2 modules; passive termination is used instead.  *Id.* at 33 (citing Ex. 2061 ¶ 98; Ex. 2044, 6; Ex. 2045, 6; Ex. 2046, 4.20.11-6; Ex. 2006, 5).

IPR2022-00999
Patent 11,232,054 B2

In Reply, Petitioner argues that Harris teaches generating all of the voltages on the module, including all of the voltages for an FBDIMM, which would include $V_{TT}$. Reply 16 (citing Inst. Dec. 20–23; Ex. 1023 ¶ 12; Ex. 2060, 30:15–20, 72:22–73:7, 103:11–104:23, 109:5–111:10, 239:8–20). Petitioner contends that "Harris's module provides the voltages for the buffer 112 to send address and control signals to the DDR memory devices, which the FBDIMM Standards make clear require not just $V_{DD}$, but also $V_{TT}$ to terminate those signals." *Id.* at 16–17 (underlining omitted) (citing Pet. 17–18; Ex. 1028, 9, 15, 68). Petitioner reproduces the figure below:



Pet. 17 (citing Ex. 1028, 68). The above figure is from the FBDIMM Standards and shows the net structure routing for addresses and commands from the advanced memory buffer (AMB) to the SDRAMs and how they are terminated by $V_{TT}$. *Id.* Petitioner contends that $V_{TT}$ is required by the JEDEC Standards to track $V_{DD}$ (Ex. 1028, 15) which is why dual buck converters for generating $V_{DD}$ and $V_{TT}$ were readily available. Reply 17–19

(citing Ex. 1028, 9; Ex. 2060, 72:22–73:7, 196:3–197:7; Ex. 1040, 1, 11; Ex. 1041, 1; Ex. 1048).

Petitioner further argues that Patent Owner's "suggestion of producing $V_{TT}$ on the motherboard—where $V_{TT}$ could change with each new generation of memory devices—would defeat the benefit of Harris's invention, e.g., 'a technology-independent voltage distribution scheme' to 'provide upgrades to next generation DRAM technology in a cost-effective manner.'" *Id.* at 19 (citing Ex. 1023 ¶¶ 2, 19).

We agree with Petitioner that the combination of Harris and the FBDIMM Standards at least suggests that $V_{TT}$ can be generated onboard the memory module. Reply 16–19 (citing Pet. 17–18; Inst. Dec. 20–23; Ex. 1023 ¶¶ 2, 12, 19; Ex. 1040, 1, 11; Ex. 1041, 1–2, 7–9; Ex. 1048; Ex. 1075, 112:12–114:8; Ex. 2060, 30:15–20, 57:17–20, 58:18–59:10, 72:22–73:7, 103:11–104:23, 109:5–111:10, 140:15–24, 239:8–20). Harris indicates that its on-board voltage regulator converts externally supplied voltage into appropriate local voltage levels for powering memory devices of the memory assembly module. Ex. 1023, code (57), ¶¶ 12, 16, Fig. 2, step 204. Petitioner shows that $V_{TT}$ is needed onboard a memory module to terminate address and control signals. Reply 16–17 (citing Pet. 17–18; Ex. 1028, 9, 15, 68). In addition, Petitioner shows that $V_{TT}$ is required by JEDEC to track $V_{DD}$, which is why dual buck converters for generating these voltages were commercially available. Reply 17–19 (citing Ex. 1028, 9; Ex. 2060, 72:22–73:7, 196:3–197:7; Ex. 1040; Ex. 1041; Ex. 1048). In light of these facts and the teachings of Harris and the FBDIMM Standards, Petitioner has shown that a person of ordinary skill in the art would have considered adding to the memory module a third buck converter to generate $V_{TT}$.

IPR2022-00999
Patent 11,232,054 B2

Patent Owner further argues that "even if $V_{TT}$ is generated on module, there is no reason that it should be generated by a buck converter." Resp. 33. Patent Owner contends that, "[a]s Micron noted, an LDO would be sufficient to power $V_{TT}$." *Id.* (citing Ex. 2006, 7; Ex. 2007–2010; Ex. 2050). Patent Owner contends that an LDO is much smaller than a buck converter, including a controller and discrete components such as an inductor, which makes the LDO preferable given the space constraint. *Id.* (citing Ex. 2061 ¶ 99). Patent Owner also argues that an LDO is preferred when the current load is below 1A. *Id.* (citing Ex. 2061 ¶ 99; Ex. 2047, 21; Ex. 2048, 23; Ex. 2049, 20; Ex. 1040, 23–24, Figs. 22–25).

In Reply, Petitioner contends that buck converters were commercially available for $V_{TT}$ and provided high efficiency compared to an LDO. Reply 19 (citing Ex. 1075, 112:12–114:8 (LDO may be only 10% efficient); Ex. 2060, 57:17–20, 58:18–59:10 (buck converters up to 98% efficient), 140:15–24 (trend has been to use buck converters)). We agree with Petitioner that, under appropriate circumstances, one of ordinary skill in the art would have chosen a buck converter over an LDO. Indeed, Patent Owner's arguments simply underscore that the person of ordinary skill in the art would have been aware of, and capable of using, various known options for voltage conversion.

> *d)    Conclusion on Motivation to Combine Harris and the FBDIMM Standards*

Petitioner has sufficiently shown that a person of ordinary skill in the art would have combined Harris and the FBDIMM standards since Harris states that its memory module may include fully buffered DIMMs (FBDs). Ex. 1023 ¶ 9. We agree that one of ordinary skill in the art would have

IPR2022-00999
Patent 11,232,054 B2

recognized this as a standard and looked to the FBDIMM Standards for information concerning the voltage values standardized for use in an FBDIMM. Ex. 1027, 83; Ex. 1028, 9. For these reasons and others set forth above, we determine that one of ordinary skill in the art would have combined Harris and the FBDIMM Standards with a reasonable expectation of success in arriving at the claims.

> 4.    *Analysis of Independent Claim 1*

> a)    *Limitation 1.a: "A memory module comprising:"*

Petitioner asserts that Harris's memory module 100A in Figure 1A or memory module 306-1 in Figure 3 corresponds to the claimed "memory module." Pet. 19–20 (citing Ex. 1023 ¶¶ 9, 17, 20, Figs. 1A, 3; Ex., 1003 ¶¶ 217–223; Ex. 1028, 38). Harris does indeed disclose a memory module with multiple memory devices such as DRAMs 110-1 to 110-N in Figure 1A or 306-1 in Figure 3.

Patent Owner does not specifically respond to Petitioner's contention for the preamble. *See* Resp.

Based on our review and consideration of the record, we determine that Petitioner has adequately shown that Harris teaches the preamble.

> b)    *Limitation 1.b: "a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system"*

Petitioner asserts that Harris and the FBDIMM Standards disclose this limitation. Pet. 20–25. For example, Petitioner notes that Harris discloses that its double-rank DIMMs may be accommodated on both sides of a printed circuit board (PCB). Pet. 20 (citing Ex. 1023 ¶ 13). Petitioner

35

further notes that a PCB may be referred to as a "memory board" or "raw card." *Id.* at 20–21 (citing Ex. 1023 ¶ 9, Ex. 1028, 10, 38, 84; Ex. 1003 ¶¶ 224–226).

As for the PCB "having an interface configured to fit into a corresponding slot connector of a host system," Petitioner notes that Harris's Figure 3 shows that each memory module 306-1 to 306-M includes an edge connection for fitting into a corresponding slot of a host system. Pet. 21 (citing Ex. 1023 ¶¶ 2, 12, 13, 19, Figs. 3, 4; Ex. 1028, 38, 84; Ex. 1003 ¶¶ 227–228).

Petitioner further contends that Harris, consistent with the FBDIMM Standards, discloses that the edge connections are "configured to couple power, data, address and control signals between the memory module and the host system." Pet. 21–25. Petitioner contends that the power signal corresponds to Harris's voltage 104 in Figure 1A (Ex. 1023 ¶ 10, 12, 19). Petitioner contends that the Harris's buffer 112 in Figure 1A is called "AMB" (Advanced Memory Buffer) in the FBDIMM Standards. Pet. 22. Petitioner indicates that buffer 112 receives data, address, and control signals via memory controller interface 114 and transmits these signals to DRAMs 110-1 to 110-N in Harris's Figure 1A. Pet. 22–25 (citing Ex. 1023 ¶ 9 (disclosing that "buffer/logic component 112 is provided for buffering command/address (C/A) space as well as data space at least for a portion of memory devices 110-1 through 110-N")). In addition, Petitioner argues that the FBDIMM Standards indicate buffer AMB receives data signals DQ0–DQ63; address signals A0–A15; and control signals RAS, CAS, WE, CS, etc. Pet. 22–23 (citing Ex. 1028, 13).

IPR2022-00999
Patent 11,232,054 B2

### (1)    Power Via Edge Connection

Claim 1 recites "the interface including a plurality of edge connections configured to couple power . . . between the memory module and the host system." Ex. 1001, 38:22–25. Patent Owner argues that "all claims of the '054 patent require that the memory module includes a module interface that fits into a memory slot of a host system and receives voltage/power from the host system via that interface." Resp. 4–5. According to Patent Owner, Harris does not disclose such a memory module. *Id.* at 5. Specifically, Patent Owner argues that "Harris supposedly provides a 'technology-independent voltage distribution scheme for memory devices wherein system board power supply and associated voltage plane(s) are eliminated.'" *Id.* at 6 (citing Ex. 1023 ¶ 19) (emphasis omitted). Patent Owner argues that Harris's memory module connects to the external voltage source from the side and not from its edge connections. *Id.* at 7. Patent Owner contends that supplying power to a DIMM from its side was known in the art. *Id.* (citing Ex. 2035; Ex. 2036, 41–42; Ex. 2061 ¶ 59).

Petitioner contends that Patent Owner does not dispute that the FBDIMM Standards teach supplying power via edge connections, which Patent Owner's expert, Dr. Mangione-Smith, admits were "standard." Reply 3 (citing Pet. 16–21; Ex. 1075, 97:16–98:18, 163:16–20; Ex. 1077, 9). Petitioner further contends that Patent Owner argues that Harris's "externally supplied voltage" requires power external to the entire host system (*id.* (citing Resp. 4–8)), when "external" relates to the DIMM memory module and does not exclude power from the host system, including from edge connections. *Id.* (citing Ex. 2060, 66:7–19, 67:20–68:21, 91:22–92:7, 129:24–130:17; Pet. 21–22). Petitioner disagrees with

37

IPR2022-00999
Patent 11,232,054 B2

Patent Owner's assertion that Harris's memory module would never utilize edge connections for power.  Reply 3–4.  To explain its position, Petitioner provides an annotated version of Harris's Figure 3 below.



FIG. 3

Petitioner contends that Harris's Figure 3 above shows memory boards 306 connected to the host system only through their edge connections (annotated by Petitioner in red), implying that power would also come from those edge connections.  Reply 4 (citing Ex. 1023, Fig. 3).  Petitioner contends that Harris's Figure 3 is nearly identical to an Intel drawing where memory modules admittedly receive power through the edge connections from the host system.  *Id.* (citing Ex. 1075, 171:3–17; Ex. 2101, 4).

Petitioner also contends that Harris discloses that each memory board receives a supply voltage which may be sourced from either the host system or a separate voltage source.  *Id.* at 4–5 (citing Ex. 1075, 167:23–168:1; Ex. 1023 ¶ 17).  Petitioner asserts that there is no dispute that the supply voltage was commonly provided through edge connectors alongside memory controller signals.  *Id.* at 5 (citing Ex. 2060, 131:3–5).

We agree with Petitioner that Harris's "external voltage source" covers sources originating from the host system (as well as sources external

to the host system). Harris states as background that DRAM devices may be "powered from system board or main board voltage sources." Ex. 1023 ¶ 2. Harris also discloses that "external voltage sources may comprise any combination of *known* or heretofore unknown voltage supplies, either regulated or unregulated, and even including variable voltages." Ex. 1023 ¶ 14 (emphasis added). The parties agree that supplying power from a host system to a memory module was 'known' in the art, as referenced by Harris. Ex. 2060, 131:3–5; Ex. 1075, 162:18–25. And, as Petitioner notes, Harris's Figure 3 shows that the memory boards have only edge connections, suggesting they receive their power from them. Ex. 1023, Fig. 3; Ex. 1003 ¶ 229. These facts support the conclusion that Harris's external voltage source may originate from the host system. Accordingly, we do not agree with Patent Owner's arguments that Harris is limited to using only external voltage sources unrelated to the host system. Resp. 4–14; Sur-Reply 2–6.

Furthermore, Petitioner demonstrates that the FBDIMM Standards show that memory modules receive power from their edge connections, and Petitioner relied on the FBDIMM Standards as disclosing this feature of the claims. *See* Pet. 16–21; Ex. 2060, 131:3–5; Ex. 1075, 97:16–98:18, 163:16–20; Ex. 1077, 9; Ex. 1028, 97 (GF-9), 103.

Based on our review and consideration of the record, we determine that Petitioner has adequately shown that the combination of Harris and the FBDIMM Standards discloses this limitation.

### (2) Data, Address, and Control Signals Via Edge Connection

Claim 1 recites an "interface including a plurality of edge connections configured to couple … data, address and control signals between the

IPR2022-00999
Patent 11,232,054 B2

memory module and the host system." Ex. 1001, 38:23–25. Patent Owner argues that the DIMM and AMB do not receive data signals (DQ0–DQ63) or address and control signals (A0–A15, RAS, CAS, WE) from the host. Resp. 14 (citing Pet. 22–25). According to Patent Owner, these signals are instead generated by the AMB based on decoded FBDIMM channel signals (PS[9:0] and PS[9:0]bar). *Id.* at 14–18 (citing Ex. 2061 ¶ 72; Ex. 1028, 29; Ex. 1027, 3–4; Ex. 2039, 2; Ex. 2101, 4; Ex. 2040, 1). Patent Owner argues that Petitioner's evidence does not show that the data, address and control signals are received from the host. *Id.* at 18. Specifically, Patent Owner relies on the figure below from the FBDIMM Standards (*see* Sur-Reply 7 (citing Ex. 1028, 13)).



According to Patent Owner, the above figure shows that data, address and controls signals (highlighted in yellow) are generated and outputted by the buffer, and are not received from the DIMM interface. Sur-Reply 6–7 (citing Pet. 23–25; Resp. 14–18; Ex. 2061 ¶¶ 72–74). Patent Owner contends this does not comport with the claim language which requires an

IPR2022-00999
Patent 11,232,054 B2

"interface including a plurality of edge connections configured to couple …
data, address and control signals between the memory module and the host
system." *Id.* at 7 (citing Ex. 1001, 38:23–25). Patent Owner argues that
Dr. Wolfe merely stated that the AMB outputs "information" to the DRAMs
but the claims require specific "signals," not just "information." *Id.* at 8
(citing Ex. 1003 ¶ 230; Ex. 2060, 7:20–11:6; Ex. 1001, 38:23–25). Patent
Owner argues that the outputs from the AMB are not transmitted over
FBDIMM's edge connections. *Id.*

Petitioner argues that Patent Owner's technology tutorial indicates
that an FBDIMM receives address and control signals similar to an RDIMM,
as shown below:





Reply 9 (citing Ex. 1077, 8–9; Ex. 1075, 91:23–92:19, 95:14–96:13,
97:16–98:18). The figures above show that the memory controllers transmit

41

IPR2022-00999
Patent 11,232,054 B2

address, command and clock signals (shown in red), or information containing these signals, to the register (RDIMM) or AMB (FBDIMM), which transmits them to the DRAMs. *Id.*; Sur-Reply 10.

Petitioner contends that the host system provides address, command and clock signals to the AMB encoded as a packetized, serialized signal on fewer wires than would be required to receive them as separate, parallel signals. Reply 9–10 (citing Resp. 14; Ex. 2061 ¶ 31; Ex. 1075, 155:22–157:1, 212:3–8, 213:3–215:20, 219:13–220:9, 226:7–228:8; Ex. 2060, 8:3–11:6). Petitioner alleges that Patent Owner is in essence attempting to rewrite the claims to require dedicated pins for these signals, which the claims do not require. *Id.*

Patent Owner argues that it is not attempting to rewrite the claims to require "dedicated pins" as Petitioner alleges. Sur-Reply 9 (citing Reply 9–10). Patent Owner asserts that the pin names indicate what "signals" are exchanged at the interface between the host and the FBDIMM, as shown in the figure below.

IPR2022-00999
Patent 11,232,054 B2

| Pin Name | Pin Description | Count |
|---|---|---|
| | **FB-DIMM Channel Signals** | 99 |
| SCK | System Clock Input, positive line | 1 |
| SCK̄ | System Clock Input, negative line | 1 |
| PN[13:0] | Primary Northbound Data, positive lines | 14 |
| PN̄[13:0] | Primary Northbound Data, negative lines | 14 |
| PS[9:0] | Primary Southbound Data, positive lines | 10 |
| PS̄[9:0] | Primary Southbound Data, negative lines | 10 |
| SN[13:0] | Secondary Northbound Data, positive lines | 14 |
| SN̄[13:0] | Secondary Northbound Data, negative lines | 14 |
| SS[9:0] | Secondary Southbound Data, positive lines | 10 |
| SS̄[9:0] | Secondary Southbound Data, negative lines | 10 |
| FBDRES | To an external precision calibration resistor connected to Vcc | 1 |
| | **DDR2 Interface Signals** | 175 |
| DQS[8:0] | Data Strobes, positive lines | 9 |
| DQS̄[8:0] | Data Strobes, negative lines | 9 |
| DQS[17:9]/DM[8:0] | Data Strobes (x4 DRAM only), positive lines. These signals are driven low to x8 DRAM on writes. | 9 |
| DQS̄[17:9] | Data Strobes (x4 DRAM only), negative lines | 9 |
| DQ[63:0] | Data | 64 |
| CB[7:0] | Checkbits | 8 |
| A[15:0]A, A[15:0]B | Addresses. A10 is part of the pre-charge command | 32 |
| BA[2:0]A, BA[2:0]B | Bank Addresses | 6 |
| RASA, RASB | Part of command, with CAS, WE, and CS[1:0]. | 2 |
| CASA, CASB | Part of command, with RAS, WE, and CS[1:0]. | 2 |
| WEA, WEB | Part of command, with RAS, CAS, and CS[1:0]. | 2 |
| ODTA, ODTB | On-die Termination Enable | 2 |
| CKE[1:0]A, CKE[1:0]B | Clock Enable (one per rank) | 4 |
| CS̄[1:0]A, CS̄[1:0]B | Chip Select (one per rank) | 4 |
| CLK[3:0] | CLK[1:0] used on 9 and 18 device DIMMs, CLK[3:0] used on 36 device DIMMs. CLK[3:2] should be out-put disabled when not in use. | 4 |
| CLK̄[3:0] | Negative lines for CLK[3:0] | 4 |
| DDRC_C14 | DDR Compensation: Common return pin for DDRC_B18 and DDRC_C18. | 1 |
| DDRC_B18 | DDR Compensation: Resistor connected to common return pin DDRC_C14 | 1 |
| DDRC_C18 | DDR Compensation: Resistor connected to common return pin DDRC_C14 | 1 |
| DDRC_B12 | DDR Compensation: Resistor connected to $V_{DD}$ | 1 |
| DDRC_C12 | DDR Compensation: Resistor connected to $V_{DD}$ | 1 |

Ex. 1028, 29. The figure above shows Patent Owner's highlighting to show
the "FB-DIMM Channel Signals" including PS[9:0] and PS[9:0]bar, and the
"DDR2 Interface Signals" including DQ0–DQ63, A0–A15, RAS, CAS, and
WE. Patent Owner states that all memory control for the DRAM resides in
the host, and argues that the fact that all read, write, and configuration
accesses are addressed to the DIMM does not undermine that the signals
Petitioner relies on are generated and outputted by the buffer, and not
exchanged at the interface between the FBDIMM and the host. Sur-Reply
9–10 (citing Ex. 2060, 7:20–11:6; Ex. 2060 ¶ 230).[6]

---

[6] Patent Owner's citation to "Ex. 2060 ¶ 230" appears to be an error and we
cannot determine from the context what Patent Owner intended to cite.

Petitioner further argues that the FBDIMM is a preferred embodiment in the '054 patent, and excluding a preferred embodiment from the claims is "rarely, if ever correct." Reply 10 (citing *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022)). To the contrary, Patent Owner argues that the claims need not encompass FBDIMM embodiments, which are disclosed but unclaimed subject matter. Sur-Reply 10 (citing *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1107 (Fed. Cir. 1996); Ex. 1001, 21:38–55).

According to Petitioner, Patent Owner concedes that the signals (PS[9:0] and PS[9:0]bar) received by the AMB result in data, address, and control signals needed by DDR2 SDRAMS. Reply 10 (citing Ex. 2061 ¶ 31). Petitioner further notes that the FBDIMM Standards state that all memory control for the DRAM resides in the host, including memory request initiation, and that the AMB acts as a DRAM memory buffer for all read, write, and configuration accesses addressed to the DIMM. *Id.* (citing Ex. 1027, 1). As a buffer for all such commands to the FBDIMM, Petitioner asserts, the AMB must necessarily couple data, address, and control signals from the host system to the memory module as the claims require. *Id.*

Petitioner and Patent Owner agree that FBDIMM AMB receives data, address, and control signals encoded in packetized, serialized form at its edge connections via the signals PS[9:0] and PS[9:0]bar, and that the AMB uses these signals to generate data, address and command signals including DQ0–DQ63, A0–A15, RAS, CAS, and WE provided to the DIMMs onboard the memory module. Pet. 22–25; Sur-Reply 10. The claims merely require an "interface including a plurality of edge connections configured to couple … data, address and control signals between the memory module and the host system." Ex. 1001, 38:23–25. We determine that the data, address, and

IPR2022-00999
Patent 11,232,054 B2

control signals of Harris and the FBDIMM Standards as received at edge connections coupling the memory module and host system satisfy this claim limitation, even though the signals are in encoded, packetized, or serialized form and thus may be received at the same pin or pins. That the signals are encoded, packetized, and serialized does not change the fact that they are data, address, and control signals. The claims do not require these signals to be received at the edge connections in any particular form or on any particular pins. *See In re Self*, 671 F.2d 1344, 1348 (CCPA 1982) (stating that limitations not appearing in the claims cannot be relied upon for patentability).

Petitioner has shown that the combination of Harris and the FBDIMM Standards teaches limitation 1.b of claim 1, and Patent Owner's arguments do not undermine Petitioner's showing.

> *c)* *Limitation 1.c: "a voltage conversion circuit coupled to the PCB and configured to provide at least three regulated voltages, wherein the voltage conversion circuit includes at least three buck converters each of which is configured to produce a regulated voltage of the at least three regulated voltages"*

Petitioner contends that Harris and the FBDIMM Standards disclose limitation 1.c of claim 1 of the '054 patent. Pet. 26–30. Specifically, Petitioner contends that Harris's Voltage Regulator Module 102 corresponds to the claimed "voltage conversion circuit." Pet. 26 (citing Ex. 1023 ¶ 10, Fig. 1A). Petitioner contends that the claimed "at least three regulated voltages" correspond to voltage 106 ($V_{cc}$) and voltage 108 ($V_{dd}$) as shown in Harris's Figure 1A, and a third voltage ($V_{TT}$) which is not actually shown in Harris's Figure but is shown in the FBDIMM Figure below.

45

IPR2022-00999
Patent 11,232,054 B2



Ex. 1028, 68.  The figure above shows voltage $V_{TT}$ terminating an array of SDRAM devices via resistor R1.

As to the voltages being "regulated," Petitioner argues Harris discloses that "at least one on-board voltage regulator" is "capable of generating tightly-controlled voltage levels."  Pet. 28 (citing Ex. 1023 ¶¶ 2, 3, 9–11; Ex. 1003 ¶ 236).

As to the "at least three buck converters," Petitioner contends that Harris teaches using buck converters to provide the three regulated voltages above.  Pet. 28 (citing Ex. 1003 ¶¶ 238–241).  Petitioner contends Harris teaches using a "high-frequency switching voltage converter capable of generating tightly-controlled voltage levels" to provide each needed on-board regulated voltage.  *Id.* (citing Ex. 1023 ¶¶ 10, 12).  Petitioner contends it would have been obvious to use a "buck converter" to convert higher input voltage (e.g., 12V) to the lower output voltage (3.5V or less), and there would have been a reasonable expectation of success because buck

converters were well-known "switching" devices commonly used to step down the voltage between its input and output, as had long been taught in textbooks. *Id.* at 28–29 (citing Ex. 1003 ¶¶ 147–150, 239–241; Ex. 1058, 3, 5, 12–16 (1995 Lenk textbook showing buck, boost, and buck-boost circuits); Ex. 1032, 161 (1995 Mohan textbook showing various step-down (buck) converters); Ex. 1030, 2:32–43, 5:39–44; Ex. 1024, Fig. 6 (Amidi showing DC/DC buck converter); Ex. 1050, 1:21 (identifying buck converters as one of "the most basic building blocks in power electronics")). Petitioner contends buck converters were well-known for their efficiency in generating step down voltages without generating excess heat or requiring large cooling devices. *Id.* at 29 (citing Ex. 1003 ¶ 240; Ex. 1059, 5:23–30; Ex. 1058, 5; Ex. 1040, 1, 23–24; Ex. 1041, 1, 13; Ex. 1048, 3; Ex. 1062, 11; Ex. 1064 ¶ 101).  Petitioner contends that it would have been obvious to use at least three converters in Harris given the need for at least three different voltages in the FBDIMM Standards.  Pet. 29–30 (citing Ex. 1028, 17–20; Ex. 1026, 2–3, 9; Ex. 1003 ¶¶ 248–249, 255; Ex. 1062, 13; Ex. 1028, 30–32).

For the reasons discussed above in Section II.D.3, we disagree with Patent Owner's arguments regarding the use of three buck converters.

Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris and the FBDIMM Standards teaches limitation 1.c of claim 1.

IPR2022-00999
Patent 11,232,054 B2

> d)    Limitation 1.d.1: "a plurality of components
> coupled to the PCB, each component of the plurality of
> components coupled to at least one regulated voltage of
> the at least three regulated voltages"

Petitioner asserts that Harris discloses a "a plurality of components coupled to the PCB" including a Buffer and DRAMs shown in Harris's Figure 3, and a Serial Presence Detect (SPD) and resistors. Pet. 31 (citing Pet. 14–19; Ex. 1003 ¶¶ 261–266). Petitioner further contends that these components are each coupled to at least one regulated voltage of the at least three regulated voltages. *Id.*

Patent Owner does not dispute that the combination of Harris and the FBDIMM Standards discloses this feature. *See* Resp.

Based on our review and consideration of the record, we determine that Petitioner has adequately shown that the combination of Harris and the FBDIMMs Standards teaches limitation 1.d.1 of claim 1.

> e)    Limitation 1.d.2: "the plurality of components
> including a plurality of synchronous dynamic random
> access memory (SDRAM) devices and"

Petitioner asserts that Harris discloses that the plurality of components includes a plurality of DDR DRAM devices 110-1 to 110-N as shown in Harris's Figure 1A and DRAM devices 312-1 to 312-8 for each of the memory modules shown in Harris's Figure 3. Pet. 31–32 (citing Ex. 1023 ¶¶ 9, 11, Figs. 1A, 3; Ex. 1003 ¶¶ 267–271). Petitioner contends that a person of ordinary skill in the art would have known that according to the JEDEC standards, DDR memory devices are "synchronous" DRAM devices. *Id.* (citing Ex. 1028, 9; Ex. 1045, cover; Ex. 1026, cover; Ex. 1046, cover).

48

Patent Owner does not dispute that the combination of Harris and the FBDIMM Standards discloses this feature. *See* Resp.

Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris and the FBDIMMs Standards teaches this limitation.

> f)   Limitation 1.d.3:  "a first circuit that is coupled to the plurality of SDRAM devices and to a first set of edge connections of the plurality of edge connections"

Petitioner contends that the "first circuit" corresponds to buffer 112 as shown in Harris's Figure 1A, as well as the buffer of memory module 306-1 in Harris's Figure 3. Pet. 32–33 (citing *id.* at 20–25; Ex. 1023, Figs. 1A, 3; Ex. 1003 ¶¶ 272–277). Petitioner contends that Harris's buffers are coupled to receive data, address, and control signals via memory controller interface 114 across edge connections, and transmits them to DRAMs 110-1 to 110-N or DRAMs 312-1 to 312-8.

Patent Owner does not specifically respond to Petitioner's contentions for this limitation. *See* Resp.

Based on our review and consideration of the record, we determine that Petitioner has adequately shown that the combination of Harris and the FBDIMM Standards teaches this limitation for purposes of institution.

> g)   Limitation 1.d.4: "wherein the first circuit is coupled to first and second regulated voltages of the at least three regulated voltages, and"

Petitioner contends that Harris's buffer corresponds to the first circuit and is coupled to "first" (e.g, $V_{DD}$ or $V_{DDQ}$ = 1.8V) and "second" (e.g., $V_{CC}$ or $V_{CCFBD}$ = 1.5V) "regulated voltages of the at least three regulated

IPR2022-00999
Patent 11,232,054 B2

voltages." Pet. 33–34 (citing *id.* 14–19, 27; Ex. 1003 ¶¶ 278–284).

Petitioner provides an annotated version of Harris's Figure 1A shown below.



As shown above, Petitioner fills in Harris's Figure 1A with additional information from the FBDIMM Standards to show that Harris's buffer 112 would be understood by a person of ordinary skill considering the FBDIMM Standards to couple to the voltages $V_{DD}$ or $V_{DDQ}$ and $V_{CC}$ or $V_{CCFBD}$.

Patent Owner does not specifically respond to Petitioner's contentions for this limitation. *See* Resp.

Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris with the FBDIMM Standards teaches this limitation 1.d.4 of claim 1.

> ### h)    Limitation 1.d.5: *"wherein the plurality of SDRAM devices are coupled to the first regulated voltage of the at least three regulated voltages"*

Petitioner contends that Harris with the FBDIMM standards discloses this limitation. Pet. 34 (citing *id.* 14–19, 27; Ex. 1003 ¶¶ 285–287). Specifically, Petitioner contends that the SDRAM devices from Harris's

Figure 1A are coupled to the first regulated voltage ($V_{DD}$ or $V_{DDQ}$ = 1.8V) of the "at least three regulated voltages." *Id.*

Patent Owner does not specifically respond to Petitioner's contentions for this limitation. *See* Resp.

Based on our review and consideration of the record, we determine that Petitioner has shown that the combination of Harris with the FBDIMM Standards teaches limitation 1.d.5 of claim 1.

### i) Conclusion for Claim 1

For the reasons explained in Section II.D.3, Petitioner shows that one of ordinary skill in the art would have had reason to combine Harris and the FBDIMM Standards with a reasonable expectation of success in arriving at claim 1. Furthermore, Petitioner has shown that the combination of Harris and the FBDIMM Standards teaches each limitation of claim 1. Accordingly, Petitioner has shown that claim 1 is unpatentable as obvious over the combination of Harris and the FBDIMM Standards.

### 5.    Analysis of Dependent Claims

Claim 2 depends from claim 1 and recites "wherein the first regulated voltage has a first voltage amplitude, and the second regulated voltage has a second voltage amplitude, and wherein a first one of the first and second voltage amplitudes is less than a second one of the first and second voltage amplitudes." Ex. 1001, 38:45–50. Petitioner contends that, as taught by the FBDIMM Standards, the first voltage amplitude may be 1.8V and the second voltage amplitude may be 1.5V which is less than the first voltage amplitude of 1.8V. Pet. 34–35 (citing *id.* at 14–19, 27; Ex. 1003 ¶¶ 288–296). Patent Owner presents no arguments specific to claim 2.

Claim 3 depends from claim 1 and recites "wherein a third regulated voltage of the at least three regulated voltages has a voltage amplitude of 1.8 volts." Petitioner contends that the third regulated voltage is $V_{DDL}$ with a value of 1.8V as shown in the FBDIMM Standards (see previous figure—"voltage mapping (A)"). Pet. 35 (citing *id.* at 14–19, 27; Ex. 1003 ¶¶ 297–301).

Patent Owner argues that because claim 3 relies solely on Voltage Mapping A, Petitioner fails to show obviousness over the combination of Harris and the FBDIMM Standards. Resp. 28. Patent Owner argues that "[a]s for Mapping A, Petitioner does not explain why a single on-board Vcc power source is insufficient for [$V_{CC}$] and [$V_{CCFBD}$] power rails when a single set of [$V_{CC}$] interface pins providing power from the host met the power needs for both [$V_{CC}$] and [$V_{CCFBD}$]." *Id.* at 29. We addressed this argument in Section II.D.3.c explaining that Petitioner shows that using separate converters for $V_{CC}$ and $V_{CCFBD}$ provides the benefits of sequencing the power, turning power on and off independently, saving cost, eliminating cross-coupling of noise, and solving space constraints. We find no flaw in Petitioner's reliance on Voltage Mapping A for claim 3.

Claim 15 depends from claim 1 and recites "wherein two of the at least three buck converters are configured to operate as a dual-buck converter." Ex. 1001, 39:59–61. Petitioner contends at the time there were many commercially available products that could output two (or more) regulated voltages using buck converters, and thus "it would be obvious to implement any two of the regulated voltages as a '*dual buck converter*' to reduce the number of integrated circuits, pins, and interconnections on the module, therefore simplifying the design." Pet. 35–36 (citing Ex. 1003

IPR2022-00999
Patent 11,232,054 B2

¶ 439; *Qualcomm*, 21 F.4th at 797–99 (Fed. Cir. 2021)). Petitioner contends that the Murata MPD4S014S dual buck converter, Texas Instruments TPS51020 dual buck converter, and Fairchild FAN5026 dual-output PWM controller were commercially available and would have been suitable to implement for use in Harris in view of the FBDIMM Standards. Pet. 37–40 (citing Ex. 1003 ¶¶ 439, 443–444, 446–447; Ex. 1023 ¶ 10; Ex. 1032, 161–64; Ex. 1040, 1, 10–11; Ex. 1041, 1–2, 7–9; Ex. 1042, 16; Ex. 1047, 3:49–50, 4:7–10, 4:37–56, 5:4–13, 5:49–59, Fig. 2; Ex. 1048, 1–2; Ex. 1050, 2:19–20, 3:36–37; Ex. 1058, 5; Ex. 1073, 49–50, 58).

Patent Owner argues that claim 15 of the '054 patent provides "two of the at least three buck converters are configured to operate as a dual-buck converter," making clear that the "dual buck converter" includes two buck converters. Resp. 14 (citing Ex. 1001, 39:59–61). Patent Owner argues that Harris does not characterize its "high-frequency switching voltage converter" as a "dual" converter. *Id.* (citing Ex. 1023 ¶ 10, Fig. 1A). Patent Owner also contends Harris's use of the indefinite article "a" before mentioning this converter means that only a single converter is used in Harris's voltage regulator module. *Id.*

Petitioner correctly asserts that Harris states that "at least one on-board voltage regulator module (VRM)" may be used to generate the voltages $V_{DD}$ and $V_{CC}$. Reply 12 (citing Ex. 1023 ¶ 10, Fig. 1A). Also, Harris's claims 1 and 10 recite "at least one voltage regulator module" which covers the possibility of multiple regulators. Although Harris expresses a preference for implementing a voltage regulator module using "a high-frequency switching voltage converter" (emphasis added) which may be understood to mean a single converter, Harris does not preclude using

multiple regulators to generate the voltages $V_{DD}$ and $V_{CC}$. Ex. 1023 ¶ 10.
As Petitioner states, Harris's voltage regulator module receives one input
voltage and generates two output voltages. Reply 12 (citing Ex. 1023,
Fig. 1A). One of ordinary skill in the art would have understood that there
are two options: to use a single converter to generate both voltages, or to use
multiple converters to generate the voltages. "When there is a design need
or market pressure to solve a problem and there are a finite number of
identified, predictable solutions, a person of ordinary skill in the art has good
reason to pursue the known options within his or her technical grasp." *KSR*,
550 U.S. at 421. Petitioner shows that dual buck converters capable of
generating the two voltages from the one input were known in the art and
used for DIMMs, including the TPS51020 dual buck converter (Ex. 1040),
the FAN5026 dual-output PWM controller (Ex. 1041), and the MPD4S014S
dual buck converter (Ex. 1042). Armed with the foregoing knowledge, a
person of ordinary skill in the art would have understood one option for
implementing Harris's voltage regulator module would be to use a dual buck
converter notwithstanding Patent Owner's arguments to the contrary.

Based on our review and consideration of the record, we determine
that Petitioner has shown that Harris in combination with the FBDIMM
Standards teaches the limitations of claims 2, 3, and 15.

### 6.    *Determination for Ground 1*

Petitioner has shown that a person of ordinary skill in the art would
have been motivated to combine Harris and the FBDIMM Standards with a
reasonable expectation of success in arriving at the memory modules recited
in claims 1–3 and 15. Accordingly, Petitioner has shown that claims 1–3

IPR2022-00999
Patent 11,232,054 B2

and 15 are unpatentable as obvious over the combination of Harris and the FBDIMM Standards.

  *E.  Ground 2:  Obviousness Over Harris, the FBDIMM Standards, and Amidi*

  Petitioner contends claims 1–30 of the '054 patent would have been obvious over the combination of Harris, the FBDIMM Standards, and Amidi.  Pet. 41–70.  For the reasons that follow, Petitioner shows by a preponderance of the evidence that claims 1–30 are unpatentable as obvious over the combination of Harris, the FBDIMM Standards, and Amidi.

  *1.  Amidi (Ex. 1024)*

  Amidi was filed on October 25, 2006, issued on May 25, 2010, and is titled "Clock and Power Fault Detection for Memory Modules." Ex. 1024, codes (22), (45), (54).  Petitioner contends Amidi is prior art under § 102(e). Pet. 11.

  Amidi's Figure 5 is reproduced below.



***FIG. 5***

Amidi's Figure 5 above illustrates power management block 510 that receives incoming system supply 520 and incoming battery supply 530, and generates outgoing memory power supply 540 which is stabilized in the face of disruptions to the system supply 520 using the battery supply 530. Ex. 1024, 4:14–22, 8:23–36, Fig. 5, Fig. 14; Ex. 1003 ¶¶ 131–132.

    2.    *Motivation to Combine*

Petitioner contends that a person of ordinary skill in the art would have been motivated to combine Harris and the FBDIMM Standards with Amidi with a reasonable expectation of success. Pet. 41. Specifically, Petitioner contends that Harris recognizes concerns with power reliability and proposes the use of a redundant power source. *Id.* (citing Ex. 1023 ¶¶ 12–14, 16, Figs. 1B, 2). Petitioner notes that Amidi teaches a redundant power source (a battery on the memory module) for maintaining data during power disruption. *Id.* at 41–42 (citing Ex. 1024, code (57), 1:28–35, 2:6–26, 4:14–60, Figs. 5–6; Ex. 1003 ¶¶ 171–177). Petitioner further notes that Amidi's power management block could be modified easily to work with Harris's FBDIMM memory module by changing the system supply 520 and memory supply 540 to 12V as taught by Harris. *Id.* at 42 (citing Ex. 1024, Fig. 5; Ex. 1023 ¶ 12; Ex. 1003 ¶¶ 173–174). According to Petitioner, a person of ordinary skill in the art would have considered it obvious that the 12V external supply would be stepped-down with a buck converter to a 5V supply for charging Amidi's battery and that Amidi's battery voltage would be stepped-up with a boost converter to the 12V level used by Harris's memory module. *Id.* at 42–43 (citing Ex. 1024, Fig. 6 (620); Ex. 1003 ¶¶ 173–174). Petitioner contends that Amidi discloses that its power management block uses "buck" converters to step-down voltages as needed,

and "boost" converters to step-up voltages as needed, as had long been taught in textbooks. *Id.* at 43 (citing Ex. 1024, 4:27–32, 4:38–40, Figs. 5, 6; Ex. 1058, 3; Ex. 1032, 161). Petitioner further contends that Amidi's battery backup mode is similar to the S3 power-saving mode of Harris's FBDIMM memory module and the FBDIMM standards, such that a person of ordinary skill in the art would have been motivated to combine their teachings. *Id.* at 43–45.

In sum, Petitioner contends that a person of ordinary skill in the art "would have been motivated to implement Harris's FBDIMM memory module with the functionality of Amidi's power management and logic blocks for detecting power disruptions and switching over to battery backup when needed." Pet. 44 (citing Ex. 1003 ¶¶ 171–176). Petitioner contends that this "straightforward modification of Harris's memory module in view of Amidi and the knowledge of a [person of ordinary skill in the art] simply uses a known technique (e.g., Amidi's battery backup techniques) to improve a similar device (e.g., Harris's memory module) in the same way (e.g., to provide a backup power supply using a battery)." *Id.* at 44 (citing Ex. 1003 ¶ 177); *see KSR*, 550 U.S. at 418. Petitioner further contends that "the modification merely applies a known technique (e.g., providing a backup power supply) to a known device (e.g., a memory module) that is ready for improvement to yield predictable results (e.g., redundancy when the system supply or clock fails)." Pet. 44 (citing Ex. 1003 ¶ 177); *see KSR*, 550 U.S. at 417.

Petitioner contends that the combination of Harris, the FBDIMM Standards, and Amidi would result in the following configuration and voltage mappings:

IPR2022-00999
Patent 11,232,054 B2



*FIG. 1A*

Pet. 45. Above, Petitioner has annotated Harris's Figure 1A to show features added from the teachings of the FBDIMM Standards (red) and features added from the teachings of Amidi (blue).

Patent Owner argues that Harris provides alternate voltage sources to power a memory module in the event of a power interruption, so Harris already provides a solution for the alleged problem that Amidi addresses. Resp. 34–40. Specifically, Patent Owner argues that Harris has "logic 124" that selects a different voltage source if power becomes unavailable on one of the supply voltage paths 120-1 through 120-K. *Id.* at 34–35 (citing Ex. 1023, Fig. 1B; Ex. 2061 ¶ 106). Patent Owner further argues that substituting Amidi's battery backup solution for Harris's redundant power sources would require substantial space to accommodate the lithium battery and associated battery charging and monitoring circuits and power management block. *Id.* at 37–38 (citing Ex. 1024, Figs. 4–6; Ex. 1023 ¶¶ 2, 13; Ex. 1061 ¶ 106, n.5; Ex. 2061 ¶ 107). Patent Owner argues that Petitioner "has entirely ignored the issue of whether the essential parts of Amidi it seeks to apply to the combination would even fit onto Harris' circuit board" and that "Petitioner has also presented no evidence that a

[person of ordinary skill in the art] would expect Harris' memory module to be able to accommodate three buck converters, a lithium battery and its associated charging and monitoring circuits, and Amidi's power management module, at least not without undergoing substantial redesign." *Id.* at 38–40 (citing Ex. 2101, 20; Ex. 1055, Fig. 4; Ex. 2061 ¶ 110).

We agree with Petitioner that Amidi provides a redundant power supply on the memory module that is independent from the host, and that a person of ordinary skill in the art would have seen the value of adding a redundant power supply onboard Harris's memory module at least for some practical applications. Reply 19–20 (citing Pet. 41–42; Ex. 1003 ¶ 172; Ex. 1024, 1:28–35, 2:6–26). Although Harris mentions an "external voltage source," it does not mention the term "battery." Hence, Patent Owner's arguments that Amidi provides a solution to a problem that Harris already solves is not correct. *See* Ex. 1003 ¶ 172 ("Amidi recognizes that it is useful to keep data on the memory module with a backup power supply on the module itself, such as a battery supply, when the entire system surrounding the memory module loses power") (citing Ex. 1024, 1:28–35; 2:6–26). Furthermore, Petitioner shows that memory modules with battery backup were known in the art and readily available. Reply 20 (citing Ex. 2035, 9; Ex. 1075, 165:10–167:7). As to the space issue, Petitioner notes that even if the battery backup occupies one side of an FBDIMM board, the other side still can include one rank or two ranks using stacked memory devices. *Id.* at 20–21 (Ex. 1028, 36; Ex. 1075, 74:22–75:25, 77:10–17).

Accordingly, we determine that Petitioner has shown that one of ordinary skill in the art would have been motivated to combine Harris, the FBDIMM Standards, and Amidi with a reasonable expectation of success.

### 3. Claims 1–3 and 15

We agree with Petitioner that the addition of Amidi does not negate Petitioner's showing with respect to the previous ground. Pet. 45–46 (citing Ex. 1003 ¶¶ 216–301, 431–448). Accordingly, Petitioner has shown that claims 1–3 and 15 are unpatentable as obvious over the combination of Harris, the FBDIMM Standards, and Amidi for the reasons stated in the previous ground.

### 4. Claim 4

Claim 4 depends from claim 1 and recites that the memory module further comprises:

> a voltage monitor circuit coupled to the PCB and to a second set of edge connections of the plurality of edge connections, the voltage monitor circuit configured to monitor an input voltage received from the second set of edge connections, the voltage monitor circuit configured to produce a trigger signal in response to the input voltage having a voltage amplitude below a predetermined threshold voltage, wherein the memory module transitions from a first operable state to a second operable state in response to the trigger signal.

Ex. 1001, 38:54–64.

Petitioner points to Amidi's power supervisory module/block 480/665/800 as claim 4's "voltage monitor circuit" coupled to Harris's edge connections for power. Pet. 46. According to Petitioner, Amidi's power supervisory module/block monitors the external system power supply 605/825 in Amidi. *Id.* Petitioner contends that Amidi's power supervisory module/block generates a "trigger signal" corresponding to Amidi's signal

IPR2022-00999
Patent 11,232,054 B2

670/858/868.  *Id.*  Petitioner contends the "predetermined threshold voltage" corresponds to Amidi's reference voltage 675/820 set to 5% or 10% below the nominal voltage of 12V.  *Id.* at 46–49 (citing Ex. 1023 ¶¶ 12, 13; Ex. 1003 ¶¶ 303–314; Ex. 1024, 4:8–11, 4:44–52, 5:25–43, 5:31–62, 8:30–62, 8:23–29, 9:8–12, Figs. 4–6, 14, 15).  Petitioner further states that the trigger signal causes the memory module to transition from normal operations using an external voltage in the normal range ("the first operable state") to self-refresh operations using a backup battery when the external voltage is outside the normal range ("the second operable state").  *Id.* at 49–50 (citing Ex. 1024, 4:44–52, 8:30–62, 9:8–22, Figs. 6–8, 14, 15; Ex. 1003 ¶¶ 315–321).

Patent Owner does not present any argument specific to claim 4.  *See* Resp.

Petitioner has shown by a preponderance of the evidence that claim 4 would have been obvious over the combination of Harris, the FBDIMM Standards, and Amidi.

### 5.   *Claims 5, 7, 8, 23 and 24*

Claim 5 depends from claim 4 and recites

> a controller coupled to the voltage monitor circuit;
> wherein, in response to the trigger signal, the controller is configured to perform one or more operations including a write operation to transfer data to non-volatile memory.

Ex. 1001, 38:65–39:3.  Claims 7, 23 and 24 recite the same or similar limitations.  Petitioner contends that the combination of Harris, the FBDIMM Standards, and Amidi discloses these claims.  Pet. 50–52 (claim 5); Pet. 55–57 (claim 8); Pet. 57–59 (claim 7); Pet. 69 (claims 23 and

24). We consider Petitioner's contentions and Patent Owner's arguments for claim 5 to be representative of the issues presented for all of these claims.

Petitioner contends that the logic for controlling the S3 sleep mode (Pet. 43–44) corresponds to the claimed "controller" that is coupled to the voltage monitor circuit (Amidi's voltage supervisory block). Pet. 50–51. Petitioner contends that "Amidi's battery backup mode is similar to the S3 power-saving mode of Harris's FBDIMM memory module, because both modes put the SDRAMs in a self-refresh state to preserve data while conserving power." Pet. 51 (citing *id.* at 43–44). According to Petitioner, "in the event of a power disruption causing Amidi's 'voltage monitor circuit' to produce a 'trigger signal' . . ., a [person of ordinary skill in the art] would have been motivated to use the S3 sleep mode discussed above . . . to conserve power when using Amidi's battery backup." *Id.* (citing Ex. 1003 ¶¶ 322–333). Petitioner contends that S3 configuration information is stored in non-volatile memory before entering the S3 sleep mode in response to the trigger signal, satisfying the "wherein" clause of claim 4 from which claim 5 depends. *Id.* at 51–52 (citing Ex. 1003 ¶¶ 322–340; Ex. 1027, 25, 117; Ex. 1028, 13; Ex. 1066, 26:64–27:4; Ex. 1067, 1–2; Ex. 1023 ¶ 19).

Patent Owner argues that each of these claims recites that the "controller" is part of the memory module. Resp. 46. However, according to Patent Owner, Dr. Wolfe stated that the S3 sleep mode is "always determined by something other than the memory module." *Id.* (citing Ex. 2060, 282:22–284:25; Ex. 2006, 3 (S3 controlled by main controller in CPU); Ex. 2061 ¶ 119. Patent Owner asserts that the memory controller outside of the memory module controls the S3 sleep mode, not a controller

onboard the memory module. *Id.* at 47 (citing Ex. 2061 ¶ 120); *see also* Sur-Reply 23–24.

Petitioner replies that Patent Owner's argument ignores the combination of Harris's FBDIMM S3 sleep mode with Amidi's teaching of backup power management and logic functionality on the memory module to "maintain memory (through refresh, for example)." Reply 23 (citing Pet. 43–44, 50–52; Inst. Dec. 35–36; Ex. 1024, 2:16–19, Fig. 11; Ex. 1003 ¶¶ 175–177). Petitioner contends that Amidi's logic disconnects the system memory controller from the module, so a person of ordinary skill in the art "would have been motivated to use the S3 mode of the buffer 112 [on Harris's module] when implementing the backup power supply and logic functionality as disclosed in Amidi, because S3 mode performs the function of refreshing the memory (e.g., self refresh), just like in Amidi." Ex. 1003 ¶¶ 329–330.

From the foregoing, it is clear that Petitioner is relying on Amidi's logic detecting a low voltage condition to initiate the S3 sleep mode of Harris's FBDIMM module, rather than a signal from the system memory controller. Petitioner otherwise shows the limitations of these claims are disclosed by the combination of Harris, the FBDIMM Standards, and Amidi.

Petitioner has shown by a preponderance of the evidence that claims 5, 7, 8, 23 and 24 are obvious over the combination of Harris, the FBDIMM Standards, and Amidi.

      *6.*    *Claims 6, 7, 9–12, and 17*

Claims 6, 7, 9–12, and 17 recite, or depend from a claim that recites, that the voltage monitor circuit generates the trigger signal in response to the input voltage being <u>above</u> a predetermined threshold voltage. Ex. 1001,

39:4–20, 39:30–49, 40:21–25.  We address Petitioner's contentions and Patent Owner's arguments for claim 6, which is representative of these claims.

Petitioner contends that claim 6 is similar to claim 4 except it concerns ***over***voltage detection rather than ***under***voltage detection as in claim 4.  Pet. 52.  Petitioner contends that Harris teaches to detect both undervoltage and overvoltage conditions.  *Id.* at 53 (citing Ex. 1023 ¶ 13).  In this regard, Harris states that the tolerance of the +12V power supply is "around +/- 15%."  Ex. 1023 ¶ 13.  Petitioner asserts that, in the combination, Amidi's power supervisory module/block 480/665/800 is coupled to Harris's edge connections for power.  Pet. 53 (citing *id.* at 20–25).  Petitioner further asserts that Amidi's signal 670/858/868 is the claimed "trigger signal" generated in response to the input voltage having an amplitude above the predetermined threshold voltage.  Pet. 53 (citing *id.* at 46–49).  Petitioner contends the predetermined threshold voltage corresponds to Harris's teaching of 15% above the nominal value of +12V, which is 13.8V.  *Id.* (citing Ex. 1023 ¶ 13; Ex. 1003 ¶¶ 341–355).

Petitioner contends that Harris teaches both overvoltage and undervoltage detection of "+/- 15%."  *Id.* (citing Ex. 1023 ¶ 13).  Petitioner contends that a person of ordinary skill in the art would have been motivated by Harris to include overvoltage detection in Amidi's "voltage monitor circuit" with a reasonable expectation of success.  *Id.* (citing Ex. 1003 ¶¶ 347–348).  Petitioner contends that circuitry for both undervoltage and overvoltage detection was well known and commercially available.  *Id.* at 54 (citing Ex. 1061, 15; Ex. 1062, 15; Ex. 1063, 1–2; Ex. 1065, code (57), ¶¶ 14, 18–19, Figs. 1, 5; Ex. 1003 ¶¶ 349–352).

IPR2022-00999
Patent 11,232,054 B2

As for the transition between the "first" and "second operable states," Petitioner contends that the "first operable state" in its combination is "e.g., normal operations using an external voltage when its amplitude is within a normal range," and the "second operable state" is "e.g., self-refresh operations using battery backup when the external voltage amplitude is outside the normal range." *Id.* at 54–55 (citing Ex. 1003 ¶¶ 356–359).

Patent Owner argues that neither Harris nor Amidi teaches detecting an overvoltage. Resp. 40. However, Harris discloses that its +12V power supply has a tolerance of "+/- 15%" which indicates it would be a concern if the power supply was greater than 15%. Ex. 1023 ¶ 13. Amidi indicates concern with "power faults." Ex. 1024, codes (54), (57). Although Patent Owner points out that Amidi discloses detection of undervoltage (Ex. 1024, Fig. 14), "power fault" is broad enough to encompass overvoltage as well. We agree with Petitioner that a person of ordinary skill in the art considering these teachings would have considered it obvious to detect overvoltage and generate a trigger signal to transition between operable states.

Patent Owner argues that the voltage regulators on which Petitioner relies do not detect input overvoltage because they can accommodate a wide range of input voltages, and there is a low probability that they would exceed their operational range. Resp. 42 (citing Ex. 2060, 58:24–61:12; Ex. 1040; Ex. 1041; Ex. 2061 ¶ 114). Petitioner replies that power surges were a known problem that could cause data loss or corruption or damage circuitry in memory boards. Reply 22 (citing Pet. 70–71; Ex. 1003 ¶¶ 138, 185). Petitioner contends that Harris discloses that its module can accommodate only "+/- 15%" of the nominal supply voltage, which is consistent with maximum ratings for commercial converters. *Id.* at 23

65

(citing Ex. 1041, 4). We agree with Petitioner that power surges would have been a problem in at least some circumstances for which one of ordinary skill in the art would have seen the value of voltage detection in order to take preventive action to avoid loss of data and damage to the memory module. Dr. Wolfe credibly explains that overvoltage was a danger known to persons of ordinary skill in the art, citing industry datasheets that specify overvoltage parameters. Ex. 1003 ¶¶ 351–352 (citing Ex. 1063, 1–2; Ex. 1061, 15; Ex. 1062, 15). Indeed, the cited evidence uses the phrase "an overvoltage fault" (Ex. 1061, 15), which shows that power faults are not limited to undervoltage situations.

On this record, we determine that Petitioner has shown that claims 6, 7, 9–12, and 17 are unpatentable as obvious over the combination of Harris, the FBDIMM Standards, and Amidi notwithstanding Patent Owner's arguments.

### 7. *Claim 13*

Claim 13 depends from claims 1 and 8, and recites "wherein the voltage monitor circuit detecting a power threshold condition includes the voltage monitor circuit detecting a power reduction condition or a low voltage condition of the input voltage." Ex. 1001, 39:50–54. Petitioner contends that claim 13 recites a limitation substantially similar to one addressed with respect to claim 4. Pet. 58 (citing Ex. 1003 ¶¶ 419–423). Patent Owner does not provide specific argument for claim 13. Petitioner has shown by a preponderance of the evidence that claim 13 would have been obvious over the combination of Harris, the FBDIMM Standards, and Amidi.

IPR2022-00999
Patent 11,232,054 B2

### 8. Claim 14

Claim 14 recites

> wherein the voltage monitor circuit detecting a power threshold condition includes the voltage monitor circuit detecting a request by the host system.

Ex. 1001, 39:55–58.

Petitioner contends that a power disruption detected by Amidi's voltage supervisory block 800 causes the system to switch to battery backup. Pet. 61 (citing Pet. 55–57). Petitioner contends that Amidi's voltage supervisory block 800 detects a request by the host system to return control to the host. *Id.* at 61–62 (citing Ex. 1003 ¶¶ 424–430). Petitioner asserts that Amidi "discloses that, if the power is restored after a failure, the voltage supervisory block detects whether the host has cleared the backup-mode bit ('*detecting a request by the host system*') and subsequently, if so, returns control of the module to the host, including handling of the power signal." *Id.* at 62 (citing Ex. 1003 ¶¶ 311, 429; Ex. 1024, 5:31–62, 8:30–62, Fig. 14 9:11–39, Figs. 8, 14 (1460–1490), 15 (steps 1530, 1540, 1570, 1580; Ex. 1003 ¶ 312).

Patent Owner does not separately argue claim 14.

Petitioner shows by a preponderance of the evidence that claim 14 is unpatentable as obvious over the combination of Harris, the FBDIMM Standards, and Amidi.

### 9. Claim 16

Petitioner contends that claim 16 is disclosed by the combination of Harris, the FBDIMM Standards, and Amidi for the reasons previously stated for claims 1, 8, and 9, noting that Amidi's voltage supervisory block (e.g., 665) ("the voltage monitor circuit") is "configured to detect an amplitude

IPR2022-00999
Patent 11,232,054 B2

change in the input voltage" when the external system supply changes by crossing the reference voltage. Pet. 58 n.4 (emphasis omitted) (citing Ex. 1003 ¶ 471).

Patent Owner presents no separate arguments for claim 16 apart from those previously discussed.

Petitioner has shown by a preponderance of the evidence that claim 16 would have been obvious over the combination of Harris, the FBDIMM Standards, and Amidi.

> 10.    *Claims 18–22 and 26–28*

Claim 18 depends from claim 16 and recites

> wherein, in the first operable state, the voltage conversion circuit provides the first regulated voltage to the plurality of SDRAM devices using a first pre-regulated voltage, and wherein, in the second operable state, the voltage conversion circuit provides the first regulated voltage to the plurality of SDRAM devices using a second pre-regulated voltage.

Ex. 1001, 40:26–32. Claim 19 requires that the pre-regulated voltages are provided to the voltage conversion circuit "via a circuit." *Id.* at 40:33–37. Claim 20 recites that the "circuit" includes respective "first" and "second diodes" coupling respective "first" and "second pre-regulated voltages" to the "voltage conversion circuit." *Id.* at 40:38–46. Claims 21, 22, 27, and 28 recite limitations from claims that have been addressed or will be addressed in this section.

Petitioner contends that the limitation of claim 18 is taught by the combination of Harris, the FBDIMM Standards, and Amidi. Pet. 63–65. Petitioner contends that "pre-regulated voltage" means either that the voltage is within the 12V +/- 15% limits described in Harris, or must be pre-regulated on the memory board itself. Pet. 63; Ex. 1023 ¶ 13. We interpret

IPR2022-00999
Patent 11,232,054 B2

"pre-regulated voltage" to mean that the voltage is regulated before conversion to a stepped up or down level by the voltage conversion unit. *See* Ex. 1001, code (57), 28:53–58, Fig. 16 (1110, 1112). Petitioner contends that Harris discloses external voltage sources that are regulated. Pet. 63 (citing Ex. 1023 ¶¶ 13–14); *see* Ex. 1023 ¶ 14 ("It should be readily recognized that the external voltage sources may comprise any combination of known or heretofore unknown voltage supplies, either <u>regulated</u> or unregulated, and even including variable voltages." (emphasis added)); Ex. 1003 ¶ 484. Thus, Harris's regulated voltage sources generate "pre-regulated voltages" as recited in these claims.

Petitioner contends that the combination discloses that in the first operable state, which is, for example, normal operation when the external voltage amplitude is within normal range, Amidi's voltage conversion circuit provides the first regulated voltage ($V_{DD}/V_{DDQ}$=1.8V) to the SDRAM devices. Pet. 63 (citing *id.* at 14–19, 27, 31–32, 45, 49–50; Ex. 1003 ¶¶ 480–487).

Petitioner further contends that the combination discloses that in the second operable state, which is, for example, self-refresh operations using battery backup when the external voltage amplitude is outside the normal range, Amidi's voltage conversion circuit provides the first regulated voltage to the SDRAM devices using a second pre-regulated voltage from a boost converter in the power management block that converts and pre-regulates the 4.2V battery voltage to the regulated output voltage of 12V. Pet. 65 (citing *id.* at 41–43, 49–50; Ex. 1003 ¶¶ 488–492).

For claim 19, Petitioner contends that the claimed "circuit" corresponds to the power switch multiplexer circuit shown in Amidi's

69

IPR2022-00999
Patent 11,232,054 B2

Figure 7 which supplies pre-regulated "System_VDD" in the first operable state (normal operation), and supplies pre-regulated and boosted "DC_18V" using the battery supply. Pet. 65–67 (citing *id.* at 26; Ex. 1023, Fig. 1A; Ex. 1024, 4:23–29, 4:56–5:24, Figs. 5–7; Ex. 1003 ¶¶ 493–500).

For claim 20, Petitioner contends that the first and second diodes as claimed are disclosed in Harris. Pet. 67–68 (citing Ex. 1024, 5:3 (first diode), 5:17 (second diode); Ex. 1024, 4:64–5:24, Fig. 7; Ex. 1003 ¶¶ 501–511).

For claims 21, 22, and 26–28, Petitioner relies on its contentions presented for claim limitations previously discussed. Pet. 68–70 (citing ¶¶ 450–452, 480–492, 494–500, 502–511, 513–526 (claim 21); ¶¶ 502–511; 527–530 (claim 22); ¶¶ 480–492, 571–576 (claim 26); ¶¶ 502–506, 577–580 (claim 27); ¶¶ 507–511, 581–584 (claim 28)).

Patent Owner does not present any arguments specific to these claims.

After reviewing the record, we determine that Petitioner has shown by a preponderance of the evidence that claims 18–22 and 26–28 would have been obvious over the combination of Harris, the FBDIMM Standards, and Amidi.

### 11.    Claim 25

Petitioner contends that the limitations of claim 25 were addressed with respect to claims 4 and 16. Pet. 58, 70.

Patent Owner provides no argument specific to claim 25. *See* Resp.

Petitioner has shown by a preponderance of the evidence that claim 25 would have been obvious over the combination of Harris, the FBDIMM Standards, and Amidi.

IPR2022-00999
Patent 11,232,054 B2

### 12.    *Claim 29*

Claim 29 depends from claim 24 and recites that the voltage monitor circuit is configured to detect whether the input voltage is above or below respective thresholds. Ex. 1001, 42:19–23. Petitioner contends that the limitations of claim 29 were addressed with respect to claims 4, 6, and 17. Pet. 58, 70.

Patent Owner provides no argument specific to claim 29. *See* Resp.

Petitioner has shown by a preponderance of the evidence that claim 29 is obvious over the combination of Harris, the FBDIMM Standards, and Amidi.

### 13.    *Claim 30*

Claim 30 depends from claim 29 and recites that the predetermined threshold voltages are above and below a "specified operating voltage." Ex. 1001, 42:24–27. Petitioner contends that the "specified operating voltage" corresponds to Harris's +12V nominal external voltage. Pet. 57 n.2 (citing Pet. 41–45; Ex. 1023 ¶¶ 12, 13).

Patent Owner does not present any arguments specific to claim 30. *See* Resp.

Petitioner has shown by a preponderance of the evidence that claim 30 would have been obvious over the combination of Harris, the FBDIMM Standards, and Amidi.

### 14.    *Determination for Ground 2*

Petitioner has demonstrated that a person of ordinary skill in the art would have had reason to combine Harris, the FBDIMM Standards, and Amidi with a reasonable expectation of success. Petitioner has also demonstrated that all of the limitations are taught or at least suggested by the

IPR2022-00999
Patent 11,232,054 B2

combination. Accordingly, under this ground, Petitioner has demonstrated by a preponderance of the evidence that claims 1–30 are unpatentable as obvious over the combination of Harris, the FBDIMM Standards, and Amidi.

F.    *Ground 3: Obviousness over Harris, the FBDIMM Standards, Amidi, and Hajeck*

Petitioner contends claims 1–30 would have been obvious over the combination of Harris, the FBDIMM Standards, Amidi, and Hajeck. Pet. 70–72.

1.    *Hajeck (Ex. 1038)*

Hajeck is titled "Storage Subsystem with Embedded Circuit for Protecting Against Anomalies in Power Signal from Host." Ex. 1001, code (54). Hajeck issued as U.S. Patent No. 6,856,556 B1 on February 15, 2005. Petitioner contends Hajeck is prior art under § 102(b). Pet. 12.

Hajeck seeks to protect storage subsystems from damage and data loss caused by irregularities in a power signal provided by a host. Ex. 1038, 1:10–13. Specifically, Hajeck seeks to prevent data loss due to loss of power from a host system, and to prevent power surges or spikes from damaging circuitry of the storage subsystem. *Id.* at 1:15–31.

Hajeck's Figure 1 is reproduced below.

IPR2022-00999
Patent 11,232,054 B2



In Hajeck's Figure 1, non-volatile memory subsystem 30 receives power
from host system 32 at charge pump 46 which supplies regulated voltage to
controller 40. *Id.* at 2:64–67. In the event of a power surge or spike, charge
pump 46 protects controller 40 from damage. *Id.* at 3:12–16. In the event of
a voltage drop, charge pump 46 with battery and capacitive array 52
provides sustained voltage to controller 40. *Id.* at 2:60–63, 3:10–13.
Voltage detection circuit 48 detects anomalies in the input voltage and
generates a "busy" signal provided to the host system 32 to block the host
system from performing write operations to the storage subsystem. *Id.* at
1:64–67, 3:30–33.

> ### 2. *Motivation to Combine*

Petitioner contends that one of ordinary skill in the art would have
been motivated to combine Hajeck with Harris, the FBDIMM Standards,
and Amidi because one would have appreciated the desirability of switching
to backup power in both undervoltage and overvoltage conditions.

73

Pet. 71–72. Hajeck teaches using a battery backup in response to power loss from the host system to complete outstanding operations and to use the charge pump to protect the controller from surges or spikes in the power supply. *See, e.g.*, Ex. 1038, code (57). Hajeck also teaches a voltage detection circuit generate a "busy" signal in response to undervoltage or overvoltage conditions. *Id.* at 3:30–43.

> 3.   *Claims 7, 9–12, 17, 29, and 30*

Petitioner asserts that claims 1–30 would have been obvious under this ground for the same reasons provided for Ground 2. Pet. 71 (citing *id.* at 45–70). Petitioner contends that to the extent one would argue that Ground 2 fails to teach *over*voltage detection, Hajeck discloses this feature. Pet. 71 (citing *id.* at 52–54). Specifically, Petitioner contends that Hajeck discloses overvoltage detection as required by claims 7, 9–12, 17, 29, and 30. Pet. 71 (citing *id.* at 52–54; Ex. 1003 ¶¶ 354–355). Petitioner contends a person of ordinary skill in the art would have looked to Hajeck's teachings about voltage anomalies when implementing Amidi's voltage supervisory block to detect both undervoltage and overvoltage anomalies. *Id.* at 71–72 (citing Ex. 1003 ¶¶ 186–188). In the combination, "Amidi's voltage supervisory block would be modified to detect voltage anomalies and switch to the backup power not only '[i]f system supply 605 has a magnitude lower than reference voltage 675' as disclosed by Amidi (Ex. 1024, 4:44–52), but also 'when the voltage exceeds a certain level' as taught by Hajeck (Ex. 1038, 3:30–43; *see also id.* at code (57), 1:10–18, 1:28–31, 1:62–2:7, 3:30–4:9, 4:62–65, Fig. 1)." *Id.* at 72. Petitioner contends that this ground teaches both overvoltage and undervoltage detection and protection, further

rendering obvious claims 6, 9, 17, and 29 and their dependent claims 7, 10–12, and 30. *Id.* (citing Ex. 1003 ¶¶ 354–355, 389, 478, 588).

Patent Owner argues that "Harris does not teach the need to detect undervoltage and overvoltage anomalies" and that Hajeck "does not teach or suggest a voltage detection circuit that produces a trigger signal that causes transitions to different operating states in over-voltage conditions or otherwise even relates to switching power sources" or "sending the trigger signal to the memory system." Resp. 42–43 (citing Pet. 48, 51). Patent Owner argues that "the only signal generated by Hajeck's voltage detection circuit 48 is a 'busy signal' 38 sent back to host 32 to prevent it from performing write operations to the memory subsystem 30 when voltage anomalies are detected." *Id.* at 43 (citing Ex. 1038, 3:30–57, Fig. 2). Patent Owner argues that Hajeck does not switch to a different operating state or a different power supply, but instead its charge pump 46 continues to provide a near-constant voltage $V_{REG}$ to controller 40. *Id.* (citing Ex. 1038, 3:6–10, 3:66–4:3; Ex. 2061 ¶ 116). Patent Owner argues that Hajeck's charge pump protects controller 40 and other circuits from damage caused by voltage surges and spikes. *Id.* at 44 (citing Ex. 1038, 4:7–9).

Petitioner replies that Patent Owner's arguments ignore the Petition's extensive explanation and evidence about a person of ordinary skill in the art's understanding of how to handle power anomalies, including both undervoltage and overvoltage conditions, with a reasonable expectation of success. Reply 21 (citing Pet. 12–13, 41–45, 53–54, 70–72; Ex. 1003 ¶¶ 138, 345–355). Petitioner contends that the Petition also explained how the combination teaches a trigger signal to switch to back-up power and avoid data loss in case of a "power fault" including undervoltage and

IPR2022-00999
Patent 11,232,054 B2

overvoltage conditions. *Id.* (citing Pet. 49–50; Ex. 1003 ¶¶ 315–321; Ex. 2060, 226:16–22, 230:17–232:6, 251:10–254:2).

We agree with Petitioner that Patent Owner's arguments attack the references individually and do not properly consider what the combination of references would have signified to a person of ordinary skill in the art. *In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981)). Petitioner relies on Hajeck for its teaching of detecting an overvoltage condition to the extent that the combination of Harris, the FBDIMM Standards, and Amidi were deemed not to already disclose that feature. Pet. 72 (citing Ex. 1038, 3:37–40). Thus, the features that Patent Owner argues are missing from Hajeck are not ones for which Petitioner relied on Hajeck.

For similar reasons, we also do not agree with Patent Owner's argument that Hajeck does not suggest that data loss was a concern because its charge pump could provide the desired $V_{REF}$ indefinitely. Resp. 44–45. Petitioner relies on Amidi for switching operational states and the voltage supply to battery backup in the event of an overvoltage. Reply 21 (citing Pet. 49–50). This argument also considers Hajeck individually, and not in combination with Harris, the FBDIMM Standards, and Amidi, as set forth in the Petition.

### 4.    *Determination for Ground 3*

Petitioner has shown that a person of ordinary skill in the art would have combined Harris, the FBDIMM Standards, Amidi and Hajeck with a reasonable expectation of success. Petitioner has also shown that all of the limitations of claims 1–30 are taught or at least suggested by the combination. On this record, Petitioner has shown by a preponderance of

IPR2022-00999
Patent 11,232,054 B2

the evidence that claims 1–30 of the '054 patent would have been obvious over the combination of Harris, the FBDIMM Standards, Amidi, and Hajeck.

    *G.    Grounds 4 and 5: Obviousness over Spiers and Amidi*

As we have determined that claims 1–30 are unpatentable as obvious under Grounds 1 to 3, we do not reach Grounds 4 and 5.

    *H.    Motion to Exclude*

Petitioner seeks to exclude materials referenced in three URLs submitted with Patent Owner's Sur-Reply on August 4, 2023. Paper 35 (citing Paper 33, 1 n.2, 24, 26). Because we do not rely on any of these URLs in a manner adverse to Petitioner, we dismiss the Motion to Exclude as moot.

## III.    CONCLUSION

For the foregoing reasons, we determine that Petitioner establishes by a preponderance of the evidence that claims 1–30 of the '054 patent are unpatentable.

IPR2022-00999
Patent 11,232,054 B2

IV.    ORDER

Accordingly, it is:

ORDERED that claims 1–30 of the '054 patent have been shown to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is dismissed as moot;

FURTHER ORDERED that Petitioner will contact the Board within seven (7) business days to correctly identify Exhibit 1023 as Harris in the Board's P-TACTS system.

FURTHER ORDERED that any party seeking judicial review must comply with the notice and service requirements of 37 C.F.R. § 90.2. [7]

---

[7] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2022-00999
Patent 11,232,054 B2

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 1–3, 15 | 103 | Harris, FBDIMM Standards | 1–3, 15 | |
| 1–30 | 103 | Harris, FBDIMM Standards, Amidi | 1–30 | |
| 1–30 | 103 | Harris, FBDIMM Standards, Amidi, Hajeck | 1–30 | |
| 1–30 | 103 | Spiers, Amidi[8] | | |
| 1–30 | 103 | Spiers, Amidi, Hajeck | | |
| **Overall Outcome** | | | 1–30 | |

---

[8] Because we determine that claims 1–30 are unpatentable on other grounds, we do not reach the remaining grounds.

79

IPR2022-00999
Patent 11,232,054 B2

FOR PETITIONER:

Eliot D. Williams
Theodore W. Chandler
Ferenc Pazmandi
Mark Speegle
Sean Lee
BAKER BOTTS LLP
eliot.williams@bakerbotts.com
ted.chandler@bakerbotts.com
ferenc.pazmandi@bakerbotts.com
mark.speegle@bakerbotts.com
sean.lee@bakerbotts.com
dlsamsungnetlistiprs@bakerbotts.com

Matthew A. Hopkins
Michael R. Rueckheim
Ryuk Park
WINSTON & STRAWN LLP
mhopkins@winston.com
Winston-IPR-Netlist@winston.com

FOR PATENT OWNER:

Hong Annita Zhong
Phillip Warrick
Jason Sheasby
Jonathan M. Lindsay
IRELL & MANELLA LLP
hzhong@irell.com
pwarrick@irell.com
jsheasby@irell.com
jlindsay@irell.com
netlistipr@irell.com

80

Trials@uspto.gov                                          Paper 53
571-272-7822                                    Date: March 18, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE OFFICE OF THE DEPUTY UNDER SECRETARY OF
COMMERCE FOR INTELLECTUAL PROPERTY AND DEPUTY
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK
OFFICE

———————————

SAMSUNG ELECTRONICS CO., LTD., MICRON TECHNOLOGY,
INC., MICRON SEMICONDUCTOR PRODUCTS, INC., and MICRON
TECHNOLOGY TEXAS LLC,[1]
Petitioners,

v.

NETLIST, INC.,
Patent Owner.

———————————

IPR2022-00996 (Patent 11,016,918 B2)
IPR2022-00999 (Patent 11,232,054 B2)

———————————

Before DERRICK BRENT,[2] *Deputy Under Secretary of Commerce for
Intellectual Property and Deputy Director of the United States Patent and
Trademark Office.*

———————————

[1] Micron Technology, Inc., Micron Semiconductor Products, Inc., and
Micron Technology Texas LLC filed petitions in IPR2023-00405 and
IPR2023-00406 and were joined as parties to these proceedings. *See*
IPR2022-00996, Paper 26; IPR2022-00999, Paper 27.
[2] Katherine K. Vidal, Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office, took no part
in this decision.  The Director's authority is delegated to Derrick Brent,
Deputy Under Secretary of Commerce for Intellectual Property and Deputy
Director of the United States Patent and Trademark Office, by operation of

IPR2022-00996 (Patent 11,016,918 B2)
IPR2022-00999 (Patent 11,232,054 B2)

### ORDER

The Office received a request for Director Review of the Final Written Decision in the above-captioned cases. *See* IPR2022-00996, Paper 52; Ex. 3100; IPR2022-00999, Paper 53; Ex. 3100. Director Vidal is recused from this matter, and the request was referred to me.

Upon consideration of the request, it is:

ORDERED that the request for Director Review is denied; and

FURTHER ORDERED that the Patent Trial and Appeal Board's Final Written Decision in this case is the final decision of the agency.

---

the Director's Memorandum § II.c. *See* Director's Memorandum, Procedures for Recusal to Avoid Conflicts of Interest and Delegations of Authority (Apr. 20, 2022) (Recusal Procedure Memo), available at www.uspto.gov/sites/default/files/documents/Director-Memorandum-on-Recusal-Procedures.pdf.

IPR2022-00996 (Patent 11,016,918 B2)
IPR2022-00999 (Patent 11,232,054 B2)

For PETITIONER:

Eliot D. Williams
Theodore W. Chandler
Ferenc Pazmandi
Aashish Kapadia
Brianna L. Potter
BAKER BOTTS LLP
Eliot.williams@bakerbotts.com
Ted.chandler@bakerbott.com
Ferenc.pazmandi@bakerbotts.com
Aashish.kapadia@bakerbotts.com
Brianna.potter@bakerbotts.com

Juan Yaquian
WINSTON & STRAWN LLP
jyaquian@winston.com


For PATENT OWNER:

Hong Annita Zhong
IRELL & MANELLA LLP
hzhong@irell.com

3



US011016918B2

(12) **United States Patent**
Chen et al.

(10) Patent No.: **US 11,016,918 B2**
(45) Date of Patent: **May 25, 2021**

(54) **FLASH-DRAM HYBRID MEMORY MODULE**

(71) Applicant: **Netlist, Inc.**, Irvine, CA (US)

(72) Inventors: **Chi-She Chen**, Walnut, CA (US);
**Jeffrey C. Solomon**, Irvine, CA (US);
**Scott H. Milton**, Irvine, CA (US);
**Jayesh Bhakta**, Cerritos, CA (US)

(73) Assignee: **Netlist, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

(21) Appl. No.: **17/138,766**

(22) Filed: **Dec. 30, 2020**

(65) **Prior Publication Data**

US 2021/0124701 A1    Apr. 29, 2021

**Related U.S. Application Data**

(63) Continuation of application No. 15/934,416, filed on
Mar. 23, 2018, which is a continuation of application
(Continued)

(51) **Int. Cl.**
*G06F 13/36* (2006.01)
*G06F 13/28* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............. *G06F 13/28* (2013.01); *G06F 1/185*
(2013.01); *G06F 3/0613* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .. G06F 13/28; G06F 13/4027; G06F 13/1694;
G06F 13/4223; G06F 12/0638;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,043,099 A    6/1936   Hanna
3,562,555 A    2/1971   Ahrons
(Continued)

FOREIGN PATENT DOCUMENTS

EP    2737383 A2    6/2014
KR    0130873 B1    4/1999
(Continued)

OTHER PUBLICATIONS

Exhibit, Decision Denying Institution of Inter Partes Review, *Smart
Modular Technologies, Inc. v. Netlist, Inc.*, Case No. 4:13-cv-05889-
YGR Document 309-3, filed Mar. 17, 2015, 23 pages.
(Continued)

*Primary Examiner* — Hashem Farrokh
(74) *Attorney, Agent, or Firm* — Shami Messinger PLLC

(57) **ABSTRACT**

In certain embodiments, a memory module includes a
printed circuit board (PCB) having an interface that couples
it to a host system for provision of power, data, address and
control signals. First, second, and third buck converters
receive a pre-regulated input voltage and produce first,
second and third regulated voltages. A converter circuit
reduces the pre-regulated input voltage to provide a fourth
regulated voltage. Synchronous dynamic random access
memory (SDRAM) devices are coupled to one or more
regulated voltages of the first, second, third and fourth
regulated voltages, and a voltage monitor circuit monitors an
input voltage and produces a signal in response to the input
voltage having a voltage amplitude that is greater than a
threshold voltage.

**30 Claims, 22 Drawing Sheets**



**US 11,016,918 B2**

Page 2

**Related U.S. Application Data**

No. 14/840,865, filed on Aug. 31, 2015, now Pat. No. 9,928,186, which is a continuation of application No. 14/489,269, filed on Sep. 17, 2014, now Pat. No. 9,158,684, which is a continuation of application No. 13/559,476, filed on Jul. 26, 2012, now Pat. No. 8,874,831, which is a continuation-in-part of application No. 12/240,916, filed on Sep. 29, 2008, now Pat. No. 8,301,833, which is a continuation of application No. 12/131,873, filed on Jun. 2, 2008, now abandoned.

(60) Provisional application No. 60/941,586, filed on Jun. 1, 2007, provisional application No. 61/512,871, filed on Jul. 28, 2011.

(51) **Int. Cl.**
| | |
|---|---|
| *G06F 12/02* | (2006.01) |
| *G06F 13/16* | (2006.01) |
| *G06F 1/18* | (2006.01) |
| *G06F 12/06* | (2006.01) |
| *G06F 13/42* | (2006.01) |
| *G11C 7/10* | (2006.01) |
| *G11C 14/00* | (2006.01) |
| *G06F 3/06* | (2006.01) |
| *G06F 13/40* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *G06F 3/0659* (2013.01); *G06F 3/0685* (2013.01); *G06F 12/0246* (2013.01); *G06F 12/0638* (2013.01); *G06F 13/1694* (2013.01); *G06F 13/4027* (2013.01); *G06F 13/4243* (2013.01); *G11C 7/1072* (2013.01); *G11C 14/0018* (2013.01); *G06F 2212/205* (2013.01); *G06F 2212/7208* (2013.01)

(58) **Field of Classification Search**
CPC .... G06F 12/0246; G06F 1/185; G06F 3/0613; G06F 3/0685; G06F 3/0659; G06F 2212/7208; G06F 2212/205; G11C 7/1072; G11C 14/0018
USPC .......................... 711/103, 104, 105; 710/138
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,916,390 | A | 10/1975 | Chang et al. |
| 4,234,920 | A | 11/1980 | Ness et al. |
| 4,420,821 | A | 12/1983 | Hoffman |
| 4,449,205 | A | 5/1984 | Hoffman |
| 4,607,332 | A | 8/1986 | Goldberg |
| 4,658,204 | A | 4/1987 | Goodwin |
| 4,882,709 | A | 11/1989 | Wyland |
| 4,884,242 | A | 11/1989 | Lacy et al. |
| 4,965,828 | A | 10/1990 | Ergott, Jr. et al. |
| 5,430,742 | A | 7/1995 | Jeddeloh et al. |
| 5,444,664 | A | 8/1995 | Kuroda et al. |
| 5,490,155 | A | 2/1996 | Abdoo et al. |
| 5,519,663 | A | 5/1996 | Harper, Jr. et al. |
| 5,519,831 | A | 5/1996 | Holzhammer |
| 5,563,839 | A | 10/1996 | Herdt et al. |
| 5,577,213 | A | 11/1996 | Avery et al. |
| 5,619,644 | A | 4/1997 | Crockett et al. |
| 5,630,096 | A | 5/1997 | Zuravleff et al. |
| 5,675,725 | A | 10/1997 | Malcolm |
| 5,757,712 | A | 5/1998 | Nagel et al. |
| 5,799,200 | A | 8/1998 | Brant et al. |
| 5,813,029 | A | 9/1998 | Klein |
| 5,870,350 | A | 2/1999 | Bertin et al. |
| 5,874,995 | A | 2/1999 | Naimpally et al. |

| | | | |
|---|---|---|---|
| 5,890,192 | A | 3/1999 | Lee et al. |
| 5,953,215 | A | 9/1999 | Karabatsos |
| 5,991,885 | A | 11/1999 | Chang et al. |
| 6,023,421 | A | 2/2000 | Iadanza et al. |
| 6,026,465 | A | 2/2000 | Mills et al. |
| 6,065,092 | A | 5/2000 | Roy |
| 6,112,310 | A | 8/2000 | Jun et al. |
| 6,145,068 | A | 11/2000 | Lewis |
| 6,158,015 | A | 12/2000 | Klein |
| 6,199,142 | B1 | 3/2001 | Saulsbury et al. |
| 6,216,247 | B1 | 4/2001 | Creta et al. |
| 6,269,382 | B1 | 7/2001 | Cabrera et al. |
| 6,336,174 | B1 | 1/2002 | Li et al. |
| 6,336,176 | B1 | 1/2002 | Leyda et al. |
| 6,363,450 | B1 | 3/2002 | Lash et al. |
| 6,421,279 | B1 | 7/2002 | Tobita et al. |
| 6,459,647 | B1 | 10/2002 | Kengeri |
| 6,487,102 | B1 | 11/2002 | Halbert et al. |
| 6,487,623 | B1 | 11/2002 | Emerson et al. |
| 6,571,244 | B1 | 5/2003 | Larson |
| 6,614,685 | B2 | 9/2003 | Wong |
| 6,658,507 | B1 | 12/2003 | Chan |
| 6,691,209 | B1 | 2/2004 | O'connell |
| 6,693,840 | B2 | 2/2004 | Shimada et al. |
| 6,721,212 | B2 | 4/2004 | Sasaki |
| 6,721,860 | B2 | 4/2004 | Klein |
| 6,769,081 | B1 | 7/2004 | Parulkar |
| 6,799,241 | B2 | 9/2004 | Kahn et al. |
| 6,799,244 | B2 | 9/2004 | Tanaka et al. |
| 6,810,513 | B1 | 10/2004 | Vest |
| 6,816,982 | B2 | 11/2004 | Ravid |
| 6,839,774 | B1 | 1/2005 | Ahn et al. |
| 6,910,635 | B1 | 6/2005 | Miks et al. |
| 6,944,042 | B2 | 9/2005 | Komatsuzaki |
| 6,948,029 | B2 | 9/2005 | Yano |
| 6,952,368 | B2 | 10/2005 | Miura et al. |
| 7,053,470 | B1 | 5/2006 | Sellers et al. |
| 7,062,618 | B2 | 6/2006 | Tsunoda et al. |
| 7,089,412 | B2 | 8/2006 | Chen |
| 7,102,391 | B1 | 9/2006 | Sun et al. |
| 7,107,480 | B1 | 9/2006 | Moshayedi et al. |
| 7,111,142 | B2 | 9/2006 | Spencer et al. |
| 7,136,978 | B2 | 11/2006 | Miura et al. |
| 7,155,627 | B2 | 12/2006 | Matsui |
| 7,200,021 | B2 | 4/2007 | Raghuram |
| 7,234,099 | B2 | 6/2007 | Gower et al. |
| 7,355,325 | B2 | 4/2008 | Lofgren et al. |
| 7,409,491 | B2 | 8/2008 | Doblar et al. |
| 7,409,590 | B2 | 8/2008 | Moshayedi et al. |
| 7,411,859 | B2 | 8/2008 | Sohn et al. |
| 7,421,552 | B2 | 9/2008 | Long |
| 7,467,251 | B2 | 12/2008 | Park et al. |
| 7,519,754 | B2 | 4/2009 | Wang et al. |
| 7,600,142 | B2 | 10/2009 | Ichikawa |
| 7,613,877 | B2 | 11/2009 | Shimozono et al. |
| 7,716,411 | B2 | 5/2010 | Panabaker et al. |
| 7,818,488 | B2 | 10/2010 | Park et al. |
| 7,873,750 | B2 | 1/2011 | Yabuta et al. |
| 7,881,150 | B2 | 2/2011 | Solomon et al. |
| 7,952,179 | B2 | 5/2011 | Chiu et al. |
| 8,001,434 | B1 | 8/2011 | Lee et al. |
| 8,081,536 | B1 | 12/2011 | Solomon et al. |
| 8,086,955 | B2 | 12/2011 | Zhou et al. |
| 8,102,614 | B2 | 1/2012 | Song et al. |
| 8,214,616 | B2 | 7/2012 | Ware et al. |
| 8,233,303 | B2 | 7/2012 | Best et al. |
| 8,301,833 | B1 | 10/2012 | Chen et al. |
| 8,407,395 | B2 | 3/2013 | Kim et al. |
| 8,412,879 | B2 | 4/2013 | Chang et al. |
| 8,516,187 | B2 | 8/2013 | Chen et al. |
| 8,671,243 | B2 | 3/2014 | Chen et al. |
| 8,677,060 | B2 | 3/2014 | Chen et al. |
| 8,874,831 | B2 | 10/2014 | Lee et al. |
| 8,880,791 | B2 | 11/2014 | Chen et al. |
| 8,904,098 | B2 | 12/2014 | Amidi et al. |
| 8,904,099 | B2 | 12/2014 | Chen et al. |
| 9,043,677 | B2 | 5/2015 | Kong et al. |
| 9,158,684 | B2 | 10/2015 | Lee et al. |
| 9,361,250 | B2 | 6/2016 | Shan et al. |

Samsung Electronics Co., Ltd.
Ex. 1001, p. 2

**US 11,016,918 B2**

Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 9,436,600 B2 | 9/2016 | Lee |
| 9,921,762 B2 | 3/2018 | Amidi et al. |
| 9,928,186 B2 | 3/2018 | Lee et al. |
| 2002/0053944 A1 | 5/2002 | Brass et al. |
| 2002/0083368 A1 | 6/2002 | Abe et al. |
| 2002/0199061 A1 | 12/2002 | Friedman et al. |
| 2003/0028733 A1 | 2/2003 | Tsunoda et al. |
| 2003/0076726 A1 | 4/2003 | Cowles et al. |
| 2003/0137881 A1 | 7/2003 | Sasaki |
| 2003/0147297 A1 | 8/2003 | Shiota et al. |
| 2003/0158995 A1 | 8/2003 | Lee et al. |
| 2003/0204776 A1 | 10/2003 | Testin |
| 2003/0206478 A1 | 11/2003 | Ayukawa et al. |
| 2003/0210601 A1 | 11/2003 | Lin et al. |
| 2004/0088508 A1 | 5/2004 | Ballard et al. |
| 2004/0163027 A1 | 8/2004 | MacLaren et al. |
| 2004/0190210 A1 | 9/2004 | Leete |
| 2005/0044302 A1 | 2/2005 | Pauley et al. |
| 2005/0060488 A1 | 3/2005 | Poechmueller |
| 2005/0132250 A1 | 6/2005 | Hansen et al. |
| 2005/0141273 A1 | 6/2005 | Park et al. |
| 2005/0144418 A1 | 6/2005 | Kita |
| 2005/0183472 A1 | 8/2005 | Choi |
| 2005/0204091 A1 | 9/2005 | Kilbuck et al. |
| 2005/0249011 A1 | 11/2005 | Maeda |
| 2005/0273548 A1 | 12/2005 | Roohparvar |
| 2006/0039197 A1 | 2/2006 | Khouri et al. |
| 2006/0069896 A1 | 3/2006 | Sanders |
| 2006/0080515 A1 | 4/2006 | Spiers et al. |
| 2006/0126369 A1 | 6/2006 | Raghuram |
| 2006/0212651 A1 | 9/2006 | Ashmore |
| 2006/0294295 A1 | 12/2006 | Fukuzo |
| 2007/0070669 A1 | 3/2007 | Tsern |
| 2007/0136523 A1* | 6/2007 | Bonella ............... G06F 9/4401 |
| | | 711/113 |
| 2007/0147115 A1 | 6/2007 | Lin et al. |
| 2007/0192627 A1 | 8/2007 | Oshikiri |
| 2007/0255898 A1 | 11/2007 | Nishide et al. |
| 2007/0276995 A1 | 11/2007 | Caulkins et al. |
| 2007/0288683 A1 | 12/2007 | Panabaker et al. |
| 2008/0104344 A1 | 5/2008 | Shimozono et al. |
| 2008/0126624 A1* | 5/2008 | Prete ...................... G11C 7/106 |
| | | 710/53 |
| 2008/0126690 A1 | 5/2008 | Rajan et al. |
| 2008/0147968 A1 | 6/2008 | Lee et al. |
| 2008/0189479 A1 | 8/2008 | Cope et al. |
| 2008/0195806 A1 | 8/2008 | Cope |
| 2008/0235443 A1 | 9/2008 | Chow et al. |
| 2008/0291727 A1 | 11/2008 | Seo et al. |
| 2009/0031099 A1 | 1/2009 | Sartore |
| 2009/0235038 A1 | 9/2009 | Sartore |
| 2010/0110748 A1 | 5/2010 | Best |
| 2010/0122200 A1 | 5/2010 | Merry, Jr. et al. |
| 2010/0274953 A1 | 10/2010 | Lee et al. |
| 2010/0322020 A1 | 12/2010 | Kim |
| 2011/0078496 A1 | 3/2011 | Jeddeloh |
| 2011/0161569 A1 | 6/2011 | Shan et al. |
| 2011/0320804 A1 | 12/2011 | Chan et al. |
| 2012/0110417 A1 | 5/2012 | Abreu et al. |
| 2012/0117402 A1 | 5/2012 | Machnicki et al. |
| 2012/0204079 A1 | 8/2012 | Takefman et al. |
| 2012/0265952 A1 | 10/2012 | Kurita |
| 2012/0271990 A1* | 10/2012 | Chen ...................... G06F 12/00 |
| | | 711/103 |
| 2012/0317433 A1 | 12/2012 | Ellis et al. |
| 2013/0019076 A1 | 1/2013 | Amidi et al. |
| 2013/0086309 A1 | 4/2013 | Lee et al. |
| 2013/0254456 A1 | 9/2013 | Chen et al. |
| 2013/0254497 A1 | 9/2013 | Chen et al. |
| 2014/0032820 A1 | 1/2014 | Harasawa et al. |
| 2014/0059170 A1 | 2/2014 | Gasparakis et al. |
| 2014/0156919 A1 | 6/2014 | Chen et al. |
| 2014/0156920 A1 | 6/2014 | Chen et al. |
| 2015/0058701 A1 | 2/2015 | Xing et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| KR | 100606242 B1 | 7/2006 |
| WO | 2013016723 A2 | 1/2013 |

OTHER PUBLICATIONS

Exhibit, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc. v. Netlist, Inc.*, Case 4:13-cv-05889-YGR Document 309-4, filed Mar. 17, 2015, 20 pages.

Exhibit, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc. v. Netlist, Inc.*, Case 4:13-cv-05889-YGR Document 309-5, filed Mar. 17, 2015, 28 pages.

Exhibit, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc. v. Netlist, Inc.*, Case 4:13-cv-05889-YGR Document 309-9, filed Mar. 17, 2015,17 pages.

Exhibit, Institution of Inter Partes Review, *Sandisk Corporation v. Netlist, Inc.*, Case 4:13-cv-05889-YGR Document 316-9, filed Mar. 24, 2015, 29 pages.

Exhibit, Institution of Inter Partes Review, *Smart Modular Technologies, Inc. v. Netlist, Inc.*, Case 4:13-cv-05889-YGR Document 309-1, filed Mar. 17, 2015, 122 pages.

JEDEC Standard, Double Data Rate (DDR) SDRAM Specification, JESD79, Jun. 2000, 77 pages.

Exhibit, Letter sent via email on Dec. 6, 2013, Case 4:13-cv-03901-YGR Document 53-2, filed Jan. 6, 2014.

Exhibit, Order Denying Defendant's Motion to Stay Pending Inter Partes Review (Doc.59), *The Procter and Gamble Company v. Team Technologies, Inc, et al.*, Case 4:13-cv-05889-YGR Document 316-6, filed Mar. 24, 2015, 10 pages.

Exhibit, Patent Public Advisory Committee Quarterly Meeting, Appeals Statistics USPTO, Case No. 4:13-cv-05889-YGR Document 309-8, filed Mar. 17, 2015, 23 pages.

Exhibit, Reporter's Transcript of Proceedings, *Netlist, Inc v. Smart Modular Technologies, Inc., et al.*, Case 4:13-cv-05889-YGR Document 316-3, filed Mar. 24, 2015, 15 pages.

Exhibit, Transcript of Official Electronic Sound Recording Proceeding, *Netlist v. Smart Modular Technologies, Inc, et al.*, Case 4:13-cv-05889-YGR Document 305-7, filed Mar. 10, 2015, 10 pages.

File History for U.S. Appl. No. 12/240,916, filed Sep. 29, 2008, 320 pages.

File History for U.S. Appl. No. 13/905,048, filed May 29, 2013, 181 pages.

File History for U.S. Appl. No. 60/941,586, filed Jun. 1, 2007, 23 pages.

File History U.S. Pat. No. 8,671,243.

Final Office Action, dated Jun. 15, 2016, issued in U.S. Appl. No. 14/489,281, 10 pages.

Final Office Action, *SanDisk Corporation v. Netlist, Inc.*, U.S. Pat. No. 8,301,833, IPR2014-0099-1007 (PTAB), dated Feb. 1, 2012, 13 pages.

Final Written Decision, U.S. Pat. No. 8,671,243, IPR2017-00587-34, Paper No. 34, entered Jun. 20, 2018, 53 pages.

Final Written Decision, U.S. Pat. No. 8,874,831, IPR2017-00692, Paper No. 25, entered Jul. 5, 2018, 42 pages.

Final Written Decision, U.S. Pat. No. 7,881,150, Case No. Case IPR2014-00882, (PTAB), Paper 33, filed Dec. 14, 2015, 51 pages.

Hasan, J. et al. Efficient Use of Memory Bandwidth to Improve Network Processor Throughput, Proceedings of the 30th Annual International Symposium on Computer Architecture (ISCA'03), IEEE, 2003, 12 pages.

Inter Partes Review No. IPR2017-00692 (PTAB), U.S. Pat. No. 8,874,831, filed Jul. 26, 2012, 78 pages.

Inter Partes Review of U.S. Pat. No. 8,874,831, Case IPR2017-00692 (PTAB), filed Jul. 26, 2012, Paper No. 1, 78 pages.

International Preliminary Report on Patentability in PCT/US12/48750, dated Apr. 3, 2014pp. 1-8.

International Search Report and Written Opinion in PCT/US12/48750, dated Oct. 10, 2012pp. 1-10.

ISSCC 2006 / Session 7 / Non-Volatile Memory / 7.7, IEEE International Solid-State Circuits Conference, 2006, 10 pages.

Samsung Electronics Co., Ltd.
Ex. 1001, p. 3

## US 11,016,918 B2

Page 4

(56)        **References Cited**

OTHER PUBLICATIONS

Jacob, B., "Memory Systems Cache, DRAM, Disk", Morgan Kaufman Publishers, Burlington, MA, 2008, Preface and Ch. 7 pp. 315-322, 58 pages.

Jandhyala, S. et al., "Design-For-Test Analysis of a Buffered SDRAM DIMM", Semiconductor Group, Texas Instruments, Proceedings of International Workshop in Memory Technology, Design and Testing, Singapore, 13014, Aug. 1996,15 pages.

JEDEC Definition of DIMM, Exhibit 1029, IPR No. 2017-00587, Dec. 18, 2017, 2 pages.

JEDEC Global Standard for the Microelectronics Industry, Why JEDEC Standards Matter, 2014, 1 page.

JEDEC Standard No. 21-C (Release 17), Annex J: Serial Presence Detects for DDR2 SDRAM (Revision 1.3), 60 pages.

Petition for Inter Partes Review of U.S. Pat. No. 8,516,187 (on behalf of SMART Modular Technologies, Inc.), filed Aug. 22, 2014.

Petition for Inter Partes Review of U.S. Pat. No. 8,671,243, filed May 29, 2013.

Petition for Inter Partes Review of U.S. Pat. No. 8,874,831, filed Jul. 26, 2012.

Petition for Inter Partes Review of U.S. Pat. No. 8,301,833 (on behalf of SMART Modular Technologies, Inc.), filed Aug. 22, 2014. U.S. Appl. No. 60/912,321, Case No. No. IPR2017-00692-1007 (PTAB), filed Apr. 17, 2017, 42 pages.

Petition for Inter Partes Review of U.S. Pat. No. 8,516,187, IPR2014-00982 (PTAB), dated Jun. 19, 2014, 67 pages.

Petition for Inter Partes Review of U.S. Pat. No. 8,671,243, Case No. IPR2017-00587-1(PTAB), May 29, 2013, 82 pages.

Petition for Inter Partes Review, *SanDisk Corporation* v. *Netlist, Inc.*, U.S. Pat. No. 8,301,833, IPR2014-00994 (PTAB), filed Jun. 20, 2014, 69 pages.

Webster's II New College Dictionary, Houghton Mifflin Company, Boston, MA, 2001, pp. 259, 1115.

Videotaped Deposition of Russel Jacob Baker, U.S. Pat. No. 8,671,243, Case Nos. IPR2017-00587-1030 (PTAB), filed Dec. 18, 2017, 268 pages.

Petitioners Demonstratives, *SK hynix Inc., et al*., v. *Netlist, Inc*., U.S. Pat. No. 8,671,243, IPR2017-00587-1037, 89 pages.

Petitioners' Reply in Support of its Motion to Exclude, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692, filed Apr. 9, 2018, 8 pages.

Petitioners' Reply to Patent Owner's Response, Inter Partes Review No. IPR2017-00587-16, U.S. Pat. No. 8,671,243, filed Jan. 12, 2018, 38 pages.

Petitioners' Reply, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692 (PTAB), Paper No. 15, filed Mar. 2, 2018, 35 pages.

Petitioners' Request for Hearing, U.S. Pat. No. 8,301,833, Case No. Case No. IPR2017-00649-2020 (PTAB), Paper No. 8, entered Aug. 23, 2017, 18 pages.

Prosecution History, U.S. Appl. No. 12/240,916, U.S. Pat. No. 8,301,833, *SK hynix Inc* v *Netlist Inc*, Case No. IPR2017-00649-1002 (PTAB), 320 pages.

Prosecution History, U.S. Appl. No. 13/559,476, U.S. Pat. No. 8,301,833, *SK hynix Inc* v *Netlist Inc*, Case No. IPR2017-00649-1002 (PTAB), 312 pages.

Prosecution History, U.S. Appl. No. 60/941,586, *SK hynix Inc* v *Netlist Inc*, Case No. IPR2017-00649-1005 (PTAB), 23 pages.

Provisional Application for Advance Dynamic Disk Memory Module, Specification, *SK hynix Inc*., V. *Netlist, Inc*., Case No. IPR2017-00649-1006 (PTAB), dated Dec. 8, 2005, 53 pages.

U.S. Appl. No. 60/912,321, filed Apr. 17, 2007.

U.S. Appl. No. 60/941,586, filed Jun. 1, 2007.

Requirement for Restriction Election, *SanDisk Corporation* v. *Netlist, Inc*., U.S. Pat. No. 8,301,833, IPR2014-00994-1003 (PTAB), dated Mar. 31, 2019, 7 pages.

Restriction Requirement in U.S. Appl. No. 12/240,916, dated Mar. 31, 2011.

Search Report (Updated) Prior Art Search for U.S. Pat. No. 8,301,833, Global Patent Solutions, Nov. 24, 2020, 179 pages.

Search Report Prior Art Search for U.S. Pat. No. 8,301,833, Global Patent Solutions, Nov. 2, 2020, 38 pages.

Second Amended Answer and Counterclaims to Plaintiff's Complaint for Declaratory Judgment, *Diablo Technologies, Inc*. v. *Netlist, Inc*., Case No. 4:13-CV-03901 (NDCA), YGR, filed Feb. 17, 2014, 21 pages.

Supplemental Declaration of Ronald H. Spuhler, *Netlist* v. *Smart Storage Systems, Inc. et. al*., Case 4:13-cv-05889-YGR Document 305-1, filed Mar. 10, 2015, 2 pages.

U.S. Office Action in U.S. Appl. No. 13/536,173, dated Apr. 15, 2013, pp. 1-10.

U.S. Appl. No. 12/240,916, Case No. IPR2017-00692-2018 (PTAB), dated Sep. 29, 2008, 52 pages.

Third Amended Complaint for Patent Infringement, *Netlist* v. *Smart Storage Systems, Inc. et. al*., Case 4:13-CV-05889-YGR (NDCA), filed Oct. 7, 2014, 21 pages.

Drawing by R. Jacob Bake regarding Address of DRAM and Flash, U.S. Pat. No. 8,671,243, Case IPR2017-00587-1023 (PTAB), filed Dec. 18, 2017, 1 page.

Advisory Action in U.S. Appl. No. 12/240,916, dated Mar. 13, 2012.

Amendment and Reply to Office Action, *SanDisk Corporation* v. *Netlist*, U.S. Appl. No. 13/536,173, IPR2014-00982 (PTAB), dated May 21, 2013, 24 pages.

Amendment and Response to Election Restriction, *SanDisk Corporation* v. *Netlist, Inc*., U.S. Pat. No. 8,301,833, IPR2014-00994-1004 (PTAB), dated May 20, 2011, 9 pages.

American Heritage Dictionary of the English Language, Third Ed., Houghton Mifflin Company, Boston, MA, 1996, 7 pages.

Appeals from the USPTO, PTAB in Nos. IPR2014-00882, IPR2014-00883, IPR2014-01011, US Court of Appeals for the Federal Circuit, decided Jul. 25, 2017, 8 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1024, IPR No. 2017-00587-1024(PTAB), 2003, 8 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1033, IPR No. 2017-00587-1033 (PTAB), 2003, 8 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1034, IPR No. 2017-00587-1033 (PTAB), 2003, 8 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1035, IPR No. 2017-00587-1035 (PTAB), 2003, 8 pages.

Corrected Petition for Inter Partes Review of Claims 1-30 of U.S. Pat. No. 8,301,833, Declaration of Michael F. Heafey, IPR2014-01370 (PTAB), filed Sep. 22, 2014, 4 pages.

Corrected Petition for Inter Partes Review of Claims 1-32 of U.S. Pat. No. 8,516,187, IPR2014-01371 (PTAB), Sep. 22, 2014, 67 pages.

Corrected Petition for Inter Partes Review of Claims 1-32 of U.S. Pat. No. 8,516,187, Declaration of Dr. Nader Bagherzadeh, IPR2014-01371 (PTAB), filed Sep. 22, 2014, 306 pages.

Decision Denying Institution of Inter Partes Review, U.S. Pat. No. 8,516,187, IPR2014-01371 (PTAB), Paper 12, entered Mar. 13, 2015, 22 pages.

Decision Denying Institution of Inter Partes Review, *SanDisk Corporation* v. *Netlist, Inc*., U.S. Pat. No. 8,301,833, IPR2014-00994 (PTAB), Paper 8, dated Dec. 16, 2014, 16 pages.

Decision Denying Institution of Inter Partes Review, *SanDisk Corporation* v. *Netlist*, U.S. Pat. No. 8,516,187, IPR2014-00982 (PTAB), Paper 9, dated Dec. 22, 2014, 16 pages.

Decision Denying Institution of Inter Partes Review, *Smart Modular Tech* v *Netlist Inc*., U.S. Pat. No. 8,301,833, IPR2014-01370 (PTAB), Paper 13, entered Mar. 13, 2015, 19 pages.

Decision Instituting Inter Partes Review, U.S. Pat. No. 8,671,243, Case No. IPR2017-00587-7(PTAB), Paper No. 7, entered Jun. 22, 2017, 40 pages.

Declaration of R. Jacob Baker, U.S. Pat. No. 8,874,831, Case IPR2017-00692-2016 (PTAB), Paper No. 10, 2017, 72 pages.

Declaration of R. Jacob Baker, U.S. Pat. No. 8,671,243, Case IPR2017-00587-2016 (PTAB), filed Oct. 13, 2019, 109 pages.

Declaration of Jeff McMullen, *Netlist, Inc*. v. *Diablo Technologies, Inc*., Case No. 4: I 3-CV-05889-YGR (NDCA), Document 362-1, filed Sep. 5, 2018, 3 pages.

Declaration of Paul Min, In Inter Partes Review of U.S. Pat. No. 8,301,833, IPR2014-00994-1020 (PTAB), filed Sep. 29, 2008, 215 pages.

**US 11,016,918 B2**

Page 5

(56)         **References Cited**

OTHER PUBLICATIONS

Declaration of Paul Min, In Inter Partes Review of U.S. Pat. No. 8,516,187, IPR2014-00982-1013 (PTAB), filed Jun. 28, 2012, pp. 240.
Declaration of Ron Maltiel, U.S. Pat. No. 8,671,243, No. IPR2017-00587-1003 (PTAB), filed May 29, 2013, 131 pages.
Declaration of Ron Maltiel, U.S. Pat. No. 8,874,831, No. IPR2017-00692-1003 (PTAB), filed Jul. 26, 2012 29, 172 pages.
Declaration of Steven J. Corr, *Netlist, Inc.* v. *SMART Storage Systems, Inc., et al.*, Case 4:13-cv-05889-YGR (NDCA), Document 305-8, filed Mar. 10, 2015, 3 pages.
Deposition of Baker, Exhibit 1030, p. 78, U.S. Pat. No. 8,671,243, *SK hynix Inc., et al.* v. *Netlist, Inc.*, Case No. IPR-2017-00587 (PTAB), filed Dec. 18, 2017, 268 pages.
Deposition of Ron Maltiel, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692-2010 (PTAB), dated Sep. 27, 2017, 155 pages.
Joint Status Report Regarding Inter Partes Review, *Netlist* v. *Smart Storage Systems, Inc. et al.*, Case No. 4:13-CV-05889-YGR (NDCA), filed Aug. 17, 2018, 4 pages.
Material Science & Engineering, Department of Material Science and Engineering, Stanford University, Exhibit 2011, Case No. IPR2017-00692, 2 pages.
Merriam-Webster's Collegiate Dictionary, Eleventh Ed., Merriam Webster Corporation, Springfield, MA, 2003, 7 pages.
Microsoft Computer Dictionary Fifth Edition, 2002, 3 pages.
Microsoft Computer Dictionary Fifth Edition, 2002, 9 pages.
Microsoft Press, Computer Dictionary, Second Edition, 1994, 4 pages.
Microsoft Windows 2000 Professional Resource Kit, 76 pages.
Notice of Allowance in U.S. Appl. No. 12/240,916, dated Sep. 17, 2012.
Notice of Allowance in U.S. Appl. No. 13/536,173, dated Jul. 2, 2013.
Notice of Allowance in U.S. Appl. No. 13/559,476, dated May 6, 2014.
Notice of Allowance in U.S. Appl. No. 13/559,476, dated Sep. 29, 2014.
Notice of Allowance in U.S. Appl. No. 13/905,048, dated Dec. 19, 2013, 8 pages.
Notice of Allowance in U.S. Appl. No. 13/905,053, dated Dec. 11, 2013.
Notice of Allowance in U.S. Appl. No. 14/173,219 dated Jul. 7, 2014.
Notice of Allowance in U.S. Appl. No. 14/489,269, dated Oct. 8, 2015.
Notice of Allowance, *SanDisk Corporation* v. *Netlist*, U.S. Appl. No. 13/536,173, IPR2014-00982 (PTAB), dated Jul. 2, 2013, 8 pages.
Office Action in U.S. Appl. No. 12/240,916, dated Apr. 3, 2012.
Office Action in U.S. Appl. No. 13/536,176, dated Apr. 15, 2013.
Office Action in U.S. Appl. No. 13/625,563, dated Aug. 5, 2013.
Office Action in U.S. Appl. No. 13/625,563, dated May 9, 2014.

Office Action in U.S. Appl. No. 13/905,048, dated Aug. 1, 2013.
Office Action in U.S. Appl. No. 13/905,053, dated Aug. 1, 2013.
Office Action in U.S. Appl. No. 14/173,219, dated Mar. 13, 2014.
Office Action in U.S. Appl. No. 14/302,292, dated Dec. 21, 2015.
Office Action in U.S. Appl. No. 12/240,916, dated Feb. 1, 2012, 14 pages.
Office Action in U.S. Appl. No. 14/173,242, dated Mar. 14, 2014, 7 pages.
Office Action, U.S. Appl. No. 12/240,916, IPR2014-0099-1005 (PTAB), dated Jul. 29, 2011, 8 pages.
Office Action, U.S. Appl. No. 12/240,916, IPR2014-0099-1010 (PTAB), dated Apr. 3, 2012, 11 pages.
Office Action, U.S. Appl. No. 13/536,173, IPR2014-00982 (PTAB), dated Apr. 15, 2013, 9 pages.
Patent Owner's Demonstratives, U.S. Pat. No. 8,671,243, Case No. IPR 2017-00587-2023, (PTAB), 57 pages.
Patent Owner's Listing of New Arguments and Evidence in Petitioners' Reply, U.S. Pat. No. 8,671,243, Case No. IPR2017-00587 (PTAB), filed Jan. 29, 2018, 6 pages.
Patent Owner's Opposition to Petitioners' Motion to Exclude, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692 (PTAB), filed Apr. 2, 2018, 2017, 11 pages.
Patent Owner's Preliminary Response, U.S. Pat. No. 8,516,187, Case IPR2014-01371 (PTAB), filed Dec. 16, 2014, 66 pages.
Patent Owner's Preliminary Response, *SanDisk Corporation* v. *Netlist, Inc.*, U.S. Pat. No. 8,301,833, IPR2014-00994 (PTAB), Paper 8, dated Oct. 2, 2014, 60 pages.
Patent Owner's Preliminary Response, *SanDisk Corporation* v. *Netlist*, U.S. Pat. No. 8,516,187, IPR2014-00982 (PTAB), dated Sep. 26, 2014, 57 pages.
Patent Owner's Preliminary Response, *SK hynix Inc., et al.*, v. *Netlist*, U.S. Pat. No. 8,301,833, Case No. IPR2017-00649 (PTAB), filed May 1, 2017, 67 pages.
Patent Owner's Preliminary Response, *SK hynix Inc., et al.*, v. *Netlist*, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692 (PTAB), filed May 1, 2017, 48 pages.
Patent Owner's Preliminary Response, *Smart Modular Tech* v. *Netlist Inc.*, U.S. Pat. No. 8,301,833, Case IPR2014-01370 (PTAB), filed Dec. 16, 2014, 66 pages.
Patent Owner's Response, U.S. Pat. No. 8,671,243, Case No. IPR2017-00587-12 (PTAB), filed Oct. 13, 2017, 80 pages.
Patent Owner's Response, *SK hynix Inc., et al.*, v. *Netlist*, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692-12 (PTAB), filed Nov. 10, 2017, 77 pages.
Petition for Inter Partes Review of Claims 1-30 of U.S. Pat. No. 8,301,833, IPR2014-01370 (PTAB), filed Aug. 22, 2014, 68 pages.
Petition for Inter Partes Review of U.S. Pat. No. 8,301,833 (on behalf of SanDisk, Corp.), filed Jun. 20, 2014.
Petition for Inter Partes Review of U.S. Pat. No. 8,301,833, filed Sep. 29, 2008.
Petition for Inter Partes Review of U.S. Pat. No. 8,516,187 (on behalf of SanDisk, Corp.), filed Jun. 19, 2014.

* cited by examiner

Samsung Electronics Co., Ltd.
Ex. 1001, p. 5



**FIG. 1**
**(PRIOR ART)**



**FIG. 3A**

Samsung Electronics Co., Ltd.
Ex. 1001, p. 6

Spansion EcoRAM Configurations _____

256GB Spansion EcoRAM Solution – Single Accelerator



256GB Single Accelerator Spansion EcoRAM Solution

256GB Spansion EcoRAM Solution – Dual Accelerator



256GB Single Accelerator Spansion EcoRAM Solution

**FIG. 2
(PRIOR ART)**



**FIG. 4B**

Samsung Electronics Co., Ltd.
Ex. 1001, p. 7



**FIG. 3B**



**FIG. 4A**

Samsung Electronics Co., Ltd.
Ex. 1001, p. 8



**FIG. 5A**



**FIG. 6**

Samsung Electronics Co., Ltd.
Ex. 1001, p. 9



**FIG. 5B**

Samsung Electronics Co., Ltd.
Ex. 1001, p. 10



**FIG. 7**



MCH — controls
data interface

MCH — controls DRAM
Commend and address

MCH — controls Flash
Commend and address

**FIG. 8A**

Samsung Electronics Co., Ltd.
Ex. 1001, p. 11



*FIG. 8B*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 12



*FIG. 9*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 13



FIG. 10

Samsung Electronics Co., Ltd.
Ex. 1001, p. 14

| DRAM density (GB) | # of blocks per bank | Flash wr–time to rd–time ratio | Avg block use time (sec) | Flash write time (sec) | Max allowed Closed Blk in queue to be written back to Flash |
|---|---|---|---|---|---|
| 1 | 250 | 55 | 1.00E–03 | 2.00E–02 | 0 |
| 1 | 250 | 55 | 1.00E–02 | 2.00E–02 | 2 |
| 1 | 250 | 55 | 2.00E–02 | 2.00E–02 | 5 |
| 1 | 250 | 55 | 5.00E–02 | 2.00E–02 | 11 |
| 2 | 500 | 55 | 1.00E–03 | 2.00E–02 | 0 |
| 2 | 500 | 55 | 1.00E–02 | 2.00E–02 | 5 |
| 2 | 500 | 55 | 2.00E–02 | 2.00E–02 | 9 |
| 2 | 500 | 55 | 5.00E–02 | 2.00E–02 | 23 |
| 4 | 1000 | 55 | 1.00E–03 | 2.00E–02 | 1 |
| 4 | 1000 | 55 | 1.00E–02 | 2.00E–02 | 9 |
| 4 | 1000 | 55 | 2.00E–02 | 2.00E–02 | 18 |
| 4 | 1000 | 55 | 5.00E–02 | 2.00E–02 | 45 |

*FIG. 11*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 15

Samsung Electronics Co., Ltd.
Ex. 1001, p. 16



*FIG. 12*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 17



*FIG. 13*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 18



*FIG. 14*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 19



*FIG. 15A*

*FIG. 15B*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 20



FIG. 15C

Samsung Electronics Co., Ltd.
Ex. 1001, p. 21



*FIG. 16*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 22



*1200*

*1210* Provide first voltage from input power supply and second voltage from first power subsystem

*1220* Second condition detected? — No / Yes

*1230* Provide first voltage and second voltage from first power subsystem

*1240* Charge second power subsystem

*1250* Third condition detected? — No / Yes

*1260* Provide first voltage and second voltage from second power subsystem

*FIG. 17*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 23



*FIG. 18*

1300

1310 — Communicate data between volatile memory and host system in a first mode

1320 — Store a first copy of data from the volatile memory to the non-volatile memory when in a second mode

1330 — Restore the first copy of data from the non-volatile memory to the volatile memory

1340 — Erase the first copy of data from the non-volatile memory

1350 — Copy second copy of data from volatile memory to non-volatile memory in a second mode

1360 — Restore the second copy of data from the non-volatile memory to the volatile memory

Samsung Electronics Co., Ltd.
Ex. 1001, p. 24



*FIG. 19*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 25



*FIG. 20*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 26



*FIG. 21*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 27



*FIG. 22*

US 11,016,918 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**FLASH-DRAM HYBRID MEMORY MODULE**

### PRIORITY CLAIM

This application is a continuation of U.S. patent application Ser. No. 15/934,416, filed Mar. 23, 2018, titled "Flash-Dram Hybrid Memory Module," which is a continuation of U.S. patent application Ser. No. 14/840,865, filed Aug. 31, 2015, titled "Flash-Dram Hybrid Memory Module," now U.S. Pat. No. 9,928,186, which is a continuation of U.S. patent application Ser. No. 14/489,269, filed Sep. 17, 2014, titled "Flash-Dram Hybrid Memory Module," now U.S. Pat. No. 9,158,684, which is a continuation of U.S. patent application Ser. No. 13/559,476, filed Jul. 26, 2012, titled "Flash-Dram Hybrid Memory Module," now U.S. Pat. No. 8,874,831, which claims the benefit of U.S. Provisional Patent Application No. 61/512,871, filed Jul. 28, 2011, and is a continuation-in-part of U.S. patent application Ser. No. 12/240,916, filed Sep. 29, 2008, titled "Non-Volatile Memory Module," now U.S. Pat. No. 8,301,833, which is a continuation of U.S. patent application Ser. No. 12/131,873, filed Jun. 2, 2008, which claims the benefit of U.S. Provisional Patent Application No. 60/941,586, filed Jun. 1, 2007, the contents of all of which are incorporated herein by reference in their entirety.

This application may be considered related to U.S. patent application Ser. No. 14/173,242, titled "Isolation Switching For Backup Of Registered Memory," filed Feb. 5, 2014, which is a continuation of U.S. patent application Ser. No. 13/905,053, titled "Isolation Switching For Backup Of Registered Memory," filed May 29, 2013, now U.S. Pat. No. 8,677,060, issued Mar. 18, 2014, which is a continuation of U.S. patent application Ser. No. 13/536,173, titled "Data Transfer Scheme For Non-Volatile Memory Module," filed Jun. 28, 2012, now U.S. Pat. No. 8,516,187, issued Aug. 20, 2013, which is a divisional of U.S. patent application Ser. No. 12/240,916, titled "Non-Volatile Memory Module," filed Sep. 29, 2008, now U.S. Pat. No. 8,301,833, issued Oct. 30, 2012, which is a continuation of U.S. patent application Ser. No. 12/131,873, filed Jun. 2, 2008, now abandoned, which claims the benefit of U.S. Provisional Application No. 60/941,586, filed Jun. 1, 2007, the contents of which are incorporated by reference herein in their entirety.

This application may also be considered related to U.S. patent application Ser. No. 15/000,834, filed Jan. 19, 2016, which is a continuation of U.S. patent application Ser. No. 14/489,332, filed Sep. 17, 2014, now U.S. Pat. No. 9,269,437, which is a continuation of U.S. patent application Ser. No. 14/173,219, filed Feb. 5, 2014, now U.S. Pat. No. 8,904,099, which is a continuation of U.S. patent application Ser. No. 13/905,048, filed May 29, 2013, now U.S. Pat. No. 6,671,243, which is a continuation of U.S. patent application Ser. No. 13/536,173 above.

This application may also be considered related to U.S. patent application Ser. No. 15/924,866, which is a continuation of U.S. patent application Ser. No. 14/489,281, filed Sep. 17, 2014, now U.S. Pat. No. 9,921,762, which is a continuation of U.S. patent application Ser. No. 13/625,563, filed Sep. 24, 2012, now U.S. Pat. No. 8,904,099, which claims the benefit of U.S. Provisional Application No. 61/583,775, filed Sep. 23, 2011.

### TECHNICAL FIELD

The present disclosure relates generally to computer memory devices, and more particularly, to devices that employ different types of memory devices such as combinations of Flash and random access memories.

### BACKGROUND

As technology advances and the usage of portable computing devices, such as tablet notebook computers, increases, more data needs to be transferred among data centers and to/from end users. In many cases, data centers are built by clustering multiple servers that are networked to increase performance.

Although there are many types of networked servers that are specific to the types applications envisioned, the basic concept is generally to increase server performance by dynamically allocating computing and storage resources. In recent years, server technology has evolved to be specific to particular applications such as 'finance transactions' (for example, point-of-service, inter-bank transaction, stock market transaction), 'scientific computation' (for example, fluid dynamic for automobile and ship design, weather prediction, oil and gas expeditions), 'medical diagnostics' (for example, diagnostics based on the fuzzy logic, medical data processing), 'simple information sharing and searching' (for example, web search, retail store website, company home page), 'email' (information distribution and archive), 'security service', 'entertainment' (for example, video-on-demand), and so on. However, all of these applications suffer from the same information transfer bottleneck due to the inability of a high speed CPU (central processing unit) to efficiently transfer data in and out of relatively slower speed storage or memory subsystems, particularly since data transfers typically pass through the CPU input/output (I/O) channels.

The data transfer limitations by the CPU are exemplified by the arrangement shown in FIG. **1**, and apply to data transfers between main storage (for example the hard disk (HD) or solid state drive (SSD) and the memory subsystems (for example DRAM DIMM (Dynamic Random Access Memory Dual In-line Memory Module) connected to the front side bus (FSB)). In arrangements such as that of FIG. **1**, the SSD/HD and DRAM DIMM of a conventional memory arrangement are connected to the CPU via separate memory control ports (not shown). FIG. **1** specifically shows, through the double-headed arrow, the data flow path between the computer or server main storage (SSD/HD) to the DRAM DIMMs. Since the SSD/HD data I/O and the DRAM DIMM data I/O are controlled by the CPU, the CPU needs to allocate its process cycles to control these I/Os, which may include the IRQ (Interrupt Request) service which the CPU performs periodically. As will be appreciated, the more time a CPU allocates to controlling the data transfer traffic, the less time the CPU has to perform other tasks. Therefore, the overall performance of a server will deteriorate with the increased amount of time the CPU has to expend in performing data transfer.

There have been various approaches to increase the data transfer throughput rates from/to the main storage, such as SSD/HD, to local storage, such as DRAM DIMM. In one example as illustrated in FIG. **2**, EcoRAM™ developed by Spansion provides a storage SSD based system that assumes a physical form factor of a DIMM. The EcoRAM™ is populated with Flash memories and a relatively small memory capacity using DRAMs which serve as a data buffer. This arrangement is capable of delivering higher throughput rate than a standard SSD based system since the EcoRAM™ is connected to the CPU (central processing unit) via a high speed interface, such as the HT (Hyper

Samsung Electronics Co., Ltd.
Ex. 1001, p. 28

US 11,016,918 B2

Transport) interface, while an SSD/HD is typically connected via SATA (serial AT attachment), USB (universal serial bus), or PCI Express (peripheral component interface express). For example, the read random access throughput rate of EcoRAM™ is near 3 GB/s compared with 400 MB/s for a NAND SSD memory subsystem using the standard PCI Express-based. This is a 7.5× performance improvement. However, the performance improvement for write random access throughput rate is less than 2×(197 MBs for the EcoRAM vs. 104 MBs for NAND SSD). This is mainly due to the fact that the write speed is cannot be faster than the NAND Flash write access time. FIG. 2 is an example of EcoRAM™ using SSD with the form factor of a standard DIMM such that it can be connected to the FSB (front side bus). However, due to the interface protocol difference between DRAM and Flash, an interface device, EcoRAM Accelerator™), which occupies one of the server's CPU sockets is used, and hence further reducing server's performance by reducing the number of available CPU sockets available, and in turn reducing the overall computation efficiency. The server's performance will further suffer due to the limited utilization of the CPU bus due to the large difference in the data transfer throughput rate between read and write operations.

The EcoRAM™ architecture enables the CPU to view the Flash DIMM controller chip as another processor with a large size of memory available for CPU access.

In general, the access speed of a Flash based system is limited by four items: the read/write speed of the Flash memory, the CPU's FSB bus speed and efficiency, the Flash DIMM controller's inherent latency, and the HT interconnect speed and efficiency which is dependent on the HT interface controller in the CPU and Flash DIMM controller chip.

The published results indicate that these shortcomings are evident in that the maximum throughput rate is 1.56 GBs for the read operation and 104 MBs for the write operation. These access rates are 25% of the DRAM read access speed, and 1.7% of the DRAM access speed at 400 MHz operation. The disparity in the access speed (15 to 1) between the read operation and write operation highlight a major disadvantage of this architecture. The discrepancy of the access speed between this type of architecture and JEDEC standard DRAM DIMM is expected to grow wider as the DRAM memory technology advances much faster than the Flash memory.

Certain types of memory modules comprise a plurality of dynamic random-access memory (DRAM) devices mounted on a printed circuit board (PCB). These memory modules are typically mounted in a memory slot or socket of a computer system (e.g., a server system or a personal computer) and are accessed by the computer system to provide volatile memory to the computer system.

Volatile memory generally maintains stored information only when it is powered. Batteries have been used to provide power to volatile memory during power failures or interruptions. However, batteries may require maintenance, may need to be replaced, are not environmentally friendly, and the status of batteries can be difficult to monitor.

Non-volatile memory can generally maintain stored information while power is not applied to the non-volatile memory. In certain circumstances, it can therefore be useful to backup volatile memory using non-volatile memory.

## OVERVIEW

Described herein is a memory module couplable to a memory controller of a host system. The memory module

includes a non-volatile memory subsystem, a data manager coupled to the non-volatile memory subsystem, a volatile memory subsystem coupled to the data manager and operable to exchange data with the non-volatile memory subsystem by way of the data manager, and a controller operable to receive commands from the memory controller and to direct (i) operation of the non-volatile memory subsystem, (ii) operation of the volatile memory subsystem, and (iii) transfer of data between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on at least one received command from the memory controller.

Also described herein is a method for managing a memory module by a memory controller, the memory module including volatile and non-volatile memory subsystems. The method includes receiving control information from the memory controller, wherein the control information is received using a protocol of the volatile memory subsystem. The method further includes identifying a data path to be used for transferring data to or from the memory module using the received control information, and using a data manager and a controller of the memory module to transfer data between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on at least one of the received control information and the identified data path.

Also described herein is a memory module wherein the data manager is operable to control one or more data flow rate, data transfer size, data buffer size, data error monitoring, and data error correction in response to receiving at least one of a control signal and control information from the controller.

Also described herein is a memory module wherein the data manager controls data traffic between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on instructions received from the controller.

Also described herein is a memory module wherein data traffic control relates to any one or more of data flow rate, data transfer size, data buffer size, data transfer bit width, formatting information, direction of data flow, and the starting time of data transfer.

Also described herein is a memory module wherein the controller configures at least one of a first memory address space of the volatile memory subsystem and a second memory address space of the non-volatile memory subsystem in response to at least one of a received command from the memory controller and memory address space initialization information of the memory module.

Also described herein is a memory module wherein the data manager is configured as a bi-directional data transfer fabric having two or more sets of data ports coupled to any one of the volatile and non-volatile memory subsystems.

Also described herein is a memory module wherein at least one of the volatile and non-volatile memory subsystems comprises one or more memory segments.

Also described herein is a memory module wherein each memory segment comprises at least one memory circuit, memory device, or memory die.

Also described herein is a memory module wherein the volatile memory subsystem comprises DRAM memory.

Also described herein is a memory module wherein the non-volatile memory subsystem comprises flash memory.

Also described herein is a memory module wherein at least one set of data ports is operated by the data manager to

Samsung Electronics Co., Ltd.
Ex. 1001, p. 29

US 11,016,918 B2

5

independently and/or concurrently transfer data to or from one or more memory segments of the volatile or non-volatile memory subsystems.

Also described herein is a memory module wherein the data manager and controller are configured to effect data transfer between the memory controller and the non-volatile memory subsystem in response to memory access commands received by the controller from the memory controller.

Also described herein is a memory module wherein the volatile memory subsystem is operable as a buffer for the data transfer between the memory controller and non-volatile memory.

Also described herein is a memory module wherein the data manager further includes a data format module configured to format data to be transferred between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on control information received from the controller.

Also described herein is a memory module wherein the data manager further includes a data buffer for buffering data delivered to or from the non-volatile memory subsystem.

Also described herein is a memory module wherein the controller is operable to perform one or more of memory address translation, memory address mapping, address domain conversion, memory access control, data error correction, and data width modulation between the volatile and non-volatile memory subsystems.

Also described herein is a memory module wherein the controller is configured to effect operation with the host system in accordance with a prescribed protocol.

Also described herein is a memory module wherein the prescribed protocol is selected from one or more of DDR, DDR2, DDR3, and DDR4 protocols.

Also described herein is a memory module wherein the controller is operable to configure memory space in the memory module based on at least one of a command received from the memory controller, a programmable value written into a register, a value corresponding to a first portion of the volatile memory subsystem, a value corresponding to a first portion of the non-volatile memory subsystem, and a timing value.

Also described herein is a memory module wherein the controller configures the memory space of the memory module using at least a first portion of the volatile memory subsystem and a first portion of the non-volatile memory subsystem, and the controller presents a unified memory space to the memory controller.

Also described herein is a memory module wherein the controller configures the memory space in the memory module using partitioning instructions that are application-specific.

Also described herein is a memory module wherein the controller is operable to copy booting information from the non-volatile to the volatile memory subsystem during power up.

Also described herein is a memory module wherein the controller includes a volatile memory control module, a non-volatile memory control module, data manager control module, a command interpreter module, and a scheduler module.

Also described herein is a memory module wherein commands from the volatile memory control module to the volatile memory subsystem are subordinated to commands from the memory controller to the controller.

6

Also described herein is a memory module wherein the controller effects pre-fetching of data from the non-volatile to the volatile memory.

Also described herein is a memory module wherein the pre-fetching is initiated by the memory controller writing an address of requested data into a register of the controller.

Also described herein is a memory module wherein the controller is operable to initiate a copy operation of data of a closed block in the volatile memory subsystem to a target block in the non-volatile memory subsystem.

Also described herein is a memory module wherein, if the closed block is re-opened, the controller is operable to abort the copy operation and to erase the target block from the non-volatile memory subsystem.

Also described herein is a method for managing a memory module wherein the transfer of data includes a bidirectional transfer of data between the non-volatile and the volatile memory subsystems.

Also described herein is a method for managing a memory module further comprising operating the data manager to control one or more of data flow rate, data transfer size, data width size, data buffer size, data error monitoring, data error correction, and the starting time of the transfer of data.

Also described herein is a method for managing a memory module further comprising operating the data manager to control data traffic between the memory controller and at least one of the volatile and non-volatile memory subsystems.

Also described herein is a method for managing a memory module wherein data traffic control relates to any one or more of data transfer size, formatting information, direction of data flow, and the starting time of the transfer of data.

Also described herein is a method for managing a memory module wherein data traffic control by the data manager is based on instructions received from the controller.

Also described herein is a method for managing a memory module further comprising operating the data manager as a bi-directional data transfer fabric with two or more sets of data ports coupled to any one of the volatile and non-volatile memory subsystems.

Also described herein is a method for managing a memory module wherein at least one of the volatile and non-volatile memory subsystems comprises one or more memory segments.

Also described herein is a method for managing a memory module wherein each memory segment comprises at least one memory circuit, memory device, or memory die.

Also described herein is a method for managing a memory module wherein the volatile memory subsystem comprises DRAM memory.

Also described herein is a method for managing a memory module wherein the non-volatile memory subsystem comprises Flash memory.

Also described herein is a method for managing a memory module further comprising operating the data ports to independently and/or concurrently transfer data to or from one or more memory segments of the volatile or non-volatile memory subsystems.

Also described herein is a method for managing a memory module further comprising directing transfer of data bi-directionally between the volatile and non-volatile memory subsystems using the data manager and in response to memory access commands received by the controller from the memory controller.

Samsung Electronics Co., Ltd.
Ex. 1001, p. 30

US 11,016,918 B2

7

Also described herein is a method for managing a memory module further comprising buffering the data transferred between the memory controller and non-volatile memory subsystem using the volatile memory subsystem.

Also described herein is a method for managing a memory module further comprising using the controller to perform one or more of memory address translation, memory address mapping, address domain conversion, memory access control, data error correction, and data width modulation between the volatile and non-volatile memory subsystems.

Also described herein is a method for managing a memory module further comprising using the controller to effect communication with a host system by the volatile memory subsystem in accordance with a prescribed protocol.

Also described herein is a method for managing a memory module wherein the prescribed protocol is selected from one or more of DDR, DDR2, DDR3, and DDR4 protocols.

Also described herein is a method for managing a memory module further comprising using the controller to configure memory space in the memory module based on at least one of a command received from the memory controller, a programmable value written into a register, a value corresponding to a first portion of the volatile memory subsystem, a value corresponding to a first portion of the non-volatile memory subsystem, and a timing value.

Also described herein is a method for managing a memory module wherein the controller configures the memory space of the memory module using at least a first portion of the volatile memory subsystem and a first portion of the non-volatile memory subsystem, and the controller presents a unified memory space to the memory controller.

Also described herein is a method for managing a memory module wherein the controller configures the memory space in the memory module using partitioning instructions that are application-specific.

Also described herein is a method for managing a memory module further comprising using the controller to copy booting information from the non-volatile to the volatile memory subsystem during power up.

Also described herein is a method for managing a memory module wherein the controller includes a volatile memory control module, the method further comprising generating commands by the volatile memory control module in response to commands from the memory controller, and transmitting the generated commands to the volatile memory subsystem.

Also described herein is a method for managing a memory module further comprising pre-fetching of data from the non-volatile memory subsystem to the volatile memory subsystem.

Also described herein is a method for managing a memory module wherein the pre-fetching is initiated by the memory controller writing an address of requested data into a register of the controller.

Also described herein is a method for managing a memory module further comprising initiating a copy operation of data of a closed block in the volatile memory subsystem to a target block in the non-volatile memory subsystem.

Also described herein is a method for managing a memory module further comprising aborting the copy operation when the closed block of the volatile memory subsystem is re-opened, and erasing the target block in the non-volatile memory subsystem.

8

Also described herein is a memory system having a volatile memory subsystem, a non-volatile memory subsystem, a controller coupled to the non-volatile memory subsystem, and a circuit coupled to the volatile memory subsystem, to the controller, and to a host system. In a first mode of operation, the circuit is operable to selectively isolate the controller from the volatile memory subsystem, and to selectively couple the volatile memory subsystem to the host system to allow data to be communicated between the volatile memory subsystem and the host system. In a second mode of operation, the circuit is operable to selectively couple the controller to the volatile memory subsystem to allow data to be communicated between the volatile memory subsystem and the nonvolatile memory subsystem using the controller, and the circuit is operable to selectively isolate the volatile memory subsystem from the host system.

Also described herein is a method for operating a memory system. The method includes coupling a circuit to a host system, a volatile memory subsystem, and a controller, wherein the controller is coupled to a non-volatile memory subsystem. In a first mode of operation that allows data to be communicated between the volatile memory subsystem and the host system, the circuit is used to (i) selectively isolate the controller from the volatile memory subsystem, and (ii) selectively couple the volatile memory subsystem to the host system. In a second mode of operation that allows data to be communicated between the volatile memory subsystem and the nonvolatile memory subsystem via the controller, the circuit is used to (i) selectively couple the controller to the volatile memory subsystem, and (ii) selectively isolate the volatile memory subsystem from the host system.

Also described herein is a nontransitory computer readable storage medium storing one or more programs configured to be executed by one or more computing devices. The programs, when executing on the one or more computing devices, cause a circuit that is coupled to a host system, to a volatile memory subsystem, and to a controller that is coupled to a nonvolatile memory subsystem, to perform a method in which, in a first mode of operation that allows data to be communicated between the volatile memory subsystem and the host system, operating the circuit to (i) selectively isolate the controller from the volatile memory subsystem, and (ii) selectively couple the volatile memory subsystem to the host system. In a second mode of operation that allows data to be communicated between the volatile memory subsystem and the nonvolatile memory subsystem via the controller, operating the circuit to (i) selectively couple the controller to the volatile memory subsystem, and (ii) selectively isolate the volatile memory subsystem from the host system.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated into and constitute a part of this specification, illustrate one or more examples of embodiments and, together with the description of example embodiments, serve to explain the principles and implementations of the embodiments.

In the drawings:

FIG. **1** is a block diagram illustrating the path of data transfer, via a CPU, of a conventional memory arrangement;

FIG. **2** is a block diagram of a known EcoRAM™ architecture;

FIGS. **3**A and **3**B are block diagrams of a non-volatile memory DIMM or NVDIMM;

FIGS. **4**A and **4**B are block diagrams of a Flash-DRAM hybrid DIMM or FDHDIMM;

Samsung Electronics Co., Ltd.
Ex. 1001, p. 31

US 11,016,918 B2

9

FIG. **5A** is a block diagram of a memory module **500** in accordance with certain embodiments described herein;

FIG. **5B** is a block diagram showing some functionality of a memory module such as that shown in FIG. **5A**;

FIG. **6** is a block diagram showing some details of the data manager (DMgr);

FIG. **7** is a functional block diagram of the on-module controller (CDC);

FIG. **8A** is a block diagram showing more details of the prior art Flash-DRAM hybrid DIMM (FDHDIMM) of FIGS. **4A** and **4B**;

FIG. **8B** is a block diagram of a Flash-DRAM hybrid DIMM (FDHDIMM) in accordance with certain embodiments disclosed herein;

FIG. **9** is a flow diagram directed to the transfer of data from Flash memory to DRAM memory and vice versa in an exemplary FDHDIMM;

FIG. **10** is a block diagram showing an example of mapping of DRAM address space to Flash memory address space; and

FIG. **11** is a table showing estimates of the maximum allowed closed blocks in a queue to be written back to Flash memory for different DRAM densities using various average block use time.

FIG. **12** is a block diagram of an example memory system compatible with certain embodiments described herein.

FIG. **13** is a block diagram of an example memory module with ECC (error-correcting code) having a volatile memory subsystem with nine volatile memory elements and a non-volatile memory subsystem with five non-volatile memory elements in accordance with certain embodiments described herein.

FIG. **14** is a block diagram of an example memory module having a microcontroller unit and logic element integrated into a single device in accordance with certain embodiments described herein.

FIGS. **15A-15C** schematically illustrate example embodiments of memory systems having volatile memory subsystems comprising registered dual in-line memory modules in accordance with certain embodiments described herein.

FIG. **16** schematically illustrates an example power module of a memory system in accordance with certain embodiments described herein.

FIG. **17** is a flowchart of an example method of providing a first voltage and a second voltage to a memory system including volatile and non-volatile memory subsystems.

FIG. **18** is a flowchart of an example method of controlling a memory system operatively coupled to a host system and which includes at least 100 percent more storage capacity in non-volatile memory than in volatile memory.

FIG. **19** schematically illustrates an example clock distribution topology of a memory system in accordance with certain embodiments described herein.

FIG. **20** is a flowchart of an example method of controlling a memory system operatively coupled to a host system, the method including operating a volatile memory subsystem at a reduced rate in a back-up mode.

FIG. **21** schematically illustrates an example topology of a connection to transfer data slices from two DRAM segments of a volatile memory subsystem of a memory system to a controller of the memory system.

FIG. **22** is a flowchart of an example method of controlling a memory system operatively coupled to a host system, the method including backing up and/or restoring a volatile memory subsystem in slices.

DESCRIPTION OF EXAMPLE EMBODIMENTS

Example embodiments are described herein in the context of a system of computers, servers, controllers, memory

10

modules, hard disk drives and software. Those of ordinary skill in the art will realize that the following description is illustrative only and is not intended to be in any way limiting. Other embodiments will readily suggest themselves to such skilled persons having the benefit of this disclosure. Reference will now be made in detail to implementations of the example embodiments as illustrated in the accompanying drawings. The same reference indicators will be used to the extent possible throughout the drawings and the following description to refer to the same or like items.

In the interest of clarity, not all of the routine features of the implementations described herein are shown and described. It will, of course, be appreciated that in the development of any such actual implementation, numerous implementation-specific decisions must be made in order to achieve the developer's specific goals, such as compliance with application- and business-related constraints, and that these specific goals will vary from one implementation to another and from one developer to another. Moreover, it will be appreciated that such a development effort might be complex and time-consuming, but would nevertheless be a routine undertaking of engineering for those of ordinary skill in the art having the benefit of this disclosure.

In accordance with this disclosure, the components, process steps, and/or data structures described herein may be implemented using various types of operating systems, computing platforms, computer programs, and/or general purpose machines. In addition, those of ordinary skill in the art will recognize that devices of a less general purpose nature, such as hardwired devices, field programmable gate arrays (FPGAs), application specific integrated circuits (ASICs), or the like, may also be used without departing from the scope and spirit of the inventive concepts disclosed herein. Where a method comprising a series of process steps is implemented by a computer or a machine and those process steps can be stored as a series of instructions readable by the machine, they may be stored on a tangible medium such as a computer memory device (e.g., ROM (Read Only Memory), PROM (Programmable Read Only Memory), EEPROM (Electrically Eraseable Programmable Read Only Memory), Flash memory, Jump Drive, and the like), magnetic storage medium (e.g., tape, magnetic disk drive, and the like), optical storage medium (e.g., CD-ROM, DVD-ROM, paper card, paper tape and the like) and other types of program memory.

The term "exemplary" where used herein is intended to mean "serving as an example, instance or illustration." Any embodiment described herein as "exemplary" is not necessarily to be construed as preferred or advantageous over other embodiments.

Disclosed herein are arrangements for improving memory access rates and addressing the high disparity (15 to 1 ratio) between the read and write data throughput rates. In one arrangement, a Flash-DRAM-hybrid DIMM (FDHDIMM) with integrated Flash and DRAM is used. Methods for controlling such an arrangement are described.

In certain embodiments, the actual memory density (size or capacity) of the DIMM and/or the ratio of DRAM memory to Flash memory is configurable for optimal use with a particular application (for example, POS, inter-bank transaction, stock market transaction, scientific computation such as fluid dynamics for automobile and ship design, weather prediction, oil and gas expeditions, medical diagnostics such as diagnostics based on the fuzzy logic, medical data processing, simple information sharing and searching such as web search, retail store website, company home

Samsung Electronics Co., Ltd.
Ex. 1001, p. 32

US 11,016,918 B2

11      12

page, email or information distribution and archive, security service, and entertainment such as video-on-demand).

In certain embodiments, the device contains a high density Flash memory with a low density DRAM, wherein the DRAM is used as a data buffer for read/write operation. The Flash serves as the main memory. Certain embodiments described herein overcome the needs of having a long separation period between an Activate command (may be referred to as RAS) and a corresponding read or write command (may be referred to as first CAS command).

In accordance with one embodiment, described with reference to FIGS. 3A and 3B, a memory system **300** includes a non-volatile (for example Flash) memory subsystem **302** and a volatile (for example DRAM) memory subsystem **304**. The examples of FIGS. 3A and 3B are directed to architectures of a non-volatile DIMM (NVDIMM) NVDIMM system that may use a power subsystem (not shown) that can include a battery or a capacitor as a means for energy storage to copy DRAM memory data into Flash memory when power loss occurs, is detected, or is anticipated to occur during operation. When normal power is restored, a restore NVDIMM operation is initiated and the data stored in the Flash memory is properly restored to the DRAM memory. In this architecture, the density of the Flash is about the same as the DRAM memory size or within a few multiples, although in some applications it may be higher. This type of architecture may also be used to provide non-volatile storage that is connected to the FSB (front side bus) to support RAID (Redundant Array of Independent Disks) based systems or other type of operations. An NVDIMM controller **306** receives and interprets commands from the system memory controller hub (MCH). The NVDIMM controller **306** control the NVDIMM DRAM and Flash memory operations. In FIG. 3A, the DRAM **304** communicates data with the MCH, while an internal bus **308** is used for data transfer between the DRAM and Flash memory subsystems. In FIG. 3B, the NVDIMM controller **306'** of NVDIMM **300'** monitors events or commands and enables data transfer to occur in a first mode between the DRAM **304'** and Flash **302'** or in a second mode between the DRAM and the MCH.

In accordance with one embodiment, a general architecture for a Flash and DRAM hybrid DIMM (FDHDIMM) system **400** is shown in FIG. 4A. The FDHDIMM interfaces with an MCH (memory controller hub) to operate and behave as a high density DIMM, wherein the MCH interfaces with the non-volatile memory subsystem (for example Flash) **402** is controlled by an FDHDIMM controller **404**. Although the MCH interfaces with the Flash via the FDHDIMM controller, the FDHDIMM overall performance is governed by the Flash access time. The volatile memory subsystem (for example DRAM) **406** is primarily used as a data buffer or a temporary storage location such that data from the Flash memory **402** is transferred to the DRAM **406** at the Flash access speed, and buffered or collected into the DRAM **406**, which then transfers the buffered data to the MCH based on the access time of DRAM. Similarly, when the MCH transfers data to the DRAM **406**, the FDHDIMM controller **404** manages the data transfer from the DRAM **406** to the Flash **402**. Since the Flash memory access speed (both read and write) is relatively slower than DRAM, (e.g. for example a few hundred microseconds for read access), the average data throughput rate of FDHDIMM **400** is limited by the Flash access speed. The DRAM **406** serves as a data buffer stage that buffers the MCH read or write data. Thus, the DRAM **406** serves as a temporary storage for the data to be transferred from/to the Flash **402**. Furthermore, in accordance with one embodiment, the MCH recognizes the physical density of an FDHDIMM operating as a high density DIMM as the density of Flash alone.

In accordance with one embodiment, a read operation can be performed by the MCH by sending an activate command (may be simply referred to as RAS, or row address strobe) to the FDHDIMM **400** to conduct a pre-fetch read data operation from the Flash **402** to the DRAM **406**, with the pre-fetch data size being for example a page (1 KB or 2 KB, or may be programmable to any size). The MCH then sends a read command (may be simply referred to as CAS, or column address strobe) to read the data out input of the DRAM. In this embodiment, the data transfer from Flash to DRAM occurs at Flash access speed rates, while data transfer from DRAM to MCH occurs at DRAM access speed rates. In this example, data latency and throughput rates are the same as any DRAM operation as long as the read operations are executed onto the pages that were opened with the activate command previously sent to pre-fetch data from the Flash to DRAM. Thus, a longer separation time period between the RAS (e.g. Activate command) and the first CAS (column address strobe e.g. read or write command) is required to account for the time it takes to pre-fetch data from the Flash to DRAM.

An example of FDHDIMM operating as a DDR DIMM with SSD is shown in FIG. 4B, wherein the FDHDIMM **400'** supports two different interface interpretations to the MCH. In the first interface interpretation, the MCH views the FDHDIMM **400'** as a combination of DRAM DIMM and SSD (not illustrated). In this mode the MCH needs to manage two address spaces, one for the DRAMs **402'** and one for the Flash **404'**. The MCH is coupled to, and controls, both of the DRAM and Flash memory subsystems. One advantage of this mode is that the CPU does not need to be in the data path when data is moved from DRAM to Flash or from Flash to DRAM. In the second interface interpretation, the MCH views the FDHDIMM **400'** as an on-DIMM Flash with the SSD in an extended memory space that is behind the DRAM space. Thus, in this mode, the MCH physically fetches data from the SSD to the DDR DRAM and then the DRAM sends the data to the MCH. Since all data movement occurs on the FDHDIMM, this mode will provide better performance than if the data were to be moved through or via the CPU.

In accordance with one embodiment and as shown in FIG. 4B, the FDHDIMM **400'** receives control signals **408** from the MCH, where the control signals may include one or more control signals specifically for the DRAM **402'** operation and one or more control signals specifically for the Flash **404'** operation. In this embodiment, the MCH or CPU is coupled to the FDHDIMM via a single data bus interface **410** which couples the MCH to the DRAM.

FIGS. **5A** and **5B** are block diagrams of a memory module **500** that is couplable to a host system (not shown). The host system may be a server or any other system comprising a memory system controller or an MCH for providing and controlling the read/write access to one or more memory systems, wherein each memory system may include a plurality of memory subsystems, a plurality of memory devices, or at least one memory module. The term "read/write access" means the ability of the MCH to interface with a memory system or subsystem in order to write data into it or read data from it, depending on the particular requirement at a particular time.

In certain embodiments, memory module **500** is a Flash-DRAM hybrid memory subsystem which may be integrated with other components of a host system. In certain embodiments, memory module **500** is a Flash-DRAM hybrid

Samsung Electronics Co., Ltd.
Ex. 1001, p. 33

US 11,016,918 B2

**13**

memory module that has the DIMM (dual-inline memory module) form factor, and may be referred to as a FDHDIMM, although it is to be understood that in both structure and operation it may be different from the FDHDIMM discussed above and described with reference to FIGS. **4**A and **4**B. Memory module **500** includes two on-module intermediary components: a controller and a data manager. These on-module intermediary components may be physically separate components, circuits, or modules, or they may be integrated onto a single integrated circuit or device, or integrated with other memory devices, for example in a three dimensional stack, or in any one of several other possible expedients for integration known to those skilled in the art to achieve a specific design, application, or economic goal. In the case of a DIMM, these on-module intermediary components are an on-DIMM Controller (CDC) **502** and an on-DIMM data manager (DMgr) **504**. While the DIMM form factor will predominate the discussion herein, it should be understood that this is for illustrative purposes only and memory systems using other form factors are contemplated as well. CDC **502** and data manager DMgr **504** are operative to manage the interface between a non-volatile memory subsystem such as a Flash **506**, a volatile memory subsystem such as a DRAM **508**, and a host system represented by MCH **510**.

In certain embodiments, CDC **502** controls the read/write access to/from Flash memory **506** from/to DRAM memory **508**, and to/from DRAM memory from/to MCH **510**.

Read/write access between DRAM **508**, Flash **506** and MCH **510** may be referred to herein generally as communication, wherein control and address information C/A **560** is sent from MCH **510** to CDC **502**, and possible data transfers follow as indicated by Data **550**, Data **555**, and/or Data **556**. In certain embodiments, the CDC **502** performs specific functions for memory address transformation, such as address translation, mapping, or address domain conversion, Flash access control, data error correction, manipulation of data width or data formatting or data modulation between the Flash memory and DRAM, and so on. In certain embodiments, the CDC **502** ensures that memory module **500** provides transparent operation to the MCH in accordance with certain industry standards, such as DDR, DDR2, DDR3, DDR4 protocols. In the arrangement shown in FIGS. **5**A and **5**B, there is no direct access from the MCH **510** to the Flash **506** memory subsystem. Thus in accordance with certain embodiments, the Flash access speed has minimal impact on the overall FDHDIMM access speed. In the schematic illustration of FIG. **5**B and in accordance with one embodiment, the CDC controller **502** receives standard DDR commands from the MCH, interprets, and produces commands and/or control signals to control the operation of the Data manager (DMgr), the Flash memory and the DRAM memory. The DMgr controls the data path routing amongst DRAMs, Flash and MCH, as detailed below. The data path routing control signals are independently operated without any exclusivity.

An exemplary role of DMgr **504** is described with reference to FIG. **6**. In certain embodiments and in response to communication from CDC **502**, DMgr **504** provides a variety of functions to control data flow rate, data transfer size, data buffer size, data error monitoring or data error correction. For example, these functions or operations can be performed on-the-fly (while data is being transferred via the DMgr **504**) or performed on buffered or stored data in DRAM or a buffer. In addition, one role of DMgr **504** is to provide interoperability among various memory subsystems or components and/or MCH **510**.

**14**

In one embodiment, an exemplary host system operation begins with initialization. The CDC **502** receives a first command from the MCH **510** to initialize FDHDIMM **500** using a certain memory space. The memory space as would be controlled by MCH **510** can be configured or programmed during initialization or after initialization has completed. The MCH **510** can partition or parse the memory space in various ways that are optimized for a particular application that the host system needs to run or execute. In one embodiment, the CDC **502** maps the actual physical Flash **506** and DRAM **508** memory space using the information sent by MCH **510** via the first command. In one embodiment, the CDC **502** maps the memory address space of any one of the Flash **506** and DRAM **508** memory subsystems using memory address space information that is received from the host system, stored in a register within FDHDIMM **500**, or stored in a memory location of a non-volatile memory subsystem, for example a portion of Flash **506** or a separate non-volatile memory subsystem. In one embodiment, the memory address space information corresponds to a portion of initialization information of the FDHDIMM **500**.

In one embodiment, MCH **510** may send a command to restore a certain amount of data information from Flash **506** to DRAM **508**. The CDC **502** provides control information to DMgr **504** to appropriately copy the necessary information from Flash **506** to the DRAM **508**. This operation can provide support for various host system booting operations and/or a special host system power up operation.

In one embodiment, MCH **510** sends a command which may include various fields comprising control information regarding data transfer size, data format options, and/or startup time. CDC **502** receives and interprets the command and provides control signals to DMgr **504** to control the data traffic between the Flash **506**, the DRAM **508**, and the MCH **510**. For example, DMgr **504** receives the data transfer size, formatting information, direction of data flow (via one or more multiplexers such as **611**, **612**, **621**, **622** as detailed below), and the starting time of the actual data transfer from CDC **502**. DMgr **504** may also receive additional control information from the CDC **502** to establish a data flow path and/or to correctly establish the data transfer fabric. In certain embodiments, DMgr **504** also functions as a bi-directional data transfer fabric. For example, DMgr **504** may have more than 2 sets of data ports facing the Flash **506** and the DRAM **508**. Multiplexers **611** and **612** provide controllable data paths from any one of the DRAMs **508**(1) and **508**(2) (DRAM-A and DRAM-B) to any one of the MCH **510** and the Flash **506**. Similarly multiplexers **621** and **622** provide controllable data paths from any one of the MCH and the Flash memory to any one of the DRAMs **508**(1) and **508**(2) (DRAM-A and DRAM-B). In one embodiment, DRAM **508**(1) is a segment of DRAM **508**, while in other embodiments, DRAM **508**(1) is a separate DRAM memory subsystem. It will be understood that each memory segment can comprise one or more memory circuits, a memory devices, and/or memory integrated circuits. Of course other configurations for DRAM **508** are possible, and other data transfer fabrics using complex data paths and suitable types of multiplexing logic are contemplated.

In accordance with one embodiment, the two sets of multiplexors **611**, **612** and **621**, **622** allow independent data transfer to Flash **506** from DRAM-A **508**(1) and DRAM-B **508**(2). For example, in response to one or more control signals or a command from CDC **502**, DMgr **504** can transfer data from DRAM-A **508**(1) to MCH **510**, via multiplexer **611**, at the same time as from DRAM-B **508**(2)

Samsung Electronics Co., Ltd.
Ex. 1001, p. 34

US 11,016,918 B2

15 16

to the Flash 506, via multiplexer 612; or data is transferred from DRAM-B 508(2) to MCH 510, via multiplexer 611, and simultaneously data is transferred from the Flash 506 to DRAM-A 508(1), via multiplexer 621. Further, in the same way that data can be transferred to or from the DRAM in both device-wide or segment-by-segment fashion, data can be transferred to or from the flash memory in device-wide or segment-by-segment fashion, and the flash memory can be addressed and accessed accordingly.

In accordance with one embodiment the illustrated arrangement of data transfer fabric of DMgr 504 also allows the CDC 502 to control data transfer from the Flash memory to the MCH by buffering the data from the Flash 506 using a buffer 602, and matching the data rate and/or data format of MCH 510. The buffer 602 is shown in FIG. 6 as a portion of a data format module 604; however, buffer 602 may also be a distributed buffer such that one buffer is used for each one of the set of multiplexer logic elements shown as multiplexers 611, 612, 621, and 622. Various buffer arrangements may be used, such as a programmable size buffer to meet the requirement of a given system design requirement, for example the disparity between read/write access time; or overall system performance, for example latency. In certain embodiments, the buffer 604 may introduce one or more clock cycle delays into a data communication path between MCH 510, DRAM 508, and Flash 506.

In certain embodiments, data format module 604 contains a data formatting subsystem (not shown) to enable DMgr 504 to format and perform data transfer in accordance with control information received from CDC 502. Data buffer 604 of data format module 602, discussed above, also supports a wide data bus 606 coupled to the Flash memory 506 operating at a first frequency, while receiving data from DRAM 508 using a relatively smaller width data bus 608 operating at a second frequency, the second frequency being larger than the first frequency in certain embodiments. The buffer 602 is designed to match the data flow rate between the DRAM 508 and the Flash 506.

A register 690 provides the ability to register commands received from MCH 510 via C/A 560 (FIG. 5A). The register 690 may communicate these commands to CDC 502 and/or to the DRAM 508 and/or Flash 506. The register 690 communicates these registered commands to CDC 502 for processing. The register 690 may also include multiple registers (not shown), such that it can provide the ability to register multiple commands, a sequence of commands, or provide a pipeline delay stage for buffering and providing a controlled execution of certain commands received from MCH 510.

In certain embodiments, the register 690 may register commands from MCH 510 and transmit the registered commands to DRAM 508 and/or Flash 506 memory subsystems. In certain embodiments, the CDC 502 monitors commands received from MCH 510, via control and address bus C/A 560, and provides appropriate control information to DMgr 504, DRAM 508, or Flash 506 to execute these commands and perform data transfer operations between MCH 510 and FDHDIMM 500 via MCH data bus 610.

FIG. 7 illustrates a functional block diagram of the CDC 502. In certain embodiments, the major functional blocks of the CDC 502 are a DRAM control block DRAMCtrl 702, Flash control block FlashCtrl 704, MCH command interpreter Cmdlnt 706, DRAM-Flash interface scheduler Scheduler 708, and DMgr control block (DMgrCtrl) 710.

In accordance with one embodiment, DRAMCtrl 702 generates DRAM commands that are independent from the commands issued by the MCH 510. In accordance with one embodiment, when the MCH 510 initiates a read/write operation from/to the same DRAM 508 that is currently executing a command from the DRAMCtrl 702, then the CDC 502 may choose to instruct DRAMCtrl 702 to abort its operation in order to execute the operation initiated by the MCH. However, the CDC 502 may also pipeline the operation so that it causes DRAMCtrl 702 to either halt or complete its current operation prior to executing that of the MCH. The CDC 502 may also instruct DRAMCtrl 702 to resume its operation once the command from MCH 510 is completed.

In accordance with one embodiment, the FlashCtrl 704 generates appropriate Flash commands for the proper read/write operations. The Cmdlnt 706 intercepts commands received from MCH 510 and generates the appropriate control information and control signals and transmit them to the appropriate FDHDIMM functional block. For example, Cmdlnt 706 issues an interrupt signal to the DRAMCtrl 702 when the MCH issues a command that collides (conflicts) with the currently executing or pending commands that DRAMCtrl 702 has initiated independently from MCH 510, thus subordinating these commands to those from the MCH. The Scheduler 708 schedules the Flash-DRAM interface operation such that there is no resource conflict in the DMgr 504. In accordance with one embodiment, the Scheduler 708 assigns time slots for the DRAMCtrl 702 and FlashCtrl 704 operation based on the current status and the pending command received or to be received from the MCH. The DMgrCtrl 710 generates and sends appropriate control information and control signals for the proper operation and control of the data transfer fabric to enable or disable data paths between Flash 506, DRAM 508, and the MCH 510.

FIG. 8A is a block diagram showing a Flash-DRAM hybrid DIMM (FDHDIMM). As seen from FIG. 8A, this Flash-DRAM hybrid DIMM requires two separate and independent address buses to separately control the address spaces: one for the Flash memory Flash 506 and the other for the DRAM memory DRAM 508. The MCH treats the DRAM 508 and Flash 506 as separate memory subsystems, for example DRAM and SSD/HD memory subsystems. The memory in each address space is controlled directly by the MCH. However, the on-DIMM data path between Flash 506 and DRAM 508 allows for direct data transfer to occur between the Flash 506 and the DRAM 508 in response to control information from Ctrl 502. In this embodiment, this data transfer mechanism provides direct support for executing commands from the MCH without having the MCH directly controlling the data transfer, and thus improving data transfer performance from Flash 506 to the DRAM 508. However, the MCH needs to manage two address spaces and two different memory protocols simultaneously. Moreover, the MCH needs to map the DRAM memory space into the Flash memory space, and the data interface time suffers due to the difference in the data access time between the Flash memory and the DRAM memory.

In accordance with one embodiment, a memory space mapping of a Flash-DRAM hybrid DIMM is shown in FIG. 8B. A memory controller of a host system (not shown) controls both of the DRAM 508 address space and the Flash 506 address space using a single unified address space. The CDC 502 receives memory access commands from the MCH and generates control information for appropriate mapping and data transfer between Flash and DRAM memory subsystem to properly carry out the memory access commands. In one embodiment, the memory controller of the host system views the large Flash memory space as a DRAM memory space, and accesses this unified memory

Samsung Electronics Co., Ltd.
Ex. 1001, p. 35

US 11,016,918 B2

space with a standard DDR (double data rate) protocol used for accessing DRAM. The unified memory space in this case can exhibit overlapping memory address space between the Flash **506** and the DRAM **508**. The overlapping memory address space may be used as a temporary storage or buffer for data transfer between the Flash **506** and the DRAM **508**. For example, the DRAM memory space may hold a copy of data from the selected Flash memory space such that the MCH can access this data normally via DDR memory access commands. The CDC **502** controls the operation of the Flash **506** and DRAM **508** memory subsystems in response to commands received from a memory controller of a host system.

In one embodiment, the unified memory space corresponds to a contiguous address space comprising a first portion of the address space of the Flash **506** and a first portion of the address space of the DRAM **508**. The first portion of the address space of the Flash **506** can be determined via a first programmable register holding a first value corresponding to the desired Flash memory size to be used. Similarly, the first portion of the address space of the DRAM **508** can be determined via a second programmable register holding a second value corresponding to the desired DRAM memory size to be used. In one embodiment, any one of the first portion of the address space of the Flash **506** and the first portion of the address space of the DRAM **508** is determined via a first value corresponding to a desired performance or memory size, the first value being received by the CDC **502** via a command sent by memory controller of the host system.

In accordance with one embodiment, a flow diagram directed to the transfer of data from Flash memory to DRAM memory and vice versa in an exemplary FDHDIMM is shown in FIG. **9**. In certain embodiments, data transfer from the Flash **506** to the DRAM **508** occurs in accordance with memory access commands which the CDC **502** receives from the memory controller of the host system. In certain embodiments, the CDC **502** controls the data transfer from the DRAM **508** to the Flash **506** so as to avoid conflict with any memory operation that is currently being executed. For example, when all the pages in a particular DRAM memory block are closed. The CDC **502** partitions the DRAM memory space into a number of blocks for the purpose of optimally supporting the desired application. The controller can configure memory space in the memory module based on at least one of one or more commands received from the MCH, instructions received from the MCH, a programmable value written into a register, a value corresponding to a first portion of the volatile memory subsystem, a value corresponding to a first portion of the non-volatile memory subsystem, and a timing value. Furthermore, the block size can be configurable by the memory controller of the host system, such that the number pages in a block can be optimized to support a particular application or a task. Furthermore, the block size may be configured on-the-fly, e.g. CDC **502** can receive instruction regarding a desired block size from the memory controller via a memory command, or via a programmable value.

In certain embodiments, a memory controller can access the memory module using a standard access protocol, such as JEDEC's DDR DRAM, by sending a memory access command to the CDC **502** which in turn determines what type of a data transfer operation it is and the corresponding target address where the data information is stored, e.g. data information is stored in the DRAM **508** or Flash **506** memory subsystems. In response to a read operation, if the CDC **502** determines that data information, e.g. a page (or

block), does not reside in the DRAM **508** but resides in Flash **506**, then the CDC **502** initiates and controls all necessary data transfer operations from Flash **506** to DRAM **508** and subsequently to the memory controller. In one embodiment, once the CDC **502** completes the data transfer operation of the requested data information from the Flash **506** to the DRAM **508**, the CDC **502** alerts the memory controller to retrieve the data information from the DRAM **508**. In on embodiment, the memory controller initiates the copying of data information from Flash **506** to DRAM **508** by writing, into a register in the CDC **502**, the target Flash address along with a valid block size. The CDC **502** in turn, executes appropriate operations and generates control information to copy the data information to the DRAM **508**. Consequently, the memory controller can access or retrieve the data information using standard memory access commands or protocol.

An exemplary flow chart is shown in FIG. **9**, a starting step or power up **902**, is followed by an initialization step **904**, the memory controller initiates, at step **906**, a data move from the Flash **506** to the DRAM **508** by writing target address and size, to a control register in the CDC **502**, which then copies, at **908**, data information from the Flash **506** to the DRAM **508** and erases the block in the Flash. Erasing the data information from Flash may be accomplished independently from (or concurrently with) other steps that CDC **502** performs in this flow chart, i.e. other steps can be executed concurrently with the Erase the Flash block step. Once the data information or a block of data information is thus moved to the DRAM **508**, the memory controller can operate on this data block using standard memory access protocol or commands at **910**. The CDC **502** checks, at **912**, if any of the DRAM **508** blocks, or copied blocks, are closed. If the memory controller closed any open blocks in DRAM **508**, then the CDC **502** initiate a Flash write to write the closed block from the DRAM **508** to the Flash **506**, at **914**. In addition, the memory controller, at **916**, reopens the closed block that is currently being written into the Flash **506**, then the CDC **502** stops the Flash write operation and erases the Flash block which was being written to, as shown at **918**. Otherwise, the CDC **502** continues and completes the writing operation to the Flash at **920**.

The dashed lines in FIG. **9** indicate independent or parallel activities that can be performed by the CDC **502**. At any time the CDC **502** receives a DRAM load command from a memory controller which writes a Flash target address and/or block size information into the RC register(s) at **922**, as described above, then the CDC **502** executes a load DRAM w/RC step **906** and initiates another branch (or a thread) of activities that includes steps **908**-**922**. In one embodiment, the CDC **502** controls the data transfer operations between DRAM **508** and Flash **506** such that the Flash **506** is completely hidden from the memory controller. The CDC **502** monitors all memory access commands sent by the memory controller using standard DRAM protocol and appropriately configures and manipulate both Flash **506** and DRAM **508** memory subsystems to perform the requested memory access operation and thus achieve the desired results. The memory controller does not interface directly with the Flash memory subsystem. Instead, the memory controller interfaces with the CDC **502** and/or DMgr **504** as shown in FIG. **5** and FIG. **6**. Moreover, the memory controller may use one or more protocol, such as DDR, DDR2, DDR3, DDR4 protocols or the like.

In accordance with one embodiment, an example of mapping a DRAM address space to Flash memory address space is shown in FIG. **10**. Two sets (**1002**, **1004**) of address

Samsung Electronics Co., Ltd.
Ex. 1001, p. 36

US 11,016,918 B2

19 20

bits AD**6** to AD**17**, forming a 24 bit extended memory page address, are allocated for the block address. For example, assuming a Block size of 256K Bytes, then a 24-bit block address space (using the two sets of AD**6** to AD**17** **1002** and **1004**) would enable access to 4 TB of Flash memory storage space. If a memory module has 1 GB of DRAM storage capacity, then it can hold approximately 4K Blocks of data in the DRAM memory, each Block comprise 256 K Bytes of data. The DRAM address space, corresponding to the 4K blocks, can be assigned to different virtual ranks and banks, where the number of virtual ranks and banks is configurable and can be manipulated to meet a specific design or performance needs. For example, if a 1G Bytes memory module is configured to comprise two ranks with eight banks per rank, then each bank would hold two hundred fifty (**250**) blocks or the equivalent of 62 M Bytes or 62K pages, where each page correspond to a 1K Bytes. Other configurations using different page, block, banks, or ranks numbers may also be used. Furthermore, an exemplary mapping of 24-bit DDR DIMM block address to Flash memory address, using Block addressing as described above, is shown in FIG. **10**. The 24-bit can be decomposed into fields, such as a logical unit number LUN address **1061** field, a Block address **1051** field, a Plane address **1041**, a Page address **1031**, and a group of least significant address bits $A_0A_1$ **1021**. The Plane address **1041** is a sub address of the block address, and it may be used to support multiple page IO so as to improve Flash memory subsystem operation. In this example, it is understood that different number of bits may be allocated to each field of the 24-bit

The CDC **502** manages the block write-back operation by queuing the blocks that are ready to be written back to the Flash memory. As described above, if any page in a queued block for a write operation is reopened, then the CDC **502** will stop the queued block write operation, and remove the block from the queue. Once all the pages in a block are closed, then the CDC **502** restarts the write-back operation and queue the block for a write operation.

In accordance with one embodiment, an exemplary read operation from Flash **506** to DRAM **508** can be performed in approximately 400 μs, while a write operation from DRAM **508** to Flash **506** can be performed in approximately 22 ms resulting in a read to write ratio of 55 to 1. Therefore, if the average time a host system's memory controller spends accessing data information in a Block of DRAM is about 22 ms (that is the duration that a Block comprises one or more pages that are open), then the block write-back operation from DRAM to Flash would not impact performance and hence the disparity between read and write access may be completely hidden from the memory controller. If the block usage time is 11 ms instead of 22 ms, then the CDC **502** control the data transfer operation between DRAM **508** and Flash **506** such that there are no more than 9 closed blocks in the queue to be written-back to the Flash memory, hence approximately an average of 100 ms can be maintained for a standard DDR DRAM operation. Moreover, the number of closed Blocks in the queue to be written-back to the Flash memory subsystem varies with the average block usage time and the desired performance for a specific host system or for a specific application running using the host system resources.

Consequently, the maximum number of closed Blocks to be written-back to Flash can be approximated to be

((# of blocks per bank)/(ratio of 'Flash_block_write-_time' to 'Flash_read_time'))*((Block usage time)/('Flash_block_write_time'))

In order to maintain less than 100 ms time period for queued write-back Blocks, then using a Flash memory subsystem having 22 ms write access time per Block would results in a maximum number of four Blocks to be queued for write operation to Flash **506**. Therefore, on average approximately 88 ms (=22 ms*4) for blocks means that each bank should not have more than four Blocks that need to be written back to the Flash **506**.

The above equation also indicates that bigger DRAM memory space can support shorter block usage times. For example, 2 GB of DRAM memory allows the 8 closed blocks to be written-back to Flash. The table in FIG. **11** provides an estimation of the maximum allowed closed blocks in the queue to be written back to the Flash memory for different DRAM density using various average block use time.

Certain embodiments described herein include a memory system which can communicate with a host system such as a disk controller of a computer system. The memory system can include volatile and non-volatile memory, and a controller. The controller backs up the volatile memory using the non-volatile memory in the event of a trigger condition. Trigger conditions can include, for example, a power failure, power reduction, request by the host system, etc. In order to power the system in the event of a power failure or reduction, the memory system can include a secondary power source which does not comprise a battery and may include, for example, a capacitor or capacitor array.

In certain embodiments, the memory system can be configured such that the operation of the volatile memory is not adversely affected by the non-volatile memory or by th controller when the volatile memory is interacting with the host system. For example, one or more isolation devices may isolate the non-volatile memory and the controller from the volatile memory when the volatile memory is interacting with the host system and may allow communication between the volatile memory and the non-volatile memory when the data of the volatile memory is being restored or backed-up. This configuration generally protects the operation of the volatile memory when isolated while providing backup and restore capability in the event of a trigger condition, such as a power failure.

In certain embodiments described herein, the memory system includes a power module which provides power to the various components of the memory system from different sources based on a state of the memory system in relation to a trigger condition (e.g., a power failure). The power module may switch the source of the power to the various components in order to efficiently provide power in the event of the power failure. For example, when no power failure is detected, the power module may provide power to certain components, such as the volatile memory, from system power while charging a secondary power source (e.g., a capacitor array). In the event of a power failure or other trigger condition, the power module may power the volatile memory elements using the previously charged secondary power source.

In certain embodiments, the power module. transitions relatively smoothly from powering the volatile memory with system power to powering it with the secondary power source. For example, the power system may power volatile memory with a third power source from the time the memory system detects that power failure is likely to occur until the time the memory system detects that the power failure has actually occurred.

In certain embodiments, the volatile memory system can be operated at a reduced frequency during backup and/or

Samsung Electronics Co., Ltd.
Ex. 1001, p. 37

US 11,016,918 B2

21

22

restore operations which can improve the efficiency of the system and save power. In some embodiments, during backup and/or restore operations, the volatile memory communicates with the non-volatile memory by writing and/or. reading data words in bit-wise slices instead of by writing entire words at once. In certain embodiments, when each slice is being written to or read from the volatile memory the unused slice(s) of volatile memory is not active, which can reduce the power consumption of the system.

In yet other embodiments, the non-volatile memory can include at least 100 percent more storage capacity than the volatile memory. This configuration can allow the memory system to efficiently handle subsequent trigger conditions.

FIG. 12 is a block diagram of an example memory system 1010 compatible with certain embodiments described herein. The memory system 1010 can be coupled to a host computer system and can include a volatile memory subsystem 1030, a non-volatile memory subsystem 1040, and a controller 1062 operatively coupled to the non-volatile memory subsystem 1040. In certain embodiments, the memory system 1010 includes at least one circuit 1052 configured to selectively operatively decouple the controller 1062 from the volatile memory subsystem 1030.

In certain embodiments, the memory system 1010 comprises a memory module. The memory system 1010 may comprise a printed-circuit board (PCB) 1020. In certain embodiments, the memory system 1010 has a memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, or 8-GB. Other volatile memory capacities are also compatible with certain embodiments described herein. In certain embodiments, the memory system 10 has a non-volatile memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, 8-GB, 16-GB, or 32-GB. Other non-volatile memory capacities are also compatible with certain embodiments described herein. In addition, memory systems 1010 having widths of 4 bytes, 8 bytes, 16 bytes, 32 bytes, or 32 bits, 64 bits, 128 bits, 256 bits, as well as other widths (in bytes or in bits), are compatible with embodiments described herein. In certain embodiments, the PCB 1020 has an industry-standard form factor. For example, the PCB 1020 can have a low profile (LP) form factor with a height of 30 millimeters and a width of 133.35 millimeters. In certain other embodiments, the PCB 1020 has a very high profile (VHP) form factor with a height of 50 millimeters or more. In certain other embodiments, the PCB 1020 has a very low profile (VLP) form factor with a height of 18.3 millimeters. Other form factors including, but not limited to, small-outline (SO-DIMM), unbuffered (UDIMM), registered (RDIMM), fully-buffered (FB-DIMM), miniDIMM, mini-RDIMM, VLP mini-DIMM, micro-DIMM, and SRAM DIMM are also compatible with certain embodiments described herein. For example, in other embodiments, certain non-DIMM form factors are possible such as, for example, single in-line memory module (SIMM), multi-media card (MMC), and small computer system interface (SCSI).

In certain preferred embodiments, the memory system 1010 is in electrical communication with the host system. In other embodiments, the memory system 1010 may communicate with a host system using some other type of communication, such as, for example, optical communication. Examples of host systems include, but are not limited to, blade servers, 1U servers, personal computers (PCs), and other applications in which space is constrained or limited. The memory system 1010 can be in communication with a disk controller of a computer system, for example. The PCB 1020 can comprise an interface 1022 that is configured to be in electrical communication with the host system (not shown). For example, the interface 1022 can comprise a plurality of edge connections which fit into a corresponding slot connector of the host system. The interface 1022 of certain embodiments provides a conduit for power voltage as well as data, address, and control signals between the memory system 1010 and the host system. For example, the interface 1022 can comprise a standard 240-pin DDR2 edge connector.

The volatile memory subsystem 1030 comprises a plurality of volatile memory elements 1032 and the non-volatile memory subsystem 1040 comprises a plurality of non-volatile memory elements 1042. Certain embodiments described herein advantageously provide nonvolatile storage via the non-volatile memory subsystem 1040 in addition to high-performance (e.g., high speed) storage via the volatile memory subsystem 1030. In certain embodiments, the first plurality of volatile memory elements 1032 comprises two or more dynamic random-access memory (DRAM) elements. Types of DRAM elements 1032 compatible with certain embodiments described herein include, but are not limited to, DDR, DDR2, DDR3, and synchronous DRAM (SDRAM). For example, in the block diagram of FIG. 12, the first memory bank 1030 comprises eight 64Mx8 DDR2 SDRAM elements 1032. The volatile memory elements 1032 may comprise other types of memory elements such as static random-access memory (SRAM). In addition, volatile memory elements 1032 having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Volatile memory elements 1032 compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBGA), micro-BOA (1.1,BGA), mini-BGA (mBGA), and chip-scale packaging (CSP).

In certain embodiments, the second plurality of non-volatile memory elements 1042 comprises one or more flash memory elements. Types of flash memory elements 1042 compatible with certain embodiments described herein include, but are not limited to, NOR flash, NAND flash, ONE-NAND flash, and multi-level cell (MLC). For example, in the block diagram of FIG. 12, the second memory bank 1040 comprises 512 MB of flash memory organized as four 128 Mb×8 NAND flash memory elements 1042. In addition, nonvolatile memory elements 1042 having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Non-volatile memory elements 1042 compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BOA), fine-pitch BOA (FBGA), micro-BOA (POA), mini-BGA (mBGA), and chip-scale packaging (CSP).

FIG. 13 is a block diagram of an example memory module 10 with ECC (error-correcting code) having a volatile memory subsystem 1030 with nine volatile memory elements 1032 and a non-volatile memory subsystem 1040 with five non-volatile memory elements 1042 in accordance with certain embodiments described herein. The additional memory element 1032 of the first memory bank 1030 and the additional memory element 1042 of the second memory bank 1040 provide the ECC capability. In certain other embodiments, the volatile memory subsystem 1030 comprises other numbers of volatile memory elements 1032 (e.g., 2, 3, 4, 5, 6, 7, more than 9). In certain embodiments, the non-volatile memory subsystem 1040 comprises other numbers of nonvolatile memory elements 1042 (e.g., 2, 3, more than 5).

Samsung Electronics Co., Ltd.
Ex. 1001, p. 38

US 11,016,918 B2

23                                                         24

Referring to FIG. 12, in certain embodiments, the logic element 1070 comprises a field-programmable gate array (FPGA). In certain embodiments, the logic element 1070 comprises an FPGA available from Lattice Semiconductor Corporation which includes an internal flash. In certain other embodiments, the logic element 1070 comprises an FPOA available from another vendor. The internal flash can improve the speed of the memory system 1010 and save physical space. Other types of logic elements 1070 compatible with certain embodiments described herein include, but are not limited to, a programmable-logic device (PLD), an application-specific integrated circuit (ASIC), a custom-designed semiconductor device, a complex programmable logic device (CPLD). In certain embodiments, the logic element 1070 is a custom device. In certain embodiments, the logic element 1070 comprises various discrete electrical elements, while in certain other embodiments, the logic element 1070 comprises one or more integrated circuits. FIG. 14 is a block diagram of an example memory module 1010 having a microcontroller unit 1060 and logic element 1070 integrated into a single controller 1062 in accordance with certain embodiments described herein. In certain embodiments, the controller 1062 includes one or more other components. For example, in one embodiment, an FPGA without an internal flash is used and the controller 1062 includes a separate flash memory component which stores configuration information to program the FPGA.

In certain embodiments, the at least one circuit 1052 comprises one or more switches coupled to the volatile memory subsystem 1030, to the controller 1062, and to the host computer (e.g., via the interface 1022, as schematically illustrated by FIGS. 12-14). The one or more switches are responsive to signals (e.g., from the controller 1062) to selectively operatively decouple the controller 1062 from the volatile memory subsystem 1030 and to selectively operatively couple the controller 1062 to the volatile memory subsystem 1030. In addition, in certain embodiments, the at least one circuit 1052 selectively operatively couples and decouples the volatile memory subsystem 1030 and the host system.

In certain embodiments, the volatile memory subsystem 1030 can comprise a registered DIMM subsystem comprising one or more registers 1160 and a plurality of DRAM elements 1180, as schematically illustrated by FIG. 15A. In certain such embodiments, the at least one circuit 1052 can comprise one or more switches 1172 coupled to the controller 1062 (e.g., logic element 1070) and to the volatile memory subsystem 1030 which can be actuated to couple and decouple the controller 1062 to and from the volatile memory subsystem 1030, respectively. The memory system 1010 further comprises one or more switches 1170 coupled to the one or more registers 1160 and to the plurality of DRAM elements 1180 as schematically illustrated by FIG. 15A. The one or more switches 1170 can be selectively switched, thereby selectively operatively coupling the volatile memory subsystem 1030 to the host system 1150. In certain other embodiments, as schematically illustrated by FIG. 15B, the one or more switches 1174 are also coupled to the one or more registers 1160 and to a power source 1162 for the one or more registers 1160. The one or more switches 1174 can be selectively switched to turn power on or off to the one or more registers 1160, thereby selectively operatively coupling the volatile memory subsystem 1030 to the host system 1150. As schematically illustrated by FIG. 15C, in certain embodiments the at least one circuit 1052 comprises a dynamic on-die termination (ODT) 1176 circuit of the logic element 1070. For example, the logic element 1070 can comprise a dynamic ODT circuit 1176 which selectively operatively couples and decouples the logic element 1070 to and from the volatile memory subsystem 1030, respectively. In addition, and similar to the example embodiment of FIG. 15A described above, the one or more switches 1170 can be selectively switched, thereby selectively operatively coupling the volatile memory subsystem 1030 to the host system 1150.

Certain embodiments described herein utilize the non-volatile memory subsystem 1040 as a flash "mirror" to provide backup of the volatile memory subsystem 1030 in the event of certain system conditions. For example, the non-volatile memory subsystem 1040 may backup the volatile memory subsystem 1030 in the event of a trigger condition, such as, for example, a power failure or power reduction or a request from the host system. In one embodiment, the nonvolatile memory subsystem 1040 holds intermediate data results in a noisy system environment when the host computer system is engaged in a long computation. In certain embodiments, a backup may be performed on a regular basis. For example, in one embodiment, the backup may occur every millisecond in response to a trigger condition. In certain embodiments, the trigger condition occurs when the memory system 1010 detects that the system voltage is below a certain threshold voltage. For example, in one embodiment, the threshold voltage is 1010 percent below a specified operating voltage. In certain embodiments, a trigger condition occurs when the voltage goes above a certain threshold value, such as, for example, 1010 percent above a specified operating voltage. In some embodiments, a trigger condition occurs when the voltage goes below a threshold or above another threshold. In various embodiments, a backup and/or restore operation may occur in reboot and/or non-reboot trigger conditions.

As schematically illustrated by FIGS. 12 and 13, in certain embodiments, the controller 1062 may comprise a microcontroller unit (MCU) 1060 and a logic element 1070. In certain embodiments, the MCU 1060 provides memory management for the non-volatile memory subsystem 1040 and controls data transfer between the volatile memory subsystem 30 and the nonvolatile memory subsystem 1040. The MCU 1060 of certain embodiments comprises a 16-bit microcontroller, although other types of microcontrollers are also compatible with certain embodiments described herein. As schematically illustrated by FIGS. 12 and 13, the logic element 1070 of certain embodiments is in electrical communication with the non-volatile memory subsystem 1040 and the MCU 1060. The logic element 1070 can provide signal level translation between the volatile memory elements 1032 (e.g., 1.8V SSTL-2 for DDR2 SDRAM elements) and the non-volatile memory elements 1042 (e.g., 3V TTL for NAND flash memory elements). In certain embodiments, the logic element 1070 is also programmed to perform address/address translation between the volatile memory subsystem 1030 and the non-volatile memory subsystem 1040. In certain preferred embodiments, 1-NAND type flash are used for the non-volatile memory elements 1042 because of their superior read speed and compact structure.

The memory system 1010 of certain embodiments is configured to be operated in at least two states. The at least two states can comprise a first state in which the controller 1062 and the non-volatile memory subsystem 1040 are operatively decoupled (e.g., isolated) from the volatile memory subsystem 1030 by the at least one circuit 1052 and a second state in which the volatile memory subsystem 1030 is operatively coupled to the controller 1062 to allow data to

Samsung Electronics Co., Ltd.
Ex. 1001, p. 39

US 11,016,918 B2

25

be communicated between the volatile memory subsystem **1030** and the nonvolatile memory subsystem **1040** via the controller **1062**. The memory system **1010** may transition from the first state to the second state in response to a trigger condition, such as when the memory system **1010** detects that there is a power interruption (e.g., power failure or reduction) or a system hang-up.

The memory system **1010** may further comprise a voltage monitor **1050**. The voltage monitor circuit **1050** monitors the voltage supplied by the host system via the interface **1022**. Upon detecting a low voltage condition (e.g., due to a power interruption to the host system), the voltage monitor circuit **1050** may transmit a signal to the controller **1062** indicative of the detected condition. The controller **1062** of certain embodiments responds to the signal from the voltage monitor circuit **1050** by transmitting a signal to the at least one circuit **1052** to operatively couple the controller to the volatile memory system **1030**, such that the memory system **1010** enters the second state. For example, the voltage monitor **1050** may send a signal to the MCU **1060** which responds by accessing the data on the volatile memory system **1030** and by executing a write cycle on the nonvolatile memory subsystem **1040**. During this write cycle, data is read from the volatile memory subsystem **1030** and is transferred to the non-volatile memory subsystem **1040** via the MCU **1060**. In certain embodiments, the voltage monitor circuit **1050** is part of the controller **1062** (e.g., part of the MCU **1060**) and the voltage monitor circuit **1050** transmits a signal to the other portions of the controller **1062** upon detecting a power threshold condition.

The isolation or operational decoupling of the volatile memory subsystem **1030** from the non-volatile memory subsystem in the first state can preserve the integrity of the operation of the memory system **1010** during periods of operation in which signals (e.g., data) are transmitted between the host system and the volatile memory subsystem **1030**. For example, in one embodiment during such periods of operation, the controller **1062** and the nonvolatile memory subsystem **1040** do not add a significant capacitive load to the volatile memory system **1030** when the memory system **1010** is in the first state. In certain embodiments, the capacitive load of the controller **1062** and the non-volatile memory subsystem **1040** do not significantly affect the signals propagating between the volatile memory subsystem **1030** and the host system. This can be particularly advantageous in relatively high-speed memory systems where loading effects can be significant. In one preferred embodiment, the at least one circuit **1052** comprises an FSA1208 Low-Power, Eight-Port, Hi-Speed Isolation Switch from Fairchild Semiconductor. In other embodiments, the at least one circuit **1052** comprises other types of isolation devices.

Power may be supplied to the volatile memory subsystem **1030** from a first power supply (e.g., a system power supply) when the memory system **1010** is in the first state and from a second power supply **1080** when the memory system **1010** is in the second state. In certain embodiments, the memory system **1010** is in the first state when no trigger condition (e.g., a power failure) is present and the memory system **1010** enters the second state in response to a trigger condition. In certain embodiments, the memory system **1010** has a third state in which the controller **1062** is operatively decoupled from the volatile memory subsystem **1030** and power is supplied to the volatile memory subsystem **1030** from a third power supply (not shown). For example, in one embodiment the third power supply may provide power to the volatile memory subsystem **1030** when the memory system **1010** detects that a trigger condition is likely to occur but has not yet occurred.

In certain embodiments, the second power supply **1080** does not comprise a battery. Because a battery is not used, the second power supply **1080** of certain embodiments may be relatively easy to maintain, does not generally need to be replaced, and is relatively environmentally friendly. In certain embodiments, as schematically illustrated by FIGS. 12-14, the second power supply **1080** comprises a step-up transformer **1082**, a step-down transformer **1084**, and a capacitor bank **1086** comprising one or more capacitors (e.g., double-layer capacitors). In one example embodiment, capacitors may take about three to four minutes to charge and about two minutes to discharge. In other embodiments, the one or more capacitors may take a longer time or a shorter time to charge and/or discharge. For example, in certain embodiments, the second power supply **1080** is configured to power the volatile memory subsystem **1030** for less than thirty minutes. In certain embodiments, the second power supply **1080** may comprise a battery. For example, in certain embodiments, the second power supply **1080** comprises a battery and one or more capacitors and is configured to power the volatile memory subsystem **1030** for no more than thirty minutes.

In certain embodiments, the capacitor bank **1086** of the second power supply **1080** is charged by the first power supply while the memory system **1010** is in the first state. As a result, the second power supply **1080** is fully charged when the memory system **1010** enters the second state. The memory system **1010** and the second power supply **1080** may be located on the same printed circuit board **1020**. In other embodiments, the second power supply **1080** may not be on the same printed circuit board **1020** and may be tethered to the printed circuit board **1020**, for example.

When operating in the first state, in certain embodiments, the step-up transformer **1082** keeps the capacitor bank **1086** charged at a peak value. In certain embodiments, the step-down transformer **1084** acts as a voltage regulator to ensure that regulated voltages are supplied to the memory elements (e.g., 1.8V to the volatile DRAM elements **1032** and 3.0V to the non-volatile flash memory elements **1042**) when operating in the second state (e.g., during power down). In certain embodiments, as schematically illustrated by FIGS. 12-14, the memory module **1010** further comprises a switch **1090** (e.g., FET switch) that switches power provided to the controller **1062**, the volatile memory subsystem **1030**, and the non-volatile memory subsystem **1040**, between the power from the second power supply **1080** and the power from the first power supply (e.g., system power) received via the interface **1022**. For example, the switch **1090** may switch from the first power supply to the second power supply **1080** when the voltage monitor **1050** detects a low voltage condition. The switch **1090** of certain embodiments advantageously ensures that the volatile memory elements **1032** and non-volatile memory elements **1042** are powered long enough for the data to be transferred from the volatile memory elements **1032** and stored in the non-volatile memory elements **1042**. In certain embodiments, after the data transfer is complete, the switch **1090** then switches back to the first power supply and the controller **1062** transmits a signal to the at least one circuit **1052** to operatively decouple the controller **1062** from the volatile memory subsystem **1030**, such that the memory system **1010** reenters the first state.

When the memory system **1010** re-enters the first state, data may be transferred back from the non-volatile memory

Samsung Electronics Co., Ltd.
Ex. 1001, p. 40

US 11,016,918 B2

27                                                      28

subsystem **1040** to the volatile memory subsystem **1030** via the controller **1062**. The host system can then resume accessing the volatile memory subsystem **1030** of the memory module **1010**. In certain embodiments, after the memory system **1010** enters or re-enters the first state (e.g., after power is restored), the host system accesses the volatile memory subsystem **1030** rather than the non-volatile memory subsystem **1040** because the volatile memory elements **1032** have superior read/write characteristics. In certain embodiments, the transfer of data from the volatile memory bank **1030** to the nonvolatile memory bank **1040**, or from the non-volatile memory bank **1040** to the volatile. memory bank **1030**, takes less than one minute per GB.

In certain embodiments, the memory system **1010** protects the operation of the volatile memory when communicating with the host-system and provides backup and restore capability in the event of a trigger condition such as a power failure. In certain embodiments, the memory system **1010** copies the entire contents of the volatile memory subsystem **1030** into the nonvolatile memory subsystem **1040** on each backup operation. Moreover, in certain embodiments, the entire contents of the non-volatile memory subsystem **1040** are copied back into the volatile memory subsystem **1030** on each restore operation. In certain embodiments, the entire contents of the non-volatile memory subsystem **1040** are accessed for each backup and/or restore operation, such that the non-volatile memory subsystem **1040** (e.g., flash memory subsystem) is used generally uniformly across its memory space and wear-leveling is not performed by the memory system **1010**. In certain embodiments, avoiding wear-leveling can decrease cost and complexity of the memory system **1010** and can improve the performance of the memory system **1010**. In certain other embodiments, the entire contents of the volatile memory subsystem **1030** are not copied into the non-volatile memory subsystem **1040** on each backup operation, but only a partial copy is performed. In certain embodiments, other management capabilities such as bad-block management and error management for the flash memory elements of the non-volatile memory subsystem **1040** are performed in the controller **1062**.

The memory system **1010** generally operates as a write-back cache in certain embodiments. For example, in one embodiment, the host system (e.g., a disk controller) writes data to the volatile memory subsystem **1030** which then writes the data to non-volatile storage which is not part of the memory system **1010**, such as, for example, a hard disk. The disk controller may wait for an acknowledgment signal from the memory system **1010** indicating that the data has been written to the hard disk or is otherwise secure. The memory system **1010** of certain embodiments can decrease delays in the system operation by indicating that the data has been written to the hard disk before it has actually done so. In certain embodiments, the memory system **1010** will still be able to recover the data efficiently in the event of a power outage because of the backup and restore capabilities described herein. In certain other embodiments, the memory system **1010** may be operated as a write-through cache or as some other type of cache.

FIG. **16** schematically illustrates an example power module **1100** of the memory system **1010** in accordance with certain embodiments described herein. The power module **1100** provides power to the various components of the memory system **1010** using different elements based on a state of the memory system **1010** in relation to a trigger condition. In certain embodiments, the power module **1100** comprises one or more of the components described above with respect to FIG. **12**. For example, in certain embodi-

ments, the power module **1100** includes the second power supply **1080** and the switch **1090**.

The power module **1100** provides a plurality of voltages to the memory system **1010** comprising non-volatile and volatile memory subsystems **1030**, **1040**. The plurality of voltages comprises at least a first voltage **1102** and a second voltage **1104**. The power module **1100** comprises an input **1106** providing a third voltage **1108** to the power module **1100** and a voltage conversion element **1120** configured to provide the second voltage **1104** to the memory system **1010**. The power module **1100** further comprises a first power element **1130** configured to selectively provide a fourth voltage **1110** to the conversion element **1120**. In certain embodiments, the first power element **1130** comprises a pulse-width modulation power controller. For example, in one example embodiment, the first power element **1130** is configured to receive a 1.8V input system voltage as the third voltage **1108** and to output a modulated 5V output as the fourth voltage **1110**.

The power module **1100** further comprises a second power element **1140** can be configured to selectively provide a fifth voltage **1112** to the conversion element **1120**. The power module **1100** can be configured to selectively provide the first voltage **1102** to the memory system **1010** either from the conversion element **1120** or from the input **1106**.

The power module **1100** can be configured to be operated in at least three states in certain embodiments. In a first state, the first voltage **1102** is provided to the memory system **1010** from the input **1106** and the fourth voltage **1110** is provided to the conversion element **1120** from the first power element **1130**. In a second state, the fourth voltage **1110** is provided to the conversion element **1120** from the first power element **1130** and the first voltage **1102** is provided to the memory system **1010** from the conversion element **1120**. In the third state, the fifth voltage **1112** is provided to the conversion element **1120** from the second power element **1140** and the first voltage **1104** is provided to the memory system **1010** from the conversion element **1120**.

In certain embodiments, the power module **1100** transitions from the first state to the second state upon detecting that a trigger condition is likely to occur and transitions from the second state to the third state upon detecting that the trigger condition has occurred. For example, the power module **1100** may transition to the second state when it detects that a power failure is about to occur and transitions to the third state when it detects that the power failure has occurred. In certain embodiments, providing the first voltage **1102** in the second state from the first power element **1130** rather than from the input **1106** allows a smoother transition from the first state to the third state. For example, in certain embodiments, providing the first voltage **1102** from the first power element **1130** has capacitive and other smoothing effects. In addition, switching the point of power transition to be between the conversion element **1120** and the first and second power elements **1130**, **1140** (e.g., the sources of the pre-regulated fourth voltage **1110** in the second state and the pre-regulated fifth voltage **1112** in the third state) can smooth out potential voltage spikes.

In certain embodiments, the second power element **1140** does not comprise a battery and may comprise one or more capacitors. For example, as schematically illustrated in FIG. **16**, the second power element **1140** comprises a capacitor array **1142**, a buck-boost converter **1144** which adjusts the voltage for charging the capacitor array and a voltage/current limiter **1146** which limits the charge current to the capacitor array **1142** and stops charging the capacitor array **1142** when it has reached a certain charge voltage. In one

Samsung Electronics Co., Ltd.
Ex. 1001, p. 41

US 11,016,918 B2

29                                                    30

example embodiment, the capacitor array **1142** comprises two 50 farad capacitors capable of holding a total charge of 4.6V. For example, in one example embodiment, the buck-boost converter **1144** receives a 1.8V system voltage (first voltage **1108**) and boosts the voltage to 4.3V which is outputted to the voltage current limiter **1146**. The voltage/current limiter **1146** limits the current going to the capacitor array **1142** to 1A and stops charging the array **1142** when it is charged to 4.3V. Although described with respect to certain example embodiments, one of ordinary skill will recognize from the disclosure herein that the second power element **1140** may include alternative embodiments. For example, different components and/or different value components may be used. For example, in other embodiments, a pure boost converter may be used instead of a buck-boost converter. In another embodiment, only one capacitor may be used instead of a capacitor array **1142**.

The conversion element **1120** can comprise one or more buck converters and/or one or more buck-boost converters. The conversion element **1120** may comprise a plurality of sub-blocks **1122**, **1124**, **1126** as schematically illustrated by FIG. **16**, which can provide more voltages in addition to the second voltage **1104** to the memory system **1010**. The sub-blocks may comprise various converter circuits such as buck-converters, boost converters, and buck-boost converter circuits for providing various voltage values to the memory system **1010**. For example, in one embodiment, sub-block **1122** comprises a buck converter, sub-block **1124** comprises a dual buck converter, and sub-block **1126** comprises a buck-boost converter as schematically illustrated by FIG. **16**. Various other components for the sub-blocks **1122**, **1124**, **1126** of the conversion element **1120** are also compatible with certain embodiments described herein. In certain embodiments, the conversion element **1120** receives as input either the fourth voltage **1110** from the first power element **1130** or the fifth voltage **1112** from the second power element **1140**, depending on the state of the power module **1100**, and reduces the input to an appropriate amount for powering various components of the memory system. For example, the buck-converter of sub-block **1122** can provide 1.8V at 2A for about 60 seconds to the volatile memory elements **1032** (e.g., DRAM), the non-volatile memory elements **1042** (e.g., flash), and the controller **1062** (e.g., an FPGA) in one embodiment. The sub-block **1124** can provide the second voltage **1104** as well as another reduced voltage **1105** to the memory system **1010**. In one example embodiment, the second voltage **1104** is 2.5V and is used to power the at least one circuit **1052** (e.g., isolation device) and the other reduced voltage **1105** is 1.2V and is used to power the controller **1062** (e.g., FPGA). The subblock **1126** can provide yet another voltage **1107** to the memory system **1010**. For example, the voltage **1107** may be 3.3V and may be used to power both the controller **1062** and the at least one circuit **1052**.

Although described with respect to certain example embodiments, one of ordinary skill will recognize from the disclosure herein that the conversion element **1120** may include alternative embodiments. For example, there may be more or less sub-blocks which may comprise other types of converters (e.g., pure boost converters) or which may produce different voltage values. In one embodiment, the volatile memory elements **1032** and nonvolatile memory elements **1042** are powered using independent voltages and are not both powered using the first voltage **1102**.

FIG. **17** is a flowchart of an example method **1200** of providing a first voltage **1102** and a second voltage **1104** to a memory system **1010** including volatile and nonvolatile memory subsystems **1030**, **1040**. While the method **1200** is described herein by reference to the memory system **1010** schematically illustrated by FIGS. **12-15**, other memory systems are also compatible with embodiments of the method **1200**. During a first condition, the method **1200** comprises providing the first voltage **1102** to the memory system **1010** from an input power supply **1106** and providing the second voltage **1104** to the memory system **1010** from a first power subsystem in operational block **1210**. For example, in one embodiment, the first power subsystem comprises the first power element **1130** and the voltage conversion element **1120** described above with respect to FIG. **16**. In other embodiments, other first power subsystems are used.

The method **1200** further comprises detecting a second condition in operational block **1220**. In certain embodiments, detecting the second condition comprises detecting that a trigger condition is likely to occur. During the second condition, the method **1200** comprises providing the first voltage **1102** and the second voltage **1104** to the memory system **1010** from the first power subsystem in an operational block **1230**. For example, referring to FIG. **16**, a switch **1148** can be toggled to provide the first voltage **1102** from the conversion element **1120** rather than from the input power supply.

The method **1200** further comprises charging a second power subsystem in operational block **1240**. In certain embodiments, the second power subsystem comprises the second power element **1140** or another power supply that does not comprise a battery. For example, in one embodiment, the second power subsystem comprises the second power element **1140** and the voltage conversion element **1120** described above with respect to FIG. **16**. In other embodiments, some other second power subsystem is used.

The method **1200** further comprises detecting a third condition in an operational block **1250** and during the third condition, providing the first voltage **1102** and the second voltage **1104** to the memory system **1010** from the second power subsystem **1140** in an operational block **1260**. In certain embodiments, detecting the third condition comprises detecting that the trigger condition has occurred. The trigger condition may comprise various conditions described herein. In various embodiments, for example, the trigger condition comprises a power reduction, power failure, or system hang-up. The operational blocks of the method **1200** may be performed in different orders in various embodiments. For example, in certain embodiments, the second power subsystem **1140** is charged before detecting the second condition.

In certain embodiments, the memory system **1010** comprises a volatile memory subsystem **1030** and a non-volatile memory subsystem **1040** comprising at least 100 percent more storage capacity than does the volatile memory subsystem. The memory system **1010** also comprises a controller **1062** operatively coupled to the volatile memory subsystem **1030** and operatively coupled to the non-volatile memory subsystem **1040**. The controller **1062** can be configured to allow data to be communicated between the volatile memory subsystem **1030** and the host system when the memory system **1010** is operating in a first state and to allow data to be communicated between the volatile memory subsystem **1030** and the non-volatile memory subsystem **1040** when the memory system **1010** is operating in a second state.

Although the memory system **1010** having extra storage capacity of the non-volatile memory subsystem **1040** has been described with respect to certain embodiments, alter-

Samsung Electronics Co., Ltd.
Ex. 1001, p. 42

31

native configurations exist. For example, in certain embodiments, there may be more than 100 percent more storage capacity in the non-volatile memory subsystem **1040** than in the volatile memory subsystem **1030**. In various embodiments, there may be at least 200, 300, or 400 percent more storage capacity in the non-volatile memory subsystem **1040** than in the volatile memory subsystem **1030**. In other embodiments, the non-volatile memory subsystem **1040** includes at least some other integer multiples of the storage capacity of the volatile memory subsystem **1030**. In some embodiments, the non-volatile memory subsystem **1040** includes a non-integer multiple of the storage capacity of the volatile memory subsystem **1030**. In one embodiment, the non-volatile memory subsystem **1040** includes less than 100 percent more storage capacity than does the volatile memory subsystem **1030**.

The extra storage capacity of the non-volatile memory subsystem **1040** can be used to improve the backup capability of the memory system **1010**. In certain embodiments in which data can only be written to portions of the non-volatile memory subsystem **1040** which do not contain data (e.g., portions which have been erased), the extra storage capacity of the nonvolatile memory subsystem **1040** allows the volatile memory subsystem **1030** to be backed up in the event of a subsequent power failure or other trigger event. For example, the extra storage capacity of the non-volatile memory subsystem **1040** may allow the memory system **1010** to backup the volatile memory subsystem **1030** efficiently in the event of multiple trigger conditions (e.g., power failures). In the event of a first power failure, for example, the data in the volatile memory system **1030** is copied to a first, previously erased portion of the nonvolatile memory subsystem **1040** via the controller **1062**. Since the non-volatile memory subsystem **1040** has more storage capacity than does the volatile memory subsystem **1030**, there is a second portion of the non-volatile memory subsystem **1040** which does not have data from the volatile memory subsystem **1030** copied to it and which remains free of data (e.g., erased). Once system power is restored, the controller **1062** of the memory system **1010** restores the data to the volatile memory subsystem **1030** by copying the backed-up data from the non-volatile memory subsystem **1040** back to the volatile memory subsystem **1030**. After the data is restored, the memory system **1010** erases the non-volatile memory subsystem **1040**. While the first portion of the non-volatile memory subsystem **1040** is being erased, it may be temporarily unaccessible.

If a subsequent power failure occurs before the first portion of the non-volatile memory subsystem **1040** is completely erased, the volatile memory subsystem **1030** can be backed-up or stored again in the second portion of the non-volatile memory subsystem **1040** as described herein. In certain embodiments, the extra storage capacity of the non-volatile memory subsystem **1040** may allow the memory system **1010** to operate more efficiently. For example, because of the extra storage capacity of the non-volatile memory subsystem **1040**, the memory system **1010** can handle a higher frequency of trigger events that is not limited by the erase time of the non-volatile memory subsystem **1040**.

FIG. **18** is a flowchart of an example method **1300** of controlling a memory system **1010** operatively coupled to a host system and which includes a volatile memory subsystem **1030** and a non-volatile memory subsystem **1040**. In certain embodiments, the non-volatile memory subsystem **1040** comprises at least 100 percent more storage capacity than does the volatile memory subsystem **30** as described

32

herein. While the method **1300** is described herein by reference to the memory system **1010** schematically illustrated by FIGS. **12-14**, the method **1300** can be practiced using other memory systems in accordance with certain embodiments described herein. In an operational block **1310**, the method **1300** comprises communicating data between the volatile memory subsystem **1030** and the host system when the memory system **1010** is in a first mode of operation. The method **1300** further comprises storing a first copy of data from the volatile memory subsystem **1030** to the non-volatile memory subsystem **1040** at a first time when the memory system **1010** is in a second mode of operation in an operational block **1320**.

In an operational block **1330**, the method **1300** comprises restoring the first copy of data from the non-volatile memory subsystem **1040** to the volatile memory subsystem **1030**. The method **1300** further comprises erasing the first copy of data from the non-volatile memory subsystem **1040** in an operational block **1340**. The method further comprises storing a second copy of data from the volatile memory subsystem **1030** to the non-volatile memory subsystem **1040** at a second time when the memory system **1010** is in the second mode of operation in an operational block **1350**. Storing the second copy begins before the first copy is completely erased from the non-volatile memory subsystem **1040**.

In some embodiments, the memory system **1010** enters the second mode of operation in response to a trigger condition, such as a power failure. In certain embodiments, the first copy of data and the second copy of data are stored in separate portions of the nonvolatile memory subsystem **1040**. The method **1300** can also include restoring the second copy of data from the non-volatile memory subsystem **1040** to the volatile memory subsystem **1030** in an operational block **1360**. The operational blocks of method **1300** referred to herein may be performed in different orders in various embodiments. For example, in some embodiments, the second copy of data is restored to the volatile memory subsystem **1030** at operational block **1360** before the first copy of data is completely erased in the operational block **1340**.

FIG. **19** schematically illustrates an example clock distribution topology **1400** of a memory system **1010** in accordance with certain embodiments described herein. The clock distribution topology **1400** generally illustrates the creation and routing of the clock signals provided to the various components of the memory system **1010**. A clock source **1402** such as, for example, a 25 MHz oscillator, generates a clock signal. The clock source **1402** may feed a clock generator **1404** which provides a clock signal **1406** to the controller **1062**, which may be an FPGA. In one embodiment, the clock generator **1404** generates a 125 MHz clock signal **1406**. The controller **1062** receives the clock signal **1406** and uses it to clock the controller **1062** master state control logic. For example, the master state control logic may control the general operation of an FPGA controller **1062**.

The clock signal **1406** can also be input into a clock divider **1410** which produces a frequency-divided version of the clock signal **1406**. In an example embodiment, the clock divider **1410** is a divide by two clock divider and produces a 62.5 MHz clock signal in response to the 125 MHz clock signal **1406**. A non-volatile memory phase-locked loop (PLL) block **1412** can be included (e.g., in the controller **1062**) which distributes a series of clock signals to the non-volatile memory subsystem **1040** and to associated control logic. For example, a series of clock signals **1414** can

Samsung Electronics Co., Ltd.
Ex. 1001, p. 43

US 11,016,918 B2

33                                                                 34

be sent from the controller **1062** to the non-volatile memory subsystem **1040**. Another clock signal **1416** can be used by the controller logic which is dedicated to controlling the non-volatile memory subsystem **1040**. For example, the clock signal **1416** may clock the portion of the controller **1062** which is dedicated to generating address and/or control lines for the non-volatile memory subsystem **1040**. A feedback clock signal **1418** is fed back into the non-volatile memory PLL block **1412**. In one embodiment, the PLL block **1412** compares the feedback clock **1418** to the reference clock **1411** and varies the phase and frequency of its output until the reference **1411** and feedback **1418** clocks are phase and frequency matched.

A version of the clock signal **1406** such as the backup clock signal **1408** may be sent from the controller to the volatile memory subsystem **1030**. The clock signal **1408** may be, for example, a differential version of the clock signal **1406**. As described herein, the backup clock signal **1408** may be used to clock the volatile memory subsystem **1030** when the memory system **1010** is backing up the data from the volatile memory subsystem **1030** into the non-volatile memory subsystem **1040**. In certain embodiments, the backup clock signal **1408** may also be used to clock the volatile memory subsystem **1030** when the memory system **1010** is copying the backed-up data back into the volatile memory subsystem **1030** from the nonvolatile memory subsystem **1040** (also referred to as restoring the volatile memory subsystem **1030**). The volatile memory subsystem **1030** may normally be run at a higher frequency (e.g., DRAM running at 400 MHz) than the nonvolatile memory subsystem **1040** (e.g., flash memory running at 62.5 MHz) when communicating with the host system (e.g., when no trigger condition is present). However, in certain embodiments the volatile memory subsystem **1030** may be operated at a reduced frequency (e.g., at twice the frequency of the non-volatile memory subsystem **1040**) without introducing significant delay into the system during backup operation and/or restore operations. Running the volatile memory subsystem **1030** at the reduced frequency during a backup and/or restore operation may advantageously reduce overall power consumption of the memory system **1010**.

In one embodiment, the backup clock **1408** and the volatile memory system clock signal **1420** are received by a multiplexer **1422**, as schematically illustrated by FIG. **19**. The multiplexer **1422** can output either the volatile memory system clock signal **1420** or the backup clock signal **1408** depending on the backup state of the memory system **1010**. For example, when the memory system **1010** is not performing a backup or restore operation and is communicating with the host system (e.g., normal operation), the volatile memory system clock signal **1420** may be provided by the multiplexer **422** to the volatile memory PLL block **1424**. When the memory system **1010** is performing a backup (or restore) operation, the backup clock signal **1408** may be provided.

The volatile memory PLL block **1424** receives the volatile memory reference clock signal **1423** from the multiplexer **1422** and can generate a series of clock signals which are distributed to the volatile memory subsystem **1030** and associated control logic. For example, in one embodiment, the PLL block **1424** generates a series of clock signals **1426** which clock the volatile memory elements **1032**. A clock signal **1428** may be used to clock control logic associated with the volatile memory elements, such as one or more registers (e.g., the one or more registers of a registered DIMM). Another clock signal **1430** may be sent to the controller **1062**. A feedback clock signal **1432** is fed back

into the volatile memory PLL block **1424**. In one embodiment, the PLL block **1424** compares the feedback clock signal **1432** to the reference clock signal **1423** and varies the phase and frequency of its output until the reference clock signal **1423** and the feedback clock signal **1432** clocks are phase and frequency matched.

The clock signal **1430** may be used by the controller **1062** to generate and distribute clock signals which will be used by controller logic which is configured to control the volatile memory subsystem **1030**. For example, control logic in the controller **1062** may be used to control the volatile memory subsystem **1030** during a backup or restore operation. The clock signal **1430** may be used as a reference clock signal for the PLL block **1434** which can generate one or more clocks **1438** used by logic in the controller **1062**. For example, the PLL block **1434** may generate one or more clock signals **1438** used to drive logic circuitry associated with controlling the volatile memory subsystem **1030**. In certain embodiments, the PLL block **1434** includes a feedback clock signal **1436** and operates in a similar manner to other PLL blocks described herein.

The clock signal **1430** may be used as a reference clock signal for the PLL block **1440** which may generate one or more clock signals used by a sub-block **1442** to generate one or more other clock signals **1444**. In one embodiment, for example, the volatile memory subsystem **1030** comprises DDR2 SDRAM elements and the sub-block **1442** generates one or more DDR2 compatible clock signals **1444**. A feedback clock signal **1446** is fed back into the PLL block **1440**. In certain embodiments, the PLL block **1440** operates in a similar manner to other PLL blocks described herein.

While described with respect to the example embodiment of FIG. **19**, various alternative clock distribution topologies are possible. For example, one or more of the clock signals have a different frequency in various other embodiments. In some embodiments, one or more of the clocks shown as differential signals are single ended signals. In one embodiment, the volatile memory subsystem **1030** operates on the volatile memory clock signal **1420** and there is no backup clock signal **1408**. In some embodiments, the volatile memory subsystem **1030** is operated at a reduced frequency during a backup operation and not during a restore operation. In other embodiments, the volatile memory subsystem **1030** is operated at a reduced frequency during a restore operation and not during a backup operation.

FIG. **20** is a flowchart of an example method **1500** of controlling a memory system **1010** operatively coupled to a host system. Although described with respect to the memory system **1010** described herein, the method **1500** is compatible with other memory systems. The memory system **1010** may include a clock distribution topology **1400** similar to the one described above with respect to FIG. **19** or another clock distribution topology. The memory system **1010** can include a volatile memory subsystem **1030** and a non-volatile memory subsystem **1040**.

In an operational block **1510**, the method **1500** comprises operating the volatile memory subsystem **1030** at a first frequency when the memory system **1010** is in a first mode of operation in which data is communicated between the volatile memory subsystem **1030** and the host system. In an operational block **1520**, the method **1500** comprises operating the non-volatile memory subsystem **1040** at a second frequency when the memory system **1010** is in a second mode of operation in which data is communicated between the volatile memory subsystem **1030** and the non-volatile memory subsystem **1040**. The method **1500** further comprises operating the volatile memory subsystem **1030** at a

Samsung Electronics Co., Ltd.
Ex. 1001, p. 44

**35**

third frequency in an operational block **1530** when the memory system **1010** is in the second mode of operation. In certain embodiments, the memory system **1010** is not powered by a battery when it is in the second mode of operation. The memory system **1010** may switch from the first mode of operation to the second mode of operation in response to a trigger condition. The trigger condition may be any trigger condition described herein such as, for example, a power failure condition. In certain embodiments, the second mode of operation includes both backup and restore operations as described herein. In other embodiments, the second mode of operation includes backup operations but not restore operations. In yet other embodiments, the second mode of operation includes restore operations but not backup operations.

The third frequency can be less than the first frequency. For example, the third frequency can be approximately equal to the second frequency. In certain embodiments, the reduced frequency operation is an optional mode. In yet other embodiments, the first, second and/or third frequencies are configurable by a user or by the memory system **1010**.

FIG. **21** schematically illustrates an example topology of a connection to transfer data slices from two DRAM segments **1630**, **1640** of a volatile memory subsystem **1030** of a memory system **1010** to a controller **1062** of the memory system **1010**. While the example of FIG. **21** shows a topology including two DRAM segments **1630**, **1640** for the purposes of illustration, each address location of the volatile memory subsystem **1030** comprises more than the two segments in certain embodiments. The data lines **1632**, **1642** from the first DRAM segment **1630** and the second DRAM segment **1640** of the volatile memory subsystem **1030** are coupled to switches **1650**, **1652** which are coupled to the controller **1062** (e.g., logic element **1070**) of the memory system **1010**. The chip select lines **1634**, **1644** and the self-refresh lines **1636**, **1646** (e.g., CKe signals) of the first and second DRAM segments **1630**, **1640**, respectively, are coupled to the controller **1062**. In certain embodiments, the controller **1062** comprises a buffer (not shown) which is configured to store data from the volatile memory subsystem **1030**. In certain embodiments, the buffer is a first-in, first out buffer (FIFO). In certain embodiments, data slices from each DRAM segment **1630**, **1640** comprise a portion of the volatile memory subsystem data bus. In one embodiment, for example, the volatile memory subsystem **1030** comprises a 72-bit data bus (e.g., each data word at each addressable location is 72 bits wide and includes, for example, 64 bits of accessible SDRAM and 8 bits of ECC), the first data slice from the first DRAM segment **1630** may comprise 40 bits of the data word, and the second data slice from the second DRAM segment **1640** may comprise the remaining 32 bits of the data word. Certain other embodiments comprise data buses and/or data slices of different sizes.

In certain embodiments, the switches **1650**, **1652** can each be selectively switched to selectively operatively couple the data lines **1632**, **1642**, respectively from the first and second DRAM segments **1630**, **1640** to the controller **1062**. The chip select lines **1634**, **1644** enable the first and second DRAM segments **1630**, **1640**, respectively, of the volatile memory subsystem **1030**, and the self-refresh lines **1636**, **1646** toggle the first and second DRAM segments **1630**, **1640**, respectively, from self-refresh mode to active mode. In certain embodiments, the first and second DRAM segments **1630**, **1640** maintain stored information but are not accessible when they are in self-refresh mode, and maintain stored information and are accessible when they are in active mode.

**36**

In certain embodiments, when the memory system **1010** is backing up the volatile memory system **1030**, data slices from only one of the two DRAM segments **1630**, **1640** at a time are sent to the controller **1062**. For example, when the first slice is being written to the controller **1062** during a back-up, the controller **1062** sends a signal via the CKe line **1636** to the first DRAM segment **1630** to put the first DRAM segment **1630** in active mode. In certain embodiments, the data slice from the first DRAM segment **1630** for multiple words (e.g., a block of words) is written to the controller **1062** before writing the second data slice from the second DRAM segment **1640** to the controller **1062**. While the first data slice is being written to the controller **1062**, the controller **1062** also sends a signal via the CKe line **1646** to put the second DRAM segment **1640** in self-refresh mode. Once the first data slice for one word or for a block of words is written to the controller **1062**, the controller **1062** puts the first DRAM segment **1630** into self-refresh mode by sending a signal via the CKe line **1636** to the first DRAM segment **1640**. The controller **1062** also puts the second DRAM segment **1640** into active mode by sending a signal via the CKe line **1646** to the second DRAM segment **1640**. The second slice for a word or for a block of words is written to the controller **1062**. In certain embodiments, when the first and second data slices are written to the buffer in the controller **1062**, the controller **1062** combines the first and second data slices **1630**, **1640** into complete words or blocks of words and then writes each complete word or block of words to the non-volatile memory subsystem **1040**. In certain embodiments, this process is called "slicing" the volatile memory subsystem **1030**.

In certain embodiments, the data may be sliced in a restore operation as well as, or instead of, during a backup operation. For example, in one embodiment, the nonvolatile memory elements **1042** write each backed-up data word to the controller **1062** which writes a first slice of the data word to the volatile memory subsystem **1030** and then a second slice of the data word to the volatile memory subsystem **1030**. In certain embodiments, slicing the volatile memory subsystem **1030** during a restore operation may be performed in a manner generally inverse to slicing the volatile memory subsystem **1030** during a backup operation.

FIG. **22** is a flowchart of an example method **1600** of controlling a memory system **1010** operatively coupled to a host system and which includes a volatile memory subsystem **1030** and a non-volatile memory subsystem **1040**. Although described with respect to the memory system **1010** described herein with respect to FIGS. **12-14** and **21**, the method **1600** is compatible with other memory systems. The method **1600** comprises communicating data words between the volatile memory subsystem **1030** and the host system when the memory system **1010** is in a first mode of operation in an operational block **1610**. For example, the memory system **1010** may be in the first mode of operation when no trigger condition has occurred and the memory system is not performing a backup and/or restore operation or is not being powered by a secondary power supply.

In an operational block **1620**, the method further comprises transferring data words from the volatile memory subsystem **1030** to the non-volatile memory subsystem **1040** when the memory system **1010** is in a second mode of operation. In certain embodiments, each data word comprises the data stored in a particular address of the memory system **1010**. The memory system **1010** may enter the second mode of operation, for example, when a trigger condition (e.g., a power failure) occurs. In certain embodiments, transferring each data word comprises storing a first

Samsung Electronics Co., Ltd.
Ex. 1001, p. 45

US 11,016,918 B2

**37**

portion (also referred to as a slice) of the data word in a buffer in an operational block **1622**, storing a second portion of the data word in the buffer in an operational block **1624**, and writing the entire data word from the buffer to the non-volatile memory subsystem **1040** in an operational block **1626**.

In one example embodiment, the data word may be a 72 bit data word (e.g., 64 bits of accessible SDRAM and 8 bits of ECC), the first portion (or "slice") may comprise 40 bits of the data word, and the second portion (or "slice") may comprise the remaining 32 bits of the data word. In certain embodiments, the buffer is included in the controller **1062**. For example, in one embodiment, the buffer is a first-in, first-out buffer implemented in the controller **1062** which comprises an FPGA. The method **1600** may generally be referred to as "slicing" the volatile memory during a backup operation. In the example embodiment, the process of "slicing" the volatile memory during a backup includes bringing the 32-bit slice out of self-refresh, reading a 32-bit block from the slice into the buffer, and putting the 32-bit slice back into self-refresh. The 40-bit slice is then brought out of self-refresh and a 40-bit block from the slice is read into a buffer. Each block may comprise a portion of multiple words. For example, each 32-bit block may comprise 32-bit portions of multiple 72-bit words. In other embodiments, each block comprises a portion of a single word. The 40-bit slice is then put back into self-refresh in the example embodiment. The 32-bit and 40-bit slices are then combined into a 72-bit block by the controller **1062** and ECC detection/correction is performed on each 72-bit word as it is read from the buffer and written into the non-volatile memory subsystem (e.g., flash).

In some embodiments, the entire data word may comprise more than two portions. For example, the entire data word may comprise three portions instead of two and transferring each data word further comprises storing a third portion of each data word in the buffer. In certain other embodiments, the data word may comprise more than three portions.

In certain embodiments, the data may be sliced in a restore operation as well as, or instead of, during a backup operation. For example, in one embodiment, the nonvolatile memory elements **1040** write each backed-up data word to the controller **1062** which writes a first portion of the data word to the volatile memory subsystem **1030** and then a second portion of the data word to the volatile memory **1030**. In certain embodiments, slicing the volatile memory subsystem **1030** during a restore operation may be performed in a manner generally inverse to slicing the volatile memory subsystem **1030** during a backup operation.

The method **1600** can advantageously provide significant power savings and can lead to other advantages. For example, in one embodiment where the volatile memory subsystem **1030** comprises DRAM elements, only the slice of the DRAM which is currently being accessed (e.g., written to the buffer) during a backup is configured in full-operational mode. The slice or slices that are not being accessed may be put in self-refresh mode. Because DRAM in self-refresh mode uses significantly less power than DRAM in full-operational mode, the method **1600** can allow significant power savings. In certain embodiments, each slice of the DRAM includes a separate self-refresh enable (e.g., CKe) signal which allows each slice to be accessed independently.

In addition, the connection between the DRAM elements and the controller **1062** may be as large as the largest slice instead of as large as the data bus. In the example embodiment, the connection between the controller **1062** and the

**38**

DRAM may be 40 bits instead of 72 bits. As a result, pins on the controller **1062** may be used for other purposes or a smaller controller may be used due to the relatively low number of pin-outs used to connect to the volatile memory subsystem **1030**. In certain other embodiments, the full width of the data bus is connected between the volatile memory subsystem **1030** and the controller **1062** but only a portion of it is used during slicing operations. For example, in some embodiments, memory slicing is an optional mode.

While embodiments and applications have been shown and described, it would be apparent to those skilled in the art having the benefit of this disclosure that many more modifications than mentioned above are possible without departing from the inventive concepts disclosed herein. The invention, therefore, is not to be restricted except in the spirit of the appended claims.

What is claimed is:

**1**. A memory module comprising:

a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system;

a first buck converter configured to provide a first regulated voltage having a first voltage amplitude;

a second buck converter configured to provide a second regulated voltage having a second voltage amplitude;

a third buck converter configured to provide a third regulated voltage having a third voltage amplitude;

a converter circuit configured to provide a fourth regulated voltage having a fourth voltage amplitude; and

a plurality of components coupled to the PCB, each component of the plurality of components coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, the plurality of components comprising:

a plurality of synchronous dynamic random access memory (SDRAM) devices coupled to the first regulated voltage, and

at least one circuit coupled between a first portion of the plurality of edge connections and the plurality of SDRAM devices, the at least one circuit operable to (i) receive a first plurality of address and control signals via the first portion of the plurality of edge connections, and (ii) output a second plurality of address and control signals to the plurality of SDRAM devices, the at least one circuit coupled to both the second regulated voltage and the fourth regulated voltage, wherein a first one of the second and fourth voltage amplitudes is less than a second one of the second and fourth voltage amplitudes.

**2**. The memory module of claim **1**, wherein the first and third buck converters are further configured to operate as a dual buck converter.

**3**. The memory module of claim **1**, wherein the first voltage amplitude is 1.8 volts.

**4**. The memory module of claim **1**, wherein the second, third, and fourth voltage amplitudes are 2.5 volts, 1.2 volts, and 3.3 volts, respectively.

**5**. The memory module of claim **1**, further comprising:

a voltage monitor circuit configured to monitor a power input voltage received via a second portion of the plurality of edge connections, the voltage monitor circuit configured to produce a trigger signal in response to the power input voltage having a voltage amplitude that is greater than a first threshold voltage.

Samsung Electronics Co., Ltd.
Ex. 1001, p. 46

US 11,016,918 B2

39

40

**6**. The memory module of claim **5**, wherein the voltage monitor circuit is further configured to produce the trigger signal in response to the power input voltage having a voltage amplitude that is less than a second threshold voltage.

**7**. The memory module of claim **6**, wherein the second threshold voltage corresponds to a voltage level that is ten percent less than a specified operating voltage.

**8**. The memory module of claim **1**, the plurality of components further comprising:

one or more registers coupled to one of the first, second, third and fourth regulated voltages, the one or more registers configured to register, in response to a clock, the first plurality of address and control signals, wherein the one of the first, second, third and fourth regulated voltages is selectively switched off to turn power off to the one or more registers while one or more components of the plurality of components are powered on.

**9**. The memory module of claim **5**, wherein the first threshold voltage corresponds to a voltage level that is ten percent greater than a specified operating voltage.

**10**. The memory module of claim **5**, the plurality of components further comprising:

a logic element including a non-volatile memory, the non-volatile memory is configured to store configuration information.

**11**. The memory module of claim **10**, wherein, in response to the trigger signal, the logic element writes information into the non-volatile memory.

**12**. The memory module of claim **5**, the plurality of components further comprising:

a non-volatile memory; and

a controller configured to receive the trigger signal, wherein, in response to the trigger signal, the controller performs a write operation to the non-volatile memory.

**13**. The memory module of claim **5**, wherein the power input voltage is coupled to the first, second, and third buck converters and the converter circuit.

**14**. The memory module of claim **8**, wherein, in response to selectively switching on the one of the first, second, third and fourth regulated voltages to the one or more registers, the one or more registers is configured to output the registered first plurality of address and control signals to the plurality of SDRAM devices.

**15**. The memory module of claim **1**, the plurality of components further comprising:

a logic element including one or more integrated circuits and discrete electrical elements, the one or more integrated circuit including an internal non-volatile memory, wherein the non-volatile memory is configured to store configuration information.

**16**. A memory module comprising:

a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system;

first, second, and third buck converters configured to receive a pre-regulated input voltage and to produce first, second and third regulated voltages, respectively;

a converter circuit configured to reduce the pre-regulated input voltage to provide a fourth regulated voltage, wherein the first, second, third and fourth regulated voltages have first, second, third, and fourth voltage amplitudes, respectively;

a plurality of components coupled to the PCB, the plurality of components including a plurality of synchronous dynamic random access memory (SDRAM) devices, each component of the plurality of components coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages; and

a voltage monitor circuit configured to monitor an input voltage received via a first portion of the plurality of edge connections, the voltage monitor circuit configured to produce a signal in response to the input voltage having a voltage amplitude that is greater than a first threshold voltage.

**17**. The memory module of claim **16**, wherein the second and third buck converters are configured to operate as a dual buck converter.

**18**. The memory module of claim **16**, the plurality of components further including:

a controller coupled to the voltage monitor circuit and configured to receive the signal, wherein the controller executes a write operation in response to the signal.

**19**. The memory module of claim **18**, wherein the write operation includes writing data information into non-volatile memory.

**20**. The memory module of claim **16**, wherein the plurality of SDRAM devices are configured to receive at least one of the first, second, third and fourth regulated voltages having a voltage amplitude of 1.8 volts.

**21**. The memory module of claim **16**, the plurality of components further including:

at least one circuit coupled between the interface and the plurality of SDRAM devices, the at least one circuit operable to receive a first plurality of address and control signals via a second portion of the plurality of edge connections and to output a second plurality of address and control signals to the plurality of SDRAM devices, the at least one circuit coupled to both the second regulated voltage and the fourth regulated voltage, wherein a first one of the second and fourth voltage amplitudes is less than a second one of the second and fourth voltage amplitudes.

**22**. The memory module of claim **16**, the plurality of components further including:

a logic element including an internal non-volatile memory, wherein the non-volatile memory is configured to store configuration information, wherein the configuration information is used to program the logic element.

**23**. A memory module comprising:

a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system;

a plurality of components coupled to the PCB, each component of the plurality of components coupled to one or more regulated voltages of first, second, third and fourth regulated voltages, the plurality of components including a plurality of synchronous dynamic random access memory (SDRAM) devices and one or more registers, the plurality of SDRAM devices coupled to the first regulated voltage, the one or more registers coupled to (i) the second regulated voltage, (ii) a portion of the plurality of edge connections, and (iii) the plurality of SDRAM devices, wherein a plu-

Samsung Electronics Co., Ltd.
Ex. 1001, p. 47

US 11,016,918 B2

41

rality of address and control signals are coupled to the one or more registers via the portion of the plurality of edge connections;

first, second, and third buck converters configured to provide the first, second and third regulated voltages, respectively; and

a converter circuit configured to provide the fourth regulated voltage,

wherein the second regulated voltage is configured to be selectively switched on or off to the one or more registers while at least the plurality of SDRAM devices are powered on,

wherein if the second regulated voltage is switched on while at least the plurality of SDRAM devices are powered on, the one or more registers are configured to couple the first plurality of address and control signals to the plurality of SDRAM devices, and

wherein if the second regulated voltage is switched off while the plurality of SDRAM devices are powered on, the one or more registers are configured to decouple the plurality of SDRAM devices from the first plurality of address and control signals.

**24**. The memory module of claim **23**, further comprising:

a voltage monitor circuit configured to monitor an input voltage received from the host system via the interface, the voltage monitor circuit configured to produce a signal in response to the input voltage having a voltage amplitude that is greater than a first threshold voltage.

42

**25**. The memory module of claim **24**, the plurality of components further including:

a controller coupled to the voltage monitor circuit and configured to receive the signal, wherein, in response to the signal, the controller executes a write operation.

**26**. The memory module of claim **25**, wherein the write operation includes writing data information to non-volatile memory.

**27**. The memory module of claim **24**, wherein the voltage monitor circuit is further configured to produce the signal in response to the input voltage having a voltage amplitude that is less than a second threshold voltage.

**28**. The memory module of claim **23**, wherein the second and third buck converters are configured to operate as a dual buck converter.

**29**. The memory module of claim **23**, wherein the plurality of SDRAM devices are configured to receive at least one of the first, second, third and fourth regulated voltages having a voltage amplitude of 1.8 volts.

**30**. The memory module of claim **23**, wherein the first, second, and third buck converters are configured to receive a pre-regulated input voltage and to provide the first, second and third regulated voltages, respectively, and wherein the converter circuit is configured to reduce the pre-regulated voltage input to provide the fourth regulated voltage.

\* \* \* \* \*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 48



US011232054B2

(12) **United States Patent**
    Chen et al.

(10) Patent No.:    **US 11,232,054 B2**
(45) Date of Patent:    ***Jan. 25, 2022**

(54) **FLASH-DRAM HYBRID MEMORY MODULE**

(71) Applicant: **Netlist, Inc.**, Irvine, CA (US)

(72) Inventors: **Chi-She Chen**, Walnut, CA (US);
**Jeffrey C. Solomon**, Irvine, CA (US);
**Scott H. Milton**, Irvine, CA (US);
**Jayesh Bhakta**, Cerritos, CA (US)

(73) Assignee: **NETLIST, INC.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/328,019**

(22) Filed: **May 24, 2021**

(65) **Prior Publication Data**

US 2021/0279194 A1    Sep. 9, 2021

**Related U.S. Application Data**

(63) Continuation of application No. 17/138,766, filed on Dec. 30, 2020, now Pat. No. 11,016,918, which is a
(Continued)

(51) **Int. Cl.**
*G06F 13/28*      (2006.01)
*G06F 12/02*      (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. *G06F 13/28* (2013.01); *G06F 1/185* (2013.01); *G06F 3/0613* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .............. G11C 7/1072; G11C 14/0018; G06F 12/0246; G06F 13/4243; G06F 13/1694;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,043,099 A    6/1936   Hanna
3,562,555 A    2/1971   Ahrons
(Continued)

FOREIGN PATENT DOCUMENTS

KR      0130873 B1    4/1999
KR    100606242 B1    7/2006
WO   2013016723 A2    1/2013

OTHER PUBLICATIONS

Microsoft Computer Dictionary Fifth Edition, 2002, 9 pages.
(Continued)

*Primary Examiner* — Hashem Farrokh
(74) *Attorney, Agent, or Firm* — Vorys, Sater, Seymour and Pease LLP

(57)      **ABSTRACT**

In certain embodiments, a memory module includes a printed circuit board (PCB) having an interface that couples it to a host system for provision of power, data, address and control signals. First, second, and third buck converters receive a pre-regulated input voltage and produce first, second and third regulated voltages. A converter circuit reduces the pre-regulated input voltage to provide a fourth regulated voltage. Synchronous dynamic random access memory (SDRAM) devices are coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, and a voltage monitor circuit monitors an input voltage and produces a signal in response to the input voltage having a voltage amplitude that is greater than a threshold voltage.

**30 Claims, 22 Drawing Sheets**



Samsung Electronics Co., Ltd.
Ex. 1001, p. 1

**US 11,232,054 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 15/934,416, filed on Mar. 23, 2018, now abandoned, which is a continuation of application No. 14/840,865, filed on Aug. 31, 2015, now Pat. No. 9,928,186, which is a continuation of application No. 14/489,269, filed on Sep. 17, 2014, now Pat. No. 9,158,684, which is a continuation of application No. 13/559,476, filed on Jul. 26, 2012, now Pat. No. 8,874,831, which is a continuation-in-part of application No. 12/240,916, filed on Sep. 29, 2008, now Pat. No. 8,301,833, which is a continuation of application No. 12/131,873, filed on Jun. 2, 2008, now abandoned.

(60) Provisional application No. 61/512,871, filed on Jul. 28, 2011, provisional application No. 60/941,586, filed on Jun. 1, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 13/16* | (2006.01) |
| *G06F 1/18* | (2006.01) |
| *G06F 12/06* | (2006.01) |
| *G06F 13/42* | (2006.01) |
| *G11C 7/10* | (2006.01) |
| *G11C 14/00* | (2006.01) |
| *G06F 3/06* | (2006.01) |
| *G06F 13/40* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *G06F 3/0659* (2013.01); *G06F 3/0685* (2013.01); *G06F 12/0246* (2013.01); *G06F 12/0638* (2013.01); *G06F 13/1694* (2013.01); *G06F 13/4027* (2013.01); *G06F 13/4243* (2013.01); *G11C 7/1072* (2013.01); *G11C 14/0018* (2013.01); *G06F 2212/205* (2013.01); *G06F 2212/7208* (2013.01)

(58) **Field of Classification Search**
CPC .............. G06F 3/0659; G06F 13/4027; G06F 12/0638; G06F 13/28; G06F 1/185; G06F 2212/205; G06F 2212/7208; G06F 3/0685; G06F 3/0613; Y02D 10/00
USPC ....................................................... 711/110
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,916,390 A | 10/1975 | Chang et al. |
| 4,234,920 A | 11/1980 | Ness et al. |
| 4,420,821 A | 12/1983 | Hoffman |
| 4,449,205 A | 5/1984 | Hoffman |
| 4,607,332 A | 8/1986 | Goldberg |
| 4,658,204 A | 4/1987 | Goodwin |
| 4,882,709 A | 11/1989 | Wyland |
| 4,884,242 A | 11/1989 | Lacy et al. |
| 4,965,828 A | 10/1990 | Ergott, Jr. et al. |
| 5,430,742 A | 7/1995 | Jeddeloh et al. |
| 5,444,664 A | 8/1995 | Kuroda et al. |
| 5,490,155 A | 2/1996 | Abdoo et al. |
| 5,519,663 A | 5/1996 | Harper, Jr. et al. |
| 5,519,831 A | 5/1996 | Holzhammer |
| 5,563,839 A | 10/1996 | Herdt et al. |
| 5,577,213 A | 11/1996 | Avery et al. |
| 5,619,644 A | 4/1997 | Crockett et al. |
| 5,630,096 A | 5/1997 | Zuravleff et al. |
| 5,675,725 A | 10/1997 | Malcolm |
| 5,757,712 A | 5/1998 | Nagel et al. |
| 5,799,200 A | 8/1998 | Brant et al. |
| 5,813,029 A | 9/1998 | Klein |
| 5,870,350 A | 2/1999 | Bertin et al. |

| | | |
|---|---|---|
| 5,874,995 A | 2/1999 | Naimpally et al. |
| 5,890,192 A | 3/1999 | Lee et al. |
| 5,953,215 A | 9/1999 | Karabatsos |
| 5,991,885 A | 11/1999 | Chang et al. |
| 6,023,421 A | 2/2000 | Iadanza et al. |
| 6,026,465 A | 2/2000 | Mills et al. |
| 6,065,092 A | 5/2000 | Roy |
| 6,112,310 A | 8/2000 | Jun et al. |
| 6,145,068 A | 11/2000 | Lewis |
| 6,158,015 A | 12/2000 | Klein |
| 6,199,142 B1 | 3/2001 | Saulsbury et al. |
| 6,216,247 B1 | 4/2001 | Creta et al. |
| 6,269,382 B1 | 7/2001 | Cabrera et al. |
| 6,336,174 B1 | 1/2002 | Li et al. |
| 6,336,176 B1 | 1/2002 | Leyda et al. |
| 6,363,465 B1 | 3/2002 | Lash et al. |
| 6,421,279 B1 | 7/2002 | Tobita et al. |
| 6,459,647 B1 | 10/2002 | Kengeri |
| 6,487,102 B1 | 11/2002 | Halbert et al. |
| 6,487,623 B1 | 11/2002 | Emerson et al. |
| 6,571,244 B1 | 5/2003 | Larson |
| 6,614,685 B2 | 9/2003 | Wong |
| 6,658,507 B1 | 12/2003 | Chan |
| 6,691,209 B1 | 2/2004 | O'connell |
| 6,693,840 B2 | 2/2004 | Shimada et al. |
| 6,721,212 B2 | 4/2004 | Sasaki |
| 6,721,860 B2 | 4/2004 | Klein |
| 6,769,081 B1 | 7/2004 | Parulkar |
| 6,799,241 B2 | 9/2004 | Kahn et al. |
| 6,799,244 B2 | 9/2004 | Tanaka et al. |
| 6,810,513 B1 | 10/2004 | Vest |
| 6,816,982 B2 | 11/2004 | Ravid |
| 6,839,774 B1 | 1/2005 | Ahn et al. |
| 6,910,635 B1 | 6/2005 | Miks et al. |
| 6,944,042 B2 | 9/2005 | Komatsuzaki |
| 6,948,029 B2 | 9/2005 | Yano |
| 6,952,368 B2 | 10/2005 | Miura et al. |
| 7,053,470 B1 | 5/2006 | Sellers et al. |
| 7,062,618 B2 | 6/2006 | Tsunoda et al. |
| 7,089,412 B2 | 8/2006 | Chen |
| 7,102,391 B1 | 9/2006 | Sun et al. |
| 7,107,480 B1 | 9/2006 | Moshayedi et al. |
| 7,111,142 B2 | 9/2006 | Spencer et al. |
| 7,136,978 B2 | 11/2006 | Miura et al. |
| 7,155,627 B2 | 12/2006 | Matsui |
| 7,200,021 B2 | 4/2007 | Raghuram |
| 7,234,099 B2 | 6/2007 | Gower et al. |
| 7,353,325 B2 | 4/2008 | Lofgren et al. |
| 7,409,491 B2 | 8/2008 | Doblar et al. |
| 7,409,590 B2 | 8/2008 | Moshayedi et al. |
| 7,411,859 B2 | 8/2008 | Sohn et al. |
| 7,421,552 B2 | 9/2008 | Long |
| 7,467,251 B2 | 12/2008 | Park et al. |
| 7,519,754 B2 | 4/2009 | Wang et al. |
| 7,600,142 B2 | 10/2009 | Ichikawa |
| 7,613,877 B2 | 11/2009 | Shimozono et al. |
| 7,716,411 B2 | 5/2010 | Panabaker et al. |
| 7,818,488 B2 | 10/2010 | Park et al. |
| 7,873,750 B2 | 1/2011 | Yabuta et al. |
| 7,881,150 B2 | 2/2011 | Solomon et al. |
| 7,952,179 B2 | 5/2011 | Chiu et al. |
| 8,001,434 B1 | 8/2011 | Lee et al. |
| 8,081,536 B1 | 12/2011 | Solomon et al. |
| 8,086,955 B2 | 12/2011 | Zhou et al. |
| 8,102,614 B2 | 1/2012 | Song et al. |
| 8,214,616 B2 | 7/2012 | Ware et al. |
| 8,233,303 B2 | 7/2012 | Best et al. |
| 8,301,833 B1 | 10/2012 | Chen et al. |
| 8,407,395 B2 | 3/2013 | Kim et al. |
| 8,412,879 B2 | 4/2013 | Chang et al. |
| 8,516,187 B2 | 8/2013 | Chen et al. |
| 8,671,243 B2 | 3/2014 | Chen et al. |
| 8,677,060 B2 | 3/2014 | Chen et al. |
| 8,874,831 B2 | 10/2014 | Lee et al. |
| 8,880,791 B2 | 11/2014 | Chen et al. |
| 8,904,098 B2 | 12/2014 | Amidi et al. |
| 8,904,099 B2 | 12/2014 | Chen et al. |
| 9,043,677 B2 | 5/2015 | Lee et al. |
| 9,158,684 B2 | 10/2015 | Lee et al. |

Samsung Electronics Co., Ltd.
Ex. 1001, p. 2

**US 11,232,054 B2**

Page 3

(56)  **References Cited**

OTHER PUBLICATIONS

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,361,250 | B2 | 6/2016 | Shan et al. |
| 9,436,600 | B2 | 9/2016 | Lee |
| 9,921,762 | B2 | 3/2018 | Amidi et al. |
| 9,928,186 | B2 | 3/2018 | Lee et al. |
| 2002/0053944 | A1 | 5/2002 | Brass et al. |
| 2002/0083368 | A1 | 6/2002 | Abe et al. |
| 2002/0199061 | A1 | 12/2002 | Friedman et al. |
| 2003/0028733 | A1 | 2/2003 | Tsunoda et al. |
| 2003/0076726 | A1 | 4/2003 | Cowles et al. |
| 2003/0137881 | A1 | 7/2003 | Sasaki |
| 2003/0147297 | A1 | 8/2003 | Shiota et al. |
| 2003/0158995 | A1 | 8/2003 | Lee et al. |
| 2003/0204776 | A1 | 10/2003 | Testin |
| 2003/0206478 | A1 | 11/2003 | Ayukawa et al. |
| 2003/0210601 | A1 | 11/2003 | Lin et al. |
| 2004/0088508 | A1 | 5/2004 | Ballard et al. |
| 2004/0163027 | A1 | 8/2004 | MacLaren et al. |
| 2004/0190210 | A1 | 9/2004 | Leete |
| 2005/0044302 | A1 | 2/2005 | Pauley et al. |
| 2005/0060458 | A1 | 3/2005 | Poechmueller |
| 2005/0132250 | A1 | 6/2005 | Hansen et al. |
| 2005/0141273 | A1 | 6/2005 | Park et al. |
| 2005/0144418 | A1 | 6/2005 | Kita |
| 2005/0185472 | A1 | 8/2005 | Randell et al. |
| 2005/0204091 | A1 | 9/2005 | Kilbuck et al. |
| 2005/0249011 | A1 | 11/2005 | Maeda |
| 2005/0273548 | A1 | 12/2005 | Roohparvar |
| 2006/0039197 | A1 | 2/2006 | Khouri et al. |
| 2006/0069896 | A1 | 3/2006 | Sanders |
| 2006/0080515 | A1 | 4/2006 | Spiers et al. |
| 2006/0126369 | A1 | 6/2006 | Raghuram |
| 2006/0212651 | A1 | 9/2006 | Ashmore et al. |
| 2006/0294295 | A1 | 12/2006 | Fukuzo |
| 2007/0070669 | A1 | 3/2007 | Tsern |
| 2007/0136523 | A1* | 6/2007 | Bonella ................. G06F 9/4401 |
| | | | 711/113 |
| 2007/0147115 | A1 | 6/2007 | Lin et al. |
| 2007/0192627 | A1 | 8/2007 | Oshikiri |
| 2007/0255898 | A1 | 11/2007 | Nishide et al. |
| 2007/0276995 | A1 | 11/2007 | Caulkins et al. |
| 2007/0288683 | A1 | 12/2007 | Panabaker et al. |
| 2008/0104344 | A1 | 5/2008 | Shimozono et al. |
| 2008/0126924 | A1* | 5/2008 | Prete ..................... G11C 7/106 |
| | | | 710/53 |
| 2008/0126690 | A1 | 5/2008 | Rajan et al. |
| 2008/0147968 | A1 | 6/2008 | Lee et al. |
| 2008/0189479 | A1 | 8/2008 | Cope et al. |
| 2008/0195806 | A1 | 8/2008 | Cope |
| 2008/0235443 | A1 | 9/2008 | Chow et al. |
| 2008/0291727 | A1 | 11/2008 | Seo et al. |
| 2009/0031009 | A1 | 1/2009 | Sartore |
| 2009/0235038 | A1 | 9/2009 | Sartore |
| 2010/0110748 | A1 | 5/2010 | Best |
| 2010/0122200 | A1 | 5/2010 | Merry, Jr. et al. |
| 2010/0274953 | A1 | 10/2010 | Lee et al. |
| 2010/0322020 | A1 | 12/2010 | Kim |
| 2011/0078496 | A1 | 3/2011 | Jeddeloh |
| 2011/0161569 | A1 | 6/2011 | Shan et al. |
| 2011/0320804 | A1 | 12/2011 | Chan et al. |
| 2012/0110417 | A1 | 5/2012 | Abreu et al. |
| 2012/0117402 | A1 | 5/2012 | Machnicki et al. |
| 2012/0204079 | A1 | 8/2012 | Takefman et al. |
| 2012/0265952 | A1 | 10/2012 | Kurita |
| 2012/0271990 | A1* | 10/2012 | Chen ...................... G06F 12/00 |
| | | | 711/103 |
| 2012/0317433 | A1 | 12/2012 | Ellis et al. |
| 2013/0019076 | A1 | 1/2013 | Amidi et al. |
| 2013/0086309 | A1 | 4/2013 | Lee et al. |
| 2013/0254456 | A1 | 9/2013 | Chen et al. |
| 2013/0254497 | A1 | 9/2013 | Chen et al. |
| 2014/0032820 | A1 | 1/2014 | Harasawa et al. |
| 2014/0059170 | A1 | 2/2014 | Gasparakis et al. |
| 2014/0156919 | A1 | 6/2014 | Chen et al. |
| 2014/0156920 | A1 | 6/2014 | Chen et al. |
| 2015/0058701 | A1 | 2/2015 | Xing et al. |

Mutnuary, B. et al., "Analysis of Fully Buffered DIMM Interface in High-speed Server Applications", IBM Corp, xSeries eServer Development, 2006 Electronic Components and Technology Conferencepp. 203-208.

Notice of Allowance in U.S. Appl. No. 13/536,173, dated Jul. 2, 2013.

Notice of Allowance in U.S. Appl. No. 13/559,476, dated May 6, 2014.

Notice of Allowance in U.S. Appl. No. 13/559,476, dated Sep. 29, 2014.

Notice of Allowance in U.S. Appl. No. 13/905,048, dated Dec. 19, 2013, 8 pages.

Notice of Allowance in U.S. Appl. No. 13/905,053, dated Dec. 11, 2013.

Notice of Allowance in U.S. Appl. No. 14/173,219 dated Jul. 7, 2014.

Notice of Allowance in U.S. Appl. No. 14/489,269, dated Oct. 8, 2015.

Notice of Allowance in U.S. Appl. No. 17/138,766, dated Mar. 24, 2021, 10 pages.

Notice of Allowance, *SanDisk Corporation* v. *Netlist*, U.S. Appl. No. 13/536,173, IPR2014-00982 (PTAB), dated Jul. 2, 2013, 8 pages.

Office Action dated Aug. 19, 2016 of the Chinese Patent Application No. 201280047758.X, 9 pages.

Office Action in U.S. Appl. No. 12/240,916, dated Apr. 3, 2012, pp. 1-12.

Office Action in U.S. Appl. No. 12/240,916, dated Feb. 1, 2012.

Office Action in U.S. Appl. No. 12/240,916, dated Apr. 3, 2012.

Office Action in U.S. Appl. No. 12/240,916, dated Jul. 29, 2011.

Office Action in U.S. Appl. No. 13/536,176, dated Apr. 15, 2013.

Office Action in U.S. Appl. No. 13/625,563, dated Aug. 5, 2013.

Office Action in U.S. Appl. No. 13/625,563, dated May 9, 2014.

Office Action in U.S. Appl. No. 13/905,048, dated Aug. 1, 2013.

Office Action in U.S. Appl. No. 13/905,053, dated Aug. 1, 2013.

Office Action in U.S. Appl. No. 14/173,219, dated Mar. 13, 2014.

Office Action in U.S. Appl. No. 14/173,242, dated Mar. 14, 2014.

Office Action in U.S. Appl. No. 14/302,292, dated Dec. 21, 2015.

Office Action in U.S. Appl. No. 15/934,416, dated Apr. 2, 2020, 21 pages.

Office Action in U.S. Appl. No. 15/934,416, dated Jan. 1, 2021, 17 pages.

Office Action in U.S. Appl. No. 15/934,416, dated Mar. 21, 2019, 8 pages.

Office Action in U.S. Appl. No. 15/934,416, dated Oct. 15, 2019, 13 pages.

Office Action in U.S. Appl. No. 17/138,766, dated Mar. 2, 2021, 7 pages.

Office Action in U.S. Appl. No. 12/240,916, dated Feb. 1, 2012, 14 pages.

Office Action in U.S. Appl. No. 14/173,242, dated Mar. 14, 2014, 7 pages.

Office Action, U.S. Appl. No. 12/240,916, IPR2014-0099-1005 (PTAB), dated Jul. 29, 2011, 8 pages.

Office Action, U.S. Appl. No. 12/240,916, IPR2014-0099-1010 (PTAB), dated Apr. 3, 2012, 11 pages.

Office Action, U.S. Appl. No. 13/536,173, IPR2014-00982 (PTAB), dated Apr. 15, 2013, 9 pages.

Patent Owner's Demonstratives, U.S. Pat. No. 8,671,243, Case No. IPR 2017-00587-2023, (PTAB), 57 pages.

Patent Owner's Listing of New Arguments and Evidence in Petitioners' Reply, U.S. Pat. No. 8,671,243, Case No. IPR2017-00587 (PTAB), filed Jan. 29, 2018, 6 pages.

Patent Owner's Opposition to Petitioners' Motion to Exclude, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692 (PTAB), filed Apr. 2, 2018, 2017, 11 pages.

Patent Owner's Preliminary Response, U.S. Pat. No. 8,516,187, Case IPR2014-01371 (PTAB), filed Dec. 16, 2014, 66 pages.

Samsung Electronics Co., Ltd.

Ex. 1001, p. 3

US 11,232,054 B2

Page 4

(56)    **References Cited**

OTHER PUBLICATIONS

Patent Owner's Preliminary Response, *SanDisk Corporation* v. *Netlist, Inc.*, U.S. Pat. No. 8,301,833, IPR2014-00994 (PTAB), Paper 8, dated Oct. 2, 2014, 60 pages.

Wong, A., The BIOS Optimization Guide, Adrian's Rojak Pot, Rev. 6.2, 1998-2001, 67 pages.

240pin DDR2 MetaSDRAM Registered DIMM based on 1 GB version C, Hynix Semiconductor, Product Description Rev. 0.2, Sep. 2008, 32 pages.

Advisory Action in U.S. Appl. No. 12/240,916, dated Mar. 13, 2012.

Amazon.com, Search for "memory module", downloaded Oct. 12, 2017, 6 pages.

Amendment and Reply to Office Action, *SanDisk Corporation* v. *Netlist*, U.S. Appl. No. 13/536,173, IPR2014-00982 (PTAB), dated May 21, 2013, 24 pages.

Amendment and Response to Election Restriction, *SanDisk Corporation* v. *Netlist, Inc.*, U.S. Pat. No. 8,301,833, IPR2014-00994-1004 (PTAB), dated May 20, 2011, 9 pages.

American Heritage Dictionary of the English Language, Third Ed., Houghton Mifflin Company, Boston, MA, 1996, 7 pages.

American National Standard Dictionary of Electrical and Electrical Terms, IEEE, Fourth Edition, Revised, ANS/IEEE Std 100-1988, Institute of Electrical Engineers, Nov. 3, 1988, 6 pages.

Annotated added to Russel Jacob Baker Deposition, Exhibit 1026, p. 78, U.S. Pat. No. 8,671,243, Case No. IPR-2017-00587 (PTAB), filed Dec. 18, 2017, 1 page.

Annotated added to Russel Jacob Baker Deposition, Exhibit 1027, p. 79, U.S. Pat. No. 8,671,243, Case No. IPR-2017-00587 (PTAB), filed Dec. 18, 2017, 1 page.

Annotated added to Russel Jacob Baker Deposition, Exhibit 1028, p. 79, U.S. Pat. No. 8,671,243, Case No. IPR-2017-00587 (PTAB), filed Dec. 18, 2017, 1 page.

Appeals from the USPTO, PTAB in Nos. IPR2014-00882, IPR2014-00883, IPR2014-01011, US Court of Appeals for the Federal Circuit, decided Jul. 25, 2017, 8 pages.

Bonella, R., Provisional Application for Advanced Dynamic Disk Memory Module, 53 pages.

Bruce, J., Synchronous DRAM Architectures, Organizations, and Alternate Technologies, Electrical and Computer Engineering Dept., Univ. of Maryland, Dec. 10, 2002, 22 pages.

Catsoulis, J., Designing Embedded Hardware: Create New Computers and Devices, O'Reilly Media, Inc. (2005), 67 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1024, IPR No. 2017-00587-1024(PTAB), 2003, 8 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1033, IPR No. 2017-00587-1033 (PTAB), 2003, 8 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1034, IPR No. 2017-00587-1033 (PTAB), 2003, 8 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1035, IPR No. 2017-00587-1035 (PTAB), 2003, 8 pages.

Chiappetta, M., Kingston Launches 667-MHz DDR2 SO-DIMM Memory, Oct. 11, 2005, 3 pages.

Notice of Final Rejection, South Korea Patent Office with English Translation, 4 pages.

Notice of Submission of Opinion, South Korea Patent Office with English Translation, 6 pages.

Corrected Petition for Inter Partes Review of Claims 1-30 of U.S. Pat. No. 8,301,833, Declaration of Michael F. Heafey, IPR2014-01370 (PTAB), filed Sep. 22, 2014, 4 pages.

Corrected Petition for Inter Partes Review of Claims 1-32 of U.S. Pat. No. 8,516,187, IPR2014-01371 (PTAB), Sep. 22, 2014, 67 pages.

Corrected Petition for Inter Partes Review of Claims 1-32 of U.S. Pat. No. 8,516,187, Declaration of Dr. Nader Bagherzadeh, IPR2014-01371 (PTAB), filed Sep. 22, 2014, 306 pages.

Data Sheet, 74F257A Quad 2-line to 1-line selector/multiplexer, non-inverting (3-State), Product specification, IC15 Data Handbook Mar. 31, 1995, 10 pages.

David, H. et al., Fully Buffered DIMM (FB-DIMM) Design Considerations, Intel Developer Forum, Intel Corp., Feb. 18, 2004, 36 pages.

Decision Denying Institution of Inter Partes Review, U.S. Pat. No. 8,301,833, Case IPR2017-00649-7 (PTAB), Paper 7, entered Jul. 24, 2017, 17 pages.

Decision Denying Institution of Inter Partes Review, U.S. Pat. No. 8,516,187, IPR2014-01371 (PTAB), Paper 12, entered Mar. 13, 2015, 22 pages.

Decision Denying Institution of Inter Partes Review, *SanDisk Corporation* v. *Netlist, Inc.*, U.S. Pat. No. 8,301,833, IPR2014-00994 (PTAB), Paper 8, dated Dec. 16, 2014, 16 pages.

Decision Denying Institution of Inter Partes Review, *SanDisk Corporation* v. *Netlist*, U.S. Pat. No. 8,516,187, IPR2014-00982 (PTAB), Paper 9, dated Dec. 22, 2014, 16 pages.

Decision Denying Institution of Inter Partes Review, *Smart Modular Tech* v *Netlist Inc.*, U.S. Pat. No. 8,301,833, IPR2014-01370 (PTAB), Paper 13, entered Mar. 13, 2015, 19 pages.

Decision Instituting Inter Partes Review, U.S. Pat. No. 8,671,243, Case No. IPR2017-00587-7(PTAB), Paper No. 7, entered Jun. 22, 2017, 40 pages.

Decision Instituting Inter Partes Review, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692-7(PTAB), Paper No. 7, entered Jul. 21, 2017, 29 pages.

Declaration of R. Jacob Baker, U.S. Pat. No. 8,874,831, Case IPR2017-00692-2016 (PTAB), filed Nov. 10, 2017, 72 pages.

Declaration of R. Jacob Baker, U.S. Pat. No. 8,671,243, Case IPR2017-00587-2016 (PTAB), filed Oct. 13, 2019, 109 pages.

Declaration of Dr. Nader Bagherzadeh, U.S. Pat. No. 8,516,187, IPR2014-01371 (PTAB), filed Sep. 22, 2014, 306 pages.

Declaration of Jeff McMullen, *Netlist, Inc.* v. *Diablo Technologies, Inc.*, Case No. 4: I 3-CV-05889-YGR (NDCA), Document 362-1, filed Sep. 5, 2018, 3 pages.

Declaration of Paul Min, In Inter Partes Review of U.S. Pat. No. 8,301,833, IPR2014-00994-1020 (PTAB), filed Sep. 29, 2008, 215 pages.

Declaration of Paul Min, In Inter Partes Review of U.S. Pat. No. 8,516,187, IPR2014-00982-1013 (PTAB), filed Jun. 28, 2012, pp. 240.

Declaration of Ron Maltiel, U.S. Pat. No. 8,671,243, No. IPR2017-00587-1003 (PTAB), filed May 29, 2013, 131 pages.

Declaration of Ron Maltiel, U.S. Pat. No. 8,874,831, No. IPR2017-00692-1003 (PTAB), filed Jul. 26, 2012 29, 172 pages.

Declaration of Steven J. Corr, *Netlist, Inc.* v. *SMART Storage Systems, Inc., et al.*, Case 4:13-cv-05889-YGR (NDCA), Document 305-8, filed Mar. 10, 2015, 3 pages.

Deposition of Baker, Exhibit 1030, p. 78, U.S. Pat. No. 8,671,243, *SK hynix Inc., et al.* v. *Netlist, Inc.*, Case No. IPR-2017-00587 (PTAB), filed Dec. 18, 2017, 268 pages.

Deposition of Ron Maltiel, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692-2010 (PTAB), dated Sep. 27, 2017, 155 pages.

*Netlist* v *Smart Storage System and Diablo Technologies*, Inc.'s Invalidity Contentions, Case No. 13-CV-05889 YGR, dated Jun. 6, 2014, 109 pages.

Drawing by R. Jacob Bake regarding Address of Dram and Flash, U.S. Pat. No. 8,671,243, Case IPR2017-00587-1023 (PTAB), filed Dec. 18, 2017, 1 page.

Elmhurst, D. et al., A 1.8-V 128-Mb 125-MHz Multilevel Cell Flash Memory With Flexible Read While Write, IEEE Journal of Solid-State Circuits, vol. 38, No. 11, Nov. 2003, 5 pages.

Ex. 1004—IPR2017-00587 Ron Maltiel CV, 7 pages.

Exhibit 1: Claim Chart Comparing Netlist's U.S. Pat. No. 8,001,434 to Smart Storage Ulltradimm, Case4:13-cv-05889-YGR Document 193-1, filed Apr. 10, 2014, 21 pages.

Exhibit, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case No. 4.13-cv-05889-YGR Document 309-3, filed Mar. 17, 2015, 23 pages.

Exhibit, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case No. 4:13-cv-05889-YGR Document 309-4, filed Mar. 17, 2015, 20 pages.

Exhibit, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case No. 4:13-cv-05889-YGR Document 309-5, filed Mar. 17, 2015, 28 pages.

Samsung Electronics Co., Ltd.
Ex. 1001, p. 4

# US 11,232,054 B2
Page 5

(56)          **References Cited**

OTHER PUBLICATIONS

Exhibit 12, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case No. 4:13-cv-05889-YGR Document 309-7, filed Mar. 17, 2015, 17 pages.
Exhibit 9, Email from Defendant's Counsel, *Netlist* v. *Smart Storage Systems, Inc. et al.*, Case 4:13-cv-05889-YGR Document 305-17, filed Mar. 10, 2015, 6 pages.
Exhibit, Institution of Inter Partes Review, *Sandisk Corporation* v. *Netlist, Inc.*, Case 4:13-cv-05889-YGR Document 316-9, filed Mar. 24, 2015, 29 pages.
Exhibit, Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case 4:13-cv-05889-YGR Document 309-1, filed Mar. 17, 2015, 22 pages.
Exhibit, Letter from Defendant's Counsel, *Netlist* v. *Smart Storage Systems, Inc. et. al.*, Case 4:13-cv-05889-YGR Document 305-16, filed Mar. 10, 2015, 3 pages.
Exhibit, Letter sent via email on Dec. 6, 2013, Case 4:13-cv-03901-YGR Document 53-2, filed Jan. 6, 2014.
Exhibit, Order Denying Defendant's Motion to Stay Pending Inter Partes Review (Doc.59), *The Procter and Gamble Company* v. *Team Technologies, Inc., et al.*, Case 4:13-cv-05889-YGR Document 316-6, filed Mar. 24, 2015, 10 pages.
Exhibit, Patent Public Advisory Committee Quarterly Meeting, Appeals Statistics USPTO, Case No. 4:13-cv-05889-YGR Document 309-8, filed Mar. 17, 2015, 23 pages.
Exhibit, Reporter's Transcript of Proceedings, *Netlist, Inc* v. *Smart Modular Technologies, Inc., et al.*, Case 4:13-cv-05889-YGR Document 316-3, filed Mar. 24, 2015, 15 pages.
Exhibit, Transcript of Official Electronic Sound Recording Proceeding, *Netlist* v. *Smart Modular Technologies, Inc., et al.*, Case 4:13-cv-05889-YGR Document 305-7, filed Mar. 10, 2015, 10 pages.
Hasan, J. et al. Efficient Use of Memory Bandwidth to Improve Network Processor Throughput, Proceedings of the 30th Annual International Symposium on Computer Architecture (ISCA'03), IEEE, 2003, 12 pages.
Horowitz, P. et al., "The Art of Electronics", Cambridge University Press 2nd Ed. 1989, pp. 471, 495-496.
Innis, J., "MPC8560 PowerQUICC III Compact Flash Interface Design", Freescale Semiconductor, Inc., 2004-2006, pp. 1-23.
Intel 1.8 Volt Intel StrataFlash Wireless Memory (L18), 2003, 100 pages.
Inter Partes Review No. IPR2017-00692 (PTAB), U.S. Pat. No. 8,874,831, filed Jul. 26, 2012, 78 pages.
JEDEC Definition of DIMM, Exhibit 1029, IPR No. 2017-00587, Dec. 18, 2017, 2 pages.
JEDEC Global Standard for the Microelectronics Industry, Why JEDEC Standards Matter, 2014, 1 page.
JEDEC Standard No. 21-C (Release 17), Annex J: Serial Presence Detects for DDR2 SDRAM (Revision 1.3), 60 pages.
JEDEC Standard, Double Data Rate (DDR): SDRAM Specification: JESD79C (Revision JESD79B), Mar. 2003, pp. 1-75.
JEDEC Standard, FBDIMM Specification: DDR2 SDRAM Fully Buffered DIMM (FBDIMM) Design Specification: JESD205, JEDEC Solid State Tech. Assoc., Mar. 2007, 129 pages.
Patent Owner's Preliminary Response, *SanDisk Corporation* v. *Netlist*, U.S. Pat. No. 8,516,187, IPR2014-00982 (PTAB), dated Sep. 26, 2014, 57 pages.

Patent Owner's Preliminary Response, *SK hynix Inc., et al.*, v. *Netlist*, U.S. Pat. No. 8,301,833, Case No. IPR2017-00649 (PTAB), filed May 1, 2017, 67 pages.
Patent Owner's Preliminary Response, *SK hynix Inc., et al.*, v. *Netlist*, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692 (PTAB), filed May 1, 2017, 48 pages.
Patent Owner's Preliminary Response, *Smart Modular Tech* v *Netlist Inc.*, U.S. Pat. No. 8,301,833, Case IPR2014-01370 (PTAB), filed Dec. 16, 2014, 66 pages.
Patent Owner's Response, U.S. Pat. No. 8,671,243, Case No. IPR2017-00587-12 (PTAB), filed Oct. 13, 2017, 80 pages.
Patent Owner's Response, *SK hynix Inc., et al.*, v. *Netlist*, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692-12 (PTAB), filed Nov. 10, 2017, 77 pages.
Patterson et al., "Computer Organization & Design: The Hardware/ Software Interface" Morgan Kaufmann Publishers, Inc. (1998), 71 pages.
Petition for Inter Partes Review of Claims 1-30 of U.S. Pat. No. 8,301,833, IPR2014-01370 (PTAB), filed Aug. 22, 2014, 68 pages.
Petition for Inter Partes Review of U.S. Pat. No. 8,301,833, filed Sep. 29, 2008.
Petition for Inter Partes Review of U.S. Pat. No. 8,671,243, Case No. IPR2017-00587-1(PTAB), May 29, 2013, 82 pages.
Petitioners Demonstratives, *SK hynix Inc., et al.*, v. *Netlist, Inc.*, U.S. Pat. No. 8,671,243, IPR2017-00587-1037, 89 pages.
Petitioners' Reply to Patent Owner's Response, Inter Partes Review No. IPR2017-00587-16, U.S. Pat. No. 8,671,243, Filed Jan. 12, 2018, 38 pages.
Petitioners' Reply, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692 (PTAB), Paper No. 15, filed Mar. 2, 2018, 35 pages.
Provisional Application for Advance Dynamic Disk Memory Module, Specification, *SK hynix Inc.*, v. *Netlist, Inc.*, Case No. IPR2017-00649-1006 (PTAB), dated Dec. 8, 2005, 53 pages.
Supplemental Declaration of Daniel E. Alberti in Response to Court Order in Support of Motion to Withdraw as Counsel of Record, *Netlist* v. *Smart Storage Systems, Inc. et. al.*, Case 4:13-cv-05889-YGR Document 362, filed Sep. 5, 2018, 3 pages.
Supplemental Declaration of Ronald H. Spuhler, *Netlist* v. *Smart Storage Systems, Inc. et. al.*, Case 4:13-cv-05889-YGR Document 305-1, filed Mar. 10, 2015, 2 pages.
Supplemental Declaration of Steven J. Corr, *Netlist* v. *Smart Storage Systems, Inc. et. al.*, Case 4:13-cv-05889-YGR Document 309, filed Mar. 17, 2015, 3 pages.
Switches—D&T Online, Switches, http://wiki.dtonline.org, Exhibit 1022, Case No. IPR2017-00587, accessed Oct. 13, 2017, 3 pages.
U.S. Office Action in U.S. Appl. No. 13/536,173, dated Apr. 15, 2013, pp. 1-10.
U.S. Appl. No. 12/240,916, Case No. IPR2017-00692-2018 (PTAB), dated Sep. 29, 2008, 52 pages.
Webster's II New College Dictionary, Houghton Mifflin Company, Boston, MA, 2001, pp. 257, 259; 1114,1115, Exhibit 1017, IPR2014-01370 (PTAB), *Smart Modular Tech* v *Netlist Inc*, U.S. Pat. No. 8,301,833, Sep. 22, 2014, 5 pages.
Ian R. Sinclair and John Dunton, Practical Electronics Handbook, Sixth Edition 2007, ELSEVIER, <http://al-marefah.blogspot.com>, retrieved from the Internet Nov. 18, 2021.

* cited by examiner

Samsung Electronics Co., Ltd.
Ex. 1001, p. 5



**FIG. 1**
**(PRIOR ART)**



**FIG. 3A**

Samsung Electronics Co., Ltd.
Ex. 1001, p. 6

*Spansion EcoRAM Configurations* _____

*256GB Spansion EcoRAM Solution − Single Accelerator*



256GB Single Accelerator Spansion EcoRAM Solution

*256GB Spansion EcoRAM Solution − Dual Accelerator*



256GB Single Accelerator Spansion EcoRAM Solution

## *FIG. 2*
## *(PRIOR ART)*



## *FIG. 4B*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 7



**FIG. 3B**



**FIG. 4A**

Samsung Electronics Co., Ltd.
Ex. 1001, p. 8



**FIG. 5A**



**FIG. 6**

Samsung Electronics Co., Ltd.
Ex. 1001, p. 9



**FIG. 5B**

Samsung Electronics Co., Ltd.
Ex. 1001, p. 10



**FIG. 7**



**FIG. 8A**

Samsung Electronics Co., Ltd.
Ex. 1001, p. 11



**FIG. 8B**

Samsung Electronics Co., Ltd.
Ex. 1001, p. 12



**FIG. 9**

Samsung Electronics Co., Ltd.
Ex. 1001, p. 13



FIG. 10

Samsung Electronics Co., Ltd.
Ex. 1001, p. 14

| DRAM density (GB) | # of blocks per bank | Flash wr–time to rd–time ratio | Avg block use time (sec) | Flash write time (sec) | Max allowed Closed Blk in queue to be written back to Flash |
|---|---|---|---|---|---|
| 1 | 250 | 55 | 1.00E–03 | 2.00E–02 | 0 |
| 1 | 250 | 55 | 1.00E–02 | 2.00E–02 | 2 |
| 1 | 250 | 55 | 2.00E–02 | 2.00E–02 | 5 |
| 1 | 250 | 55 | 5.00E–02 | 2.00E–02 | 11 |
| 2 | 500 | 55 | 1.00E–03 | 2.00E–02 | 0 |
| 2 | 500 | 55 | 1.00E–02 | 2.00E–02 | 5 |
| 2 | 500 | 55 | 2.00E–02 | 2.00E–02 | 9 |
| 2 | 500 | 55 | 5.00E–02 | 2.00E–02 | 23 |
| 4 | 1000 | 55 | 1.00E–03 | 2.00E–02 | 1 |
| 4 | 1000 | 55 | 1.00E–02 | 2.00E–02 | 9 |
| 4 | 1000 | 55 | 2.00E–02 | 2.00E–02 | 18 |
| 4 | 1000 | 55 | 5.00E–02 | 2.00E–02 | 45 |

*FIG. 11*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 15

Case: 24-1859 Document: 24 Page: 326 Filed: 11/04/2024

Samsung Electronics Co., Ltd.
Ex. 1001, p. 16



*FIG. 12*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 17



*FIG. 13*

Case: 24-1859    Document: 24    Page: 328    Filed: 11/04/2024

Samsung Electronics Co., Ltd.
Ex. 1001, p. 18



*FIG. 14*

Case: 24-1859    Document: 24    Page: 329    Filed: 11/04/2024

Samsung Electronics Co., Ltd.
Ex. 1001, p. 19



*FIG. 15A*

*FIG. 15B*

Case: 24-1859   Document: 24   Page: 330   Filed: 11/04/2024

Samsung Electronics Co., Ltd.
Ex. 1001, p. 20



*FIG. 15C*

Case: 24-1859    Document: 24    Page: 331    Filed: 11/04/2024

Samsung Electronics Co., Ltd.
Ex. 1001, p. 21



*FIG. 16*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 22



*FIG. 17*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 23



*1300*

1310 — Communicate data between volatile memory and host system in a first mode

1320 — Store a first copy of data from the volatile memory to the non-volatile memory when in a second mode

1330 — Restore the first copy of data from the non-volatile memory to the volatile memory

1340 — Erase the first copy of data from the non-volatile memory

1350 — Copy second copy of data from volatile memory to non-volatile memory in a second mode

1360 — Restore the second copy of data from the non-volatile memory to the volatile memory

*FIG. 18*

Case: 24-1859    Document: 24    Page: 334    Filed: 11/04/2024

Samsung Electronics Co., Ltd.
Ex. 1001, p. 24



*FIG. 19*

Case: 24-1859    Document: 24    Page: 335    Filed: 11/04/2024

Samsung Electronics Co., Ltd.
Ex. 1001, p. 25



*FIG. 20*

Case: 24-1859    Document: 24    Page: 336    Filed: 11/04/2024

Samsung Electronics Co., Ltd.
Ex. 1001, p. 26



*FIG. 21*

Samsung Electronics Co., Ltd.
Ex. 1001, p. 27



*1600*

1610 — Communicate data words between volatile memory and host system in first mode

1620 — Transfer data words from volatile memory system to non-volatile memory system

1622 — Store first slice of data word in buffer

1624 — Store second slice of data word in buffer

1626 — Write entire data word from buffer to non-volatile memory

*FIG. 22*

US 11,232,054 B2

**1**

# FLASH-DRAM HYBRID MEMORY MODULE

## PRIORITY CLAIM

This application is a continuation of U.S. patent application Ser. No. 17/138,766, filed Dec. 30, 2020, titled "Flash-Dram Hybrid Memory", now U.S. Pat. No. 11,016,918, which is a continuation of U.S. patent application Ser. No. 15/934,416, filed Mar. 23, 2018, titled "Flash-Dram Hybrid Memory Module," which is a continuation of U.S. patent application Ser. No. 14/840,865, filed Aug. 31, 2015, titled "Flash-Dram Hybrid Memory Module," now U.S. Pat. No. 9,928,186, which is a continuation of U.S. patent application Ser. No. 14/489,269, filed Sep. 17, 2014, titled "Flash-Dram Hybrid Memory Module," now U.S. Pat. No. 9,158,684, which is a continuation of U.S. patent application Ser. No. 13/559,476, filed Jul. 26, 2012, titled "Flash-Dram Hybrid Memory Module," now U.S. Pat. No. 8,874,831, which claims the benefit of U. S. Provisional Patent Application No. 61/512,871, filed Jul. 28, 2011, and is a continuation-in-part of U.S. patent application Ser. No. 12/240,916, filed Sep. 29, 2008, titled "Non-Volatile Memory Module," now U.S. Pat. No. 8,301,833, which is a continuation of U.S. patent application Ser. No. 12/131,873, filed Jun. 2, 2008, which claims the benefit of U. S. Provisional Patent Application No. 60/941,586, filed Jun. 1, 2007, the contents of all of which are incorporated herein by reference in their entirety.

This application may be considered related to U.S. patent application Ser. No. 14/173,242, titled "Isolation Switching For Backup Of Registered Memory," filed Feb. 5, 2014, which is a continuation of U.S. patent application Ser. No. 13/905,053, titled "Isolation Switching For Backup Of Registered Memory," filed May 29, 2013, now U.S. Pat. No. 8,677,060, issued Mar. 18, 2014, which is a continuation of U.S. patent application Ser. No. 13/536,173, titled "Data Transfer Scheme For Non-Volatile Memory Module," filed Jun. 28, 2012, now U.S. Pat. No. 8,516,187, issued Aug. 20, 2013, which is a divisional of U.S. patent application Ser. No. 12/240,916, titled "Non-Volatile Memory Module," filed Sep. 29, 2008, now U.S. Pat. No. 8,301,833, issued Oct. 30, 2012, which is a continuation of U.S. patent application Ser. No. 12/131,873, filed Jun. 2, 2008, now abandoned, which claims the benefit of U.S. Provisional Application No. 60/941,586, filed Jun. 1, 2007, the contents of which are incorporated by reference herein in their entirety.

This application may also be considered related to U.S. patent application Ser. No. 15/000,834, filed Jan. 19, 2016 (abandoned), which is a continuation of U.S. patent application Ser. No. 14/489,332, filed Sep. 17, 2014, now U.S. Pat. No. 9,269,437, which is a continuation of U.S. patent application Ser. No. 14/173,219, filed Feb. 5, 2014, now U.S. Pat. No. 8,904,099, which is a continuation of U.S. patent application Ser. No. 13/905,048, filed May 29, 2013, now U.S. Pat. No. 6,671,243, which is a continuation of U.S. patent application Ser. No. 13/536,173 above.

This application may also be considered related to U.S. patent application Ser. No. 15/924,866, (abandoned), which is a continuation of U.S. patent application Ser. No. 14/489,281, filed Sep. 17, 2014, now U.S. Pat. No. 9,921,762, which is a continuation of U.S. patent application Ser. No. 13/625,563, filed Sep. 24, 2012, now U.S. Pat. No. 8,904,098, which claims the benefit of U.S. Provisional Application No. 61/583,775, filed Sep. 23, 2011.

## TECHNICAL FIELD

The present disclosure relates generally to computer memory devices, and more particularly, to devices that employ different types of memory devices such as combinations of Flash and random access memories.

## BACKGROUND

As technology advances and the usage of portable computing devices, such as tablet notebook computers, increases, more data needs to be transferred among data centers and to/from end users. In many cases, data centers are built by clustering multiple servers that are networked to increase performance.

Although there are many types of networked servers that are specific to the types applications envisioned, the basic concept is generally to increase server performance by dynamically allocating computing and storage resources. In recent years, server technology has evolved to be specific to particular applications such as 'finance transactions' (for example, point-of-service, inter-bank transaction, stock market transaction), 'scientific computation' (for example, fluid dynamic for automobile and ship design, weather prediction, oil and gas expeditions), 'medical diagnostics' (for example, diagnostics based on the fuzzy logic, medical data processing), 'simple information sharing and searching' (for example, web search, retail store website, company home page), 'email' (information distribution and archive), 'security service', 'entertainment' (for example, video-on-demand), and so on. However, all of these applications suffer from the same information transfer bottleneck due to the inability of a high speed CPU (central processing unit) to efficiently transfer data in and out of relatively slower speed storage or memory subsystems, particularly since data transfers typically pass through the CPU input/output (I/O) channels.

The data transfer limitations by the CPU are exemplified by the arrangement shown in FIG. **1**, and apply to data transfers between main storage (for example the hard disk (HD) or solid state drive (SSD) and the memory subsystems (for example DRAM DIMM (Dynamic Random Access Memory Dual In-line Memory Module) connected to the front side bus (FSB)). In arrangements such as that of FIG. **1**, the SSD/HD and DRAM DIMM of a conventional memory arrangement are connected to the CPU via separate memory control ports (not shown). FIG. **1** specifically shows, through the double-headed arrow, the data flow path between the computer or server main storage (SSD/HD) to the DRAM DIMMs. Since the SSD/HD data I/O and the DRAM DIMM data I/O are controlled by the CPU, the CPU needs to allocate its process cycles to control these I/Os, which may include the IRQ (Interrupt Request) service which the CPU performs periodically. As will be appreciated, the more time a CPU allocates to controlling the data transfer traffic, the less time the CPU has to perform other tasks. Therefore, the overall performance of a server will deteriorate with the increased amount of time the CPU has to expend in performing data transfer.

There have been various approaches to increase the data transfer throughput rates from/to the main storage, such as SSD/HD, to local storage, such as DRAM DIMM. In one example as illustrated in FIG. **2**, EcoRAM™ developed by Spansion provides a storage SSD based system that assumes a physical form factor of a DIMM. The EcoRAM™ is populated with Flash memories and a relatively small memory capacity using DRAMs which serve as a data buffer. This arrangement is capable of delivering higher throughput rate than a standard SSD based system since the EcoRAM™ is connected to the CPU (central processing unit) via a high speed interface, such as the HT (Hyper

Samsung Electronics Co., Ltd.
Ex. 1001, p. 28

US 11,232,054 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

Transport) interface, while an SSD/HD is typically connected via SATA (serial AT attachment), USB (universal serial bus), or PCI Express (peripheral component interface express). For example, the read random access throughput rate of EcoRAM™ is near 3 GB/s compared with 400 MB/s for a NAND SSD memory subsystem using the standard PCI Express-based. This is a 7.5× performance improvement. However, the performance improvement for write random access throughput rate is less than 2× (197 MBs for the EcoRAM vs. 104 MBs for NAND SSD). This is mainly due to the fact that the write speed is cannot be faster than the NAND Flash write access time. FIG. 2 is an example of EcoRAM™ using SSD with the form factor of a standard DIMM such that it can be connected to the FSB (front side bus). However, due to the interface protocol difference between DRAM and Flash, an interface device, EcoRAM Accelerator™), which occupies one of the server's CPU sockets is used, and hence further reducing server's performance by reducing the number of available CPU sockets available, and in turn reducing the overall computation efficiency. The server's performance will further suffer due to the limited utilization of the CPU bus due to the large difference in the data transfer throughput rate between read and write operations.

The EcoRAM™ architecture enables the CPU to view the Flash DIMM controller chip as another processor with a large size of memory available for CPU access.

In general, the access speed of a Flash based system is limited by four items: the read/write speed of the Flash memory, the CPU's FSB bus speed and efficiency, the Flash DIMM controller's inherent latency, and the HT interconnect speed and efficiency which is dependent on the HT interface controller in the CPU and Flash DIMM controller chip.

The published results indicate that these shortcomings are evident in that the maximum throughput rate is 1.56 GB s for the read operation and 104 MBs for the write operation. These access rates are 25% of the DRAM read access speed, and 1.7% of the DRAM access speed at 400 MHz operation. The disparity in the access speed (15 to 1) between the read operation and write operation highlight a major disadvantage of this architecture. The discrepancy of the access speed between this type of architecture and JEDEC standard DRAM DIMM is expected to grow wider as the DRAM memory technology advances much faster than the Flash memory.

Certain types of memory modules comprise a plurality of dynamic random-access memory (DRAM) devices mounted on a printed circuit board (PCB). These memory modules are typically mounted in a memory slot or socket of a computer system (e.g., a server system or a personal computer) and are accessed by the computer system to provide volatile memory to the computer system.

Volatile memory generally maintains stored information only when it is powered. Batteries have been used to provide power to volatile memory during power failures or interruptions. However, batteries may require maintenance, may need to be replaced, are not environmentally friendly, and the status of batteries can be difficult to monitor.

Non-volatile memory can generally maintain stored information while power is not applied to the non-volatile memory. In certain circumstances, it can therefore be useful to backup volatile memory using non-volatile memory.

OVERVIEW

Described herein is a memory module couplable to a memory controller of a host system. The memory module includes a non-volatile memory subsystem, a data manager coupled to the non-volatile memory subsystem, a volatile memory subsystem coupled to the data manager and operable to exchange data with the non-volatile memory subsystem by way of the data manager, and a controller operable to receive commands from the memory controller and to direct (i) operation of the non-volatile memory subsystem, (ii) operation of the volatile memory subsystem, and (iii) transfer of data between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on at least one received command from the memory controller.

Also described herein is a method for managing a memory module by a memory controller, the memory module including volatile and non-volatile memory subsystems. The method includes receiving control information from the memory controller, wherein the control information is received using a protocol of the volatile memory subsystem. The method further includes identifying a data path to be used for transferring data to or from the memory module using the received control information, and using a data manager and a controller of the memory module to transfer data between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on at least one of the received control information and the identified data path.

Also described herein is a memory module wherein the data manager is operable to control one or more of data flow rate, data transfer size, data buffer size, data error monitoring, and data error correction in response to receiving at least one of a control signal and control information from the controller.

Also described herein is a memory module wherein the data manager controls data traffic between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on instructions received from the controller.

Also described herein is a memory module wherein data traffic control relates to any one or more of data flow rate, data transfer size, data buffer size, data transfer bit width, formatting information, direction of data flow, and the starting time of data transfer.

Also described herein is a memory module wherein the controller configures at least one of a first memory address space of the volatile memory subsystem and a second memory address space of the non-volatile memory subsystem in response to at least one of a received command from the memory controller and memory address space initialization information of the memory module.

Also described herein is a memory module wherein the data manager is configured as a bi-directional data transfer fabric having two or more sets of data ports coupled to any one of the volatile and non-volatile memory subsystems.

Also described herein is a memory module wherein at least one of the volatile and non-volatile memory subsystems comprises one or more memory segments.

Also described herein is a memory module wherein each memory segment comprises at least one memory circuit, memory device, or memory die.

Also described herein is a memory module wherein the volatile memory subsystem comprises DRAM memory.

Also described herein is a memory module wherein the non-volatile memory subsystem comprises flash memory.

Also described herein is a memory module wherein at least one set of data ports is operated by the data manager to

Samsung Electronics Co., Ltd.
Ex. 1001, p. 29

US 11,232,054 B2

5

independently and/or concurrently transfer data to or from one or more memory segments of the volatile or non-volatile memory subsystems.

Also described herein is a memory module wherein the data manager and controller are configured to effect data transfer between the memory controller and the non-volatile memory subsystem in response to memory access commands received by the controller from the memory controller.

Also described herein is a memory module wherein the volatile memory subsystem is operable as a buffer for the data transfer between the memory controller and non-volatile memory.

Also described herein is a memory module wherein the data manager further includes a data format module configured to format data to be transferred between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on control information received from the controller.

Also described herein is a memory module wherein the data manager further includes a data buffer for buffering data delivered to or from the non-volatile memory subsystem.

Also described herein is a memory module wherein the controller is operable to perform one or more of memory address translation, memory address mapping, address domain conversion, memory access control, data error correction, and data width modulation between the volatile and non-volatile memory subsystems.

Also described herein is a memory module wherein the controller is configured to effect operation with the host system in accordance with a prescribed protocol.

Also described herein is a memory module wherein the prescribed protocol is selected from one or more of DDR, DDR2, DDR3, and DDR4 protocols.

Also described herein is a memory module wherein the controller is operable to configure memory space in the memory module based on at least one of a command received from the memory controller, a programmable value written into a register, a value corresponding to a first portion of the volatile memory subsystem, a value corresponding to a first portion of the non-volatile memory subsystem, and a timing value.

Also described herein is a memory module wherein the controller configures the memory space of the memory module using at least a first portion of the volatile memory subsystem and a first portion of the non-volatile memory subsystem, and the controller presents a unified memory space to the memory controller.

Also described herein is a memory module wherein the controller configures the memory space in the memory module using partitioning instructions that are application-specific.

Also described herein is a memory module wherein the controller is operable to copy booting information from the non-volatile to the volatile memory subsystem during power up.

Also described herein is a memory module wherein the controller includes a volatile memory control module, a non-volatile memory control module, data manager control module, a command interpreter module, and a scheduler module.

Also described herein is a memory module wherein commands from the volatile memory control module to the volatile memory subsystem are subordinated to commands from the memory controller to the controller.

6

Also described herein is a memory module wherein the controller effects pre-fetching of data from the non-volatile to the volatile memory.

Also described herein is a memory module wherein the pre-fetching is initiated by the memory controller writing an address of requested data into a register of the controller.

Also described herein is a memory module wherein the controller is operable to initiate a copy operation of data of a closed block in the volatile memory subsystem to a target block in the non-volatile memory subsystem.

Also described herein is a memory module wherein, if the closed block is re-opened, the controller is operable to abort the copy operation and to erase the target block from the non-volatile memory subsystem.

Also described herein is a method for managing a memory module wherein the transfer of data includes a bidirectional transfer of data between the non-volatile and the volatile memory subsystems.

Also described herein is a method for managing a memory module further comprising operating the data manager to control one or more of data flow rate, data transfer size, data width size, data buffer size, data error monitoring, data error correction, and the starting time of the transfer of data.

Also described herein is a method for managing a memory module further comprising operating the data manager to control data traffic between the memory controller and at least one one of the volatile and non-volatile memory subsystems.

Also described herein is a method for managing a memory module wherein data traffic control relates to any one or more of data transfer size, formatting information, direction of data flow, and the starting time of the transfer of data.

Also described herein is a method for managing a memory module wherein data traffic control by the data manager is based on instructions received from the controller.

Also described herein is a method for managing a memory module further comprising operating the data manager as a bi-directional data transfer fabric with two or more sets of data ports coupled to any one of the volatile and non-volatile memory subsystems.

Also described herein is a method for managing a memory module wherein at least one of the volatile and non-volatile memory subsystems comprises one or more memory segments.

Also described herein is a method for managing a memory module wherein each memory segment comprises at least one memory circuit, memory device, or memory die.

Also described herein is a method for managing a memory module wherein the volatile memory subsystem comprises DRAM memory.

Also described herein is a method for managing a memory module wherein the non-volatile memory subsystem comprises Flash memory.

Also described herein is a method for managing a memory module further comprising operating the data ports to independently and/or concurrently transfer data to or from one or more memory segments of the volatile or non-volatile memory subsystems.

Also described herein is a method for managing a memory module further comprising directing transfer of data bi-directionally between the volatile and non-volatile memory subsystems using the data manager and in response to memory access commands received by the controller from the memory controller.

Samsung Electronics Co., Ltd.
Ex. 1001, p. 30

US 11,232,054 B2

7

Also described herein is a method for managing a memory module further comprising buffering the data transferred between the memory controller and non-volatile memory subsystem using the volatile memory subsystem.

Also described herein is a method for managing a memory module further comprising using the controller to perform one or more of memory address translation, memory address mapping, address domain conversion, memory access control, data error correction, and data width modulation between the volatile and non-volatile memory subsystems.

Also described herein is a method for managing a memory module further comprising using the controller to effect communication with a host system by the volatile memory subsystem in accordance with a prescribed protocol.

Also described herein is a method for managing a memory module wherein the prescribed protocol is selected from one or more of DDR, DDR2, DDR3, and DDR4 protocols.

Also described herein is a method for managing a memory module further comprising using the controller to configure memory space in the memory module based on at least one of a command received from the memory controller, a programmable value written into a register, a value corresponding to a first portion of the volatile memory subsystem, a value corresponding to a first portion of the non-volatile memory subsystem, and a timing value.

Also described herein is a method for managing a memory module wherein the controller configures the memory space of the memory module using at least a first portion of the volatile memory subsystem and a first portion of the non-volatile memory subsystem, and the controller presents a unified memory space to the memory controller.

Also described herein is a method for managing a memory module wherein the controller configures the memory space in the memory module using partitioning instructions that are application-specific.

Also described herein is a method for managing a memory module further comprising using the controller to copy booting information from the non-volatile to the volatile memory subsystem during power up.

Also described herein is a method for managing a memory module wherein the controller includes a volatile memory control module, the method further comprising generating commands by the volatile memory control module in response to commands from the memory controller, and transmitting the generated commands to the volatile memory subsystem.

Also described herein is a method for managing a memory module further comprising pre-fetching of data from the non-volatile memory subsystem to the volatile memory subsystem.

Also described herein is a method for managing a memory module wherein the pre-fetching is initiated by the memory controller writing an address of requested data into a register of the controller.

Also described herein is a method for managing a memory module further comprising initiating a copy operation of data of a closed block in the volatile memory subsystem to a target block in the non-volatile memory subsystem.

Also described herein is a method for managing a memory module further comprising aborting the copy operation when the closed block of the volatile memory subsystem is re-opened, and erasing the target block in the non-volatile memory subsystem.

8

Also described herein is a memory system having a volatile memory subsystem, a non-volatile memory subsystem, a controller coupled to the non-volatile memory subsystem, and a circuit coupled to the volatile memory subsystem, to the controller, and to a host system. In a first mode of operation, the circuit is operable to selectively isolate the controller from the volatile memory subsystem, and to selectively couple the volatile memory subsystem to the host system to allow data to be communicated between the volatile memory subsystem and the host system. In a second mode of operation, the circuit is operable to selectively couple the controller to the volatile memory subsystem to allow data to be communicated between the volatile memory subsystem and the nonvolatile memory subsystem using the controller, and the circuit is operable to selectively isolate the volatile memory subsystem from the host system.

Also described herein is a method for operating a memory system. The method includes coupling a circuit to a host system, a volatile memory subsystem, and a controller, wherein the controller is coupled to a non-volatile memory subsystem. In a first mode of operation that allows data to be communicated between the volatile memory subsystem and the host system, the circuit is used to (i) selectively isolate the controller from the volatile memory subsystem, and (ii) selectively couple the volatile memory subsystem to the host system. In a second mode of operation that allows data to be communicated between the volatile memory subsystem and the nonvolatile memory subsystem via the controller, the circuit is used to (i) selectively couple the controller to the volatile memory subsystem, and (ii) selectively isolate the volatile memory subsystem from the host system.

Also described herein is a nontransitory computer readable storage medium storing one or more programs configured to be executed by one or more computing devices. The programs, when executing on the one or more computing devices, cause a circuit that is coupled to a host system, to a volatile memory subsystem, and to a controller that is coupled to a nonvolatile memory subsystem, to perform a method in which, in a first mode of operation that allows data to be communicated between the volatile memory subsystem and the host system, operating the circuit to (i) selectively isolate the controller from the volatile memory subsystem, and (ii) selectively couple the volatile memory subsystem to the host system. In a second mode of operation that allows data to be communicated between the volatile memory subsystem and the nonvolatile memory subsystem via the controller, operating the circuit to (i) selectively couple the controller to the volatile memory subsystem, and (ii) selectively isolate the volatile memory subsystem from the host system.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated into and constitute a part of this specification, illustrate one or more examples of embodiments and, together with the description of example embodiments, serve to explain the principles and implementations of the embodiments.

In the drawings:

FIG. 1 is a block diagram illustrating the path of data transfer, via a CPU, of a conventional memory arrangement;

FIG. 2 is a block diagram of a known EcoRAM™ architecture;

FIGS. 3A and 3B are block diagrams of a non-volatile memory DIMM or NVDIMM;

FIGS. 4A and 4B are block diagrams of a Flash-DRAM hybrid DIMM or FDHDIMM;

Samsung Electronics Co., Ltd.
Ex. 1001, p. 31

US 11,232,054 B2

9

FIG. **5A** is a block diagram of a memory module **500** in accordance with certain embodiments described herein;

FIG. **5B** is a block diagram showing some functionality of a memory module such as that shown in FIG. **5A**;

FIG. **6** is a block diagram showing some details of the data manager (DMgr);

FIG. **7** is a functional block diagram of the on-module controller (CDC);

FIG. **8A** is a block diagram showing more details of the prior art Flash-DRAM hybrid DIMM (FDHDIMM) of FIGS. **4A** and **4B**;

FIG. **8B** is a block diagram of a Flash-DRAM hybrid DIMM (FDHDIMM) in accordance with certain embodiments disclosed herein;

FIG. **9** is a flow diagram directed to the transfer of data from Flash memory to DRAM memory and vice versa in an exemplary FDHDIMM;

FIG. **10** is a block diagram showing an example of mapping of DRAM address space to Flash memory address space; and

FIG. **11** is a table showing estimates of the maximum allowed closed blocks in a queue to be written back to Flash memory for different DRAM densities using various average block use time.

FIG. **12** is a block diagram of an example memory system compatible with certain embodiments described herein.

FIG. **13** is a block diagram of an example memory module with ECC (error-correcting code) having a volatile memory subsystem with nine volatile memory elements and a non-volatile memory subsystem with five non-volatile memory elements in accordance with certain embodiments described herein.

FIG. **14** is a block diagram of an example memory module having a microcontroller unit and logic element integrated into a single device in accordance with certain embodiments described herein.

FIGS. **15A-15C** schematically illustrate example embodiments of memory systems having volatile memory subsystems comprising registered dual in-line memory modules in accordance with certain embodiments described herein.

FIG. **16** schematically illustrates an example power module of a memory system in accordance with certain embodiments described herein.

FIG. **17** is a flowchart of an example method of providing a first voltage and a second voltage to a memory system including volatile and non-volatile memory subsystems.

FIG. **18** is a flowchart of an example method of controlling a memory system operatively coupled to a host system and which includes at least 100 percent more storage capacity in non-volatile memory than in volatile memory.

FIG. **19** schematically illustrates an example clock distribution topology of a memory system in accordance with certain embodiments described herein.

FIG. **20** is a flowchart of an example method of controlling a memory system operatively coupled to a host system, the method including operating a volatile memory subsystem at a reduced rate in a back-up mode.

FIG. **21** schematically illustrates an example topology of a connection to transfer data slices from two DRAM segments of a volatile memory subsystem of a memory system to a controller of the memory system.

FIG. **22** is a flowchart of an example method of controlling a memory system operatively coupled to a host system, the method including backing up and/or restoring a volatile memory subsystem in slices.

DESCRIPTION OF EXAMPLE EMBODIMENTS

Example embodiments are described herein in the context of a system of computers, servers, controllers, memory

10

modules, hard disk drives and software. Those of ordinary skill in the art will realize that the following description is illustrative only and is not intended to be in any way limiting. Other embodiments will readily suggest themselves to such skilled persons having the benefit of this disclosure. Reference will now be made in detail to implementations of the example embodiments as illustrated in the accompanying drawings. The same reference indicators will be used to the extent possible throughout the drawings and the following description to refer to the same or like items.

In the interest of clarity, not all of the routine features of the implementations described herein are shown and described. It will, of course, be appreciated that in the development of any such actual implementation, numerous implementation-specific decisions must be made in order to achieve the developer's specific goals, such as compliance with application- and business-related constraints, and that these specific goals will vary from one implementation to another and from one developer to another. Moreover, it will be appreciated that such a development effort might be complex and time-consuming, but would nevertheless be a routine undertaking of engineering for those of ordinary skill in the art having the benefit of this disclosure.

In accordance with this disclosure, the components, process steps, and/or data structures described herein may be implemented using various types of operating systems, computing platforms, computer programs, and/or general purpose machines. In addition, those of ordinary skill in the art will recognize that devices of a less general purpose nature, such as hardwired devices, field programmable gate arrays (FPGAs), application specific integrated circuits (ASICs), or the like, may also be used without departing from the scope and spirit of the inventive concepts disclosed herein. Where a method comprising a series of process steps is implemented by a computer or a machine and those process steps can be stored as a series of instructions readable by the machine, they may be stored on a tangible medium such as a computer memory device (e.g., ROM (Read Only Memory), PROM (Programmable Read Only Memory), EEPROM (Electrically Eraseable Programmable Read Only Memory), Flash memory, Jump Drive, and the like), magnetic storage medium (e.g., tape, magnetic disk drive, and the like), optical storage medium (e.g., CD-ROM, DVD-ROM, paper card, paper tape and the like) and other types of program memory.

The term "exemplary" where used herein is intended to mean "serving as an example, instance or illustration." Any embodiment described herein as "exemplary" is not necessarily to be construed as preferred or advantageous over other embodiments.

Disclosed herein are arrangements for improving memory access rates and addressing the high disparity (15 to 1 ratio) between the read and write data throughput rates. In one arrangement, a Flash-DRAM-hybrid DIMM (FDHDIMM) with integrated Flash and DRAM is used. Methods for controlling such an arrangement are described.

In certain embodiments, the actual memory density (size or capacity) of the DIMM and/or the ratio of DRAM memory to Flash memory is configurable for optimal use with a particular application (for example, POS, inter-bank transaction, stock market transaction, scientific computation such as fluid dynamics for automobile and ship design, weather prediction, oil and gas expeditions, medical diagnostics such as diagnostics based on the fuzzy logic, medical data processing, simple information sharing and searching such as web search, retail store website, company home

Samsung Electronics Co., Ltd.
Ex. 1001, p. 32

**11**

page, email or information distribution and archive, security service, and entertainment such as video-on-demand).

In certain embodiments, the device contains a high density Flash memory with a low density DRAM, wherein the DRAM is used as a data buffer for read/write operation. The Flash serves as the main memory. Certain embodiments described herein overcome the needs of having a long separation period between an Activate command (may be referred to as RAS) and a corresponding read or write command (may be referred to as first CAS command).

In accordance with one embodiment, described with reference to FIGS. **3**A and **3**B, a memory system **300** includes a non-volatile (for example Flash) memory subsystem **302** and a volatile (for example DRAM) memory subsystem **304**. The examples of FIGS. **3**A and **3**B are directed to architectures of a non-volatile DIMM (NVDIMM) NVDIMM system that may use a power subsystem (not shown) that can include a battery or a capacitor as a means for energy storage to copy DRAM memory data into Flash memory when power loss occurs, is detected, or is anticipated to occur during operation. When normal power is restored, a restore NVDIMM operation is initiated and the data stored in the Flash memory is properly restored to the DRAM memory. In this architecture, the density of the Flash is about the same as the DRAM memory size or within a few multiples, although in some applications it may be higher. This type of architecture may also be used to provide non-volatile storage that is connected to the FSB (front side bus) to support RAID (Redundant Array of Independent Disks) based systems or other type of operations. An NVDIMM controller **306** receives and interprets commands from the system memory controller hub (MCH). The NVDIMM controller **306** control the NVDIMM DRAM and Flash memory operations. In FIG. **3**A, the DRAM **304** communicates data with the MCH, while an internal bus **308** is used for data transfer between the DRAM and Flash memory subsystems. In FIG. **3**B, the NVDIMM controller **306'** of NVDIMM **300'** monitors events or commands and enables data transfer to occur in a first mode between the DRAM **304'** and Flash **302'** or in a second mode between the DRAM and the MCH.

In accordance with one embodiment, a general architecture for a Flash and DRAM hybrid DIMM (FDHDIMM) system **400** is shown in FIG. **4**A. The FDHDIMM interfaces with an MCH (memory controller hub) to operate and behave as a high density DIMM, wherein the MCH interfaces with the non-volatile memory subsystem (for example Flash) **402** is controlled by an FDHDIMM controller **404**. Although the MCH interfaces with the Flash via the FDHDIMM controller, the FDHDIMM overall performance is governed by the Flash access time. The volatile memory subsystem (for example DRAM) **406** is primarily used as a data buffer or a temporary storage location such that data from the Flash memory **402** is transferred to the DRAM **406** at the Flash access speed, and buffered or collected into the DRAM **406**, which then transfers the buffered data to the MCH based on the access time of DRAM. Similarly, when the MCH transfers data to the DRAM **406**, the FDHDIMM controller **404** manages the data transfer from the DRAM **406** to the Flash **402**. Since the Flash memory access speed (both read and write) is relatively slower than DRAM, (e.g. for example a few hundred microseconds for read access), the average data throughput rate of FDHDIMM **400** is limited by the Flash access speed. The DRAM **406** serves as a data buffer stage that buffers the MCH read or write data. Thus, the DRAM **406** serves as a temporary storage for the data to be transferred from/to the Flash **402**. Furthermore, in accordance with one embodiment, the MCH recognizes the

**12**

physical density of an FDHDIMM operating as a high density DIMM as the density of Flash alone.

In accordance with one embodiment, a read operation can be performed by the MCH by sending an activate command (may be simply referred to as RAS, or row address strobe) to the FDHDIMM **400** to conduct a pre-fetch read data operation from the Flash **402** to the DRAM **406**, with the pre-fetch data size being for example a page (1 KB or 2 KB, or may be programmable to any size). The MCH then sends a read command (may be simply referred to as CAS, or column address strobe) to read the data out input of the DRAM. In this embodiment, the data transfer from Flash to DRAM occurs at Flash access speed rates, while data transfer from DRAM to MCH occurs at DRAM access speed rates. In this example, data latency and throughput rates are the same as any DRAM operation as long as the read operations are executed onto the pages that were opened with the activate command previously sent to pre-fetch data from the Flash to DRAM. Thus, a longer separation time period between the RAS (e.g. Activate command) and the first CAS (column address strobe e.g. read or write command) is required to account for the time it takes to pre-fetch data from the Flash to DRAM.

An example of FDHDIMM operating as a DDR DIMM with SSD is shown in FIG. **4**B, wherein the FDHDIMM **400'** supports two different interface interpretations to the MCH. In the first interface interpretation, the MCH views the FDHDIMM **400'** as a combination of DRAM DIMM and SSD (not illustrated). In this mode the MCH needs to manage two address spaces, one for the DRAMs **402'** and one for the Flash **404'**. The MCH is coupled to, and controls, both of the DRAM and Flash memory subsystems. One advantage of this mode is that the CPU does not need to be in the data path when data is moved from DRAM to Flash or from Flash to DRAM. In the second interface interpretation, the MCH views the FDHDIMM **400'** as an on-DIMM Flash with the SSD in an extended memory space that is behind the DRAM space. Thus, in this mode, the MCH physically fetches data from the SSD to the DDR DRAM and then the DRAM sends the data to the MCH. Since all data movement occurs on the FDHDIMM, this mode will provide better performance than if the data were to be moved through or via the CPU.

In accordance with one embodiment and as shown in FIG. **4**B, the FDHDIMM **400'** receives control signals **408** from the MCH, where the control signals may include one or more control signals specifically for the DRAM **402'** operation and one or more control signals specifically for the Flash **404'** operation. In this embodiment, the MCH or CPU is coupled to the FDHDIMM via a single data bus interface **410** which couples the MCH to the DRAM.

FIGS. **5**A and **5**B are block diagrams of a memory module **500** that is couplable to a host system (not shown). The host system may be a server or any other system comprising a memory system controller or an MCH for providing and controlling the read/write access to one or more memory systems, wherein each memory system may include a plurality of memory subsystems, a plurality of memory devices, or at least one memory module. The term "read/write access" means the ability of the MCH to interface with a memory system or subsystem in order to write data into it or read data from it, depending on the particular requirement at a particular time.

In certain embodiments, memory module **500** is a Flash-DRAM hybrid memory subsystem which may be integrated with other components of a host system. In certain embodiments, memory module **500** is a Flash-DRAM hybrid

Samsung Electronics Co., Ltd.
Ex. 1001, p. 33

US 11,232,054 B2

13

memory module that has the DIMM (dual-inline memory module) form factor, and may be referred to as a FDHDIMM, although it is to be understood that in both structure and operation it may be different from the FDHDIMM discussed above and described with reference to FIGS. 4A and 4B. Memory module 500 includes two on-module intermediary components: a controller and a data manager. These on-module intermediary components may be physically separate components, circuits, or modules, or they may be integrated onto a single integrated circuit or device, or integrated with other memory devices, for example in a three dimensional stack, or in any one of several other possible expedients for integration known to those skilled in the art to achieve a specific design, application, or economic goal. In the case of a DIMM, these on-module intermediary components are an on-DIMM Controller (CDC) 502 and an on-DIMM data manager (DMgr) 504. While the DIMM form factor will predominate the discussion herein, it should be understood that this is for illustrative purposes only and memory systems using other form factors are contemplated as well. CDC 502 and data manager DMgr 504 are operative to manage the interface between a non-volatile memory subsystem such as a Flash 506, a volatile memory subsystem such as a DRAM 508, and a host system represented by MCH 510.

In certain embodiments, CDC 502 controls the read/write access to/from Flash memory 506 from/to DRAM memory 508, and to/from DRAM memory from/to MCH 510. Read/write access between DRAM 508, Flash 506 and MCH 510 may be referred to herein generally as communication, wherein control and address information C/A 560 is sent from MCH 510 to CDC 502, and possible data transfers follow as indicated by Data 550, Data 555, and/or Data 556. In certain embodiments, the CDC 502 performs specific functions for memory address transformation, such as address translation, mapping, or address domain conversion, Flash access control, data error correction, manipulation of data width or data formatting or data modulation between the Flash memory and DRAM, and so on. In certain embodiments, the CDC 502 ensures that memory module 500 provides transparent operation to the MCH in accordance with certain industry standards, such as DDR, DDR2, DDR3, DDR4 protocols. In the arrangement shown in FIGS. 5A and 5B, there is no direct access from the MCH 510 to the Flash 506 memory subsystem. Thus in accordance with certain embodiments, the Flash access speed has minimal impact on the overall FDHDIMM access speed. In the schematic illustration of FIG. 5B and in accordance with one embodiment, the CDC controller 502 receives standard DDR commands from the MCH, interprets, and produces commands and/or control signals to control the operation of the Data manager (DMgr), the Flash memory and the DRAM memory. The DMgr controls the data path routing amongst DRAMs, Flash and MCH, as detailed below. The data path routing control signals are independently operated without any exclusivity.

An exemplary role of DMgr 504 is described with reference to FIG. 6. In certain embodiments and in response to communication from CDC 502, DMgr 504 provides a variety of functions to control data flow rate, data transfer size, data buffer size, data error monitoring or data error correction. For example, these functions or operations can be performed on-the-fly (while data is being transferred via the DMgr 504) or performed on buffered or stored data in DRAM or a buffer. In addition, one role of DMgr 504 is to provide interoperability among various memory subsystems or components and/or MCH 510.

14

In one embodiment, an exemplary host system operation begins with initialization. The CDC 502 receives a first command from the MCH 510 to initialize FDHDIMM 500 using a certain memory space. The memory space as would be controlled by MCH 510 can be configured or programmed during initialization or after initialization has completed. The MCH 510 can partition or parse the memory space in various ways that are optimized for a particular application that the host system needs to run or execute. In one embodiment, the CDC 502 maps the actual physical Flash 506 and DRAM 508 memory space using the information sent by MCH 510 via the first command. In one embodiment, the CDC 502 maps the memory address space of any one of the Flash 506 and DRAM 508 memory subsystems using memory address space information that is received from the host system, stored in a register within FDHDIMM 500, or stored in a memory location of a non-volatile memory subsystem, for example a portion of Flash 506 or a separate non-volatile memory subsystem. In one embodiment, the memory address space information corresponds to a portion of initialization information of the FDHDIMM 500.

In one embodiment, MCH 510 may send a command to restore a certain amount of data information from Flash 506 to DRAM 508. The CDC 502 provides control information to DMgr 504 to appropriately copy the necessary information from Flash 506 to the DRAM 508. This operation can provide support for various host system booting operations and/or a special host system power up operation.

In one embodiment, MCH 510 sends a command which may include various fields comprising control information regarding data transfer size, data format options, and/or startup time. CDC 502 receives and interprets the command and provides control signals to DMgr 504 to control the data traffic between the Flash 506, the DRAM 508, and the MCH 510. For example, DMgr 504 receives the data transfer size, formatting information, direction of data flow (via one or more multiplexers such as 611, 612, 621, 622 as detailed below), and the starting time of the actual data transfer from CDC 502. DMgr 504 may also receive additional control information from the CDC 502 to establish a data flow path and/or to correctly establish the data transfer fabric. In certain embodiments, DMgr 504 also functions as a bi-directional data transfer fabric. For example, DMgr 504 may have more than 2 sets of data ports facing the Flash 506 and the DRAM 508. Multiplexers 611 and 612 provide controllable data paths from any one of the DRAMs 508(1) and 508(2) (DRAM-A and DRAM-B) to any one of the MCH 510 and the Flash 506. Similarly multiplexers 621 and 622 provide controllable data paths from any one of the MCH and the Flash memory to any one of the DRAMs 508(1) and 508(2) (DRAM-A and DRAM-B). In one embodiment, DRAM 508(1) is a segment of DRAM 508, while in other embodiments, DRAM 508(1) is a separate DRAM memory subsystem. It will be understood that each memory segment can comprise one or more memory circuits, a memory devices, and/or memory integrated circuits. Of course other configurations for DRAM 508 are possible, and other data transfer fabrics using complex data paths and suitable types of multiplexing logic are contemplated.

In accordance with one embodiment, the two sets of multiplexors 611, 612 and 621, 622 allow independent data transfer to Flash 506 from DRAM-A 508(1) and DRAM-B 508(2). For example, in response to one or more control signals or a command from CDC 502, DMgr 504 can transfer data from DRAM-A 508(1) to MCH 510, via multiplexer 611, at the same time as from DRAM-B 508(2)

Samsung Electronics Co., Ltd.
Ex. 1001, p. 34

US 11,232,054 B2

15

to the Flash **506**, via multiplexer **612**; or data is transferred from DRAM-B **508**(2) to MCH **510**, via multiplexer **611**, and simultaneously data is transferred from the Flash **506** to DRAM-A **508**(1), via multiplexer **621**. Further, in the same way that data can be transferred to or from the DRAM in both device-wide or segment-by-segment fashion, data can be transferred to or from the flash memory in device-wide or segment-by-segment fashion, and the flash memory can be addressed and accessed accordingly.

In accordance with one embodiment the illustrated arrangement of data transfer fabric of DMgr **504** also allows the CDC **502** to control data transfer from the Flash memory to the MCH by buffering the data from the Flash **506** using a buffer **602**, and matching the data rate and/or data format of MCH **510**. The buffer **602** is shown in FIG. 6 as a portion of a data format module **604**; however, buffer **602** may also be a distributed buffer such that one buffer is used for each one of the set of multiplexer logic elements shown as multiplexers **611**, **612**, **621**, and **622**. Various buffer arrangements may be used, such as a programmable size buffer to meet the requirement of a given system design requirement, for example the disparity between read/write access time; or overall system performance, for example latency. In certain embodiments, the buffer **604** may introduce one or more clock cycle delays into a data communication path between MCH **510**, DRAM **508**, and Flash **506**.

In certain embodiments, data format module **604** contains a data formatting subsystem (not shown) to enable DMgr **504** to format and perform data transfer in accordance with control information received from CDC **502**. Data buffer **604** of data format module **602**, discussed above, also supports a wide data bus **606** coupled to the Flash memory **506** operating at a first frequency, while receiving data from DRAM **508** using a relatively smaller width data bus **608** operating at a second frequency, the second frequency being larger than the first frequency in certain embodiments. The buffer **602** is designed to match the data flow rate between the DRAM **508** and the Flash **506**.

A register **690** provides the ability to register commands received from MCH **510** via C/A **560** (FIG. 5A). The register **690** may communicate these commands to CDC **502** and/or to the DRAM **508** and/or Flash **506**. The register **690** communicates these registered commands to CDC **502** for processing. The register **690** may also include multiple registers (not shown), such that it can provide the ability to register multiple commands, a sequence of commands, or provide a pipeline delay stage for buffering and providing a controlled execution of certain commands received from MCH **510**.

In certain embodiments, the register **690** may register commands from MCH **510** and transmit the registered commands to DRAM **508** and/or Flash **506** memory subsystems. In certain embodiments, the CDC **502** monitors commands received from MCH **510**, via control and address bus C/A **560**, and provides appropriate control information to DMgr **504**, DRAM **508**, or Flash **506** to execute these commands and perform data transfer operations between MCH **510** and FDHDIMM **500** via MCH data bus **610**.

FIG. 7 illustrates a functional block diagram of the CDC **502**. In certain embodiments, the major functional blocks of the CDC **502** are a DRAM control block DRAMCtrl **702**, Flash control block FlashCtrl **704**, MCH command interpreter CmdInt **706**, DRAM-Flash interface scheduler Scheduler **708**, and DMgr control block (DMgrCtrl) **710**.

In accordance with one embodiment, DRAMCtrl **702** generates DRAM commands that are independent from the commands issued by the MCH **510**. In accordance with one

16

embodiment, when the MCH **510** initiates a read/write operation from/to the same DRAM **508** that is currently executing a command from the DRAMCtrl **702**, then the CDC **502** may choose to instruct DRAMCtrl **702** to abort its operation in order to execute the operation initiated by the MCH. However, the CDC **502** may also pipeline the operation so that it causes DRAMCtrl **702** to either halt or complete its current operation prior to executing that of the MCH. The CDC **502** may also instruct DRAMCtrl **702** to resume its operation once the command from MCH **510** is completed.

In accordance with one embodiment, the FlashCtrl **704** generates appropriate Flash commands for the proper read/write operations. The CmdInt **706** intercepts commands received from MCH **510** and generates the appropriate control information and control signals and transmit them to the appropriate FDHDIMM functional block. For example, CmdInt **706** issues an interrupt signal to the DRAMCtrl **702** when the MCH issues a command that collides (conflicts) with the currently executing or pending commands that DRAMCtrl **702** has initiated independently from MCH **510**, thus subordinating these commands to those from the MCH. The Scheduler **708** schedules the Flash-DRAM interface operation such that there is no resource conflict in the DMgr **504**. In accordance with one embodiment, the Scheduler **708** assigns time slots for the DRAMCtrl **702** and FlashCtrl **704** operation based on the current status and the pending command received or to be received from the MCH. The DMgrCtrl **710** generates and sends appropriate control information and control signals for the proper operation and control of the data transfer fabric to enable or disable data paths between Flash **506**, DRAM **508**, and the MCH **510**.

FIG. **8**A is a block diagram showing a Flash-DRAM hybrid DIMM (FDHDIMM). As seen from FIG. **8**A, this Flash-DRAM hybrid DIMM requires two separate and independent address buses to separately control the address spaces: one for the Flash memory Flash **506** and the other for the DRAM memory DRAM **508**. The MCH treats the DRAM **508** and Flash **506** as separate memory subsystems, for example DRAM and SSD/HD memory subsystems. The memory in each address space is controlled directly by the MCH. However, the on-DIMM data path between Flash **506** and DRAM **508** allows for direct data transfer to occur between the Flash **506** and the DRAM **508** in response to control information from Ctrl **502**. In this embodiment, this data transfer mechanism provides direct support for executing commands from the MCH without having the MCH directly controlling the data transfer, and thus improving data transfer performance from Flash **506** to the DRAM **508**. However, the MCH needs to manage two address spaces and two different memory protocols simultaneously. Moreover, the MCH needs to map the DRAM memory space into the Flash memory space, and the data interface time suffers due to the difference in the data access time between the Flash memory and the DRAM memory.

In accordance with one embodiment, a memory space mapping of a Flash-DRAM hybrid DIMM is shown in FIG. **8**B. A memory controller of a host system (not shown) controls both of the DRAM **508** address space and the Flash **506** address space using a single unified address space. The CDC **502** receives memory access commands from the MCH and generates control information for appropriate mapping and data transfer between Flash and DRAM memory subsystem to properly carry out the memory access commands. In one embodiment, the memory controller of the host system views the large Flash memory space as a DRAM memory space, and accesses this unified memory

Samsung Electronics Co., Ltd.

Ex. 1001, p. 35

US 11,232,054 B2

17

18

space with a standard DDR (double data rate) protocol used for accessing DRAM. The unified memory space in this case can exhibit overlapping memory address space between the Flash **506** and the DRAM **508**. The overlapping memory address space may be used as a temporary storage or buffer for data transfer between the Flash **506** and the DRAM **508**. For example, the DRAM memory space may hold a copy of data from the selected Flash memory space such that the MCH can access this data normally via DDR memory access commands. The CDC **502** controls the operation of the Flash **506** and DRAM **508** memory subsystems in response to commands received from a memory controller of a host system.

In one embodiment, the unified memory space corresponds to a contiguous address space comprising a first portion of the address space of the Flash **506** and a first portion of the address space of the DRAM **508**. The first portion of the address space of the Flash **506** can be determined via a first programmable register holding a first value corresponding to the desired Flash memory size to be used. Similarly, the first portion of the address space of the DRAM **508** can be determined via a second programmable register holding a second value corresponding to the desired DRAM memory size to be used. In one embodiment, any one of the first portion of the address space of the Flash **506** and the first portion of the address space of the DRAM **508** is determined via a first value corresponding to a desired performance or memory size, the first value being received by the CDC **502** via a command sent by memory controller of the host system.

In accordance with one embodiment, a flow diagram directed to the transfer of data from Flash memory to DRAM memory and vice versa in an exemplary FDHDIMM is shown in FIG. **9**. In certain embodiments, data transfer from the Flash **506** to the DRAM **508** occurs in accordance with memory access commands which the CDC **502** receives from the memory controller of the host system. In certain embodiments, the CDC **502** controls the data transfer from the DRAM **508** to the Flash **506** so as to avoid conflict with any memory operation that is currently being executed. For example, when all the pages in a particular DRAM memory block are closed. The CDC **502** partitions the DRAM memory space into a number of blocks for the purpose of optimally supporting the desired application. The controller can configure memory space in the memory module based on at least one of one or more commands received from the MCH, instructions received from the MCH, a programmable value written into a register, a value corresponding to a first portion of the volatile memory subsystem, a value corresponding to a first portion of the non-volatile memory subsystem, and a timing value. Furthermore, the block size can be configurable by the memory controller of the host system, such that the number pages in a block can be optimized to support a particular application or a task. Furthermore, the block size may be configured on-the-fly, e.g. CDC **502** can receive instruction regarding a desired block size from the memory controller via a memory command, or via a programmable value.

In certain embodiments, a memory controller can access the memory module using a standard access protocol, such as JEDEC's DDR DRAM, by sending a memory access command to the CDC **502** which in turn determines what type of a data transfer operation it is and the corresponding target address where the data information is stored, e.g. data information is stored in the DRAM **508** or Flash **506** memory subsystems. In response to a read operation, if the CDC **502** determines that data information, e.g. a page (or

block), does not reside in the DRAM **508** but resides in Flash **506**, then the CDC **502** initiates and controls all necessary data transfer operations from Flash **506** to DRAM **508** and subsequently to the memory controller. In one embodiment, once the CDC **502** completes the data transfer operation of the requested data information from the Flash **506** to the DRAM **508**, the CDC **502** alerts the memory controller to retrieve the data information from the DRAM **508**. In on embodiment, the memory controller initiates the copying of data information from Flash **506** to DRAM **508** by writing, into a register in the CDC **502**, the target Flash address along with a valid block size. The CDC **502** in turn, executes appropriate operations and generates control information to copy the data information to the DRAM **508**. Consequently, the memory controller can access or retrieve the data information using standard memory access commands or protocol.

An exemplary flow chart is shown in FIG. **9**, a starting step or power up **902**, is followed by an initialization step **904**, the memory controller initiates, at step **906**, a data move from the Flash **506** to the DRAM **508** by writing target address and size, to a control register in the CDC **502**, which then copies, at **908**, data information from the Flash **506** to the DRAM **508** and erases the block in the Flash. Erasing the data information from Flash may be accomplished independently from (or concurrently with) other steps that CDC **502** performs in this flow chart, i.e. other steps can be executed concurrently with the Erase the Flash block step. Once the data information or a block of data information is thus moved to the DRAM **508**, the memory controller can operate on this data block using standard memory access protocol or commands at **910**. The CDC **502** checks, at **912**, if any of the DRAM **508** blocks, or copied blocks, are closed. If the memory controller closed any open blocks in DRAM **508**, then the CDC **502** initiate a Flash write to write the closed block from the DRAM **508** to the Flash **506**, at **914**. In addition, the memory controller, at **916**, reopens the closed block that is currently being written into the Flash **506**, then the CDC **502** stops the Flash write operation and erases the Flash block which was being written to, as shown at **918**. Otherwise, the CDC **502** continues and completes the writing operation to the Flash at **920**.

The dashed lines in FIG. **9** indicate independent or parallel activities that can be performed by the CDC **502**. At any time the CDC **502** receives a DRAM load command from a memory controller which writes a Flash target address and/or block size information into the RC register(s) at **922**, as described above, then the CDC **502** executes a load DRAM w/RC step **906** and initiates another branch (or a thread) of activities that includes steps **908**-**922**. In one embodiment, the CDC **502** controls the data transfer operations between DRAM **508** and Flash **506** such that the Flash **506** is completely hidden from the memory controller. The CDC **502** monitors all memory access commands sent by the memory controller using standard DRAM protocol and appropriately configures and manipulate both Flash **506** and DRAM **508** memory subsystems to perform the requested memory access operation and thus achieve the desired results. The memory controller does not interface directly with the Flash memory subsystem. Instead, the memory controller interfaces with the CDC **502** and/or DMgr **504** as shown in FIG. **5** and FIG. **6**. Moreover, the memory controller may use one or more protocol, such as DDR, DDR2, DDR3, DDR4 protocols or the like.

In accordance with one embodiment, an example of mapping a DRAM address space to Flash memory address space is shown in FIG. **10**. Two sets (**1002**, **1004**) of address

Samsung Electronics Co., Ltd.
Ex. 1001, p. 36

US 11,232,054 B2

19 20

bits AD**6** to AD**17**, forming a 24 bit extended memory page address, are allocated for the block address. For example, assuming a Block size of 256K Bytes, then a 24-bit block address space (using the two sets of AD**6** to AD**17** **1002** and **1004**) would enable access to 4 TB of Flash memory storage space. If a memory module has 1 GB of DRAM storage capacity, then it can hold approximately 4K Blocks of data in the DRAM memory, each Block comprise 256 K Bytes of data. The DRAM address space, corresponding to the 4K blocks, can be assigned to different virtual ranks and banks, where the number of virtual ranks and banks is configurable and can be manipulated to meet a specific design or performance needs. For example, if a 1G Bytes memory module is configured to comprise two ranks with eight banks per rank, then each bank would hold two hundred fifty (250) blocks or the equivalent of 62 M Bytes or 62K pages, where each page correspond to a 1K Bytes. Other configurations using different page, block, banks, or ranks numbers may also be used. Furthermore, an exemplary mapping of 24-bit DDR DIMM block address to Flash memory address, using Block addressing as described above, is shown in FIG. **10**. The 24-bit can be decomposed into fields, such as a logical unit number LUN address **1061** field, a Block address **1051** field, a Plane address **1041**, a Page address **1031**, and a group of least significant address bits $A_0A_1$ **1021**. The Plane address **1041** is a sub address of the block address, and it may be used to support multiple page IO so as to improve Flash memory subsystem operation. In this example, it is understood that different number of bits may be allocated to each field of the 24-bit

The CDC **502** manages the block write-back operation by queuing the blocks that are ready to be written back to the Flash memory. As described above, if any page in a queued block for a write operation is reopened, then the CDC **502** will stop the queued block write operation, and remove the block from the queue. Once all the pages in a block are closed, then the CDC **502** restarts the write-back operation and queue the block for a write operation.

In accordance with one embodiment, an exemplary read operation from Flash **506** to DRAM **508** can be performed in approximately 400 μs, while a write operation from DRAM **508** to Flash **506** can be performed in approximately 22 ms resulting in a read to write ratio of 55 to 1. Therefore, if the average time a host system's memory controller spends accessing data information in a Block of DRAM is about 22 ms (that is the duration that a Block comprises one or more pages that are open), then the block write-back operation from DRAM to Flash would not impact performance and hence the disparity between read and write access may be completely hidden from the memory controller. If the block usage time is 11 ms instead of 22 ms, then the CDC **502** control the data transfer operation between DRAM **508** and Flash **506** such that there are no more than 9 closed blocks in the queue to be written-back to the Flash memory, hence approximately an average of 100 ms can be maintained for a standard DDR DRAM operation. Moreover, the number of closed Blocks in the queue to be written-back to the Flash memory subsystem varies with the average block usage time and the desired performance for a specific host system or for a specific application running using the host system resources.

Consequently, the maximum number of closed Blocks to be written-back to Flash can be approximated to be

((#of blocks per bank)/(ratio of 'Flash_block_write_time' to 'Flash_read_time'))*((Block usage time)/('Flash_block_write_time'))

In order to maintain less than 100 ms time period for queued write-back Blocks, then using a Flash memory subsystem having 22 ms write access time per Block would results in a maximum number of four Blocks to be queued for write operation to Flash **506**. Therefore, on average approximately 88 ms (=22 ms*4) for blocks means that each bank should not have more than four Blocks that need to be written back to the Flash **506**.

The above equation also indicates that bigger DRAM memory space can support shorter block usage times. For example, 2 GB of DRAM memory allows the 8 closed blocks to be written-back to Flash. The table in FIG. **11** provides an estimation of the maximum allowed closed blocks in the queue to be written back to the Flash memory for different DRAM density using various average block use time.

Certain embodiments described herein include a memory system which can communicate with a host system such as a disk controller of a computer system. The memory system can include volatile and non-volatile memory, and a controller. The controller backs up the volatile memory using the non-volatile memory in the event of a trigger condition. Trigger conditions can include, for example, a power failure, power reduction, request by the host system, etc. In order to power the system in the event of a power failure or reduction, the memory system can include a secondary power source which does not comprise a battery and may include, for example, a capacitor or capacitor array.

In certain embodiments, the memory system can be configured such that the operation of the volatile memory is not adversely affected by the non-volatile memory or by the controller when the volatile memory is interacting with the host system. For example, one or more isolation devices may isolate the non-volatile memory and the controller from the volatile memory when the volatile memory is interacting with the host system and may allow communication between the volatile memory and the non-volatile memory when the data of the volatile memory is being restored or backed-up. This configuration generally protects the operation of the volatile memory when isolated while providing backup and restore capability in the event of a trigger condition, such as a power failure.

In certain embodiments described herein, the memory system includes a power module which provides power to the various components of the memory system from different sources based on a state of the memory system in relation to a trigger condition (e.g., a power failure). The power module may switch the source of the power to the various components in order to efficiently provide power in the event of the power failure. For example, when no power failure is detected, the power module may provide power to certain components, such as the volatile memory, from system power while charging a secondary power source (e.g., a capacitor array). In the event of a power failure or other trigger condition, the power module may power the volatile memory elements using the previously charged secondary power source.

In certain embodiments, the power module. transitions relatively smoothly from powering the volatile memory with system power to powering it with the secondary power source. For example, the power system may power volatile memory with a third power source from the time the memory system detects that power failure is likely to occur until the time the memory system detects that the power failure has actually occurred.

In certain embodiments, the volatile memory system can be operated at a reduced frequency during backup and/or

Samsung Electronics Co., Ltd.
Ex. 1001, p. 37

US 11,232,054 B2

21                                                                    22

restore operations which can improve the efficiency of the system and save power. In some embodiments, during backup and/or restore operations, the volatile memory communicates with the non-volatile memory by writing and/or. reading data words in bit-wise slices instead of by writing entire words at once. In certain embodiments, when each slice is being written to or read from the volatile memory the unused slice(s) of volatile memory is not active, which can reduce the power consumption of the system.

In yet other embodiments, the non-volatile memory can include at least 100 percent more storage capacity than the volatile memory. This configuration can allow the memory system to efficiently handle subsequent trigger conditions.

FIG. 12 is a block diagram of an example memory system 1010 compatible with certain embodiments described herein. The memory system 1010 can be coupled to a host computer system and can include a volatile memory subsystem 1030, a non-volatile memory subsystem 1040, and a controller 1062 operatively coupled to the non-volatile memory subsystem 1040. In certain embodiments, the memory system 1010 includes at least one circuit 1052 configured to selectively operatively decouple the controller 1062 from the volatile memory subsystem 1030.

In certain embodiments, the memory system 1010 comprises a memory module. The memory system 1010 may comprise a printed-circuit board (PCB) 1020. In certain embodiments, the memory system 1010 has a memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, or 8-GB. Other volatile memory capacities are also compatible with certain embodiments described herein. In certain embodiments, the memory system 10 has a non-volatile memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, 8-GB, 16-GB, or 32-GB. Other non-volatile memory capacities are also compatible with certain embodiments described herein. In addition, memory systems 1010 having widths of 4 bytes, 8 bytes, 16 bytes, 32 bytes, or 32 bits, 64 bits, 128 bits, 256 bits, as well as other widths (in bytes or in bits), are compatible with embodiments described herein. In certain embodiments, the PCB 1020 has an industry-standard form factor. For example, the PCB 1020 can have a low profile (LP) form factor with a height of 30 millimeters and a width of 133.35 millimeters. In certain other embodiments, the PCB 1020 has a very high profile (VHP) form factor with a height of 50 millimeters or more. In certain other embodiments, the PCB 1020 has a very low profile (VLP) form factor with a height of 18.3 millimeters. Other form factors including, but not limited to, small-outline (SO-DIMM), unbuffered (UDIMM), registered (RDIMM), fully-buffered (FB-DIMM), miniDIMM, mini-RDIMM, VLP mini-DIMM, micro-DIMM, and SRAM DIMM are also compatible with certain embodiments described herein. For example, in other embodiments, certain non-DIMM form factors are possible such as, for example, single in-line memory module (SIMM), multi-media card (MMC), and small computer system interface (SCSI).

In certain preferred embodiments, the memory system 1010 is in electrical communication with the host system. In other embodiments, the memory system 1010 may communicate with a host system using some other type of communication, such as, for example, optical communication. Examples of host systems include, but are not limited to, blade servers, 1 U servers, personal computers (PCs), and other applications in which space is constrained or limited. The memory system 1010 can be in communication with a disk controller of a computer system, for example. The PCB 1020 can comprise an interface 1022 that is configured to be in electrical communication with the host system (not

shown). For example, the interface 1022 can comprise a plurality of edge connections which fit into a corresponding slot connector of the host system. The interface 1022 of certain embodiments provides a conduit for power voltage as well as data, address, and control signals between the memory system 1010 and the host system. For example, the interface 1022 can comprise a standard 240-pin DDR2 edge connector.

The volatile memory subsystem 1030 comprises a plurality of volatile memory elements 1032 and the non-volatile memory subsystem 1040 comprises a plurality of non-volatile memory elements 1042. Certain embodiments described herein advantageously provide nonvolatile storage via the non-volatile memory subsystem 1040 in addition to high-performance (e.g., high speed) storage via the volatile memory subsystem 1030. In certain embodiments, the first plurality of volatile memory elements 1032 comprises two or more dynamic random-access memory (DRAM) elements. Types of DRAM elements 1032 compatible with certain embodiments described herein include, but are not limited to, DDR, DDR2, DDR3, and synchronous DRAM (SDRAM). For example, in the block diagram of FIG. 12, the first memory bank 1030 comprises eight 64M×8 DDR2 SDRAM elements 1032. The volatile memory elements 1032 may comprise other types of memory elements such as static random-access memory (SRAM). In addition, volatile memory elements 1032 having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Volatile memory elements 1032 compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBOA), micro-BOA (1.1, BGA), mini-BGA (mBGA), and chip-scale packaging (CSP).

In certain embodiments, the second plurality of non-volatile memory elements 1042 comprises one or more flash memory elements. Types of flash memory elements 1042 compatible with certain embodiments described herein include, but are not limited to, NOR flash, NAND flash, ONE-NAND flash, and multi-level cell (MLC). For example, in the block diagram of FIG. 12, the second memory bank 1040 comprises 512 MB of flash memory organized as four 128 Mb×8 NAND flash memory elements 1042. In addition, nonvolatile memory elements 1042 having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Non-volatile memory elements 1042 compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BOA), fine-pitch BOA (FBGA), micro-BOA (POA), mini-BGA (mBGA), and chip-scale packaging (CSP).

FIG. 13 is a block diagram of an example memory module 10 with ECC (error-correcting code) having a volatile memory subsystem 1030 with nine volatile memory elements 1032 and a non-volatile memory subsystem 1040 with five non-volatile memory elements 1042 in accordance with certain embodiments described herein. The additional memory element 1032 of the first memory bank 1030 and the additional memory element 1042 of the second memory bank 1040 provide the ECC capability. In certain other embodiments, the volatile memory subsystem 1030 comprises other numbers of volatile memory elements 1032 (e.g., 2, 3, 4, 5, 6, 7, more than 9). In certain embodiments, the non-volatile memory subsystem 1040 comprises other numbers of nonvolatile memory elements 1042 (e.g., 2, 3, more than 5).

Samsung Electronics Co., Ltd.
Ex. 1001, p. 38

23

Referring to FIG. **12**, in certain embodiments, the logic element **1070** comprises a field-programmable gate array (FPGA). In certain embodiments, the logic element **1070** comprises an FPGA available from Lattice Semiconductor Corporation which includes an internal flash. In certain other embodiments, the logic element **1070** comprises an FPOA available from another vendor. The internal flash can improve the speed of the memory system **1010** and save physical space. Other types of logic elements **1070** compatible with certain embodiments described herein include, but are not limited to, a programmable-logic device (PLD), an application-specific integrated circuit (ASIC), a custom-designed semiconductor device, a complex programmable logic device (CPLD). In certain embodiments, the logic element **1070** is a custom device. In certain embodiments, the logic element **1070** comprises various discrete electrical elements, while in certain other embodiments, the logic element **1070** comprises one or more integrated circuits. FIG. **14** is a block diagram of an example memory module **1010** having a microcontroller unit **1060** and logic element **1070** integrated into a single controller **1062** in accordance with certain embodiments described herein. In certain embodiments, the controller **1062** includes one or more other components. For example, in one embodiment, an FPGA without an internal flash is used and the controller **1062** includes a separate flash memory component which stores configuration information to program the FPGA.

In certain embodiments, the at least one circuit **1052** comprises one or more switches coupled to the volatile memory subsystem **1030**, to the controller **1062**, and to the host computer (e.g., via the interface **1022**, as schematically illustrated by FIGS. **12-14**). The one or more switches are responsive to signals (e.g., from the controller **1062**) to selectively operatively decouple the controller **1062** from the volatile memory subsystem **1030** and to selectively operatively couple the controller **1062** to the volatile memory subsystem **1030**. In addition, in certain embodiments, the at least one circuit **1052** selectively operatively couples and decouples the volatile memory subsystem **1030** and the host system.

In certain embodiments, the volatile memory subsystem **1030** can comprise a registered DIMM subsystem comprising one or more registers **1160** and a plurality of DRAM elements **1180**, as schematically illustrated by FIG. **15**A. In certain such embodiments, the at least one circuit **1052** can comprise one or more switches **1172** coupled to the controller **1062** (e.g., logic element **1070**) and to the volatile memory subsystem **1030** which can be actuated to couple and decouple the controller **1062** to and from the volatile memory subsystem **1030**, respectively. The memory system **1010** further comprises one or more switches **1170** coupled to the one or more registers **1160** and to the plurality of DRAM elements **1180** as schematically illustrated by FIG. **15**A. The one or more switches **1170** can be selectively switched, thereby selectively operatively coupling the volatile memory subsystem **1030** to the host system **1150**. In certain other embodiments, as schematically illustrated by FIG. **15**B, the one or more switches **1174** are also coupled to the one or more registers **1160** and to a power source **1162** for the one or more registers **1160**. The one or more switches **1174** can be selectively switched to turn power on or off to the one or more registers **1160**, thereby selectively operatively coupling the volatile memory subsystem **1030** to the host system **1150**. As schematically illustrated by FIG. **15**C, in certain embodiments the at least one circuit **1052** comprises a dynamic on-die termination (ODT) **1176** circuit of the logic element **1070**. For example, the logic element **1070**

24

can comprise a dynamic ODT circuit **1176** which selectively operatively couples and decouples the logic element **1070** to and from the volatile memory subsystem **1030**, respectively. In addition, and similar to the example embodiment of FIG. **15**A described above, the one or more switches **1170** can be selectively switched, thereby selectively operatively coupling the volatile memory subsystem **1030** to the host system **1150**.

Certain embodiments described herein utilize the non-volatile memory subsystem **1040** as a flash "mirror" to provide backup of the volatile memory subsystem **1030** in the event of certain system conditions. For example, the non-volatile memory subsystem **1040** may backup the volatile memory subsystem **1030** in the event of a trigger condition, such as, for example, a power failure or power reduction or a request from the host system. In one embodiment, the nonvolatile memory subsystem **1040** holds intermediate data results in a noisy system environment when the host computer system is engaged in a long computation. In certain embodiments, a backup may be performed on a regular basis. For example, in one embodiment, the backup may occur every millisecond in response to a trigger condition. In certain embodiments, the trigger condition occurs when the memory system **1010** detects that the system voltage is below a certain threshold voltage. For example, in one embodiment, the threshold voltage is 10 percent below a specified operating voltage. In certain embodiments, a trigger condition occurs when the voltage goes above a certain threshold value, such as, for example, 10 percent above a specified operating voltage. In some embodiments, a trigger condition occurs when the voltage goes below a threshold or above another threshold. In various embodiments, a backup and/or restore operation may occur in reboot and/or non-reboot trigger conditions.

As schematically illustrated by FIGS. **12** and **13**, in certain embodiments, the controller **1062** may comprise a microcontroller unit (MCU) **1060** and a logic element **1070**. In certain embodiments, the MCU **1060** provides memory management for the non-volatile memory subsystem **1040** and controls data transfer between the volatile memory subsystem **30** and the nonvolatile memory subsystem **1040**. The MCU **1060** of certain embodiments comprises a 16-bit microcontroller, although other types of microcontrollers are also compatible with certain embodiments described herein. As schematically illustrated by FIGS. **12** and **13**, the logic element **1070** of certain embodiments is in electrical communication with the non-volatile memory subsystem **1040** and the MCU **1060**. The logic element **1070** can provide signal level translation between the volatile memory elements **1032** (e.g., 1.8V SSTL-2 for DDR2 SDRAM elements) and the non-volatile memory elements **1042** (e.g., 3V TTL for NAND flash memory elements). In certain embodiments, the logic element **1070** is also programmed to perform address/address translation between the volatile memory subsystem **1030** and the non-volatile memory subsystem **1040**. In certain preferred embodiments, 1-NAND type flash are used for the non-volatile memory elements **1042** because of their superior read speed and compact structure.

The memory system **1010** of certain embodiments is configured to be operated in at least two states. The at least two states can comprise a first state in which the controller **1062** and the non-volatile memory subsystem **1040** are operatively decoupled (e.g., isolated) from the volatile memory subsystem **1030** by the at least one circuit **1052** and a second state in which the volatile memory subsystem **1030** is operatively coupled to the controller **1062** to allow data to

Samsung Electronics Co., Ltd.

Ex. 1001, p. 39

US 11,232,054 B2

25

be communicated between the volatile memory subsystem **1030** and the nonvolatile memory subsystem **1040** via the controller **1062**. The memory system **1010** may transition from the first state to the second state in response to a trigger condition, such as when the memory system **1010** detects that there is a power interruption (e.g., power failure or reduction) or a system hang-up.

The memory system **1010** may further comprise a voltage monitor **1050**. The voltage monitor circuit **1050** monitors the voltage supplied by the host system via the interface **1022**. Upon detecting a low voltage condition (e.g., due to a power interruption to the host system), the voltage monitor circuit **1050** may transmit a signal to the controller **1062** indicative of the detected condition. The controller **1062** of certain embodiments responds to the signal from the voltage monitor circuit **1050** by transmitting a signal to the at least one circuit **1052** to operatively couple the controller to the volatile memory system **1030**, such that the memory system **1010** enters the second state. For example, the voltage monitor **1050** may send a signal to the MCU **1060** which responds by accessing the data on the volatile memory system **1030** and by executing a write cycle on the nonvolatile memory subsystem **1040**. During this write cycle, data is read from the volatile memory subsystem **1030** and is transferred to the non-volatile memory subsystem **1040** via the MCU **1060**. In certain embodiments, the voltage monitor circuit **1050** is part of the controller **1062** (e.g., part of the MCU **1060**) and the voltage monitor circuit **1050** transmits a signal to the other portions of the controller **1062** upon detecting a power threshold condition.

The isolation or operational decoupling of the volatile memory subsystem **1030** from the non-volatile memory subsystem in the first state can preserve the integrity of the operation of the memory system **1010** during periods of operation in which signals (e.g., data) are transmitted between the host system and the volatile memory subsystem **1030**. For example, in one embodiment during such periods of operation, the controller **1062** and the nonvolatile memory subsystem **1040** do not add a significant capacitive load to the volatile memory subsystem **1030** when the memory system **1010** is in the first state. In such embodiments, the capacitive load of the controller **1062** and the non-volatile memory subsystem **1040** do not significantly affect the signals propagating between the volatile memory subsystem **1030** and the host system. This can be particularly advantageous in relatively high-speed memory systems where loading effects can be significant. In one preferred embodiment, the at least one circuit **1052** comprises an FSA1208 Low-Power, Eight-Port, Hi-Speed Isolation Switch from Fairchild Semiconductor. In other embodiments, the at least one circuit **1052** comprises other types of isolation devices.

Power may be supplied to the volatile memory subsystem **1030** from a first power supply (e.g., a system power supply) when the memory system **1010** is in the first state and from a second power supply **1080** when the memory system **1010** is in the second state. In certain embodiments, the memory system **1010** is in the first state when no trigger condition (e.g., a power failure) is present and the memory system **1010** enters the second state in response to a trigger condition. In certain embodiments, the memory system **1010** has a third state in which the controller **1062** is operatively decoupled from the volatile memory subsystem **1030** and power is supplied to the volatile memory subsystem **1030** from a third power supply (not shown). For example, in one embodiment the third power supply may provide power to

26

the volatile memory subsystem **1030** when the memory system **1010** detects that a trigger condition is likely to occur but has not yet occurred.

In certain embodiments, the second power supply **1080** does not comprise a battery. Because a battery is not used, the second power supply **1080** of certain embodiments may be relatively easy to maintain, does not generally need to be replaced, and is relatively environmentally friendly. In certain embodiments, as schematically illustrated by FIGS. 12-14, the second power supply **1080** comprises a step-up transformer **1082**, a step-down transformer **1084**, and a capacitor bank **1086** comprising one or more capacitors (e.g., double-layer capacitors). In one example embodiment, capacitors may take about three to four minutes to charge and about two minutes to discharge. In other embodiments, the one or more capacitors may take a longer time or a shorter time to charge and/or discharge. For example, in certain embodiments, the second power supply **1080** is configured to power the volatile memory subsystem **1030** for less than thirty minutes. In certain embodiments, the second power supply **1080** may comprise a battery. For example, in certain embodiments, the second power supply **1080** comprises a battery and one or more capacitors and is configured to power the volatile memory subsystem **1030** for no more than thirty minutes.

In certain embodiments, the capacitor bank **1086** of the second power supply **1080** is charged by the first power supply while the memory system **1010** is in the first state. As a result, the second power supply **1080** is fully charged when the memory system **1010** enters the second state. The memory system **1010** and the second power supply **1080** may be located on the same printed circuit board **1020**. In other embodiments, the second power supply **1080** may not be on the same printed circuit board **1020** and may be tethered to the printed circuit board **1020**, for example.

When operating in the first state, in certain embodiments, the step-up transformer **1082** keeps the capacitor bank **1086** charged at a peak value. In certain embodiments, the step-down transformer **1084** acts as a voltage regulator to ensure that regulated voltages are supplied to the memory elements (e.g., 1.8V to the volatile DRAM elements **1032** and 3.0V to the non-volatile flash memory elements **1042**) when operating in the second state (e.g., during power down). In certain embodiments, as schematically illustrated by FIGS. 12-14, the memory module **1010** further comprises a switch **1090** (e.g., FET switch) that switches power provided to the controller **1062**, the volatile memory subsystem **1030**, and the non-volatile memory subsystem **1040**, between the power from the second power supply **1080** and the power from the first power supply (e.g., system power) received via the interface **1022**. For example, the switch **1090** may switch from the first power supply to the second power supply **1080** when the voltage monitor **1050** detects a low voltage condition. The switch **1090** of certain embodiments advantageously ensures that the volatile memory elements **1032** and non-volatile memory elements **1042** are powered long enough for the data to be transferred from the volatile memory elements **1032** and stored in the non-volatile memory elements **1042**. In certain embodiments, after the data transfer is complete, the switch **1090** then switches back to the first power supply and the controller **1062** transmits a signal to the at least one circuit **1052** to operatively decouple the controller **1062** from the volatile memory subsystem **1030**, such that the memory system **1010** reenters the first state.

When the memory system **1010** re-enters the first state, data may be transferred back from the non-volatile memory

Samsung Electronics Co., Ltd.
Ex. 1001, p. 40

27

subsystem **1040** to the volatile memory subsystem **1030** via the controller **1062**. The host system can then resume accessing the volatile memory subsystem **1030** of the memory module **1010**. In certain embodiments, after the memory system **1010** enters or re-enters the first state (e.g., after power is restored), the host system accesses the volatile memory subsystem **1030** rather than the non-volatile memory subsystem **1040** because the volatile memory elements **1032** have superior read/write characteristics. In certain embodiments, the transfer of data from the volatile memory bank **1030** to the nonvolatile memory bank **1040**, or from the non-volatile memory bank **1040** to the volatile. memory bank **1030**, takes less than one minute per GB.

In certain embodiments, the memory system **1010** protects the operation of the volatile memory when communicating with the host-system and provides backup and restore capability in the event of a trigger condition such as a power failure. In certain embodiments, the memory system **1010** copies the entire contents of the volatile memory subsystem **1030** into the nonvolatile memory subsystem **1040** on each backup operation. Moreover, in certain embodiments, the entire contents of the non-volatile memory subsystem **1040** are copied back into the volatile memory subsystem **1030** on each restore operation. In certain embodiments, the entire contents of the non-volatile memory subsystem **1040** are accessed for each backup and/or restore operation, such that the non-volatile memory subsystem **1040** (e.g., flash memory subsystem) is used generally uniformly across its memory space and wear-leveling is not performed by the memory system **1010**. In certain embodiments, avoiding wear-leveling can decrease cost and complexity of the memory system **1010** and can improve the performance of the memory system **1010**. In certain other embodiments, the entire contents of the volatile memory subsystem **1030** are not copied into the non-volatile memory subsystem **1040** on each backup operation, but only a partial copy is performed. In certain embodiments, other management capabilities such as bad-block management and error management for the flash memory elements of the non-volatile memory subsystem **1040** are performed in the controller **1062**.

The memory system **1010** generally operates as a write-back cache in certain embodiments. For example, in one embodiment, the host system (e.g., a disk controller) writes data to the volatile memory subsystem **1030** which then writes the data to non-volatile storage which is not part of the memory system **1010**, such as, for example, a hard disk. The disk controller may wait for an acknowledgment signal from the memory system **1010** indicating that the data has been written to the hard disk or is otherwise secure. The memory system **1010** of certain embodiments can decrease delays in the system operation by indicating that the data has been written to the hard disk before it has actually done so. In certain embodiments, the memory system **1010** will still be able to recover the data efficiently in the event of a power outage because of the backup and restore capabilities described herein. In certain other embodiments, the memory system **1010** may be operated as a write-through cache or as some other type of cache.

FIG. **16** schematically illustrates an example power module **1100** of the memory system **1010** in accordance with certain embodiments described herein. The power module **1100** provides power to the various components of the memory system **1010** using different elements based on a state of the memory system **1010** in relation to a trigger condition. In certain embodiments, the power module **1100** comprises one or more of the components described above with respect to FIG. **12**. For example, in certain embodi-

28

ments, the power module **1100** includes the second power supply **1080** and the switch **1090**.

The power module **1100** provides a plurality of voltages to the memory system **1010** comprising non-volatile and volatile memory subsystems **1030**, **1040**. The plurality of voltages comprises at least a first voltage **1102** and a second voltage **1104**. The power module **1100** comprises an input **1106** providing a third voltage **1108** to the power module **1100** and a voltage conversion element **1120** configured to provide the second voltage **1104** to the memory system **1010**. The power module **1100** further comprises a first power element **1130** configured to selectively provide a fourth voltage **1110** to the conversion element **1120**. In certain embodiments, the first power element **1130** comprises a pulse-width modulation power controller. For example, in one example embodiment, the first power element **1130** is configured to receive a 1.8V input system voltage as the third voltage **1108** and to output a modulated 5V output as the fourth voltage **1110**.

The power module **1100** further comprises a second power element **1140** can be configured to selectively provide a fifth voltage **1112** to the conversion element **1120**. The power module **1100** can be configured to selectively provide the first voltage **1102** to the memory system **1010** either from the conversion element **1120** or from the input **1106**.

The power module **1100** can be configured to be operated in at least three states in certain embodiments. In a first state, the first voltage **1102** is provided to the memory system **1010** from the input **1106** and the fourth voltage **1110** is provided to the conversion element **1120** from the first power element **1130**. In a second state, the fourth voltage **1110** is provided to the conversion element **1120** from the first power element **1130** and the first voltage **1102** is provided to the memory system **1010** from the conversion element **1120**. In the third state, the fifth voltage **1112** is provided to the conversion element **1120** from the second power element **1140** and the first voltage **1104** is provided to the memory system **1010** from the conversion element **1120**.

In certain embodiments, the power module **1100** transitions from the first state to the second state upon detecting that a trigger condition is likely to occur and transitions from the second state to the third state upon detecting that the trigger condition has occurred. For example, the power module **1100** may transition to the second state when it detects that a power failure is about to occur and transitions to the third state when it detects that the power failure has occurred. In certain embodiments, providing the first voltage **1102** in the second state from the first power element **1130** rather than from the input **1106** allows a smoother transition from the first state to the third state. For example, in certain embodiments, providing the first voltage **1102** from the first power element **1130** has capacitive and other smoothing effects. In addition, switching the point of power transition to be between the conversion element **1120** and the first and second power elements **1130**, **1140** (e.g., the sources of the pre-regulated fourth voltage **1110** in the second state and the pre-regulated fifth voltage **1112** in the third state) can smooth out potential voltage spikes.

In certain embodiments, the second power element **1140** does not comprise a battery and may comprise one or more capacitors. For example, as schematically illustrated in FIG. **16**, the second power element **1140** comprises a capacitor array **1142**, a buck-boost converter **1144** which adjusts the voltage for charging the capacitor array and a voltage/current limiter **1146** which limits the charge current to the capacitor array **1142** and stops charging the capacitor array **1142** when it has reached a certain charge voltage. In one

Samsung Electronics Co., Ltd.
Ex. 1001, p. 41

US 11,232,054 B2

29 30

example embodiment, the capacitor array **1142** comprises two 50 farad capacitors capable of holding a total charge of 4.6V. For example, in one example embodiment, the buck-boost converter **1144** receives a 1.8V system voltage (first voltage **1108**) and boosts the voltage to 4.3V which is outputted to the voltage current limiter **1146**. The voltage/current limiter **1146** limits the current going to the capacitor array **1142** to 1 A and stops charging the array **1142** when it is charged to 4.3V. Although described with respect to certain example embodiments, one of ordinary skill will recognize from the disclosure herein that the second power element **1140** may include alternative embodiments. For example, different components and/or different value components may be used. For example, in other embodiments, a pure boost converter may be used instead of a buck-boost converter. In another embodiment, only one capacitor may be used instead of a capacitor array **1142**.

The conversion element **1120** can comprise one or more buck converters and/or one or more buck-boost converters. The conversion element **1120** may comprise a plurality of sub-blocks **1122**, **1124**, **1126** as schematically illustrated by FIG. **16**, which can provide more voltages in addition to the second voltage **1104** to the memory system **1010**. The sub-blocks may comprise various converter circuits such as buck-converters, boost converters, and buck-boost converter circuits for providing various voltage values to the memory system **1010**. For example, in one embodiment, sub-block **1122** comprises a buck converter, sub-block **1124** comprises a dual buck converter, and sub-block **1126** comprises a buck-boost converter as schematically illustrated by FIG. **16**. Various other components for the sub-blocks **1122**, **1124**, **1126** of the conversion element **1120** are also compatible with certain embodiments described herein. In certain embodiments, the conversion element **1120** receives as input either the fourth voltage **1110** from the first power element **1130** or the fifth voltage **1112** from the second power element **1140**, depending on the state of the power module **1100**, and reduces the input to an appropriate amount for powering various components of the memory system. For example, the buck-converter of sub-block **1122** can provide 1.8V at 2 A for about 60 seconds to the volatile memory elements **1032** (e.g., DRAM), the non-volatile memory elements **1042** (e.g., flash), and the controller **1062** (e.g., an FPGA) in one embodiment. The sub-block **1124** can provide the second voltage **1104** as well as another reduced voltage **1105** to the memory system **1010**. In one example embodiment, the second voltage **1104** is 2.5V and is used to power the at least one circuit **1052** (e.g., isolation device) and the other reduced voltage **1105** is 1.2V and is used to power the controller **1062** (e.g., FPGA). The subblock **1126** can provide yet another voltage **1107** to the memory system **1010**. For example, the voltage **1107** may be 3.3V and may be used to power both the controller **1062** and the at least one circuit **1052**.

Although described with respect to certain example embodiments, one of ordinary skill will recognize from the disclosure herein that the conversion element **1120** may include alternative embodiments. For example, there may be more or less sub-blocks which may comprise other types of converters (e.g., pure boost converters) or which may produce different voltage values. In one embodiment, the volatile memory elements **1032** and nonvolatile memory elements **1042** are powered using independent voltages and are not both powered using the first voltage **1102**.

FIG. **17** is a flowchart of an example method **1200** of providing a first voltage **1102** and a second voltage **1104** to a memory system **1010** including volatile and nonvolatile memory subsystems **1030**, **1040**. While the method **1200** is described herein by reference to the memory system **1010** schematically illustrated by FIGS. **12-15**, other memory systems are also compatible with embodiments of the method **1200**. During a first condition, the method **1200** comprises providing the first voltage **1102** to the memory system **1010** from an input power supply **1106** and providing the second voltage **1104** to the memory system **1010** from a first power subsystem in operational block **1210**. For example, in one embodiment, the first power subsystem comprises the first power element **1130** and the voltage conversion element **1120** described above with respect to FIG. **16**. In other embodiments, other first power subsystems are used.

The method **1200** further comprises detecting a second condition in operational block **1220**. In certain embodiments, detecting the second condition comprises detecting that a trigger condition is likely to occur. During the second condition, the method **1200** comprises providing the first voltage **1102** and the second voltage **1104** to the memory system **1010** from the first power subsystem in an operational block **1230**. For example, referring to FIG. **16**, a switch **1148** can be toggled to provide the first voltage **1102** from the conversion element **1120** rather than from the input power supply.

The method **1200** further comprises charging a second power subsystem in operational block **1240**. In certain embodiments, the second power subsystem comprises the second power element **1140** or another power supply that does not comprise a battery. For example, in one embodiment, the second power subsystem comprises the second power element **1140** and the voltage conversion element **1120** described above with respect to FIG. **16**. In other embodiments, some other second power subsystem is used.

The method **1200** further comprises detecting a third condition in an operational block **1250** and during the third condition, providing the first voltage **1102** and the second voltage **1104** to the memory system **1010** from the second power subsystem **1140** in an operational block **1260**. In certain embodiments, detecting the third condition comprises detecting that the trigger condition has occurred. The trigger condition may comprise various conditions described herein. In various embodiments, for example, the trigger condition comprises a power reduction, power failure, or system hang-up. The operational blocks of the method **1200** may be performed in different orders in various embodiments. For example, in certain embodiments, the second power subsystem **1140** is charged before detecting the second condition.

In certain embodiments, the memory system **1010** comprises a volatile memory subsystem **1030** and a non-volatile memory subsystem **1040** comprising at least 100 percent more storage capacity than does the volatile memory subsystem. The memory system **1010** also comprises a controller **1062** operatively coupled to the volatile memory subsystem **1030** and operatively coupled to the non-volatile memory subsystem **1040**. The controller **1062** can be configured to allow data to be communicated between the volatile memory subsystem **1030** and the host system when the memory system **1010** is operating in a first state and to allow data to be communicated between the volatile memory subsystem **1030** and the non-volatile memory subsystem **1040** when the memory system **1010** is operating in a second state.

Although the memory system **1010** having extra storage capacity of the non-volatile memory subsystem **1040** has been described with respect to certain embodiments, alter-

Samsung Electronics Co., Ltd.

Ex. 1001, p. 42

US 11,232,054 B2

31

native configurations exist. For example, in certain embodiments, there may be more than 100 percent more storage capacity in the non-volatile memory subsystem **1040** than in the volatile memory subsystem **1030**. In various embodiments, there may be at least 200, 300, or 400 percent more storage capacity in the non-volatile memory subsystem **1040** than in the volatile memory subsystem **1030**. In other embodiments, the non-volatile memory subsystem **1040** includes at least some other integer multiples of the storage capacity of the volatile memory subsystem **1030**. In some embodiments, the non-volatile memory subsystem **1040** includes a non-integer multiple of the storage capacity of the volatile memory subsystem **1030**. In one embodiment, the non-volatile memory subsystem **1040** includes less than 100 percent more storage capacity than does the volatile memory subsystem **1030**.

The extra storage capacity of the non-volatile memory subsystem **1040** can be used to improve the backup capability of the memory system **1010**. In certain embodiments in which data can only be written to portions of the non-volatile memory subsystem **1040** which do not contain data (e.g., portions which have been erased), the extra storage capacity of the nonvolatile memory subsystem **1040** allows the volatile memory subsystem **1030** to be backed up in the event of a subsequent power failure or other trigger event. For example, the extra storage capacity of the non-volatile memory subsystem **1040** may allow the memory system **1010** to backup the volatile memory subsystem **1030** efficiently in the event of multiple trigger conditions (e.g., power failures). In the event of a first power failure, for example, the data in the volatile memory subsystem **1030** is copied to a first, previously erased portion of the nonvolatile memory subsystem **1040** via the controller **1062**. Since the non-volatile memory subsystem **1040** has more storage capacity than does the volatile memory subsystem **1030**, there is a second portion of the non-volatile memory subsystem **1040** which does not have data from the volatile memory subsystem **1030** copied to it and which remains free of data (e.g., erased). Once system power is restored, the controller **1062** of the memory system **1010** restores the data to the volatile memory subsystem **1030** by copying the backed-up data from the non-volatile memory subsystem **40** back to the volatile memory subsystem **1030**. After the data is restored, the memory system **1010** erases the non-volatile memory subsystem **1040**. While the first portion of the non-volatile memory subsystem **1040** is being erased, it may be temporarily unaccessible.

If a subsequent power failure occurs before the first portion of the non-volatile memory subsystem **1040** is completely erased, the volatile memory subsystem **1030** can be backed-up or stored again in the second portion of the non-volatile memory subsystem **1040** as described herein. In certain embodiments, the extra storage capacity of the non-volatile memory subsystem **1040** may allow the memory system **1010** to operate more efficiently. For example, because of the extra storage capacity of the non-volatile memory subsystem **1040**, the memory system **1010** can handle a higher frequency of trigger events that is not limited by the erase time of the non-volatile memory subsystem **1040**.

FIG. **18** is a flowchart of an example method **1300** of controlling a memory system **1010** operatively coupled to a host system and which includes a volatile memory subsystem **1030** and a non-volatile memory subsystem **1040**. In certain embodiments, the non-volatile memory subsystem **1040** comprises at least 100 percent more storage capacity than does the volatile memory subsystem **30** as described

32

herein. While the method **1300** is described herein by reference to the memory system **1010** schematically illustrated by FIGS. **12-14**, the method **1300** can be practiced using other memory systems in accordance with certain embodiments described herein. In an operational block **1310**, the method **1300** comprises communicating data between the volatile memory subsystem **1030** and the host system when the memory system **1010** is in a first mode of operation. The method **1300** further comprises storing a first copy of data from the volatile memory subsystem **1030** to the non-volatile memory subsystem **1040** at a first time when the memory system **1010** is in a second mode of operation in an operational block **1320**.

In an operational block **1330**, the method **1300** comprises restoring the first copy of data from the non-volatile memory subsystem **1040** to the volatile memory subsystem **1030**. The method **1300** further comprises erasing the first copy of data from the non-volatile memory subsystem **1040** in an operational block **1340**. The method further comprises storing a second copy of data from the volatile memory subsystem **1030** to the non-volatile memory subsystem **1040** at a second time when the memory system **1010** is in the second mode of operation in an operational block **1350**. Storing the second copy begins before the first copy is completely erased from the non-volatile memory subsystem **1040**.

In some embodiments, the memory system **1010** enters the second mode of operation in response to a trigger condition, such as a power failure. In certain embodiments, the first copy of data and the second copy of data are stored in separate portions of the nonvolatile memory subsystem **1040**. The method **1300** can also include restoring the second copy of data from the non-volatile memory subsystem **1040** to the volatile memory subsystem **1030** in an operational block **1360**. The operational blocks of method **1300** referred to herein may be performed in different orders in various embodiments. For example, in some embodiments, the second copy of data is restored to the volatile memory subsystem **1030** at operational block **1360** before the first copy of data is completely erased in the operational block **1340**.

FIG. **19** schematically illustrates an example clock distribution topology **1400** of a memory system **1010** in accordance with certain embodiments described herein. The clock distribution topology **1400** generally illustrates the creation and routing of the clock signals provided to the various components of the memory system **1010**. A clock source **1402** such as, for example, a 25 MHz oscillator, generates a clock signal. The clock source **1402** may feed a clock generator **1404** which provides a clock signal **1406** to the controller **1062**, which may be an FPGA. In one embodiment, the clock generator **1404** generates a 125 MHz clock signal **1406**. The controller **1062** receives the clock signal **1406** and uses it to clock the controller **1062** master state control logic. For example, the master state control logic may control the general operation of an FPGA controller **1062**.

The clock signal **1406** can also be input into a clock divider **1410** which produces a frequency-divided version of the clock signal **1406**. In an example embodiment, the clock divider **1410** is a divide by two clock divider and produces a 62.5 MHz clock signal in response to the 125 MHz clock signal **1406**. A non-volatile memory phase-locked loop (PLL) block **1412** can be included (e.g., in the controller **1062**) which distributes a series of clock signals to the non-volatile memory subsystem **1040** and to associated control logic. For example, a series of clock signals **1414** can

Samsung Electronics Co., Ltd.
Ex. 1001, p. 43

US 11,232,054 B2

33                                                                    34

be sent from the controller **1062** to the non-volatile memory subsystem **1040**. Another clock signal **1416** can be used by the controller logic which is dedicated to controlling the non-volatile memory subsystem **1040**. For example, the clock signal **1416** may clock the portion of the controller **1062** which is dedicated to generating address and/or control lines for the non-volatile memory subsystem **1040**. A feedback clock signal **1418** is fed back into the non-volatile memory PLL block **1412**. In one embodiment, the PLL block **1412** compares the feedback clock **1418** to the reference clock **1411** and varies the phase and frequency of its output until the reference **1411** and feedback **1418** clocks are phase and frequency matched.

A version of the clock signal **1406** such as the backup clock signal **1408** may be sent from the controller to the volatile memory subsystem **1030**. The clock signal **1408** may be, for example, a differential version of the clock signal **1406**. As described herein, the backup clock signal **1408** may be used to clock the volatile memory subsystem **1030** when the memory system **1010** is backing up the data from the volatile memory subsystem **1030** into the non-volatile memory subsystem **1040**. In certain embodiments, the backup clock signal **1408** may also be used to clock the volatile memory subsystem **1030** when the memory system **1010** is copying the backed-up data back into the volatile memory subsystem **1030** from the nonvolatile memory subsystem **1040** (also referred to as restoring the volatile memory subsystem **1030**). The volatile memory subsystem **1030** may normally be run at a higher frequency (e.g., DRAM running at 400 MHz) than the nonvolatile memory subsystem **1040** (e.g., flash memory running at 62.5 MHz) when communicating with the host system (e.g., when no trigger condition is present). However, in certain embodiments the volatile memory subsystem **1030** may be operated at a reduced frequency (e.g., at twice the frequency of the non-volatile memory subsystem **1040**) without introducing significant delay into the system during backup operation and/or restore operations. Running the volatile memory subsystem **1030** at the reduced frequency during a backup and/or restore operation may advantageously reduce overall power consumption of the memory system **1010**.

In one embodiment, the backup clock **1408** and the volatile memory system clock signal **1420** are received by a multiplexer **1422**, as schematically illustrated by FIG. **19**. The multiplexer **1422** can output either the volatile memory system clock signal **1420** or the backup clock signal **1408** depending on the backup state of the memory system **1010**. For example, when the memory system **1010** is not performing a backup or restore operation and is communicating with the host system (e.g., normal operation), the volatile memory system clock signal **1420** may be provided by the multiplexer **422** to the volatile memory PLL block **1424**. When the memory system **1010** is performing a backup (or restore) operation, the backup clock signal **1408** may be provided.

The volatile memory PLL block **1424** receives the volatile memory reference clock signal **1423** from the multiplexer **1422** and can generate a series of clock signals which are distributed to the volatile memory subsystem **1030** and associated control logic. For example, in one embodiment, the PLL block **1424** generates a series of clock signals **1426** which clock the volatile memory elements **1032**. A clock signal **1428** may be used to clock control logic associated with the volatile memory elements, such as one or more registers (e.g., the one or more registers of a registered DIMM). Another clock signal **1430** may be sent to the controller **1062**. A feedback clock signal **1432** is fed back

into the volatile memory PLL block **1424**. In one embodiment, the PLL block **1424** compares the feedback clock signal **1432** to the reference clock signal **1423** and varies the phase and frequency of its output until the reference clock signal **1423** and the feedback clock signal **1432** clocks are phase and frequency matched.

The clock signal **1430** may be used by the controller **1062** to generate and distribute clock signals which will be used by controller logic which is configured to control the volatile memory subsystem **1030**. For example, control logic in the controller **1062** may be used to control the volatile memory subsystem **1030** during a backup or restore operation. The clock signal **1430** may be used as a reference clock signal for the PLL block **1434** which can generate one or more clocks **1438** used by logic in the controller **1062**. For example, the PLL block **1434** may generate one or more clock signals **1438** used to drive logic circuitry associated with controlling the volatile memory subsystem **1030**. In certain embodiments, the PLL block **1434** includes a feedback clock signal **1436** and operates in a similar manner to other PLL blocks described herein.

The clock signal **1430** may be used as a reference clock signal for the PLL block **1440** which may generate one or more clock signals used by a sub-block **1442** to generate one or more other clock signals **1444**. In one embodiment, for example, the volatile memory subsystem **1030** comprises DDR2 SDRAM elements and the sub-block **1442** generates one or more DDR2 compatible clock signals **1444**. A feedback clock signal **1446** is fed back into the PLL block **1440**. In certain embodiments, the PLL block **1440** operates in a similar manner to other PLL blocks described herein.

While described with respect to the example embodiment of FIG. **19**, various alternative clock distribution topologies are possible. For example, one or more of the clock signals have a different frequency in various other embodiments. In some embodiments, one or more of the clocks shown as differential signals are single ended signals. In one embodiment, the volatile memory subsystem **1030** operates on the volatile memory clock signal **1420** and there is no backup clock signal **1408**. In some embodiments, the volatile memory subsystem **1030** is operated at a reduced frequency during a backup operation and not during a restore operation. In other embodiments, the volatile memory subsystem **1030** is operated at a reduced frequency during a restore operation and not during a backup operation.

FIG. **20** is a flowchart of an example method **1500** of controlling a memory system **1010** operatively coupled to a host system. Although described with respect to the memory system **1010** described herein, the method **1500** is compatible with other memory systems. The memory system **1010** may include a clock distribution topology **1400** similar to the one described above with respect to FIG. **19** or another clock distribution topology. The memory system **1010** can include a volatile memory subsystem **30** and a non-volatile memory subsystem **1040**.

In an operational block **1510**, the method **1500** comprises operating the volatile memory subsystem **1030** at a first frequency when the memory system **1010** is in a first mode of operation in which data is communicated between the volatile memory subsystem **1030** and the host system. In an operational block **1520**, the method **1500** comprises operating the non-volatile memory subsystem **1040** at a second frequency when the memory system **1010** is in a second mode of operation in which data is communicated between the volatile memory subsystem **1030** and the non-volatile memory subsystem **1040**. The method **1500** further comprises operating the volatile memory subsystem **1030** at a

Samsung Electronics Co., Ltd.
Ex. 1001, p. 44

US 11,232,054 B2

35                                                                    36

third frequency in an operational block **1530** when the memory system **1010** is in the second mode of operation. In certain embodiments, the memory system **1010** is not powered by a battery when it is in the second mode of operation. The memory system **1010** may switch from the first mode of operation to the second mode of operation in response to a trigger condition. The trigger condition may be any trigger condition described herein such as, for example, a power failure condition. In certain embodiments, the second mode of operation includes both backup and restore operations as described herein. In other embodiments, the second mode of operation includes backup operations but not restore operations. In yet other embodiments, the second mode of operation includes restore operations but not backup operations.

The third frequency can be less than the first frequency. For example, the third frequency can be approximately equal to the second frequency. In certain embodiments, the reduced frequency operation is an optional mode. In yet other embodiments, the first, second and/or third frequencies are configurable by a user or by the memory system **1010**.

FIG. **21** schematically illustrates an example topology of a connection to transfer data slices from two DRAM segments **1630**, **1640** of a volatile memory subsystem **1030** of a memory system **1010** to a controller **1062** of the memory system **1010**. While the example of FIG. **21** shows a topology including two DRAM segments **1630**, **1640** for the purposes of illustration, each address location of the volatile memory subsystem **1030** comprises more than the two segments in certain embodiments. The data lines **1632**, **1642** from the first DRAM segment **1630** and the second DRAM segment **1640** of the volatile memory subsystem **1030** are coupled to switches **1650**, **1652** which are coupled to the controller **1062** (e.g., logic element **1070**) of the memory system **1010**. The chip select lines **1634**, **1644** and the self-refresh lines **1636**, **1646** (e.g., CKe signals) of the first and second DRAM segments **1630**, **1640**, respectively, are coupled to the controller **1062**. In certain embodiments, the controller **1062** comprises a buffer (not shown) which is configured to store data from the volatile memory subsystem **1030**. In certain embodiments, the buffer is a first-in, first out buffer (FIFO). In certain embodiments, data slices from each DRAM segment **1630**, **1640** comprise a portion of the volatile memory subsystem data bus. In one embodiment, for example, the volatile memory subsystem **1030** comprises a 72-bit data bus (e.g., each data word at each addressable location is 72 bits wide and includes, for example, 64 bits of accessible SDRAM and 8 bits of ECC), the first data slice from the first DRAM segment **1630** may comprise 40 bits of the data word, and the second data slice from the second DRAM segment **1640** may comprise the remaining 32 bits of the data word. Certain other embodiments comprise data buses and/or data slices of different sizes.

In certain embodiments, the switches **1650**, **1652** can each be selectively switched to selectively operatively couple the data lines **1632**, **1642**, respectively from the first and second DRAM segments **1630**, **1640** to the controller **1062**. The chip select lines **1634**, **1644** enable the first and second DRAM segments **1630**, **1640**, respectively, of the volatile memory subsystem **1030**, and the self-refresh lines **1636**, **1646** toggle the first and second DRAM segments **1630**, **1640**, respectively, from self-refresh mode to active mode. In certain embodiments, the first and second DRAM segments **1630**, **1640** maintain stored information but are not accessible when they are in self-refresh mode, and maintain stored information and are accessible when they are in active mode.

In certain embodiments, when the memory system **1010** is backing up the volatile memory system **1030**, data slices from only one of the two DRAM segments **1630**, **1640** at a time are sent to the controller **1062**. For example, when the first slice is being written to the controller **1062** during a back-up, the controller **1062** sends a signal via the CKe line **1636** to the first DRAM segment **1630** to put the first DRAM segment **1630** in active mode. In certain embodiments, the data slice from the first DRAM segment **1630** for multiple words (e.g., a block of words) is written to the controller **1062** before writing the second data slice from the second DRAM segment **1640** to the controller **1062**. While the first data slice is being written to the controller **1062**, the controller **1062** also sends a signal via the CKe line **1646** to put the second DRAM segment **1640** in self-refresh mode. Once the first data slice for one word or for a block of words is written to the controller **1062**, the controller **1062** puts the first DRAM segment **1630** into self-refresh mode by sending a signal via the CKe line **1636** to the first DRAM segment **1640**. The controller **1062** also puts the second DRAM segment **1640** into active mode by sending a signal via the CKe line **1646** to the second DRAM segment **1640**. The second slice for a word or for a block of words is written to the controller **1062**. In certain embodiments, when the first and second data slices are written to the buffer in the controller **1062**, the controller **1062** combines the first and second data slices **1630**, **1640** into complete words or blocks of words and then writes each complete word or block of words to the non-volatile memory subsystem **1040**. In certain embodiments, this process is called "slicing" the volatile memory subsystem **1030**.

In certain embodiments, the data may be sliced in a restore operation as well as, or instead of, during a backup operation. For example, in one embodiment, the nonvolatile memory elements **1042** write each backed-up data word to the controller **1062** which writes a first slice of the data word to the volatile memory subsystem **1030** and then a second slice of the data word to the volatile memory subsystem **1030**. In certain embodiments, slicing the volatile memory subsystem **1030** during a restore operation may be performed in a manner generally inverse to slicing the volatile memory subsystem **1030** during a backup operation.

FIG. **22** is a flowchart of an example method **1600** of controlling a memory system **1010** operatively coupled to a host system and which includes a volatile memory subsystem **1030** and a non-volatile memory subsystem **1040**. Although described with respect to the memory system **1010** described herein with respect to FIGS. **12-14** and **21**, the method **1600** is compatible with other memory systems. The method **1600** comprises communicating data words between the volatile memory subsystem **1030** and the host system when the memory system **1010** is in a first mode of operation in an operational block **1610**. For example, the memory system **1010** may be in the first mode of operation when no trigger condition has occurred and the memory system is not performing a backup and/or restore operation or is not being powered by a secondary power supply.

In an operational block **1620**, the method further comprises transferring data words from the volatile memory subsystem **1030** to the non-volatile memory subsystem **1040** when the memory system **1010** is in a second mode of operation. In certain embodiments, each data word comprises the data stored in a particular address of the memory system **1010**. The memory system **1010** may enter the second mode of operation, for example, when a trigger condition (e.g., a power failure) occurs. In certain embodiments, transferring each data word comprises storing a first

Samsung Electronics Co., Ltd.
Ex. 1001, p. 45

US 11,232,054 B2

37                                                    38

portion (also referred to as a slice) of the data word in a buffer in an operational block **1622**, storing a second portion of the data word in the buffer in an operational block **1624**, and writing the entire data word from the buffer to the non-volatile memory subsystem **1040** in an operational block **1626**.

In one example embodiment, the data word may be a 72 bit data word (e.g., 64 bits of accessible SDRAM and 8 bits of ECC), the first portion (or "slice") may comprise 40 bits of the data word, and the second portion (or "slice") may comprise the remaining 32 bits of the data word. In certain embodiments, the buffer is included in the controller **1062**. For example, in one embodiment, the buffer is a first-in, first-out buffer implemented in the controller **1062** which comprises an FPGA. The method **1600** may generally be referred to as "slicing" the volatile memory during a backup operation. In the example embodiment, the process of "slicing" the volatile memory during a backup includes bringing the 32-bit slice out of self-refresh, reading a 32-bit block from the slice into the buffer, and putting the 32-bit slice back into self-refresh. The 40-bit slice is then brought out of self-refresh and a 40-bit block from the slice is read into a buffer. Each block may comprise a portion of multiple words. For example, each 32-bit block may comprise 32-bit portions of multiple 72-bit words. In other embodiments, each block comprises a portion of a single word. The 40-bit slice is then put back into self-refresh in the example embodiment. The 32-bit and 40-bit slices are then combined into a 72-bit block by the controller **1062** and ECC detection/correction is performed on each 72-bit word as it is read from the buffer and written into the non-volatile memory subsystem (e.g., flash).

In some embodiments, the entire data word may comprise more than two portions. For example, the entire data word may comprise three portions instead of two and transferring each data word further comprises storing a third portion of each data word in the buffer. In certain other embodiments, the data word may comprise more than three portions.

In certain embodiments, the data may be sliced in a restore operation as well as, or instead of, during a backup operation. For example, in one embodiment, the nonvolatile memory elements **1040** write each backed-up data word to the controller **1062** which writes a first portion of the data word to the volatile memory subsystem **1030** and then a second portion of the data word to the volatile memory **1030**. In certain embodiments, slicing the volatile memory subsystem **1030** during a restore operation may be performed in a manner generally inverse to slicing the volatile memory subsystem **1030** during a backup operation.

The method **1600** can advantageously provide significant power savings and can lead to other advantages. For example, in one embodiment where the volatile memory subsystem **1030** comprises DRAM elements, only the slice of the DRAM which is currently being accessed (e.g., written to the buffer) during a backup is configured in full-operational mode. The slice or slices that are not being accessed may be put in self-refresh mode. Because DRAM in self-refresh mode uses significantly less power than DRAM in full-operational mode, the method **1600** can allow significant power savings. In certain embodiments, each slice of the DRAM includes a separate self-refresh enable (e.g., CKe) signal which allows each slice to be accessed independently.

In addition, the connection between the DRAM elements and the controller **1062** may be as large as the largest slice instead of as large as the data bus. In the example embodiment, the connection between the controller **1062** and the DRAM may be 40 bits instead of 72 bits. As a result, pins on the controller **1062** may be used for other purposes or a smaller controller may be used due to the relatively low number of pin-outs used to connect to the volatile memory subsystem **1030**. In certain other embodiments, the full width of the data bus is connected between the volatile memory subsystem **1030** and the controller **1062** but only a portion of it is used during slicing operations. For example, in some embodiments, memory slicing is an optional mode.

While embodiments and applications have been shown and described, it would be apparent to those skilled in the art having the benefit of this disclosure that many more modifications than mentioned above are possible without departing from the inventive concepts disclosed herein. The invention, therefore, is not to be restricted except in the spirit of the appended claims.

What is claimed is:

**1**. A memory module comprising:

a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system;

a voltage conversion circuit coupled to the PCB and configured to provide at least three regulated voltages, wherein the voltage conversion circuit includes at least three buck converters each of which is configured to produce a regulated voltage of the at least three regulated voltages;

a plurality of components coupled to the PCB, each component of the plurality of components coupled to at least one regulated voltage of the at least three regulated voltages, the plurality of components including a plurality of synchronous dynamic random access memory (SDRAM) devices and a first circuit that is coupled to the plurality of SDRAM devices and to a first set of edge connections of the plurality of edge connections, wherein the first circuit is coupled to first and second regulated voltages of the at least three regulated voltages, and wherein the plurality of SDRAM devices are coupled to the first regulated voltage of the at least three regulated voltages.

**2**. The memory module of claim **1**, wherein the first regulated voltage has a first voltage amplitude, and the second regulated voltage has a second voltage amplitude; and wherein a first one of the first and second voltage amplitudes is less than a second one of the first and second voltage amplitudes.

**3**. The memory module of claim **1**, wherein a third regulated voltage of the at least three regulated voltages has a voltage amplitude of 1.8 volts.

**4**. The memory module of claim **1**, further comprising:

a voltage monitor circuit coupled to the PCB and to a second set of edge connections of the plurality of edge connections, the voltage monitor circuit configured to monitor an input voltage received from the second set of edge connections, the voltage monitor circuit configured to produce a trigger signal in response to the input voltage having a voltage amplitude below a predetermined threshold voltage, wherein the memory module transitions from a first operable state to a second operable state in response to the trigger signal.

**5**. The memory module of claim **4**, further comprising:

a controller coupled to the voltage monitor circuit; wherein, in response to the trigger signal, the controller

Samsung Electronics Co., Ltd.
Ex. 1001, p. 46

US 11,232,054 B2

39                                                                                 40

is configured to perform one or more operations including a write operation to transfer data to non-volatile memory.

**6**. The memory module of claim **1**, further comprising:

a voltage monitor circuit coupled to the PCB and to a second set of edge connections of the plurality of edge connections, the voltage monitor circuit configured to monitor an input voltage received from the second set of edge connections, the voltage monitor circuit configured to produce a trigger signal in response to the input voltage having a voltage amplitude above a predetermined threshold voltage, wherein the memory module transitions from a first operable state to a second operable state in response to the trigger signal.

**7**. The memory module of claim **6**, further comprising:

a controller coupled to the voltage monitor circuit; wherein, in response to the trigger signal, the controller is configured to perform one or more operations including a write operation to transfer data to non-volatile memory.

**8**. The memory module of claim **1**, further comprising:

a controller coupled to the PCB, the controller including a voltage monitor circuit configured to monitor an input voltage received from a second set of edge connections of the plurality of edge connections, wherein, in response to the voltage monitor circuit detecting a power threshold condition, the voltage monitor circuit transmits a signal to one or more portions of the controller.

**9**. The memory module of claim **8**, wherein the voltage monitor circuit detecting a power threshold condition includes the voltage monitor circuit detecting an amplitude of the input voltage being above a first predetermined threshold voltage, and wherein the first predetermined threshold voltage is above a specified operating voltage.

**10**. The memory module of claim **9**, wherein the first predetermined threshold voltage is ten percent above the specified operating voltage.

**11**. The memory module of claim **9**, wherein the voltage monitor circuit detecting a power threshold condition includes the voltage monitor circuit detecting an amplitude of the input voltage being below a second predetermined threshold voltage, wherein the second predetermined threshold voltage is below the specified operating voltage, and wherein the memory module transitions from a first operable state to a second operable state in response to the signal.

**12**. The memory module of claim **11**, wherein the second predetermined threshold voltage is ten percent below the specified operating voltage.

**13**. The memory module of claim **8**, wherein the voltage monitor circuit detecting a power threshold condition includes the voltage monitor circuit detecting a power reduction condition or a low voltage condition of the input voltage.

**14**. The memory module of claim **8**, wherein the voltage monitor circuit detecting a power threshold condition includes the voltage monitor circuit detecting a request by the host system.

**15**. The memory module of claim **1**, wherein two of the at least three buck converters are configured to operate as a dual-buck converter.

**16**. A memory module comprising:

a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system;

a voltage conversion circuit coupled to the PCB and configured to provide a plurality of regulated voltages,

wherein the voltage conversion circuit includes three buck converters each of which is configured to produce a regulated voltage of the plurality of regulated voltages;

a plurality of components coupled to the PCB, each component of the plurality of components coupled to at least one regulated voltage of the plurality of regulated voltages, the plurality of components including a plurality of synchronous dynamic random access memory (SDRAM) devices, the plurality of SDRAM devices coupled to a first regulated voltage of the plurality of regulated voltages; and

a controller coupled to the PCB, the controller including a voltage monitor circuit coupled to an input voltage received from the host system via the interface, the voltage monitor circuit configured to detect an amplitude change in the input voltage, wherein, in response to the voltage monitor detecting an amplitude change in the input voltage, the memory module transitions from a first operable state to a second operable state.

**17**. The memory module of claim **16**, wherein the voltage monitor circuit is configured to detect the input voltage being above a first predetermined threshold voltage and to detect the input voltage being below a second predetermined threshold voltage.

**18**. The memory module of claim **16**, wherein, in the first operable state, the voltage conversion circuit provides the first regulated voltage to the plurality of SDRAM devices using a first pre-regulated voltage, and wherein, in the second operable state, the voltage conversion circuit provides the first regulated voltage to the plurality of SDRAM devices using a second pre-regulated voltage.

**19**. The memory module of claim **18**, wherein, in the first operable state, the first pre-regulated voltage is supplied to the voltage conversion circuit via a circuit, and wherein, in the second operable state, the second pre-regulated voltage is supplied to the voltage conversion circuit via the circuit.

**20**. The memory module of claim **19**, wherein the circuit includes a first diode having a first input and a first output, the first input is coupled to the first pre-regulated voltage and the first output is coupled to the voltage conversion circuit, and wherein the circuit includes a second diode having a second input and a second output, the second input is coupled to the second pre-regulated voltage and the second output is coupled to the first output and to the voltage conversion circuit.

**21**. The memory module of claim **16**, further comprising:

a first circuit having a first input, a second input and an output, the first input coupled to a first pre-regulated voltage, the second input coupled to a second pre-regulated voltage, the output coupled to the voltage conversion circuit, wherein the voltage conversion circuit provides the first regulated voltage to the plurality of SDRAM devices using a supply voltage, wherein, in the first operable state, the first circuit provides the supply voltage to the voltage conversion circuit via the output using the first pre-regulated voltage, and wherein, in the second state, the first circuit provides the supply voltage to the voltage conversion circuit via the output using the second pre-regulated voltage.

**22**. The memory module of claim **21**, wherein the first circuit includes a first diode coupled between the first input and the output and a second diode coupled between the second input and the output.

**23**. The memory module of claim **16**, wherein the voltage monitor circuit is configured to produce a trigger signal in response to detecting an amplitude change in the input

Samsung Electronics Co., Ltd.

Ex. 1001, p. 47

US 11,232,054 B2

41

voltage; and wherein, in response to the trigger signal, the controller is configured to perform one or more operations including a write operation to transfer data to non-volatile memory.

24. A memory module comprising:

a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system;

a voltage conversion circuit configured to provide a plurality of regulated voltages, wherein the voltage conversion circuit includes three buck converters each of which is configured to produce a regulated voltage of the plurality of regulated voltages;

a plurality of components each coupled to at least one regulated voltage of the plurality of regulated voltages, the plurality of components including a plurality of synchronous dynamic random access memory (SDRAM) devices, wherein the plurality of SDRAM devices are coupled to a first regulated voltage of the plurality of regulated voltages; and

a controller including a voltage monitor circuit coupled to an input voltage received from the host system via the interface of the PCB, the voltage monitor circuit configured to monitor the input voltage, wherein the controller is configured to perform one or more operations in response to the voltage monitor circuit detecting an amplitude change in the input voltage, and wherein the

42

one or more operations include a write operation to transfer data into non-volatile memory.

25. The memory module of claim 24, wherein, in response to the voltage monitor circuit detecting an amplitude change in the input voltage, the memory module transitions from a first operable state to a second operable state.

26. The memory module of claim 25, wherein, in the first operable state, the voltage conversion circuit provides the first regulated voltage to the plurality of SDRAM devices using a first pre-regulated voltage, and wherein, in the second operable state, the voltage conversion circuit provides the first regulated voltage to the plurality of SDRAM devices using a second pre-regulated voltage.

27. The memory module of claim 26, wherein the first pre-regulated voltage is coupled to the voltage conversion circuit via a first diode.

28. The memory module of claim 27, wherein the second pre-regulated voltage is coupled to the voltage conversion circuit via a second diode.

29. The memory module of claim 24, wherein the voltage monitor circuit is configured to detect the input voltage being above a first predetermined threshold voltage or below a second predetermined threshold voltage.

30. The memory module of claim 29, wherein the first predetermined threshold voltage is above a specified operating voltage, and the second predetermined threshold voltage is below the specified operating voltage.

*  *  *  *  *

Samsung Electronics Co., Ltd.
Ex. 1001, p. 48

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** <u>2024-1859, 2024-1863</u>

**Short Case Caption:** <u>Netlist, Inc. v. Samsung Electronics Co., Ltd.</u>

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑  the filing has been prepared using a proportionally-spaced typeface and includes <u>13,996</u> words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>11/04/2024</u>

Signature: <u>/s/ Jeffrey A. Lamken</u>

Name: <u>Jeffrey A. Lamken</u>