Nos. 24-1859, 24-1863

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

NETLIST, INC.,

*Appellant*,

V.

SAMSUNG ELECTRONICS CO., LTD., MICRON TECHNOLOGY INC., MICRON
SEMICONDUCTOR PRODUCTS, INC., MICRON TECHNOLOGY TEXAS, LLC,

*Appellees*.

On Appeal from the U.S. Patent and Trademark Office, Patent Trial and Appeal
Board, Nos. IPR2022-00996, IPR2022-00999, IPR2023-00405, IPR2023-00406

## REPLY BRIEF FOR APPELLANT NETLIST, INC.

Jeffrey A. Lamken
Rayiner Hashem
Jennifer Elizabeth Fischell
Lidiya Mishchenko
Kayvon Ghayoumi
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000
jlamken@mololamken.com

Philip J. Warrick
IRELL & MANELLA LLP
750 17th Street, N.W., Suite 850
Washington, D.C.  20006
(202) 777-6512
pwarrick@irell.com

Jason Sheasby
H. Annita Zhong
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067
(310) 277-1010

*Counsel for Appellant Netlist, Inc.*
*(Additional Counsel Listed on Inside Cover)*

Elizabeth Kathleen Clarke
Bonnie K. St. Charles
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL  60654
(312) 450-6700

Sara Margolis
Catherine Martinez
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
(212) 607-8160

Jonathan M. Lindsay
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA  92660
(949) 760-5220

*Counsel for Appellant Netlist, Inc.*

# TABLE OF CONTENTS

Page

ARGUMENT ....................................................................................1

I.    The Board's Determination That Harris and FBDIMM Teach the
      Claimed Memory Module Cannot Be Sustained ............................................1

      A.    The Board Erred in Departing From the Petition's Grounds ...............2

      B.    The Board Failed To Properly Evaluate Motivation To
            Combine Where Harris Teaches Away From the Claimed
            Invention ................................................................................6

            1.    The Board Failed To Explain Why Skilled Artisans
                  Would Pursue the Board's Proposed Modification to
                  Harris ...........................................................................7

            2.    Harris's Teaching Away From the Claims Requires
                  Reversal .........................................................................8

            3.    Samsung's Other Evidence Cannot Support the Board
                  Decision ......................................................................15

II.   The Board's Determination That Skilled Artisans Would Modify
      Harris To Include Three (or Four) Voltage Converters Cannot
      Be Sustained ...............................................................................17

      A.    The Board Failed To Explain Why Skilled Artisans
            Would Have Modified Harris To Include Additional
            On-Board Converters ................................................................17

      B.    Substantial Evidence Does Not Support the Board's
            Conclusion ..............................................................................21

III.  The Board's Determinations Regarding the Voltage-Monitoring
      Limitations Cannot Be Sustained .................................................23

      A.    The Board Erred in Determining That Skilled Artisans
            Would Have Combined Harris's FBDIMM With Amidi
            (Grounds 2 and 3) ....................................................................24

i

B.    Amidi Does Not Disclose a Voltage Monitor That Detects an Overvoltage as Required by Claim 5 (and Similar Claims)................27

C.    Amidi Does Not Teach Performing a Write Operation in Response to a Trigger Signal, as Required by Claim 12 (and Similar Claims) ...........................................................................28

D.    Hajeck Does Not Cure the Deficiencies (Ground 3)...........................31

IV.    The Board's Unreasoned Analysis of Other Claims and Limitations Requires Remand........................................................................................32

CONCLUSION ..................................................................................................33

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re Anova Hearing Labs, Inc.*,
    809 F. App'x 840 (Fed. Cir. 2020) ....................................................26

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
    677 F.3d 1361 (Fed. Cir. 2012) .........................................................13

*Corephotonics, Ltd. v. Apple Inc.*,
    84 F.4th 990 (Fed. Cir. 2023) ........................................................5, 6

*DePuy Spine, Inc. v. Medtronic Sofamor Darek, Inc.*,
    567 F.3d 1314 (Fed Cir. 2009) ...................................................8, 9, 14

*EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*,
    859 F.3d 1341 (Fed. Cir. 2017) ...........................................................4

*Fanduel, Inc. v. Interactive Games LLC*,
    966 F.3d 1344 (Fed. Cir. 2020) .........................................................33

*In re Fritch*,
    972 F.3d 1260 (Fed. Cir. 1992) .........................................................20

*Henny Penny Corp. v. Frymaster LLC*,
    938 F.3d 1324 (Fed. Cir. 2019) .............................................19, 22, 24

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
    849 F.3d 1034 (Fed. Cir. 2017) .............................................18, 20, 33

*InterDigital Commc'ns, LLC v. ITC*,
    690 F.3d 1318 (Fed. Cir. 2012) ..................................................... 15, 19

*Kerry Grp. Servs. Int'l, Ltd. v. Fla. Food Prods., LLC*,
    No. 23-2092, 2025 WL 582881 (Fed. Cir. Feb. 24, 2025)..............................3, 4

*Koninklijke Philips N.V. v. Google LLC*,
    948 F.3d 1330 (Fed. Cir. 2020) ...........................................................6

*In re Magnum Oil Tools Int'l, Ltd.*,
    829 F.3d 1364 (Fed. Cir. 2016) .........................................................21

*Medtronic, Inc. v. Teleflex Innovations S.À.R.L.*,
  68 F.4th 1298 (Fed. Cir. 2023) ............................................................. 14

*In re NuVasive*,
  842 F.3d 1376 (Fed. Cir. 2016) ...................................... 20, 23, 26, 33

*Paice LLC v. Ford Motor Co.*,
  881 F.3d 894 (Fed. Cir. 2018) ....................................... 30, 31, 33

*Raytheon Techs. Corp. v. Gen. Elec. Co.*,
  993 F.3d 1374 (Fed. Cir. 2021) .............................................. 16

*In re Sang-Su Lee*,
  277 F.3d 1338 (Fed. Cir. 2002) .............................................. 19

*SAS Inst., Inc. v. Iancu*,
  584 U.S. 357 (2018) ........................................................... 5, 6

*S.-Tek Sys., LLC v. Engineered Corrosion Sols., LLC*,
  748 F. App'x 1003 (Fed. Cir. 2018) .................................... 26

*TQ Delta, LLC v. Cisco Sys., Inc.*,
  942 F.3d 1352 (Fed. Cir. 2019) .......................................... 21

*In re Van Os*,
  844 F.3d 1359 (Fed. Cir. 2017) .......................................... 20

*Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*,
  97 F.4th 882 (Fed. Cir. 2024) ............................... 7, 18, 31

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
  853 F.3d 1272 (Fed. Cir. 2017) ............................... 2, 4, 6

## STATUTES

35 U.S.C. § 312(a)(3) ............................................................ 2

# ARGUMENT

## I.    THE BOARD'S DETERMINATION THAT HARRIS AND FBDIMM TEACH THE CLAIMED MEMORY MODULE CANNOT BE SUSTAINED

The challenged claims require (1) voltage "converter[s]" on the memory module (or DIMM), that (2) receive "power" from the "host system" (motherboard) via "edge connections" on the DIMM.  Appx220 (38:20-26) ('918 patent claim 1); *see* Netlist.Br.32.  It is undisputed that the Board found that power-input limitation obvious by ***combining*** Harris's DIMM, and its on-board "regulated voltage supply," with the "FBDIMM standard['s] . . . bottom edge connections for" receiving motherboard "power."  Samsung.Br.2-3, 24.  The Board concluded that skilled artisans would "implement[ ] [the] edge connections . . . disclosed in the FBDIMM standard" in Harris's DIMM "to achieve . . . the challenged claims."  Samsung.Br.2-3.

Samsung's Petition, however, never articulated the Harris-plus-FBDIMM theory on which the Board concededly relied.  Netlist.Br.34-35.  Samsung's efforts to rewrite its Petition fail.  The Board also never explained ***why*** skilled artisans would have been motivated to modify Harris's DIMM—which undisputedly receives power from an "external voltage source," Appx4675 (¶12)—to receive power from the motherboard instead.  Netlist.Br.36-37.  Samsung does not deny that the Board was required to explain why skilled artisans would have modified Harris.  But Samsung does not identify anywhere the Board did that.  That requires vacatur.

Harris's teaching away from the claims independently requires reversal. Harris disparages the "**system board** power supply" and "replace[s]" it with an "**external** voltage source." Appx4675-76 (¶¶ 12, 19) (emphasis added). And Harris modifies a standard FBDIMM to "eliminate[]" the "system board power supply" and corresponding edge-connector "pins." Appx4675-76 (¶¶ 12, 19). Skilled artisans would not have reversed that modification. Netlist.Br.39-41.

Samsung does not deny Harris disparages motherboard power. It points to other statements that supposedly show Harris is compatible with obtaining power from the motherboard, as the claims require. Samsung.Br.29-34. But those ambiguous statements cannot overcome Harris's clear disparagement of receiving motherboard power. And Samsung's other arguments cannot salvage the Board's decision.

## A.    The Board Erred in Departing From the Petition's Grounds

Samsung does not deny that the AIA "foreclose[s]" finding claims unpatentable based on a "theory of *prima facie* obviousness absent from the petition." *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1286 (Fed. Cir. 2017) (citing 35 U.S.C. § 312(a)(3)); *see* Netlist.Br.34-35. Here, Samsung's Petition urged that **Harris itself** taught the claimed on-board voltage converters that receive host-system power via edge connectors. Appx316; Netlist.Br.34-35. The Petition nowhere articulated the theory the Board adopted (and Samsung defends on appeal):

2

that skilled artisans would **combine** Harris, which powers on-board converters from an "external voltage source," with "edge connections" for receiving host-system power from "the FBDIMM standard." *See* Samsung.Br.3. Nor did the Petition purport to explain why skilled artisans would have pursued that modification. The Board's failure to "hold [Samsung] to the obviousness theory articulated" in its Petition requires, at a minimum, vacatur. *Kerry Grp. Servs. Int'l, Ltd. v. Fla. Food Prods., LLC*, No. 23-2092, 2025 WL 582881, at *4 (Fed. Cir. Feb. 24, 2025).

1. Samsung contends that its Petition articulated the combination on which the Board ultimately relied. But Samsung's quote from the Petition proves the opposite. Samsung.Br.25-26 (quoting Appx314-17). The only relevant portion of that two-page block quote is the last paragraph, which addressed claim 1's requirements of "'power, data, address and control signals between the memory module and the host system.'" Appx316 (emphasis removed). That passage included a bulleted list addressing each signal type separately. For **power**, the Petition invoked **Harris alone** (EX1023):

- "*power*": EX1023, ¶[0012] ("power"/"+12V" "pins"); *id*., ¶¶[0010, 19] & Fig.1A (104, below).

Appx316; *see* Netlist.Br.34. Tellingly, the Petition cited the FBDIMM standard for the **other** signals—"'data,'" "'address,'" and "'control'"—but **not** "'power.'" Appx316-17 (emphasis removed). Moreover, nowhere in the quoted passage (or elsewhere) did the Petition argue that skilled artisans would "implement[]" the

3

FBDIMM standard's "edge connections for power" in Harris's DIMM. Samsung.Br.2-3; *see* Netlist.Br.34-36.  Nor did the Petition purport to explain ***why*** skilled artisans would pursue that approach.  Netlist.Br.35-36, 38-39.

Samsung cannot evade the consequences of having failed to advance in its Petition the combination of Harris and the FBDIMM standard for the power-input limitation.  Samsung points to the Petition's discussion of ***other*** limitations. Samsung.Br.24-25.  But where a petition presents an "element-by-element" analysis relying on "specific portions of the prior art" for each element—as here—the Board cannot find obviousness based on a ***different*** permutation of references. *EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*, 859 F.3d 1341, 1348 (Fed. Cir. 2017).  This case is similar to *Wasica*, where "the petition relied solely on" one "embodiment" in one reference to teach a "constant frequency limitation." 853 F.3d at 1283, 1286.  The petitioner, this Court held, could not later urge that skilled artisans "would then have modified" that embodiment "to use a constant-frequency modulation scheme as taught in other references." *Id.* at 1286.  That was a "new theory of *prima facie* obviousness" that was "foreclosed by statute."  *Id.* at 1286-87; *see Kerry Grp.*, 2025 WL 582881, at *4; *EmeraChem*, 859 F.3d at 1348-49.  So too here:  Because Samsung's petition relied ***only*** on Harris for the power-input limitation, the Board could not find that limitation obvious based on Harris as ***modified*** by the FBDIMM standard.

4

Netlist never "conceded" that the Petition was "relying on the combination of Harris and the FBDIMM Standards." Samsung.Br.27. Netlist strenuously argued that such a theory was ***absent*** from the Petition, explaining that "the Petition does not suggest further modifying Harris's . . . 'external voltage source'" based on the FBDIMM standard to obtain motherboard power "from the edge connections." Appx877; *see* Appx684-85 ("does not propose to modify" Harris's power source). Samsung's quotations from Netlist's briefing, Samsung.Br.27 (quoting Appx680; Appx12239), address disputes about what ***Harris alone*** discloses.

2.    Samsung argues that the "Institution Decisions" gave Netlist "notice" of the Final Written Decision's obviousness theory. Samsung.Br.26-27. The Institution Decision, however, nowhere articulated the theory that skilled artisans would modify Harris by "implementing edge connections" for power according to the FBDIMM standard. Samsung.Br.2-3; *see* Appx565-66. More importantly, any such notice could not salvage the Board's decision. IPRs must satisfy the separate "requirements" of the Administrative Procedure Act ("APA") ***and*** the AIA. *Core-photonics, Ltd. v. Apple Inc*., 84 F.4th 990, 1001 (Fed. Cir. 2023). The AIA requires the "***Petition*** . . . [to] provide . . . element-by-element specifics of the patentability challenges," and strictly cabins the "'scope of the litigation'" to those specific "'contentions.'" *Id.* (quoting *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 366-67 (2018)) (emphasis added). The ***AIA*** thus precludes the Board from relying on theories absent

5

from the petition, even if the "institution decision" arguably provided the "'reasonable notice'" the *APA* requires. *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1336 (Fed. Cir. 2020) (citing *SAS*, 584 U.S. at 366-67). That forecloses Samsung's "notice" argument. Samsung's cases are inapposite because they predate *SAS* and address only the APA, not the AIA's separate requirements. *See Corephotonics*, 84 F.4th at 1002.

Nor could Samsung raise its Harris-plus-FBDIMM theory for the first time in its ***reply brief*** below. Samsung.Br.28. The AIA precludes that tactic, "even if the new theory is responsive to the patent owner's response or the Board's institution decision." *Corephotonics*, 84 F.4th at 1008. Samsung's characterization of its reply brief as merely expanding upon its Petition, Samsung.Br.28, fails. The theory that skilled artisans would ***modify*** Harris based on the FBDIMM standard to receive power from the edge connector, Samsung.Br.2-3, is a new obviousness theory, not merely an extension of the Petition's contention that Harris's "external power source" ***itself*** taught receiving host-system power via edge connectors. *See Wasica*, 853 F.3d at 1283.

## B. The Board Failed To Properly Evaluate Motivation To Combine Where Harris Teaches Away From the Claimed Invention

Samsung concedes that the Board found the power-input limitation taught by a combination of Harris and the FBDIMM standard rather than Harris alone. *See* Samsung.Br.2-3, 24. That dooms its defense of the Board's decision. The Board

never explained **why** skilled artisans would have been motivated to replace Harris's "external voltage source" with motherboard power from edge connections as in the FBDIMM standard. Netlist.Br.37-39. Samsung never addresses that failure. Harris's teaching away from the claims—it disparages **motherboard** power and modifies the FBDIMM to use **external** power—independently requires reversal. Netlist.Br.39-41. Samsung's contrary arguments misapprehend the teaching-away standard and Harris's teachings.

1. *The Board Failed To Explain Why Skilled Artisans Would Pursue the Board's Proposed Modification to Harris*

Samsung concedes that the Board relied on modifying Harris and combining it with the FBDIMM standard. Samsung.Br.2-3, 24. But it identifies nowhere the Board explained **why** skilled artisans would have been motivated to pursue that combination. Netlist.Br.37-39. The Board asserted that skilled artisans would know that Harris's DIMM "**may** be" modified to receive host-system power according to the FBDIMM standard. Appx50 (emphasis added); Netlist.Br.38-39. But that was not enough—the Board was required to explain why skilled artisans would be **motivated** to do that, not merely that they would have been **capable of** doing so. *See Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*, 97 F.4th 882, 886-87 (Fed. Cir. 2024).

Samsung's failure to respond to that argument is fatal. Samsung's only theory on appeal is that skilled artisans would "implement[ ]" Harris's DIMM with "edge

7

connections for power" as "in the FBDIMM standard." Samsung.Br.2-3, 24. Absent a showing of motivation to perform that modification, the Board's decision cannot stand.

### 2.    *Harris's Teaching Away From the Claims Requires Reversal*

Samsung does not dispute that Harris "'criticize[s], discredit[s], or otherwise discourage[s],'" *DePuy Spine, Inc. v. Medtronic Sofamor Darek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009), receiving power "from system board or main board voltage sources" via edge connectors. Appx4674(¶2); *see* Netlist.Br.39. Harris explains that it is "difficult" for "system board or mainboard voltage sources . . . to provide [the] tightly regulated power" cutting-edge DRAM chips require. Appx4674(¶2). Motherboards also supply a fixed set of voltages specific to a DRAM technology ("DDR2," "DDR3," etc.). Appx4674(¶2). Thus, they cannot support "upgrades to next generation DRAM technology" without replacing the motherboard and power supply. Appx4674(¶2).

Samsung also does not dispute that Harris overcomes the "issues" with "system board or main board voltage sources" by powering on-board voltage converters "from an external source." Appx4674(¶¶2, 3); *see* Netlist.Br.39-40. That provides "tighter" power regulation. Appx4676(¶19). It also renders the DIMM "[i]ndependent" of the fixed set of voltages provided by the "system board power [supply]." Appx4676(¶19). Thus, DIMMs can be "upgrade[d]" with new

8

DRAM technologies that require different voltages, "without changing [the] system board power [supply]." Appx4676(¶20). And the use of external power allows the "system board power supply" and associated edge-connector "pin[s]" to be "eliminated," reducing "complexity" and "cost." Appx4676(¶19).

Harris thus disparages and teaches "eliminat[ing]" the very arrangement the claims require—receiving "power" from the "host system" via "edge connections." Appx4676(¶19); Appx220(38:20-24); *see* Netlist.Br.39-41. Harris "replace[s]" that claimed arrangement with ***something different***—an "external voltage source" that is independent of the motherboard power supply and conventional bottom-edge power connections. Appx4675(¶12). Harris teaches away.

a.     Samsung argues that Harris "does not ***preclude*** receiving" motherboard "power from edge connections," or say the DIMM "***cannot*** use" that approach. Samsung.Br.30, 38 (emphasis added). But the question is not whether Harris "preclude[s]" the claimed approach, or says it "cannot" be used. Samsung.Br.30, 38. It is whether Harris "'criticize[s], discredit[s], or otherwise discourage[s]'" that approach. *DePuy Spine*, 567 F.3d at 1327. Harris plainly does. That forecloses the Board's decision. Netlist.Br.39-41.

Regardless, Harris rejects motherboard power, in favor of an "external voltage source," as shown in the annotated image of Harris's Figure 1A below. Netlist.Br.19, 39-40, 43-44.

9



Netlist.Br.19, 40, 43 (citing Appx44; Appx679) (annotated).

As shown above, Harris clearly distinguishes the "external voltage source" from the bottom-edge connector through which motherboard power otherwise would be supplied. Samsung's expert testified that "Figure 1A" depicts a conventional edge "connector" for transmitting "data, address, and control signals" (red above). Appx1887-88. But Figure 1A does not depict receiving *power* from that connector. Instead, Figure 1A depicts the "external voltage source" (yellow) as connected on the *side* of the DIMM. In Harris, therefore, the external voltage source is *different* and *separate* from the conventional motherboard power supply. Netlist.Br.39-40.[1]

---

[1] Samsung concedes that it was known in the art to use a connector on the "'side'" of the DIMM to receive power from an external source. Samsung.Br.38. The record includes other examples of DIMMs receiving power from connectors on the side. Appx10010-11. There is nothing "mysterious" about such a power source. Samsung.Br.23.

Samsung accuses Netlist of supposedly relying on a "***doctored*** image" "without identifying that Netlist altered [it]." Samsung.Br.29-30. But Netlist noted, the first time the image was reproduced, that it was "annotated by Netlist in proceedings below." Netlist.Br.19 (citing Appx44). Samsung asserts that Figure 1A is a "block diagram" that does not show physical connections, Samsung.Br.30, but its expert testified that "Figure 1A" "discloses a ***connector*** with pins for data, address, and control signals," Appx1887-88 (emphasis added). There is no dispute that the connector would be "at the bottom." Samsung.Br.31. Netlist merely annotated Figure 1A consistent with Samsung's expert testimony.

Samsung urges that, because Harris "identifies FBDIMM . . . as a preferred embodiment," it "does not teach away from FBDIMMs or their conventional use of edge connections at the bottom for power." Samsung.Br.31. But Harris teaches a ***modified*** FBDIMM that is "not interchangeable with [a] standard DIMM." Appx4675(¶13). Harris "replace[s]" the conventional edge-connector "pins" for motherboard power with "+12V pins (from an ***external*** voltage source)." Appx4675(¶12) (emphasis added). And Harris "eliminate[s]" the "system board power supply." Appx4676(¶19). Skilled artisans would not have been motivated to reverse the very modification to conventional FBDIMMs that Harris teaches. Netlist.Br.39-40.

11

Confronted with Harris's clear disclosure of "eliminat[ing]" the motherboard power supply, Appx4676(¶19), Samsung argues Harris does not mean what it says. According to Samsung, Harris does not necessarily "'eliminate[ ]'" the motherboard power supply "'altogether,'" but "replaces several *different* voltage supplies from the motherboard … with a *single* 12V supply from the motherboard." Samsung.Br.31 (emphasis altered). That is, Samsung reads Harris as replacing one set of edge connectors with a different set of edge connectors, without changing the power *source*. But Harris is clear that the "system board power *supply* … [is] eliminated"—not just a subset of *connectors*. Appx4676(¶19) (emphasis added).

Samsung's response to Netlist's argument that skilled artisans would not expect success rests on the same misreading of Harris. Samsung.Br.34-36; *see* Netlist.Br.41-42. Harris does not teach motherboards that provide the 12V power Harris's DIMM requires. And Samsung's expert was not "'aware of'" any motherboard that "'provide[d] 12 volts to a DIMM'" (as opposed to other components, like "'graphics cards'"). Samsung.Br.35-36.

b.    Samsung similarly tries to redefine Harris's "*external* voltage source" as encompassing an *internal* voltage source on the motherboard. Samsung argues that "external" means only "external to the module," not "external to the mother-board." Samsung.Br.37. But Harris uses the term "external voltage source" in contradistinction to motherboard power sources. Harris disparages "*system board*

or *main board* voltage sources," and instead teaches use of an "*external* [voltage] source." Appx4674(¶¶2, 3) (emphasis added). Absent a contrary indication, this Court "assume[s] different terms"—especially terms used in contradistinction to each other—"convey different meanings." *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1371 (Fed. Cir. 2012).

Samsung's reading of "external" to mean "external to the module" also makes no sense in the context of Harris. Samsung.Br.37. Harris discloses that the "standard" FBDIMM's "power supply interface pins" are "replace[d]" with "six +12V pins *(from an external voltage source)*." Appx4675(¶12) (emphasis added). If that statement referred to changing the number and voltage of the pins but not the power source, as Samsung posits, the parenthetical "(from an external voltage source)" would be unnecessary. The power "source" would be the motherboard for both the conventional FBDIMM and the modified FBDIMM; there would be no need to label it an "external voltage source" in one place but not the other. Rather, the parenthetical indicates that the modified FBDIMM receives power from a different "source" than a conventional FBDIMM—"from an *external* voltage source," instead of a "*system board* or *main board* voltage source[]." Appx4674-75(¶¶2, 12) (emphasis added).

c.     Samsung's contention that Netlist forfeited its teaching-away argument by not using those exact "words" below, Samsung.Br.29, doubly fails. Because the

Petition relied on ***Harris alone*** for the power-input limitation, *see* pp. 2-6, *supra*, Netlist had no occasion to argue that Harris taught away from a Harris-plus-FBDIMM combination.

Regardless, Netlist's briefing "'fairly put'" the Board "'on notice as to the substance of the issue.'" *Medtronic, Inc. v. Teleflex Innovations S.À.R.L.*, 68 F.4th 1298, 1305 (Fed. Cir. 2023). Netlist argued that Harris "***reject[ed]***" "receiving power via its edge connections," as in the challenged claims, and taught ***the opposite***: "eliminating [the] system-board-specific power supply" and using external power. Appx877; *see* Appx460; Appx478. Harris, Netlist noted, described the inability of the motherboard power supply to "'provide tightly regulated power'" as a "problem" and purported to "overcome[]" that problem "by eliminating [the] 'system board power supply'" and using "'an external voltage source.'" Appx473-74; *see* Appx677-80. Indeed, that was the "***entire purpose*** of Harris," and provided its stated benefits. Appx475; *see* Appx877. Thus, Netlist plainly argued that Harris "'criticize[d], discredit[ed], or otherwise discourage[d]'"—*i.e.*, taught away from—receiving host-system power via edge connections. *DePuy Spine*, 567 F.3d at 1327.[2]

---

[2] For the same reason, Netlist did not forfeit its argument that skilled artisans would not expect success. Appx681; *contra* Samsung.Br.34.

3.    *Samsung's Other Evidence Cannot Support the Board Decision*

Samsung cites other scattershot evidence that supposedly shows Harris "does not preclude" the claimed approach.  Samsung.Br.38.  But teaching away merely requires disparagement of an approach, not ruling it out.  *See* pp. 8-11, *supra*.  It is thus irrelevant whether "Netlist's expert admitted that receiving power on the **side** of the DIMM"—as shown in Harris's Figure 1A—"does not preclude [also] receiving power from [the] edge connections on the bottom of the DIMM." Samsung.Br.38-39 (emphasis altered).  Where Harris teaches "eliminat[ing]" the motherboard power supply, Appx4676(¶19), skilled artisans would not be motivated to construct a DIMM that receives power **both** from the motherboard and an external power supply, even if Harris does not explicitly say that cannot be done. Similarly, it is irrelevant whether such an approach was "'known.'"  Samsung.Br.39 (emphasis removed).  Harris teaches away from that approach.

Samsung offers a bullet-point list of quotes from the Board's decision, but nowhere explains how they address—much less overcome—Harris's teaching away. Samsung.Br.32-34.  Samsung also fails to address Netlist's corresponding arguments.  Netlist.Br.42-47.  Those quotations do not save the Board's decision regardless.  They do not discuss teaching away, and cannot be deployed to reject an argument the agency never addressed, using a rationale it never provided.  *See Inter-Digital Commc'ns, LLC v. ITC*, 690 F.3d 1318, 1329 (Fed. Cir. 2012).  Harris's

mention of conventional "'system board or main board voltage sources'" in its "'background,'" Appx4674 (¶2), does not support the Board's conclusion, because Harris mentions them only to disparage them and to teach eliminating and replacing them with an external voltage source. Likewise, Harris's statement that the "'external voltage sources may comprise any combination of known or heretofore unknown voltage supplies,'" Appx4675 (¶14), simply means that various types of external power sources may be used, Netlist.Br.42-47. It does not mean that the "external voltage source" can be the "system board or main board voltage source[]" Harris disparages. Appx4674-75 (¶¶2, 3, 12).

Samsung quotes, without elaboration, the Board's remark that power in Harris may be sourced from the "'memory controller.'" Samsung.Br.33 (quoting Appx49). But as Netlist explained, it is undisputed that memory controllers are *incapable* of supplying power. Netlist.Br.44-45. Skilled artisans would not read that fleeting reference to an impossible configuration to undermine Harris's clear teaching away. *See id.*; *Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021). Samsung has no response. Nor does Samsung dispute that, because that statement appears only in the '918 patent IPR decision, it cannot support the Board's decision as to the '054 patent. Netlist.Br.44-45.

Finally, Figure 3 does not support the Board's decision. Samsung.Br.37-38. While Samsung and the Board read that figure as suggesting the "external voltage

source" could be motherboard power received via "edge connections," Harris states that the power "supply" is "not explicitly shown" in Figure 3. Appx4675 (¶17). Figure 3 thus says nothing about what the "external voltage supply" may be. Netlist pointed that out, Netlist.Br.46-47, but Samsung has no response. And Samsung does not deny that the Board invoked Figure 3 only in the '054 patent IPR decision, so Figure 3 cannot support the '918 patent IPR decision. Netlist.Br.46-47.

## II. THE BOARD'S DETERMINATION THAT SKILLED ARTISANS WOULD MODIFY HARRIS TO INCLUDE THREE (OR FOUR) VOLTAGE CONVERTERS CANNOT BE SUSTAINED

All challenged claims require generating three (or four) "regulated voltage[s]" using three (or four) voltage "converters" on the DIMM. Netlist.Br.47; *see, e.g.*, Appx220 (38:18-52) ('918 patent); Appx268 (38:25-30) ('054 patent). The Board did not deny that Harris teaches a memory module with *one* on-board converter that generates *two* regulated voltages, $V_{CC}$ and $V_{DD}$. Netlist.Br.49. The Board thus posited that skilled artisans would have modified Harris's already functional DIMM to include three (or four) on-board converters generating three (or four) regulated voltages. Appx24-29; Appx113-18. Those rationales are unreasoned and unsupported. Netlist.Br.47-56.

## A. The Board Failed To Explain Why Skilled Artisans Would Have Modified Harris To Include Additional On-Board Converters

There is no dispute that, where the Board relies on modifying a reference to find obviousness, it must show why skilled artisans would have been motivated to

pursue the modification.  *See Virtek*, 97 F.4th at 886-87.  Nor is there any dispute that the APA requires the Board to explain its motivation-to-combine analysis consistent with reasoned decisionmaking.  *See Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1047 (Fed. Cir. 2017).  Here, the Board posited that skilled artisans would have modified Harris to add on-board converters supplying additional regulated voltages, but failed to provide a legally sufficient explanation for why skilled artisans would have done so.  Netlist.Br.48-51.

1.    The Board's analysis boiled down to the assertion that skilled artisans ***could have*** modified Harris as proposed.  According to the Board, the combination of Harris and the FBDIMM standard "suggests" additional voltages "can be" generated on-board the DIMM, Appx36; Appx124, and that multiple converters "can be used," Appx26, or could be an "option," Appx28.  Based on those assertions, the Board ruled that a DIMM "with four buck converters to generate respective voltages" would have been "'suitable'" "'in at least some situations.'"  Appx29; Samsung.Br.44.  But the theory that skilled artisans would have considered a particular approach to be a technically possible option is legally insufficient to show motivation to modify or combine.  *Virtek*, 97 F.4th at 886-87.  Netlist pointed that out.  Netlist.Br.48-51.  But Samsung nowhere explains how "can be" or "is an option" constitutes a legally sufficient basis for finding motivation.

Hard-pressed to defend the Board's skeletal analysis, Samsung argues no analysis was necessary. The Board did not need to show motivation to "modify" Harris to incorporate three or four voltage converters, Samsung asserts, because Harris *itself* taught those elements. Samsung.Br.42-43. But the Board plainly relied on a modification to Harris and nowhere denied it must show a motivation for that modification. Appx27. Under the heading "***Modifying*** Harris to Have Four Converters," the Board addressed Netlist's argument that skilled artisans "would not have modified Harris's memory module to have four converters" and Samsung's arguments in response. Appx24-29 (emphasis added). The Board did not find that Harris ***alone*** teaches the required number of converters, Appx24-29, so this Court cannot affirm on that rationale, *see InterDigital*, 690 F.3d at 1329; Netlist.Br.49-51.

2.   The Board, moreover, was required to "'weigh[]'" the costs and benefits of the proposed modifications. *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1331-32 (Fed. Cir. 2019). The Board did not dispute that DIMMs are highly space-constrained, or that adding on-board voltage converters would reduce memory capacity by occupying space otherwise available for memory chips. Netlist.Br.50. But the Board did not meaningfully address those drawbacks or explain how any benefits would outweigh them. Netlist.Br.50-51. Failure to address required factors is not reasoned decisionmaking. *See In re Sang-Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002).

19

Samsung asserts that the Board "considered and rejected Netlist's arguments about 'space'" constraints. Samsung.Br.45. But the Board offered no real analysis. It acknowledged the drawbacks of adding on-board voltage converters to already tightly packed FBDIMMs, but simply agreed with Samsung that skilled artisans would have done so anyway. Appx28; Appx116. Samsung insists that it was enough for the Board to "credit[ ]" Samsung's expert. Samsung.Br.46. But where the Board "credits" party arguments or expert testimony, it still must "explain" its reasoning with "'its own analysis.'" *In re NuVasive*, 842 F.3d 1376, 1383-84 (Fed. Cir. 2016); *Icon Health*, 849 F.3d at 1047. The Board could not regurgitate Samsung's expert's opinions without saying ***why*** it agreed. *See* Appx117-18.

Samsung points to the Board's assertion that additional voltage converters can "'fit'" on the DIMM. Samsung.Br.45 (quoting Appx116). But that is just a conclusion that skilled artisans ***could*** add converters. It does not address "desirability of the modification" in view of drawbacks like reduced memory capacity. *In re Fritch*, 972 F.3d 1260, 1265-66 & n.12 (Fed. Cir. 1992); *see* Netlist.Br.50-51. And Samsung's contention that the Board could ignore space constraints because ***the patents*** teach additional on-board voltage converters, Samsung.Br.46, is impermissible "*ex post* reasoning," *In re Van Os*, 844 F.3d 1359, 1361-62 (Fed. Cir. 2017). Samsung cannot use the "challenged patent[s] as a

roadmap" to combine the prior art. *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1361 (Fed. Cir. 2019).

The Board also improperly shifted the burden to Netlist to "demonstrate" that the required additional converters ***would not*** fit on Harris's DIMM. Appx116; *see* Netlist.Br.55-56. But Samsung, the petitioner, had the burden to show its proposed combination ***was*** feasible. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016); *see* Netlist.Br.55-56. Samsung responds that it was not required to show that additional converters would fit to establish motivation. Samsung.Br.53-54. But insofar as the only motivation analysis Samsung identifies is the Board's assertion that additional converters can "'fit,'" Samsung.Br.45 (quoting Appx116), the Board was required to hold ***Samsung*** to its burden of proving that.

## B.    Substantial Evidence Does Not Support the Board's Conclusion

The Board determined that skilled artisans would have achieved the claims by including four separate voltage converters on-board Harris's FBDIMM to supply four regulated voltages. Appx30-38. The Board pointed to five other voltages in the FBDIMM standard, $V_{DDL}$, $V_{DDQ}$, $V_{DDFBD}$, $V_{DDSPD}$, and $V_{TT}$, and asserted that skilled artisans would have included separate on-board converters for those voltages. Appx30-38. Those determinations are unsupported by substantial evidence. Netlist.Br.52-53. Samsung's contrary arguments, resting largely on unexplained and unresponsive block quotes and string citations, fail.

21

V<sub>CCFBD</sub>, V<sub>DDL</sub>, and V<sub>DDQ</sub>.  Skilled artisans would not have included separate on-board converters for these voltages because they are the same as $V_{CC}$ or $V_{DD}$, which Harris's DIMM already supplies.  Netlist.Br.53.  The fact that these voltages "are required by the DRAM on the FBDIMM," Samsung.Br.47, is irrelevant. Samsung does not deny that those voltages are the same as $V_{CC}$ or $V_{DD}$, or that they could be supplied by Harris's pre-existing $V_{CC}$ or $V_{DD}$ sources without additional on-board converters.  Netlist.Br.53.  Indeed, standard FBDIMMs do not receive $V_{DDL}$ or $V_{DDQ}$; they supply those voltages from their $V_{DD}$ supply.  Appx5040.

Samsung repeats the Board's assertion that separate converters for $V_{CCFBD}$, $V_{DDL}$, and $V_{DDQ}$ would have generic benefits such as "'sequencing the power, turning power on and off independently, saving cost, eliminating cross-coupling of noise, and solving space constraints.'"  Samsung.Br.48 (citing Appx27).  But the Board did not weigh those putative benefits against the acknowledged ***costs***.  *Henny Penny*, 938 F.3d at 1331-32.  Samsung's two-page block quote, Samsung.Br.48-49, proves the point:  Nowhere did the Board mention the downsides of additional voltage converters, or explain why any benefits outweighed those drawbacks.  The Board simply asserted that "in . . . ***some*** situations" a skilled artisan would use separate converters.  Appx29 (emphasis added).  But the Board did not identify any such situations, much less explain why skilled artisans would have adopted that configuration in those situations.  Netlist.Br.53-54.

$V_{TT}$.  The Board failed to explain why skilled artisans would have generated $V_{TT}$ on-board Harris's FBDIMM, given that Harris does not require $V_{TT}$ and it was known that $V_{TT}$ could be generated on the module without using a separate on-board converter.  Netlist.Br.54.  Samsung asserts that the FBDIMM standard "require[s]" $V_{TT}$.  Samsung.Br.49-51.  But that does not explain why skilled artisans would have *modified* Harris to include $V_{TT}$ when Harris's FBDIMM *omits* it, and space is paramount regardless.  Netlist.Br.51, 54.  The Board's assertion that the evidence "at least suggests" that $V_{TT}$ "*can* be generated onboard," Appx36 (emphasis added), is not substantial evidence of motivation to modify, *see* p. 18, *supra*.  Samsung does not meaningfully argue it is.

$V_{DDSPD}$.  Samsung does not dispute it would have been inefficient to generate $V_{DDSPD}$ using an on-board voltage converter.  Netlist.Br.54-55.  Samsung quotes the Board's statements that skilled artisans would have generated $V_{DDSPD}$ "onboard the memory module" and considered it "a desirable [option] to pursue" "in at least *some* scenarios."  Samsung.Br.53 (citing Appx40-41) (emphasis added).  That rationale lacks the "'specificity'" required to find motivation, *NuVasive*, 842 F.3d at 1381-82, and fails to weigh costs and benefits.

## III.  THE BOARD'S DETERMINATIONS REGARDING THE VOLTAGE-MONITORING LIMITATIONS CANNOT BE SUSTAINED

Dependent claim 5 of the '918 patent (and similar claims) requires a "voltage monitor" that "monitor[s] a power input voltage" and "produce[s] a trigger signal"

23

when it detects an overvoltage (*i.e.*, when "a voltage amplitude . . . is greater than a first threshold voltage"). Appx220(38:61-67). Claim 12 (and similar claims) adds the requirement of saving data upon detecting overvoltage: It requires "a controller configured to receive the trigger signal" and to "respon[d]" by "perform[ing] a write operation to . . . non-volatile memory." Appx221(39:31-36). The Board's determinations that those claims were taught by the combination of Harris and the FBDIMM standard (Ground 1), combined with Amidi and Hajeck (Grounds 2 and 3), cannot be sustained. Netlist.Br.56-57.

### A.    The Board Erred in Determining That Skilled Artisans Would Have Combined Harris's FBDIMM With Amidi (Grounds 2 and 3)

The Board posited that the voltage-monitor limitation would have been obvious by combining Harris's modified FBDIMM with the Amidi battery-backup system that, according to the Board, disclosed the claimed voltage monitor. Appx74-75; *see* Netlist.Br.56-57. But the Board improperly failed to consider whether skilled artisans would have pursued that combination in view of the costs and benefits. *See Henny Penny*, 938 F.3d at 1331-32. The Board did not deny that the combination would devastate memory capacity by requiring ***half*** the memory chips on Harris's DIMM to be removed, but insisted, without explanation, that skilled artisans would have pursued that approach nonetheless. Appx74-75; *see* Netlist.Br.56-57.

Samsung does not dispute that incorporating Amidi's battery backup into Harris would require removing half the memory chips to make room for Amidi's backup battery. Samsung.Br.58. Samsung argues skilled artisans could use chip-stacking technology—where multiple memory chips are "stacked" on top of each other so they occupy the same area on the DIMM as a single chip—to offset any capacity loss. Samsung.Br.58-59. But Harris's unmodified DIMM could use such chip-stacking technology as well. For example, if Harris's unmodified DIMM had space for eight chips, the combination with Amidi would reduce that to four chips. While skilled artisans could "'double'" the capacity of both embodiments through chip-stacking, Samsung.Br.58-59, Harris's unmodified DIMM would still have double the capacity—double the capacity of eight chips versus double the capacity of four chips—as the Harris-plus-Amidi combination.

Samsung's alternative contention that "'maximizing capacity'" was so unimportant to skilled artisans that they would give up *half* of Harris's capacity to combine it with Amidi, Samsung.Br.58, defies the record. FBDIMMs, like Harris's, undisputedly were created "to increase the capacity of server DIMMs." Appx9540; *see* Appx10178; Appx9795-97. Samsung ignores that evidence.

The Harris-plus-Amidi combination also offers no benefits because Amidi is redundant of Harris. Netlist.Br.57-59. The Board asserted that skilled artisans would turn to Amidi for battery-backup power in case of power failure, Appx74, but

Harris already teaches an "independent," "redundant" backup power source, Appx4675 (¶¶ 14, 16). The Board never identified any benefit Amidi provided over Harris's backup power source, much less one that would justify losing half of Harris's memory capacity. Netlist.Br.59-60. Samsung points to no such analysis. That alone requires vacatur. *See NuVasive*, 842 F.3d at 1381-82.

Samsung asserts that Amidi's backup battery would be more valuable in the event of "a power outage" because Harris's backup power supposedly comes from the "computer." Samsung.Br.56. But Harris's "independent voltage supply" is "external" to the computer and "may comprise any . . . voltage supplies," such as a backup generator. Appx4675 (¶ 14). Samsung's assertion that skilled artisans would have regarded Amidi as a "'suitable'" solution to the "'known problem'" of power loss, Samsung.Br.57-58, fails for the same reason. Harris had no power-loss "problem," because it ***already had*** a backup power source. Samsung ignores that completely. Netlist.Br.59-60. Samsung tries to distinguish *South-Tek Systems, LLC v. Engineered Corrosion Solutions, LLC*, 748 F. App'x 1003 (Fed. Cir. 2018), and *In re Anova Hearing Labs, Inc.*, 809 F. App'x 840 (Fed. Cir. 2020), by pointing to irrelevant factual differences. Samsung.Br.56-57. But Samsung cannot dispute the principle that skilled artisans lack motivation to combine references that offer only "redundant" functionality. 748 F. App'x at 1007; *see* 809 F. App'x at 843.

26

### B.     Amidi Does Not Disclose a Voltage Monitor That Detects an Overvoltage as Required by Claim 5 (and Similar Claims)

Even assuming skilled artisans would have given up half of Harris's memory capacity to combine it with Amidi, they still would not have arrived at the claims. Netlist.Br.61-62.  Claim 5 (and similar claims) requires a "voltage monitor" that "produce[s] a trigger signal in response to" an "*overvoltage*."  Appx220(38:60-65) (emphasis added).  Amidi's putative voltage monitor, however, detects and responds to a "power fault," which Amidi defines as a situation where the input voltage falls "***below*** a reference voltage"—*i.e.*, ***undervoltage***.  Appx4697(8:23-29) (emphasis added); *see* Appx4692; Netlist.Br.61-62.

Samsung points to its expert's testimony that Amidi teaches "'overvoltage ***detection*,'" Samsung.Br.60 (emphasis added), but that is insufficient.  The claim requires not only detecting overvoltage, but "produc[ing] a trigger signal in response to" an overvoltage.  Appx220(38:61-67).  Samsung's expert theorized that Amidi detects "overvoltage" ***implicitly***; when Amidi detects whether the voltage "is below the 3.0-volt threshold," he posited, that implicitly "determin[es] if it is greater than" 3.0V.  Appx9424-26(255:8-257:2).  Even if that far-fetched theory were true, Samsung's expert nowhere testified that Amidi produces a trigger signal in response

to that implicit overvoltage detection.  Amidi undisputedly produces a trigger signal only in response to detecting ***undervoltage***.  Netlist.Br.62.[3]

Samsung pivots to ***Harris***, arguing that its disclosure of voltage regulators having a "'±15%'" voltage tolerance taught detecting overvoltage.  Samsung.Br.61. But as Netlist explained, and Samsung nowhere disputes, a "'±15%'" voltage tolerance is a "'wide tolerance'" that means Harris's regulators are ***highly resistant*** to power surges.  Netlist.Br.62-63.  If anything, Harris's ability to tolerate over-voltage without damage ***teaches away*** from detecting overvoltage.

### C.    Amidi Does Not Teach Performing a Write Operation in Response to a Trigger Signal, as Required by Claim 12 (and Similar Claims)

Claim 12 (and other similar claims) adds the requirement that "a controller" "respon[ds]" to the overvoltage trigger signal by "perform[ing] a write operation to . . . non-volatile memory."  Appx221(39:31-36).  Amidi undisputedly does not teach performing a write operation in response to an overvoltage.  *See* Netlist.Br.63.  The Petition thus urged a combination where, upon Amidi's putative voltage monitor detecting an overvoltage, a modified "S3 sleep mode" (a power-saving mode in the FBDIMM standard) would respond by "writing S3 configuration information 'into

---

[3] The only other "evidence" the Board identified, Samsung.Br.59-60, were industry "datasheets" disclosing voltage tolerances of components, Appx80.  But the Board nowhere explained how the mere existence of those operational limits taught a system for detecting and responding to overvoltage conditions.  Appx80.

the non-volatile memory'" and "going to sleep." Appx363-64 (emphasis omitted);
*see* Appx82. The Board adopted that rationale, Appx82, but did not respond to
Netlist's argument that the combination could not work and skilled artisans would
not have pursued such a jerry-rigged combination. Netlist.Br.65 (quoting
Appx9557).

Citing half a dozen pages of the Board's decision, and block quoting almost
two pages, Samsung asserts that Netlist "overlook[ed]" where the Board supposedly
addressed those issues. Samsung.Br.62-64 (quoting Appx66-70, Appx80-81,
Appx81-84). None of those cited pages, however, contains a ***reasoned explanation***
of motivation to combine. The Board's decision at Appx66-70 and Appx80-81
addresses whether the asserted combination contains a "non-volatile memory" and
writes information to it, which is not disputed on appeal. *See* Netlist.Br.65. There
is no explanation in any of those pages of how or why skilled artisans would have
modified S3 sleep mode to write information to non-volatile memory upon detecting
an overvoltage. Netlist.Br.65-66.

Samsung's block quote of Appx81-84 also does not contain any explanation.
There, the Board simply summarized the parties' arguments, and asserted that skilled
artisans would have "'understood that overvoltage detection and generating the
trigger signal onboard the memory module was an option to pursue'" and "'would
have been both predictable and pursued with a reasonable expectation of success.'"

Samsung.Br.63 (quoting Appx81-84). That perfunctory conclusion falls short of APA requirements. *See Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 905 (Fed. Cir. 2018) (cited Samsung.Br.64). Nor does it address the relevant issue. That portion of the Board's decision addresses "overvoltage *detection*" and "*generating* the trigger signal," Appx83 (emphasis added), not writing data to non-volatile memory *in response* to that trigger signal, or the Petition's theory that skilled artisans would have performed that limitation by modifying S3 sleep mode. And nothing cited or quoted by the Board responds to Netlist's argument that skilled artisans *would not* have been motivated to modify (or expected success in modifying) the FBDIMM to enter S3 mode upon an overvoltage trigger signal. Appx717-18; Appx893-94; Appx9556-57.

Turning to Netlist's argument that the Board's combination was unworkable, Samsung does not dispute that the "'computer' could not 'properly operate if the memory module were allowed to just enter S3 state by itself,'" as the Board's combination would require. Netlist.Br.65. Samsung asserts that "the computer . . . will *not* operate properly when there is a power fault" anyway, Samsung.Br.65-66, but that underscores the problem with Samsung's theory. S3 sleep mode undisputedly is controlled by the computer's *CPU* and involves *the CPU* writing data to non-volatile memory before going to sleep. Appx9556-57. Samsung nowhere explains how S3 sleep mode is supposed to work in a situation where the CPU is non-

operational and thus unable to trigger entry into S3 sleep mode or write data to non-volatile memory, as the claims require.

### D.    Hajeck Does Not Cure the Deficiencies (Ground 3)

The Board alternatively invoked Hajeck for overvoltage detection but provided ***no*** motivation to combine Hajeck with the other references required for the other limitations.  Appx86-87; Netlist.Br.66-69.  That requires remand.  *Virtek*, 97 F.4th at 886-87.  Samsung block quotes ***the Petition*** and asserts the Board agreed with its motivation-to-combine analysis.  Samsung.Br.67-68.  But the Board did not say it ***agreed*** with that analysis, much less explain why.  Appx86-87.  The Board cannot just "'summarize and reject arguments without explaining why [it] accepts the prevailing argument.'"  *Paice*, 881 F.3d at 905.

Samsung's motivation argument fails on the merits as well.  Samsung does not deny Hajeck teaches a ***complete*** solution to power loss:  Hajeck discloses a memory device that switches to a "charge pump" and blocks "write operations" when it detects overvoltage ***or*** undervoltage.  Appx6056.  Amidi, by contrast, detects only undervoltage.  *See* pp. 27-28, *supra*.  Skilled artisans motivated by solving a power-fault problem thus would have no reason to combine Hajeck's complete solution with Amidi's half-solution.  The only reason to combine those two references was Samsung's need to identify a "trigger signal"—which Hajeck undisputedly does

not teach—to render the claims obvious.  Netlist.Br.66-69.  Such hindsight-driven analysis cannot stand.

Samsung's response that Amidi and Hajeck are "consistent" is no response. Samsung.Br.69.  Even if true, that would not be a reason why skilled artisans in possession of Hajeck would have turned to Amidi, when Hajeck already solves both overvoltage and undervoltage.

## IV.   THE BOARD'S UNREASONED ANALYSIS OF OTHER CLAIMS AND LIMITATIONS REQUIRES REMAND

Samsung argues the Board adequately addressed claims 8 and 14 of the '918 patent because it "referred back" to its analysis for limitation 1[a].  Samsung.Br.70.[4] But those claims incorporate additional requirements; it was insufficient for the Board to refer back to its prior discussion.  Claims 8 and 14 require that the "first plurality of address and control signals" be "*receive[d]*" by the "circuit" *and* "*output[ted]*" to DRAMs.  Appx220-21 (38:41-52, 39:9-19, 39:40-45) (emphasis added).  The Board never denied that Harris's AMB transmits *different* signals to the DRAM devices than the ones received.  Netlist.Br.69.  And in analyzing claim 14, the Board referred to its analysis of limitation 1[a]—which *does not contain* the same requirements.  Appx65-66.  Indeed, the pages of the Board's decision Samsung

---

[4] Limitation 1[a] refers to the limitation as labeled in Netlist's opening brief.

cites (Appx55-56) do not mention the relevant requirements. That is not reasoned decisionmaking.

Samsung's other arguments fare no better. The Board's "'cit[ations] to the relevant'" portions of the Petition, Samsung.Br.72, are irrelevant. Unlike in *Paice*, the Board's analysis here is not "readily discernible," 881 F.3d at 905. The Board never provided ***any reasoning***, merely citations. *NuVasive*, 842 F.3d at 1384. The APA requires more. *See Icon Health*, 849 F.3d at 1047.

Samsung asserts that "Netlist presented no arguments" on these limitations. Samsung.Br.72. But Samsung had the burden—Netlist had no "obligation" even to respond. *Fanduel, Inc. v. Interactive Games LLC*, 966 F.3d 1344, 1341-42 (Fed. Cir. 2020); *see Icon Health*, 849 F.3d at 1047. The problem is not merely that the Board's reasoning could have been "'more thorough.'" Samsung.Br.72. It is that the Board's reasoning was ***non-existent***. Netlist.Br.69-70. For that reason, Samsung's harmless-error argument fails. Samsung.Br.72-73. Harmfulness need not be shown when the Board offers "no explanation at all." *Icon Health*, 849 F.3d at 1047. Vacatur is required.

## CONCLUSION

The final written decisions should be reversed or vacated.

April 11, 2025

Respectfully submitted,

/s/ Jeffrey A. Lamken

Philip J. Warrick
IRELL & MANELLA LLP
750 17th Street, N.W., Suite 850
Washington, D.C.  20006
(202) 777-6512
pwarrick@irell.com

Jason Sheasby
H. Annita Zhong
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067
(310) 277-1010

Jonathan M. Lindsay
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA  92660
(949) 760-5220

Jeffrey A. Lamken
Rayiner Hashem
Jennifer Elizabeth Fischell
Lidiya Mishchenko
Kayvon Ghayoumi
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000
jlamken@mololamken.com

Elizabeth Kathleen Clarke
Bonnie K. St. Charles
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL  60654
(312) 450-6700

Sara Margolis
Catherine Martinez
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
(212) 607-8160

*Counsel for Appellant Netlist, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  2024-1859, 2024-1863

**Short Case Caption:**  Netlist, Inc. v. Samsung Electronics Co., Ltd.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑  the filing has been prepared using a proportionally-spaced typeface and includes  6,976  words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/11/2025          Signature:  /s/ Jeffrey A. Lamken

                          Name:  Jeffrey A. Lamken